FILED
2016 Feb-18  PM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## <u>SOUTHERN DIVISION</u>

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:15-cr-00167-MHH-TMP** |
| | ) | |
| **RANDY D. VISSER** | ) | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

COMES NOW the United States of America, by and through undersigned counsel, and respectfully files its Sentencing Memorandum in the above-captioned case. The United States hereby recommends that the Defendant receive a sentence within the advisory guideline range of 27 to 33 months' imprisonment. Such is a just and reasonable sentence befitting the extensive conspiracy and scheme to defraud Nissan North America, Inc. – a conspiracy the Defendant led and orchestrated for his own personal benefit. In support of that recommendation, the United States says as follows:

## FACTUAL BACKGROUND

The defendant, Randy D. Visser ("Visser"), was the Executive Manager at Serra Nissan, which is located in the Northern District of Alabama. As the Executive Manager at Serra Nissan during the relevant time period, Visser was responsible for overseeing sales and service, hiring certain management-level employees, and was directly in charge of all marketing and advertising.

During the relevant time period, Serra Nissan was co-owned by Visser's wife, Kristina Serra Visser (who owned 50% of the dealership) and his father-in-law, Anthony Serra (who owned the other 50%). Serra Visser Nissan, however, is a car dealership in Cullman, Alabama, in the Northern District of Alabama, that, during the time frame set out in the Information, was co-owned by Visser (49%), Anthony Serra (49%), and Kristina Serra Visser (2%).

Serra Nissan and Serra Visser Nissan are franchises of Nissan North America, Inc. (hereafter, "NNA"). NNA has many financial incentive programs it uses to reward dealerships who meet specified sales requirements. If the dealer hit the specified sales targets for each incentive, during the specified incentive period, they would receive an additional dollar amount per car sold.

As one of the terms of its incentive program, NNA prohibited a process known as "pooling of sales." If a dealer owned or was associated with more than one dealership, it could not combine sales or attribute sales from one dealership to another in order to meet sales incentives. Dealers were required to submit accurate Retail Delivery Reports ("RDR"), meaning, the dealer had to report where the car was actually sold. It was commonly known in the industry that "pooling of sales" was not an acceptable practice because it entailed lying to NNA.[1]

---

[1] During the August 10, 2015 trial of Visser's co-conspirator, Kimberly Branch (Case# 2:15-CR-154-MHH-TMP, hereafter, the "Branch Trial"), Serra Visser Nissan employees Harold Yelverton and Greg Boyles testified that, based on their

**The March 15, 2013 Audit Closing Meeting**

NNA had an audit process that it used to make sure RDR information was accurately reported. On March 15, 2013, Visser and Forest Housner, Director of Operations, met with Jeff Creecy, an auditor with NNA. (GX 25.) [2] The purpose of the meeting was to discuss the results of an incentive audit that NNA had conducted on new car sales transactions between January 4, 2012 and January 2, 2013. *Id.* At trial, Housner, Visser, and Creecy all testified that during that meeting, Creecy told Housner and Visser numerous times that it was critical that Serra Nissan submit accurate information in its RDRs. (Trial Tr. 123:20-23; 218:5-9; 340:2-18.) Creecy also testified that one of the reasons it was critical that the dealership submit accurate information in its RDR, including the dealership at which the vehicle was sold, was because NNA used the RDR information to determine what incentive payments a dealership was actually entitled to receive from NNA.

As the Controller, Branch was familiar with the Nissan incentive audit

---

experience in the car sales industry, they knew it was wrong to shift the sales and that it was a practice NNA did not allow. (Trial Tr. 415:19-21; 470:1-11.) A copy of the August 10-13, 2015 trial transcripts (Volumes I through IV) are attached hereto, respectively, as Exhibits A-D.

[2] References to "Government Exhibits" refer to exhibits admitted during the trial of Kimberly Branch (Case# 2:15-CR-154-MHH-TMP).  Branch was convicted of conspiracy to commit wire fraud on August 14, 2015, after a four-day jury trial that included testimony from Visser and other employees of Serra Nissan, Serra Visser Nissan, and NNA.

process because she participated in the 2012-2013 audit. She and Creecy testified that her role in the audit process was to submit the accounting information initially requested by NNA in excel spreadsheet form[3], and to make sure the requested deal jackets[4] were pulled and ready for NNA if they came to do an on-site audit.[5]

Creecy emailed Branch on March 8, 2013, to provide her with the list of deal jackets that would need to be pulled in preparation for the on-site audit that took place from March 13-15, 2013. (GX 21.) As a result of that audit, NNA charged Serra Nissan back $24,780 in incentives for vehicles that had been misreported.

**Visser's Plan to Shift Sales from Cullman to Birmingham**

Shortly after the March 15, 2013 audit meeting, Visser realized that Serra Nissan was not going to hit its sales objective for the Dealer Volume Bonus

---

[3] Creecy explained that the initial step in the incentive audit process was for NNA to cross-check the RDR data with state registration systems and other databases for inconsistencies. Then, if there were red flags raised, NNA would ask the dealership to provide its internal accounting records for certain transactions that had been flagged. The dealership's Controller would usually be the person to gather and provide that information, as it would require creating an excel spreadsheet of the sales transaction information from the dealership's Dealer Management Software (DMS). At the time, Serra Nissan used Reynolds & Reynolds for its DMS, and Serra Visser Nissan used DealerTrack.

[4] A "deal jacket" is a color-coded folder that the dealership used to hold all the paperwork associated with a vehicle sales transaction. Actual Cullman deal jackets were displayed to the jury during the Branch Trial, though redacted copies were admitted into evidence because of the extensive amount of personal identifying information they contained. (GX 1-15.)

[5] Creecy also testified that the third stage of the audit was to come on-site to the dealership and cross-check the information submitted in the RDR with the accounting information provided by the dealership, and then match it to the hard-copy information found in the deal jackets.

incentive program that ended April 1, 2013.  (GX 41, 44.) The Dealer Volume Bonus ("DVB") was a tiered incentive program that required Serra Nissan and Serra Visser Nissan to meet certain sales objectives in order to make a maximum bonus of $700 per car. GX 37. To meet the highest incentive payment, Serra Nissan (Birmingham) had to sell 172 new cars during the incentive period. (GX 44.) Serra Visser Nissan (Cullman) only had to sell 77 new cars to meet the highest sales objective level. *Id.* When Visser realized that the Cullman store had already met its highest sales objective, he told Housner that they were going to start "shifting sales" from Cullman to Birmingham, i.e., reporting to NNA that cars actually sold to customers in Cullman were sold in Birmingham.

Visser drafted a list of instructions and had Housner fax those instructions to the Cullman store. (GX 40.)[6] The fax instructed Cullman to stop RDR'ing cars they sold, to stop printing Bills of Sale and Title Applications (as those would have to be printed at the Birmingham store), and to book the deals in the Birmingham accounting system. Visser underlined: "Its VERY IMPORTANT that [the customers] get the title application from Bham as Nissan checks the registration against what we RDR so any discrepancy here would be a problem." (GX 40.)

Harold Yelverton, General Manager of the Cullman store at the time, testified that after receiving the fax, he instructed the Cullman sales team,

---

[6] A copy of Government's Exhibit 40 from the Branch Trial is attached hereto as Exhibit E.

including Greg Boyles, to begin following those instructions and shifting sales to the Birmingham store. As a result, fifteen vehicles sold in Cullman were RDR'd to NNA as having been sold in Birmingham. (GX 1-15, 34-35.) This allowed Serra Nissan to hit its highest objective and obtain $64,800 in incentives it would not have been entitled to, but for the shifting of the fifteen Cullman sales. (GX 34-35.)

**Shepard's and Green's Roles**

Gerald Shepard, a sales manager at Serra Nissan, was instructed by Housner to RDR the fifteen deals in Birmingham. Using information provided to him by Jeff Green, who was then employed at Serra VW across the street, Shepard input the RDR information to NNA representing that the fifteen cars sold in Cullman had been sold in Birmingham.

Jeff Green also testified at the Branch trial that he knew what they were doing was wrong because it entailed submitting false information to NNA to get incentives. His instructions from Housner were to make duplicate Birmingham deal jackets for the fifteen deals in the event that NNA audited Serra Nissan, so they would match the information Shepard had submitted in the RDR. Green testified that he made fake Bills of Sale and Title Applications in Birmingham, which he put in the original Cullman deal jackets, and in the fifteen fake Birmingham deal jackets. Green also testified that Branch provided him with the original Cullman deal jackets on four separate occasions, in order for him to make

the fifteen fake Birmingham deal jackets.

Branch admitted to creating and keeping a list of the fifteen shifted sales on her desk and on her desktop computer. (GX 24.) The printed copy of the list was seized during a search warrant conducted at the dealership in October 2013. Stapled to the list of fifteen deals was a printout of three emails exchanged between Branch, Visser, and Housner, in June and July of 2013. The first email from Visser, to Branch and Housner, sent on Saturday, June 1, 2013, stated:

> When birmimgham missed their objective 2 months ago and we used cullmans sales, did we book these unit in Reynolds accounting under Bham? I just wanted to make sure we did. When nissan audits us they get a log of every deal booked in reynolds.

(GX 24.) Branch responded two days later on Monday, June 3, 2013, to both Visser and Housner:

> These deals were not booked in accounting, but I have a list of these deals and can manually add them to any report that Nissan requires. Jeff also created a Birmingham deal jacket for each of these deals, so we would have it if they ever request the deal to be pulled.

(GX 24.) Visser did not respond to Housner and Branch until Saturday, July 27, 2013:

> Ok just manually add them (or manually remove them if they audit cullman) when they do the next audit. In Alabama the factory has 12 months from the date the incentive was paid to conduct an audit.

(GX 24.) The incentives were paid to the dealership on April 10, 2013, so NNA would have had until April 10, 2014 to conduct an audit that would have included the fifteen shifted sales. (GX 17.) When the documents were seized from Branch's

desk by law enforcement, it was in the middle of the one-year audit period.

**The Subpoena and Visser's Subsequent Contacts with NNA**

On June 16, 2014, at the request of the U.S. Attorney's Office, a Grand Jury sitting in the Northern District of Alabama issued a subpoena to Serra Nissan for all documents related to the fifteen deals at issue in this case. (GX 45.) That subpoena was served on corporate counsel for Serra Nissan on June 17, 2014. The next day, Visser contacted Patrick Byrnes, a Dealer Operations Manager at NNA and Serra Nissan's primary contact at NNA. (GX 22.) Visser told Byrnes about the fifteen deals that had been RDR'd in Birmingham, but were actually sold in Cullman. *Id*. Subsequently, Visser called Byrnes and told him that fifteen sales had been "accidentally" RDR'd in Birmingham, though they were actually sold in Cullman. Visser testified that Byrnes told him to "just let sleeping dogs lie," though Byrnes denied ever telling Visser that. Visser also sent a text message to Byrnes a day or two after emailing, asking Byrnes:

> Do You think nissan has a problem with leaving their deals as they are since they were truly sold retail and the two stores total objective was actually hit? Do you consider it to be an issue? Is just leaving the deals as reported ok?

(GX 22.)  Byrnes testified that he felt Visser's text was trying to get him to say it was okay to leave the deals as they were. Byrnes responded to Visser via email the following Monday on June 23, 2014, explaining that the practice was unacceptable to NNA because it was "pooling of sales" and the deals would need to be

unwound. *Id.* However, because the deals were outside the one-year audit period, they could not be unwound by the dealership or NNA.

Subsequently, in response to the June 16, 2014 subpoena, Serra Nissan produced the fifteen *Cullman* deal jackets, but not the fifteen fake Birmingham deal jackets. (GX 1-15, 23.) Shortly after those documents were produced to the government, on August 1, 2014, Branch signed a "Certification and Acknowledgement," under penalty of perjury, that attested to the produced records being true and accurate copies of business records maintained at Serra Nissan *on behalf of Serra Visser*. (GX 23 (emphasis added).)

Ten days later, on August 11, 2014, Visser notified Creecy that during a "self-audit," Serra Nissan identified fifteen deals that were RDR'd "under the incorrect Dealer number." (GX 31.) When Creecy responded that the deals could not be corrected outside the one-year audit period (GX 32), Visser sent another letter to Creecy, attaching his calculation of what Serra Nissan owed NNA for the fifteen deals, and included a check for $64,800 "to settle the issue." (GX 33.)

**Visser's "Cooperation" With the Government**

On March 10, 2015, Visser was sent a letter from the United States Attorney's Office for the Northern District of Alabama, notifying him that he was the target of a federal grand jury investigation involving a scheme to defraud NNA by submitting false information via wire transmission. Though Visser elected to

cooperate and came in for a proffer session on April 10, 2015, he declined the terms of the *Kastigar* letter that was provided to him and did not sign.

At the sentencing hearing in this case, the United States expects to offer evidence that during the proffer session, held four months prior to Branch's trial, Visser told federal agents that Housner came to him in March 2013, shortly before the end of the month, and told him that Serra Visser Nissan was on pace to hit the NNA sales incentive objective but Serra Nissan was not. Based on this, Visser decided to begin shifting Cullman sales to Birmingham so that Birmingham could hit its objective. Visser told agents that he instructed Housner to "get it done," but did not know how Housner was going to do this; Visser claimed he just told Housner to do it. Visser made no mention of the instructions he drafted (GX 40) or the fax sent to Cullman instructing them exactly what to do.[7] To the contrary, Visser told agents that he did not know all the details of what was done with the fifteen deals; he just knew that it was done and that Serra Nissan met its sales objective. Visser also claimed that, for all he knew, they could have directed Serra Visser Nissan customers to come to Serra Nissan.

Visser told the agents that the only people involved with the shifting of sales were Housner, Green, Branch, and himself – though he later stated that a sales manager would have had to RDR the cars to NNA. He also said that he never saw

---

[7] At this point in the investigation, the government was not aware that the fax (GX 40) existed.

the fifteen Serra Nissan deal jackets that Green created; he was just told by Branch that Green created them.  And after the government issued the subpoena to Serra Nissan requesting the original deal jackets for the fifteen deals (the ones Green created), Visser told agents that it was *Branch* who told him that the subpoena was for the fifteen deals shifted from Cullman to Birmingham. Visser stated that once he realized this, he contacted his attorneys.

When asked about the audit process, Visser explained that when NNA performs an audit of a dealership, they match the customer's registration information from the state with the information reported in the RDR. This, he explained, was why he told Housner that the title application for the cars sold at Serra Visser Nissan had to be changed to Serra Nissan. But Visser claimed that he did not know, when directing Housner to do this, that false documents would have to be created.

When asked why false deal jackets *were* created for the fifteen sales, Visser claimed he did not know why the deal jackets would have been made because NNA would not look at physical jackets unless they performed an onsite audit at Serra Nissan. Visser believed that, in their email exchange (GX 24), Branch was just telling him that Serra Nissan was "good to go" in case NNA performed any type of audit.

On July 30, 2015, Visser again met with the government to prepare for his

testimony in the Branch trial. Because the substance of what he said was no different than the proffer, the agents did not repeat the memorialization.

However, on August 5, 2015, five days before Branch's trial was scheduled to begin, the government again met with Visser to discuss some discrepancies that had come up between his previous statements to law enforcement and evidence found during the course of the ongoing investigation. During the meeting, agents showed Visser a copy of the fax that contained the detailed instructions for shifting sales (GX 40). The government expects to present testimony at sentencing from an agent who was present when Visser admitted that he created the information in the fax. Visser then changed his earlier statement (when he told agents the only instructions he had given about shifting the sales was simply telling Housner to "get it done") because, after his last proffer meeting, he recalled writing some instructions. However, at no point prior to this exchange did Visser or his attorney notify the government of this "recollection." At that point, however, Visser admitted that he "told [his employees] exactly what the process was."

Visser also reviewed the email in which Branch stated that she would manually add or remove the shifted sales (GX 24). Visser admitted that he knew this meant that Branch would manually add the sales to Birmingham or remove the sales from Cullman on the Excel spreadsheet sent to NNA prior to an audit. The sales would have to be manually added so the Excel spreadsheet would match the

RDR report. If not, it would be a red flag to NNA during the audit process.

Visser instructed Serra Visser Nissan not to tell the customers because he didn't want the customers involved. He thought customers might not agree to it, or they might tell NNA, which would mean they would be caught by NNA.

After thinking about how money would be received from lenders and other accounting entries associated with moving the sales from one dealership to the other, Visser said about Branch, "she would have to be involved," because Branch would have been responsible for reconciling the incentive money. He also recognized that the way the deals were actually booked in accounting, versus the way he had instructed, would entail less work for Branch. Visser recognized that his instructions would have created more work for her department.

When asked about Branch's role at the dealership, Visser stated that as Controller, she was responsible for the entire accounting department. She managed the office, produced the monthly financials, managed the accounting staff, etc. She would reconcile the bank statements and provide income statements and balance sheets. When NNA sent incentive money, Branch would reconcile the incentive payments. Branch would have to get with the sales department to find out about the incentive programs because there are at least ten categories of different incentives. Branch would know what the dealership was supposed to get in incentive money because she had to know how to book it in accounting. She also had to know the

RDR information for audit purposes.

When asked about her role in the audit process, Visser explained that Branch would export lists of sales to give to NNA, she would be the one to make the deals available to the auditor, and she was responsible for ensuring deals were pulled for the auditor. In short, Visser stated, "accounting is the hub of the dealership."

Visser was also asked about his role as Executive Manager.[8] He explained there is a process one must go through before being named Executive Manager. One must be nominated, and then NNA tracks your performance for six months. Visser also recognized the Nissan Dealer Agreement dated April 25, 2012, which identified him as the Executive Manager.[9]

This time, when agents asked about the subpoena for the fifteen deal jackets,

---

[8] While the Nissan Dealer Agreement states that Visser was the Executive Manager, he testified that he was the General Manager and those terms appeared to be interchangeable.

[9] Due to the proprietary nature of the information, a copy of the Nissan Dealer Agreement will be produced at the sentencing and the government will request that it be filed under seal. However, the provisions regarding the Executive Manager state: "Seller and Dealer agree that the retention by Dealer of qualified management is of critical importance to the successful operation of Dealer and to the achievement of the purposes and objectives of this Agreement. This Agreement has been entered into by Seller in reliance upon, and in consideration of, the personal qualifications, expertise, reputation, integrity, experience, ability and representations with respect thereto of the person named as Executive Manager in the Final Article of this Agreement and on Dealer's representation to Seller and agreement that the person identified as Executive Manager shall be Dealer's executive manager, shall have full managerial authority for the Dealership Operations, and shall continually provide his or her personal services in operating the dealership and will be physically present at the Dealership Facilities." NNA000066, Article Fourth, Section (a).

Visser said he was in Michigan when it was served and he received a telephone call from Housner about the subpoena. According to Visser, he and Housner had several conversations; at first, they were unsure why the Government wanted these particular deals and he recalled that they had trouble pulling the fifteen deals. He thought, at some point, Housner (not Branch, as he said previously) told him that the fifteen deals were the shifted Cullman deals.

Visser stated that he did not know that what he had done was illegal but admitted that when someone makes up false documents in the car business, what they are doing is wrong. He also admitted he felt pressured by his NNA representative to sell as many cars as possible and that he did not get permission from NNA to RDR sales at Serra Visser Nissan as sales at Serra Nissan. And while he did not think the NNA District Operations Manager would have cared about the pooling of sales, he knew the audit department would have a problem with it.

At the end of the preparation session, Visser expressed sympathy for Branch because she had acted at his direction. He claimed he did not know the extent of her involvement with his plan, but recognized she had to have been involved due to the accounting that had to be done for the scheme to be successful.

**Visser's Trial Testimony**

On August 11, 2015, Visser was called as a government witness in the Branch Trial. When the questions turned to Branch's job responsibilities at the

dealership, Visser's answers became markedly different from what he had told federal agents just five days earlier.

Visser testified that it was *not* Branch's job to make sure the dealership was paid what it was entitled to in incentives; he claimed it was his job. (Trial Tr. 201:23-202:4). He also claimed that Branch would have to get the dealer incentive amounts from him or Housner, because she would not know:

> A. … If we didn't send her an e-mail, she would send us an e-mail saying how much do we earn in Nissan money, and we would send her an e-mail back.
> Q. Would it have been for an individual car or just the total number?
> A. Total number.
> Q. So there really wasn't any reconciliation other than putting that total number in the accounting?
> A. That's correct.
> Q. So she didn't look at, well, this car number one should have been this amount and this is what we got?
> A. Not for dealer incentives, no.

(Trial Tr. 279:7-12.) Visser testified, despite being the accountant for multiple, multi-million dollar car dealerships, she did not do any reconciliation other than putting the total number of incentives into the accounting system. (Trial Tr. 279:7-12.)

When asked who was responsible for reconciling the lump sum incentive deposits that NNA made into the dealership's bank account, he claimed he did not know. (Trial Tr. 204:6-23.) When confronted, however, he finally admitted it was Branch:

16

Q. Did you tell [Branch] that $126,000 lump sum payment is for these 500 cars, and those 500 cars, each of those cars got these five incentives? Did you break down to her how that incentive payment was calculated for the purposes of reconciling that?

A. No, I did not.

Q. So who would have had to have done that?

A. I would have done that or Forest would have done that. We would have calculated how much we made. Sometimes we would e-mail our rep and say, how much did we earn in this program? Sometimes these programs get complicated. So we would say how much would we earn? They would send us an e-mail back saying, you earned this amount. We would tell Kim, set up this amount as receivable. This is the amount that they're going to pay us. I believe they would pay us in just a lump sum.

Q. So every day you would send her the information of how each lump sum payment was broken down – in one quarter, if there were 500 cars sold, you were the one that told her how to break down each of those lump sum payments into which cars were sold and which five incentives applied to each car, so that it can be entered into accounting?

A. Only once a month.

Q. So who would have been responsible, after you sent that once a month, for actually making every entry into the accounting required for where that money was coming from, how it had to be applied, who had to be paid, which sales representatives had to get commissions, who was responsible for financially calculating that?

A. Well, sales people did not get paid on the dealer incentives. That was one inventory that would be made.

Q. Who was responsible –

A. Kim Branch was responsible for making that entry.

(Trial Tr. 205:9-206:15.)

And when asked whether Branch was responsible for reconciling audit charge backs, despite his affirmative response five days earlier, Visser testified at trial that she was *not* responsible for reconciling those figures:

Q. If there were charge backs or the results of the audit were charge

17

backs, was she responsible for reconciling the incentive payments with the RDR data?

A. No.

Q. She wasn't responsible for reconciling the charge backs with what was sold?

A. No, at the end of the audit, they would have a closing meeting, I would be present, Forest Housner would be present. And then we would tell Ms. Branch, I would tell her or Forest would tell her, we got a charge back $19,000, it's coming up next month, just be aware of it. That's it. That would be her responsibility.

Q. Then you would go into the accounting system and reconcile the line items of the books to account for those charge backs, or would Ms. Branch do that?

A. It would just be one single entry.

Q. Would you make that entry, or was it Ms. Branch?

A. No – yes, Ms. Branch would, yes.

Q. Okay. So she sent the spreadsheet to accounting to Nissan, she pulled the files for the audit, she would have been responsible for reconciling accounting if there were charge backs, and you felt that was a limited role in the audit process?

A. That was her involvement, yes.

(Trial Tr. 203:6-204:4).

Visser's testimony was also internally inconsistent at times: at one point he said he communicated with Branch mostly via email (Trial Tr. 284:2-14), but later testified he only emailed or texted Branch "very little" and "maybe once a week" (Trial Tr. 304:13-25):

Q. Mr. Visser, how many times did you e-mail or text Ms. Branch per day?

A. I would say, it would be a guess, but on average I would – very little. I would say maybe once a week.

Q. Once a week.

A. That would be my guess. I would have to go back and count the e-mails. It wouldn't be a lot. We would have a conversation, and then maybe we could send three or four back. But unless there was

something that I needed, I would get with Forest. I would have to go
back and look, but that's just my estimate.
Q. I just want to remind you that you are under oath. I am going to ask
you again.
The Court: I think the witness knows that he is under oath, Ms. Wick.

(Trial Tr. 304:13-305:2.)

Visser also testified at trial that he did not know if the fifteen Serra Nissan
Birmingham jackets ever existed. (Trial Tr. 317:6-11). When confronted on
redirect with a copy of the email in which Branch told him that Green had created
them, Visser then recanted and admitted that it was his understanding that
Birmingham deal jackets were created. (Trial Tr. 320:16-321:2.)

When asked the same question he had been asked during witness
preparation, regarding how he found out the government had subpoenaed the
fifteen shifted deals, Visser's answer at trial was that he found out from someone
"not at the dealership," specifically, his lawyer. (Trial Tr. 290:21-291:10.) Visser
also testified that he did *not* talk to Branch about the subpoena, *id.*, though Branch
admitted on cross that she had had discussions with Visser about the fifteen deal
jackets requested in the subpoena being the fifteen shifted Cullman deals. (Trial Tr.
655:20-25.)

When questioned about the facts he agreed to in his plea agreement,
specifically, Branch's role in the offense, Visser attempted to revise the statement
he agreed to:

19

Q. Okay. I want to make sure I understand. You were just reading the sentence, "As part of the scheme, [Jeff Green], a sales manager at Serra Volkswagen, was instructed to create false documents showing the cars were sold at Serra Nissan, in the event Serra Nissan was audited by Nissan North America, Inc."

A. I didn't know that was a new sentence. I thought Inc. was just a period abbreviating incorporated. I thought that was one sentence.

Q. Then it says, "[Kim Branch], the controller of Serra Nissan created a list of the 15 relevant deals to be given to [Jeff Green] to make the false deal jackets." That is a separate sentence.

A. When I signed this, I did not realize that.

Q. Do me a favor, if you could read on the bottom of page 5 in bold, the star point where it says, "the defendant hereby stipulates."

A. The defendant hereby stipulates the facts stated above are substantially correct, and the Court can use these facts in calculating the defendant's sentence. The defendant further acknowledges that these facts do not constitute all of the evidence of each and every act that the defendant and/or a co-conspirator may have committed."

Q. Is that your signature below that paragraph?

A. Yes, it is.

Q. Did you review this before signing the plea agreement?

A. Yes, we did. We made several changes to it.

Q. Is this version that you are reading the version that you signed that was filed in your case?

A. Yes, it is.

Q. Did the Court, at your plea colloquy, ask you if you agreed to these facts as stated as you just read?

A. Yes, I did.

Q. Did you say yes?

A. Yes, I did.

…

Q. Do you understand, pursuant to your plea agreement, what happens if you were to come here today and lie in any way to the jury?

A. That the plea agreement would be null and void.

Q. What else would happen?

A. I'd probably be charged with perjury.

(Trial Tr. 270:20-273:13.)

## RESPONSE TO DEFENSE OBJECTIONS

Visser has lodged several objections[10] to the Presentence Investigation Report (PSR), largely raising factual disputes that are categorically refuted by his statements to law enforcement and the Branch Trial proceedings before this Honorable Court.[11]   The primary objections Visser raises are to the upward adjustments for Role in the Offense – Organizer or Leader of Criminal Activity, U.S.S.G. § 3B1.1(a) (PSR at ¶ 21); Role in the Offense – Abuse of Position of Public or Private Trust, U.S.S.G. § 3B1.3 (PSR at ¶ 22); Obstruction of Justice - U.S.S.G. § 3C1.1 (PSR at ¶¶ 15, 23); and Acceptance of Responsibility - U.S.S.G. § 3E1.1(b) (PSR at ¶ 27).[12] With regard to the offense conduct and offense characteristics that form the basis of the calculation of the Defendant's advisory guideline range, the United States addresses each of those in turn below.   The Defendant's objections to the PSR are due to be denied.

### 1.  Organizer or Leader of Criminal Activity, U.S.S.G. § 3B1.1(a)

The United States Sentencing Guidelines provide for an adjustment for a

---

[10] Visser's objections were not filed with the Court, but rather were emailed to the Probation Officer that prepared the PSR, with a copy sent to the prosecutor, on October 27, 2015. However, they were attached to the Defendant's Sentencing Memorandum as an exhibit and are in the record as Doc. 24-1.

[11] A number of Visser's objections were related to typographical errors or facts that had changed since the PSR was issued. To the extent the Probation Officer determines they are valid objections, the government has no objection to the corrections. These include objections 1-7, 14-17.

[12] The remaining objectors, 13 and 18, are guidelines calculation revisions necessary if Visser's objections are adopted.

defendant's aggravated role in a criminal offense: "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."[13] The Eleventh Circuit has explained:

> Relevant factors in determining whether a § 3B1.1(a) enhancement is warranted include: (1) exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

*United States v. Freeman*, 440 Fed.Appx. 810, **2 (11th Cir. 2011) (internal citation and quotation marks omitted).  The Eleventh Circuit also emphasized that "[i]t is not necessary that every factor is present for the enhancement to be applied in a particular case." *Id.*

The defendant himself counts as a participant in counting the number of participants in the scheme.  *See United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir.1994) ("when determining the number of participants, the defendant is considered to be one of the five").  Also, the participants need not have been convicted of a crime. U.S.S.G. § 3B1.1 comment. n.1. The Commission has explained that its "intent is that this adjustment should increase with both the size

---

[13]   The Guidelines expressly provide that the enhancement for abuse of a position of public or private trust under U.S.S.G. §3B1.3 may be utilized in conjunction with the aggravating role adjustment under U.S.S.G. §3B1.1.

of the organization and the degree of the defendant's responsibility."  U.S.S.G. § 3B1.1 Background.  "Furthermore, a defendant does not have to be a leader or organizer of all five participants" for the enhancement to apply – "the enhancement is warranted if the defendant was a leader or organizer of only one of the other participants." *United States v. Cruz-Natal*, 150 Fed.Appx 961, 966 (11th Cir.2005).

Five or more participants were clearly established in the record of the Branch Trial. Visser, Gerald Shepard, Jeffrey Green, Harold Yelverton, Forest Housner and Kim Branch all testified regarding their role in the fraud – all but Branch admitted they had the intent to defraud NNA and knew it was wrong. All except Visser acted at the direction of Housner, who acted at the direction of Visser (Trial Tr. 238:6-16; 373:21-374:8.) Visser himself testified that, when he realized Serra Nissan was not going to hit the incentive target in March 2013, it was "100% his idea" to shift sales from Cullman to Birmingham in order to make the incentive money. (Trial Tr. 224:18-225:9.) Visser admitted he typed out a set of explicit instructions, which he gave to Housner to fax to the Cullman store, which instructed employees how to commit the fraud (GX 40; Trial Tr. 224:18-225:9.) Visser also testified that the intended audience of that fax was employees in Cullman and Birmingham, including the sales managers and finance managers who were necessary to commit the fraud. (Trial Tr. 238:6-16.) Because Visser was the organizer and leader of a criminal activity that involved at least five

participants, the four-level enhancement should be applied.

## 2.  Abuse of Position of Public or Private Trust, U.S.S.G. § 3B1.3

The United States Sentencing Guidelines impose a two-level enhancement if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The Eleventh Circuit has explained that "§ 3B1.3 applies in the fraud context where the defendant is in a fiduciary, or other personal trust relationship to the victim of the fraud, and the defendant takes advantage of the relationship to perpetrate or conceal the offense." *United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008) (internal citation and quotation marks omitted).

In analyzing whether section 3B1.3 applies in a fiduciary or personal trust situation, a court must "distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." *United States v. Garrison*, 133 F.3d 831, 838 (11th Cir. 1998) (internal citations omitted). "Since the 'primary concern of § 3B1.3 is to penalize defendants who take advantage of a *position* that provides them freedom to commit or conceal a difficult-to-detect wrong,' only such a defendant whose position enables or significantly facilitates the offense is eligible for this enhancement." *Id.* (citing *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir.

24

1996)(emphasis added)).

"For the adjustment to apply, the government must establish both elements: (1) that the defendant held a place of public or private trust; and (2) that the defendant abused that position in a way that significantly facilitated the commission or concealment of the offense." *United States v. Ward*, 222 F.3d 909, 911 (11th Cir. 2000).

The initial question is whether or not Visser occupied a position of trust. *See United States v. Mullens*, 65 F.3d 1560, 1567 (11th Cir.1995) ("One must hold a position of trust before it can be abused, however."). The Guidelines provide, "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion." U.S.S.G. § 3B1.3, cmt. 1.[14] Although it is not required that the relationship satisfy the legal definition of a fiduciary, *United States v. Kummer*, 89 F.3d 1536, 1547 (11th Cir.1996), the Eleventh Circuit has stated that the "guideline enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required." *United States v. Garrison*, 133 F.3d 831, 838 (11th Cir.1998) (quoting *United States v. Brunson*, 54 F.3d 673, 678 (10th Cir.1995)). *Garrison*

---

[14] The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, the guideline." *Stinson v. United States*, 508 U.S. 36, 37-38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

also quotes a similar statement from the Sixth Circuit: "[A]s used in the guideline, 'position of public or private trust' is a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary." 133 F.3d at 839 (quoting *United States v. Ragland*, 72 F.3d 500, 503 (6th Cir.1996)). *See also United States v. Kummer*, 89 F.3d 1536, 1547 (11th Cir.1996)("the abuse of trust enhancement only requires a finding that defendant possessed a position 'characterized by professional or managerial discretion' which 'contributed in some significant way to facilitating the commission of the offense.'") (quoting U.S.S.G. § 3B1.3, comment.(n. 1)).

The abuse-of-private trust enhancement is appropriate where wire fraud is the underlying offense, so long as the double counting is permissible. *See United States v. Bracciale*, 374 F.3d 998, 1110 (11th Cir.2004). In *Bracciale*, the defendant was a Regional Sales Manager at Kraft Foods ("Kraft"), who was charged with one count of wire fraud in violation of 18 U.S.C. 1343, 1346, and 2. *Id.* at 1000-01. Bracciale argued at sentencing that the abuse-of-trust enhancement resulted in impermissible double counting because his wire fraud conduct was the same conduct used for the abuse-of-trust enhancement. *Id.* at 1002-1003. The Eleventh Circuit affirmed the district court's application of the abuse-of-trust enhancement because it found that: 1) the specific offense characteristics did not already take into account Bracciale's abuse of trust because they applied regardless

of his position at Kraft; 2) the base offense level did not include abuse of trust because it applied to a variety of frauds, regardless of the defendant's position at the time they were committed; 3) the "same-conduct" analysis in *Garrison* is dicta that is not binding precedent; and 4) double counting is permissible where the Sentencing Commission intended that separate guidelines sections be applied cumulatively. *Id.* at 1005-10.

First, the court determined that Bracciale's specific offense characteristics, i.e., ten levels added because Kraft's "loss" was over $500,000 and two levels added because Bracciale's offense involved more than minimal planning, "in no way account[ed] for Bracciale's abuse of trust" because the same enhancements would have applied if he had been a senior executive or a mail room employee whose fraud resulted in a loss of more than $500,000, and because the fact that his scheme was complex was irrelevant to the abuse-of-trust analysis. *Id.* at 1005.

Similarly, the court found Bracciale's base offense level of six, under U.S.S.G. § 2F1.1(a)[15], did not account for his abuse of trust conduct. Because the base offense level of six is assigned to a wide variety of crimes, including fraud, deceit, forgery, and some counterfeiting offenses, the court found that the base offense level is *not* dependent on any abuse of trust or breach of fiduciary duty –

---

[15] *Bracciale* was decided using the 1995 version of the United States Sentencing Guidelines. Section 2F1.1 was deleted by consolidation with §2B1.1 effective November 1, 2001 (*see* U.S.S.G. Appendix C, amendment 617).

"rather, [Bracciale] was sentenced under §2F1.1(a) because his underlying offense is a form of fraud." *Id.* at 1005. The court noted that "any defendant committing one of the numerous types of fraud listed under §2F1.1(a) receives a base offense level of six irrespective of whether any abuse of trust or breach of fiduciary duty was involved in the commission of his fraud offense." *Id.*[16]

The court's conclusion was also consistent with the commentary to §3B1.3 – the key question is the defendant's position because if a bank executive and bank teller engage in two separate but identical wire fraud transfers, only the bank executive would be eligible for the abuse-of-trust enhancement. *Id.* at 1006. *See also United States v. Milligan*, 958 F.2d 345, 347 (11th Cir.1992) (applying the abuse-of-trust enhancement in an embezzlement case because the applicable guideline, §2B1.1, covers all kinds of theft and therefore, "the only way that an embezzler receives any kind of enhancement for abuse of position of trust is through [§3B1.3]"); *United States v. Smith,* 231 F.3d 800, 819 (11 Cir.2000) (providing that "[t]he fact that another defendant committed the same offense without use or abuse of the defendant's position [of trust] does not preclude

---

[16] Importantly, Bracciale's plea agreement listed breach of fiduciary duty as an element of his underlying fraud offense. *Bracciale,* 374 F.3d at 1006. The court still found that the base offense level of six in §2F1.1 was for "various forms of fraud and is not dependent on how the defendant committed the fraud or the elements of the particular crime involved." *Id.* "For *sentencing guidelines purposes*, Bracciale's abuse of his position of trust or breach of his fiduciary duty is captured only by the abuse-of-trust enhancement." *Id.*

application of the §3B1.3 enhancement").

Finally, the court noted in *Bracciale* that dicta in the Medicare fraud case of *United States v. Garrison* might suggest a contrary result, as Visser is arguing here. Specifically, that because Garrison's offense conduct of perpetrating a fraud against Medicare was the same conduct being used as the basis for the abuse-of-trust enhancement she received, the enhancement would be double counting. *Id.* at 1007. The court in *Bracciale* explicitly noted that the "same-conduct" analysis in *Garrison* was dicta, and not binding precedent on the court. *Id.* at 1007-1008. It also noted that while the Eleventh Circuit had cited *Garrison* on many occasions, it had never cited the case primarily for its "same-conduct" analysis, but instead cited it "for its conclusion that Garrison did not occupy a position of trust vis-à-vis the victim of the fraud." *Id.* at 1008 (citing, *e.g.*, *United States v. Hall,* 349 F.3d 1320, 1324-26 (11th Cir.2003); *United States v. Liss*, 265 F.3d 1220, 1229 (11th Cir.2001) (citing *Garrison* when *affirming* an abuse-of-trust enhancement for doctors who committed Medicare fraud); *United States v. Smith*, 231 F.3d 800, 819-20 (11th Cir.2000); *United States v. Mills*, 138 F.3d 928, 941 (11th Cir. 1998).

Visser held a place of private trust with NNA and abused that position in a way that significantly facilitated the commission *and* concealment of the offense. As Executive Manager of the Serra Nissan dealership, Visser was responsible for overseeing all operations (Trial Tr. 198:5-11), which included accurately

submitting the RDR information in order to qualify for NNA incentives. (Trial Tr. 63:15-19.) The description of Visser's position in the Nissan Dealer Agreement makes clear that Visser's position was characterized by professional and managerial discretion:

> "Seller and Dealer agree that the retention by Dealer of qualified management is of critical importance to the successful operation of Dealer and to the achievement of the purposes and objectives of this Agreement. This Agreement has been entered into by Seller in reliance upon, and in consideration of, *the personal qualifications, expertise, reputation, integrity, experience, ability and representations with respect thereto of the person named as Executive Manager* in the Final Article of this Agreement and on Dealer's representation to Seller and agreement that *the person identified as Executive Manager shall be Dealer's executive manager, shall have full managerial authority for the Dealership Operations*, and shall continually provide his or her personal services in operating the dealership and will be physically present at the Dealership Facilities."

NNA000066, Article Fourth, Section (a) (emphasis added).

It was Visser's extensive knowledge of how the NNA incentive programs worked, and most importantly, how NNA's audit process worked, that significantly facilitated the commission *and* concealment of the offense. Visser created specific instructions for how to commit the fraud so NNA could not detect it. (GX 40.) And though there was an extensive audit process NNA performed to determine if the information was submitted correctly (Trial Tr. 107:5-114:22; 124:14-20), NNA relied on the Executive Manager and the dealership to accurately submit information in relation to the incentive programs. Because the audit process

involved the dealership submitting its own accounting information, if the dealership intentionally set out to defraud NNA, there would be no way for NNA to detect it. (Trial Tr. 116:5-14.) There was no definitive way for the NNA auditor to know, looking at a deal jacket, whether it was an authentic deal jacket or a duplicate. (Trial Tr. 116:2-4.) In fact, Jeff Creecy, the NNA auditor, testified that if the RDR information matched the accounting information submitted by the dealership, and it matched the deal jacket that was provided during the audit, there would be no way for NNA to determine if the information was false. (Trial Tr. 116:5-14.) The purpose of the audit was to make sure there were not errors in the RDR information; it was not to ferret out fraud. (Trial Tr. 124:14-20.) Outside of the audit process, there was no way NNA had to verify the RDR information submitted by dealerships. (Trial Tr. 126:25-127:3.) Visser's special knowledge of accounting and the car industry allowed him to commit the fraud in such a way that, but for the government finding out, would never have been detected by NNA.

Visser also argues that the addition of two points for abuse of private trust is double counting. However, the application of these guidelines is permissible double counting.[17]   First, Visser's base offense level of six, pursuant to U.S.S.G.

_____

[17] The Eleventh Circuit has explained that "[i]mpermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Dudley*, 463

§2B1.1(a)(2), has nothing to do with his position at Serra Nissan or his relationship with NNA – it is the same base offense level for larceny, embezzlement, forgery, and counterfeiting offenses. His specific offense characteristic includes a six-level enhancement for the amount of loss pursuant to 2B1.1(b)(1)(D), which applies regardless of any abuse of trust. The adjustments for role in the offense (U.S.S.G. § 3B1.1(a)), obstruction (U.S.S.G. § 3C1.1), and the government's decision to not move for the third point of acceptance (U.S.S.G. § 3E1.1(a)) are unrelated to Visser's fiduciary position as Executive Manager of the dealership.

The Court will "presume that the Sentencing Commission intended separate guidelines sections to apply cumulatively, unless specifically directed otherwise." *Dudley*, 463 F.3d at 1227.   In addition, "[d]ouble counting a factor during sentencing is permitted if the Sentencing Commission . . . intended that result and each guideline section in question concerns conceptually separate notions relating to sentencing." *Ibid* (internal quotation and citation omitted).

The Eleventh Circuit has routinely allowed the enhancements at issue in this case to be applied together, as contemplated by the guidelines.  *See United States v. Germany*, 296 Fed.Appx. 852 (11th Cir. 2008) (upholding imposition of enhancements for abuse of a position of trust, an aggravated role, and the amount of loss); *see also* U.S.S.G. § 3B1.3 (an aggravated role enhancement can be

---

F.3d 1221, 1226–27 (11th Cir.2006) (*per curiam*)  (internal quotation and citations omitted).

applied in tandem with an abuse of trust enhancement).

### 3. Obstruction of Justice - U.S.S.G. § 3C1.1

The United States Sentencing Guidelines impose a two-level enhancement if

"(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."

U.S.S.G. § 3C1.1. Examples of conduct deemed "obstructive" under § 3C1.1 include: committing, suborning, or attempting to suborn perjury pertaining to conduct that forms the basis of the offense of conviction; providing materially false information to a judge or magistrate judge; or providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense. *Id.* § 3C1.1 cmt. 4(B), (F), (G). Evidence, facts, statements or information that is "material" is that which, "if believed, would tend to influence or affect the issue under determination." *Id.* § 3C1.1 cmt. 6.

"Perjury, for purposes of applying this enhancement, has been defined by the United States Supreme Court as 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002) (citing *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122

L.Ed.2d 445 (1993)); *see also United States v. Hubert*, 138 F.3d 912, 915 (11th Cir.1998) (holding that "[p]erjury under oath on material matters, not due to confusion or mistake, justifies such an increase.").

In applying the obstruction-of-justice enhancement, the court "must identify what the defendant did, why that conduct warranted the enhancement, and how that conduct hindered either the investigation or prosecution of the offense." *United States v. Membrides*, 570 Fed.Appx. 859, 861 (11th Cir. 2014). Though even where such individualized findings are not made, the enhancement will be upheld "if the record clearly reflects and supports the basis for the enhancement." *Id.* "The defendant need not be successful in his attempt to impede or obstruct the administration of justice in order for the enhancement to apply." *Id.* (citing *United States v. Taylor*, 88 F.3d 938, 943–44 (11th Cir.1996).

For example, the enhancement was upheld where a defendant made contradictory statements regarding the identity of his codefendants, and his role and the role of his codefendants in a fraud scheme. *United States v. Arguedas*, 86 F.3d 1054, 1059 (11th Cir. 1996). In *Arguedas,* the defendant stated at his plea hearing that his codefendant assisted in the scheme. However, in an interview with a federal agent immediately after his plea hearing, the defendant stated he himself played the role of his codefendant. *Id.* The defendant also stated in the interview that a different co-defendant had no knowledge of the fraud scheme. *Id.* Yet in his

proffer, the defendant stated that he paid that co-defendant $1,000 for his part in the scheme. *Id.* The enhancement was upheld because the court properly found that Arguedas obstructed justice by making materially false statements during the course of his investigation and prosecution. *Id. See also United States v. Partin*, No. 15-11008, 2015 WL 9022251, at *4 (11th Cir. Dec. 16, 2015) (upholding an enhancement for obstruction of justice where the defendant lied on two occasions during his trial); *United States v. Rouhani*, 598 Fed.Appx. 626, 630 (11th Cir. 2015) (upholding an obstruction enhancement where the court found the defendant willfully lied about material facts by providing inconsistent statements at trial); *United States v. Reason*, 571 Fed.Appx. 828, 834 (11th Cir. 2014) (imposing the § 3C1.1 enhancement based on one instance of conflicting perjured testimony).

Visser attempted and did willfully obstruct and impede the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to his relevant conduct and the role of his co-conspirator, Kimberly Branch. Specifically, Visser provided materially false information to law enforcement agents during his meetings with them, and to this Honorable Court during Branch's trial in August 2015.

From the moment he took the stand during Branch's trial, Visser willfully misrepresented, and attempted to minimize, Branch's responsibilities as Controller of multiple Serra car dealerships, her knowledge and involvement in the scheme to

defraud NNA, and her involvement in the NNA audit process.[18]  His testimony was material because, if believed, it could have influenced or affected the jury's determination of Branch's guilt.[19] In his attempts to make it sound like Branch had less responsibility at the dealership than she actually had, Visser made several materially false statements that were contradicted by earlier statements he had made to the government, testimony from other witnesses, and evidence collected during the investigation.

During his meetings with the government prior to trial, Visser explained that, as the Controller, it was Branch's responsibility to reconcile *every dollar* received from NNA, especially the incentive payments, because she prepared the income statements and balance sheets, and had to know how to book the information into the dealership's accounting system. However, at trial, Visser testified that it was *not* Branch's job to make sure the dealership was paid what it was entitled to in incentives, and attempted to claim that it was his job. (Trial Tr. 201:23-202:4). He also claimed that Branch would have to get the dealer incentive amounts from him or Housner, because she would not know. (Trial Tr. 279:7-12.) At the sentencing hearing, the United States expects to offer evidence from a

---

[18]  Visser's testimony was so flagrantly false, that a reporter for AL.com approached the prosecutor immediately afterwards and asked the government whether it intended to bring perjury charges against Visser.

[19] Multiple witnesses that testified, both Serra Nissan employees and employees of Nissan North America, contradicted Visser's testimony, allowing the jury to assess the veracity of his testimony.

search warrant executed on Visser's email account that proves the materiality of this misstatement.

Prior to trial, Visser explained to agents that Branch had an extensive role in reconciling the NNA incentive payments with the RDR sales data, and reconciling any charge backs that NNA assessed due to incorrect RDR data. However, at trial, Visser testified that she was *not* responsible for reconciling those figures. (Trial Tr. 203:6-204:4). Visser also testified that, despite being the accountant for multiple, multi-million dollar car dealerships, she did not do any reconciliation other than putting the total number of incentives into the accounting system. (Trial Tr. 279:7-12.) When asked who was responsible for reconciling the lump sum incentive deposits that NNA made into the dealership's bank account, he claimed he did not know. (Trial Tr. 204:6-23.) When confronted, however, he finally admitted it was Branch (Trial Tr. 205:9-206:15.) Only when pushed did Visser finally admit what he had told agents previously – Branch would reconcile the incentive payments herself, get with the salespeople to find out about incentive programs, and know what the dealership was supposed to get in incentive money so she could accurately book it in accounting.

In contrast to Visser's portrayal, Patrick Byrnes from NNA testified that the dealer was responsible for reviewing weekly incentive payments for earnings statements from NNA for accuracy, and submitting corrections, and the Controller

was usually the person responsible for that. (Trial Tr. 63:5-64:2.)   Byrnes also

testified that the Controller would have access to NNA's Vehicle Incentive

Management System ("VIMS") and that the purpose of the VIMS system was so

that the dealership could reconcile each vehicle that was sold, to determine the

actual amount of incentive dollars it was entitled to receive. (Trial Tr. 77:19-79:3.)

"Reconciling" required the Controller of a dealership to break down Nissan's lump

sum payments into which incentives went with which vehicles that were sold, in

order for the dealership to ensure it was properly paid – each vehicle could have

multiple incentives on it and VINS was the primary method for determining what

incentives a dealership had earned. (Trial Tr. 79:4-80:21.) Byrnes testified that

each month, he would provide Branch directly with the RDR reports for both Serra

Nissan and Serra Visser Nissan so she could reconcile what they showed as being

sold for those months. (Trial Tr. 99:11-22.)

Visser's testimony was also internally inconsistent: at one point he said he

communicated with Branch mostly via email (Trial Tr. 284:2-14), but later he

testified he only emailed or texted with Branch "very little" and "maybe once a

week" (Trial Tr. 304:13-25). The government executed a search warrant on

Visser's email account and expects to offer evidence at the sentencing hearing that

he emailed Branch and Housner constantly, sometimes upward of five or ten

emails a day. Even Housner testified that Visser would email him "nonstop" (Trial

Tr. 328:20-25), sometimes sending "five e-mails in five minutes" (Trial Tr. 375:17-376:1), and often copying Branch on the emails to Housner (Trial Tr. 329:1-9). Visser's material misstatements of how often he communicated with Branch were another attempt to minimize her role in the day-to-day financial operations of the dealership.

Visser also testified at trial that he did not know if the fifteen Serra Nissan Birmingham jackets ever existed. (Trial Tr. 317:6-11). However, during his proffer, Visser told agents that not only did he know they had been created, he knew they *had* to be created as part of the fraud, because the title application had to be created for the Serra Nissan deal, and it had to be filed somewhere. When confronted on redirect with a copy of the email in which Branch told him that Green had created them, Visser then recanted and admitted that it was his understanding that Birmingham deal jackets were created. (Trial Tr. 320:16-321:2.)

Visser's testimony regarding the grand jury subpoena also differed at trial from what he told the Government in meetings prior to trial. During his proffer and trial preparation sessions, Visser told agents that he learned of the Government's subpoena of the fifteen Birmingham deal jackets from Housner, who told him it was the fifteen Cullman deals and that they were having a hard time finding the deals requested. Visser also told agents that Branch told him that the subpoena was

requesting the fifteen Cullman deals they had shifted. However, at trial, Visser testified that he was made aware that the Government had subpoenaed the fifteen deal jackets by someone "not at the dealership," specifically, his lawyer. (Trial Tr. 290:21-291:10.) Visser also testified at trial that he did *not* talk to Branch about the subpoena, *id.*, though Branch admitted on cross that she had had discussions with Visser about the fifteen deal jackets requested in the subpoena being the fifteen shifted Cullman deals. (Trial Tr. 655:20-25.)

In addition, as part of his plea agreement, Visser agreed to stipulated facts that formed the factual basis of his plea agreement, including the fact that "[Kimberly Branch], the Controller of Serra Nissan, created a list of the fifteen relevant deals to be given to J.G. to make the false deal jackets." (2015-CR-167, Doc. 2.) However, at trial, Visser attempted to revise the statement he made regarding Branch. (Trial Tr. 270:20-273:13.) Visser's claim at trial that he did not understand the period was at the end of a sentence, as opposed to an abbreviation, was disingenuous at best given the fact that he had multiple opportunities to discuss and revise the agreement with his attorney, and admitted that they made several changes to it. (Trial Tr. 270:20-271:19.) Because Visser willfully obstructed justice and perjured himself regarding material matters, the two-level enhancement is appropriate.

40

**4.  Acceptance of Responsibility - U.S.S.G. § 3E1.1(b)**

"Under U.S.S.G. § 3E1.1(b), a defendant who 'clearly demonstrates acceptance of responsibility for his offense,' *see* U.S.S.G. § 3E1.1(a), is entitled to an additional one-level reduction in his offense level if, among other conditions, the government makes a motion 'stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial." *United States v. Stephens*, 387 Fed.Appx. 943, 944 (11th Cir. 2010) (citing U.S.S.G § 3E1.1(b)).

The commentary to this section explains the rationale for requiring the government to file a motion: "Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing." U.S.S.G. § 3E1.1 comment. (n. 6). A defendant's claim for an additional one-level reduction will be rejected where there was no government motion filed in support of such reduction. *United States v. Wade*, 458 F.3d 1273, 1282 (11th Cir.2006). *See also United States v. Sloley*, 464 F.3d 355, 359 (2nd Cir.2006) (holding the government's filing of a formal motion as being a "necessary pre-requisite to the additional one-level decrease.") "The plain language of § 3E1.1(b) vests the prosecutor with broad

discretion in deciding whether to seek an additional one-level reduction under § 3E1.1(b)." *United States v. Gunn*, 215 Fed.Appx. 785, 791 (11th Cir. 2007). Furthermore, "the defendant bears the burden of showing that he is entitled to a reduction for acceptance of responsibility and must present *more* than a guilty plea." *Stephens*, 387 Fed.Appx. at 944 (emphasis added).

The Eleventh Circuit has not yet decided under what circumstances it may review the government's decision not to file a § 3E1.1(b) motion, though in the related context of government motions under U.S.S.G. § 5K1.1 for substantial assistance, the government's decision not to file such a motion may be reviewed only for unconstitutional motive. *United States v. Stephens*, 387 Fed.Appx. 943, 944 (11th Cir.2010) (citing *United States v. Nealy*, 232 F.3d 825, 831 (11th Cir.2000).

"Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1, comment. (n. 4). And while "there may be extraordinary circumstances that enable the court to apply the § 3E1.1 reduction despite the obstruction-of-justice enhancement," U.S.S.G. § 3E1.1, comment. (n.4), those circumstances are not present in this case. While the guidelines do not clarify what constitutes "extraordinary circumstances," something more than a guilty plea and providing information is required. If simply

meeting the requirements of § 3E1.1 was sufficient, the guidelines would not indicate that "exceptional circumstances" were necessary to receive a reduction when the defendant receives an enhancement for obstruction of justice. *United States v. Gaines*, 138 Fed.Appx. 255, 258 (11th Cir. 2005). And the Eleventh Circuit has affirmed the denial of this one-level reduction where the government elected not to file the motion because the defendant did not state the full truth. *United States v. Villa,* 572 Fed.Appx. 958, 961 (11th Cir. 2014).

The terms of Visser's plea agreement were clear:

> The defendant understands that should the defendant violate any condition of pretrial release or violate any federal, state, or local law, or should the defendant say or do something that is inconsistent with acceptance of responsibility, the United States will no longer be bound by its obligation to make the recommendations set forth in paragraph V of the Agreement, but instead, may make any recommendation deemed appropriate by the United States Attorney in her sole discretion.

(Doc. 2). In addition, Visser was fully aware of what would happen if he lied during his testimony in the Branch Trial:

> Q. Do you understand, pursuant to your plea agreement, what happens if you were to come here today and lie in any way to the jury?
> A. That the plea agreement would be null and void.
> Q. What else would happen?
> A. I'd probably be charged with perjury.

(Trial Tr. 270:20-273:13.) While Visser will likely argue that his numerous misstatements were caused by lack of clarity in the question, misunderstanding, and mistake, it is the government's prerogative to assess the truthfulness of

Visser's testimony, or lack thereof, when deciding not to file a motion under U.S.S.G. § 3E1.1(b).

## Application of Sentencing Factors under 18 U.S.C. § 3553(a)

Having correctly calculated the Guidelines range, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in 18 U.S.C. § 3553(a).  The requirement is "not merely that a sentencing court when handing down a sentence be stingy enough to avoid one that is too long, *but also that it be generous enough to avoid one that is too short.*"  *United States v. Irey*, 612 F.3d 1160, 1197 (11th Cir. 2010) (en banc) (emphasis added).    Based on the trial record in the Branch case and Visser's obstructive conduct, the government submits that a sentence within the advisory guidelines range of 27 to 33 months' imprisonment (Total Offense Level 18) would achieve the purposes of sentencing set forth in Section 3553(a).

The recommended sentence appropriately reflects "[t]he nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The recommended sentence also "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  Those considerations reflect "the 'just deserts' concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish but to punish justly." *Irey*,

612 F.3d at 1206.   Furthermore, "promoting respect for the law" includes promoting respect for testifying under oath and providing truthful information to law enforcement agents. On multiple occasions during his meetings with the government, Visser made material misstatements regarding facts critical to the investigation. If Harold Yelverton had not kept a folded up copy of Visser's faxed instructions in his wallet for two years, "just in case anyone came asking," the government would have been left with Visser's claim that he just told Housner to "get it done" and gave no further instructions. During each meeting, the government told Visser that his only responsibility as a witness was to tell the truth and that if he lied, not only could his plea agreement be revoked, but he could face charges of perjury. It is imperative that the Court send a message to Visser and defendants like him that respect for the law means telling the truth to law enforcement agents, and telling the truth under oath.

The Eleventh Circuit has also explained that "[b]ecause the punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be.  The seriousness of a crime varies directly with the harm it causes or threatens.  It follows that the greater the harm the more serious the crime, and the longer the sentence should be." *Id.*

The Court's recognition of the seriousness of the offense would also meet the sentencing goal of general deterrence.  This was not a civil case about a

financial dispute between a car dealership and its franchisor. This was a case where an Executive Manager, someone that NNA trusted to run its franchise dealership, unilaterally decided to *steal* from NNA because he did not feel the sales objectives were fair. Rather than contacting NNA and going through the appropriate channels, he instructed his subordinates to break the law by participating in an extensive scheme to defraud NNA – all for $64,800 in incentive payments. A sentence of imprisonment should be handed down with hopes that others instilled with the private trust who are involved in or might become involved in defrauding companies such as NNA, will consider the possibility of going to prison before deciding to steal from them.

Specific deterrence is also a consideration.  A sentence of imprisonment will send an appropriate reminder that the Defendant's conduct will not be condoned. This includes both the offense conduct with which he was charged, and the obstructive conduct he committed when he lied to federal agents and this Honorable Court during the Branch Trial. The government submits that the recommended sentence would thus meet the sentencing goals of both general and specific deterrence.

Finally, a prison sentence would avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. §18 U.S.C. § 3553(a)(6).  Section 3553(a)(6) focuses on unwarranted

disparities among similarly-situated federal defendants.   While no other co-conspirators have been sentenced yet for the conduct at issue in this case, as the leader who devised an elaborate scheme to defraud NNA for his own personal gain, an advisory guideline sentence meets the goals of sentencing and is just.

Respectfully submitted this 18th day of February, 2016.

JOYCE WHITE VANCE
United States Attorney


_____/s/_____
AMANDA S. WICK
Special Assistant United States Attorney




**CERTIFICATE OF SERVICE**

I certify that on February 18, 2016, I filed this document electronically with the United States District Court for the Northern District of Alabama using the CM/ECF system and thereby caused a copy to be served on the Defendant's counsel of record.