Case 2:15-cr-00167-MHH-TMP   Document 25-1   Filed 02/18/16   Page 1 of 96

VOLUME I of V, page 1

FILED
2016 Feb-18  PM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

1

2

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF ALABAMA

5                        SOUTHERN DIVISION

6

7    UNITED STATES OF AMERICA,        *
            Plaintiff,                *
8                                     * Case No. CR-15-MHH-0154-S
            v.                        *
9                                     *
     KIMBERLY H. BRANCH,              *     Birmingham, Alabama
10                                    *      August 10, 2015
            Defendant.               *         9:00 a.m.
11   ********************************** *

12

13     TRANSCRIPT OF TRIAL BY JURY, VOLUME I OF V, WITNESS EXCERPTS
               BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
14                   UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24   Court Reporter:          Chanetta L. Sinkfield, CCR, RMR
                              United States Federal Courthouse
                              1729 Fifth Avenue North
25                            Birmingham, AL 35203

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**APPEARANCES**


FOR THE PLAINTIFF:          U.S. ATTORNEY'S OFFICE
                            Assistant U.S. Attorney,
                            AMANDA SCHLAGER WICK
                            JENNIFER SMITH MURNAHAN
                            1801 4th Avenue North
                            Birmingham, AL 35203


FOR THE DEFENDANT:          WILLIAM H. BROOME, ESQ.
                            1110 Wilmer Avenue
                            P.O. BOX 1952
                            Anniston, AL 36202


Court Reporter:             Chanetta L. Sinkfield, CCR, RMR
                            United States Federal Courthouse
                            1729 Fifth Avenue North
                            Birmingham, AL 35203

```
 1                      I  N  D  E X

 2               August 10, 2015; VOLUME I

 3

 4                  Direct  Cross  Redirect   Recross

 5    GOVERNMENT'S
      WITNESSES
 6   _____

 7    PATRICK BYRNES      50    89    96        100

 8    JEFF CREECY        101   136   140

 9

10

11    GOVERNMENT'S EXHIBITS        OFFERED      ADMITTED
     _____

12    NO. 37                       57           58

13    NO. 44                       69           70

14    NO. 29                       78           78

15    NO. 28                       81           81

16    NO. 22                       83           83

17    NO. 21                      113          113

18    NO. 25                      120          120

19    NO. 31                      127          127

20    NO. 32                      131          132

21    NO. 33                      135          135

22

23

24

25
```

1          While the government does that, does anyone on the

2     jury need a break for a minute?  Are you all okay?

3          (Jurors nodding affirmatively.)

4               THE COURT:  Why don't you get that monitor turned

5     back around, please, before you all begin your examination.

6               MS. WICK:  Your Honor, we have one witness

7     coordinator, and I think who's in a trial with sixty

8     witnesses.  So if you could give us a minute to go get them.

9               THE COURT:  Ms. Wick, I think Ms. Murnahan needs

10    you.

11              MS. WICK:  Your Honor, the government calls Patrick

12    Byrnes.

13              THE COURTROOM DEPUTY:  Could I get you to stand,

14    please, and raise your right hand.

15         Do you swear or affirm to tell the truth, the whole

16    truth, and nothing but the truth so help you God?

17              THE WITNESS:  Yes, I do.

18              THE COURTROOM DEPUTY:  Thank you.  Please be seated.

19    Will you state your first and last name.

20              THE WITNESS:  My name is Patrick.  Last name is

21    Byrnes, B-y-r-n-e-s.

22              THE COURTROOM DEPUTY:  Thank you.

23                         DIRECT EXAMINATION

24    BY MS. WICK:

25    Q    Mr. Byrnes, could you tell the Court where you are

1   currently employed.

2   *A*   I am currently employed by Nissan North America.

3   *Q*   Can you just tell us a little bit briefly about your

4   educational background.

5   *A*   I have a bachelor of science degree from the State

6   University of New York at Brockport.

7   *Q*   Did you do any post-graduate work?

8   *A*   No.

9   *Q*   I think you said you currently work for Nissan North

10  America.  What is your experience in that car sales industry?

11  *A*   I have been in the automotive/transportation business for

12  21 years.

13  *Q*   That's a long time, so can you give us kind of maybe your

14  most recent work history?

15  *A*   Yes, I have been with Nissan North America beginning in

16  December of 2008.

17  *Q*   What did you do when you started in 2008?

18  *A*   Initially, when I started with Nissan, I was the regional

19  commercial operations manager.  I was responsible for

20  establishing their Nissan commercial vehicle dealer network in

21  the southeast region.  Basically a stock number of dealers

22  became Nissan commercial vehicle dealers.

23  *Q*   I think a moment ago you said you currently work for

24  Nissan North America.  Did you say what your current role is?

25  *A*   Currently the dealer operations manager.

1    Q    You are currently the dealer operations for what area?

2    A    The district of west Atlanta.

3    Q    Now, you were the dealer operations manager for a

4    different region in March 2013?

5    A    Correct.

6    Q    What region was that?

7    A    It was the district of Birmingham.  Birmingham/North

8    America.

9    Q    Can you explain to the jury what your job

10   responsibilities were as the district operations manager for

11   the Birmingham area.

12   A    It's actually the dealer operations manager.

13   Q    Did I say district?

14   A    Yes, it's common mistake.  As dealer operations manager,

15   my primary responsibility is to be the primary contact between

16   Nissan, and the dealer buying that out will be responsible for

17   the district.  With that being said, I helped those dealers

18   basically to increase sales.  I do that by providing reports

19   on a monthly basis, showing how they fair in the state

20   compared to other dealers, and then also look at the

21   opportunities where they may be deficient in certain model

22   lines.

23   Q    Was part of your job -- I'm going to call it, I think you

24   are sometimes called DOM, correct?

25   A    Correct.

1   Q     For ease of reference, we'll just go with D-O-M, DOM for

2   short.  So as being the DOM, was part of your job

3   responsibilities, did it have anything to do with the

4   incentive program that dealerships had to hit?

5   A     Yes, I would communicate all incentive programs to

6   dealers.

7   Q     Would that include the objectives that they would have to

8   hit?

9   A     Yes.

10  Q     What is the objective?

11  A     The objective is basically a number that has been set by

12  Nissan for a dealer based on their market area and based on

13  prior sales.

14  Q     Did that number differ for each dealership?

15  A     Yes.

16  Q     Now as part of being the DOM, did you also provide

17  information on the incentive program rules?

18  A     Yes.

19  Q     What information did you provide?

20  A     I would have provided the overview of the program that

21  was set forth by Nissan, and then we would have also provided

22  the official program rules that governs all of Nissan's

23  incentives and programs.

24  Q     You mentioned that you were the DOM for north Alabama in

25  March 2013.  Would that have included both the Cullman,

1   Alabama, and the Birmingham, Alabama areas?

2   A    Yes.

3   Q    So you were the DOM for both Serra Nissan Birmingham and

4   Serra Visser Nissan in Cullman?

5   A    That is correct.

6   Q    At some point in time, did you have dealings with the

7   Serra Nissan dealership?

8   A    Yes.

9   Q    How often did you have contact with the Serra Nissan

10  Birmingham dealership?

11  A    I would provide e-mail correspondence on a daily basis.

12  There could be calls on a daily, weekly basis.  And on average

13  there would be a visit on a monthly basis.  One visit on a

14  monthly basis.

15  Q    Who did you deal with at the Serra Nissan dealership?

16  A    Randy Visser, Forest Housner, Abdul Mughal, and then

17  Gerald Shepard.

18  Q    Just for the court reporter, Mr. Mughal is spelled

19  M-u-g-h-a-l.

20  A    Sorry about that.

21  Q    That's okay.  I think you said earlier, part of your

22  responsibility as the DOM was to be the dealership's primary

23  point of contact with Nissan North America?

24  A    Correct.

25  Q    Were you responsible for answering any of their questions

1    about their incentive programs?

2    A     Yes.  Any questions that they would have would come to

3    me.

4    Q     Who else could they have contacted if they had questions

5    about the incentive program?

6    A     There is a contest and incentive hotline or an 800-number

7    that they could reach out to.  There's also an e-mail address

8    for that contest and incentive.

9    Q     Could anyone at the dealership who had questions about

10   the incentive program have contacted that hotline?

11   A     Yes.

12   Q     In the material that went out, the hotline for any

13   questions about the incentives, how they worked, whether they

14   were entitled to them, was there any question related to

15   incentives for that hotline?

16   A     Yes.

17   Q     Prior to June 2014, had anyone at Serra Nissan asked you

18   questions about any of the incentive programs or the rules?

19   A     In general, I am sure there was questions that came up

20   that I answered.  Specifically regarding the program period

21   February through March of 2013, no.

22   Q     Was part of your job as the DOM to be familiar with each

23   and every incentive program that Nissan was running at any

24   given time?

25   A     Yes, I had to have a good understanding of the programs.

1    *Q*    Because how many incentives could Nissan be running at

2    any given time period?

3    *A*    Numerous.  Five, ten, fifteen.

4    *Q*    Would the rules for each one be identical, or would they

5    be different?

6    *A*    The rules would be the same.

7    *Q*    Was there a common set of rules that applied to all of

8    them?

9    *A*    Yes, that is considered the official program rules that

10   govern all programs, that apply to all programs that are, you

11   know, being used at that time.

12   *Q*    I am going to ask you about those.  Let me come back to

13   them.  How long was the average incentive period program that

14   Nissan did?

15   *A*    Usually a month.

16   *Q*    Can you describe the incentive program that was in place

17   during February and March 2013?

18   *A*    Yes.  That program is what we called the dealer volume

19   bonus program.  It was in place from February 12th through

20   April 1st of 2013.  That corresponded with the end of the

21   fiscal year for Nissan.  The fiscal year ended March 31st, and

22   the dealer volume bonus program was put in place to incentify

23   dealers to sell as many cars as possible.

24   *Q*    That was a really big money push at the end of year for

25   Nissan?

1    *A*    Correct.

2    *Q*    Had they had similar programs, similar dealer volume

3    bonuses at the end of year or at the end of Nissan's fiscal

4    year?

5    *A*    Yes.

6    *Q*    In previous years?

7    *A*    Yes.

8    *Q*    I am handing you what has been previously marked as

9    Government's Exhibit 37.

10             Mr. Byrnes, do you recognize that document?

11   *A*    Yes, I do.

12   *Q*    What is that?

13   *A*    This is the official program rules.  It is basically the

14   document that applies to all of the Nissan programs and

15   incentives that are in place.

16   *Q*    Can you just take a moment and look through the records

17   that I have handed you and tell me if those are true and

18   accurate copies of official program rules.

19   *A*    (Witness complying.)  Yes.

20   *Q*    Are those program rules created and kept in the ordinary

21   course of Nissan's business?

22   *A*    Yes.

23             MS. WICK:  Your Honor, at this time, the government

24   would move to admit Government's Exhibit 37?

25             MR. BROOME:  We have no objection, Your Honor.

1          THE COURT:  It's admitted.

2          MS. WICK:  Your Honor, the witness is going to

3   discuss a couple of pages.  May we publish those to the jury?

4          THE COURT:  You may.

5   BY MS. WICK:

6   Q    Mr. Byrnes, turning to Government's Exhibit 37, page 1.

7   I believe it's marked in the bottom of your corner with an

8   NNA004680?

9   A    Yes.

10  Q    The first three pages, pages 1, 2, and 3, what are those?

11  A    Those again those are the official program rules.  Those

12  are basically the master rules that apply to all the

13  incentives and programs that are in place for Nissan.

14  Q    When were those rules sent to the dealerships?

15  A    They would have been sent to the dealership when the

16  program was announced.

17  Q    How did the dealership receive them?

18  A    They would have received them via e-mail.

19  Q    Were there other ways for the dealership to get it?

20  A    Yes.  There is a portal, it's the Nissan incentive award

21  portal, and that is on the NNA net site, which anybody at a

22  Nissan dealership either in the sales, management, or

23  administrative management would be aware to find that

24  information.

25  Q    I am hoping that you can explain some of the provisions

1    in there for the jury.  Let's start with number one, Roman

2    Numeral I, A-2, down where it says reporting under the

3    eligibility requirements.  A little bit lower.  Sorry, we're

4    dealing with technology.  Just give us one second.  That was

5    my mistake, I-C-2.  I apologize.

6    A    Okay.

7    Q    (Speaking to paralegal assistant, Julie Gold.)  It was

8    one 2-A under Eligibility Requirements.  I apologize, Mr.

9    Byrnes.  We are getting the hang of this.  Okay.

10        Can you explain, under Eligibility Requirements, Roman

11   Numeral I-A-2.

12   A    "Physically available at the dealer's location or in

13   dealer inventory."  Basically, the vehicle to be recorded at

14   sale needs to be available at the dealership of record at the

15   time of the transaction.

16   Q    So that's for a car to qualify for any incentive -- for

17   any incentive payment under these official program rules?

18   A    Correct.

19   Q    Can you tell me -- if we could get rid of that call

20   out.

21        Looking at the document that you have, can you tell me

22   where on there it says that a dealership has to accurately

23   report the information that's submitted to Nissan North

24   America?

25   A    Under 1-C-2, Reporting.  "Proper vehicle information

1    submitted in the..."  what we call "the retail delivery

2    reporting system will determine eligible incentive awards.

3    Designated sales type code must be accurately reported.  A $50

4    administrative fee may per unit may be assessed on any unit

5    with an incorrect sales type code."

6    Q    Okay.  And so, can you explain what the retail delivery

7    reporting system is?

8    A    Yes, that's the Nissan system that all Nissan dealers

9    have access to where they go ahead and report their vehicle

10   sales through that system.

11   Q    It says it's called RDR.  Is it commonly known as RDR or

12   RDR'ing?

13   A    RDR, that's correct.

14   Q    So if I am understanding this right, I'm not in the car

15   industry, but the way that Nissan North America could

16   determine what dealerships qualify -- which incentives the

17   dealership qualified for was the information submitted in the

18   RDR system?

19   A    That is correct.

20   Q    Mr. Byrnes, can you explain to the jury what a dealer

21   trade is.

22   A    Yes.  A dealer trade is where one dealer that has a

23   customer interested in a specific vehicle -- unfortunately,

24   that dealer does not have that in their inventory -- so they

25   do a basically a dealer locate, and they find a dealer within

1    their area that has that identical vehicle.  They contact that

2    dealer and make arrangements, as long as both the parties

3    agree to have that vehicle dealer traded to the dealer that

4    has the customer interested in that unit.

5    Q    So if I understand that when a person goes into a car

6    dealership, they want a car.  That car dealership does not

7    have it, so they have to essentially buy it from another

8    dealership to sell it to the customer?

9    A    That is correct.

10   Q    And in the example that you just gave, if the customer

11   buys the car at a different dealership and not at that

12   dealership that they went into, is that an actual dealer

13   trade?

14   A    No.

15   Q    I think on the document that you had in front of you

16   there was a Section 2-G.

17        Could we call back up Government's Exhibit 37.  And I

18   think it would be on page 2.

19   A    Yes.

20        MS. WICK:  Your Honor, just one second.  I touched

21   something to -- Tammi, do you know how to get the arrows off?

22        THE COURTROOM DEPUTY:  You can touch down at the

23   bottom or the top.  It should tell you to clear.  There we go.

24   Yes.

25        MS. WICK:  Thank you.  Sorry about that.  There was

1    a giant label that says "clear" that I missed.  Okay.  We got

2    it.  Okay.  We got it.

3    BY MS. WICK:

4    Q    So looking at the second page under Roman Numeral II,

5    Section G.

6    A    Okay.

7    Q    If we could call that out.

8         Can you read 2-G and explain what that means to the

9    jury.

10   A    Yes.  "Vehicles transferred and/or sold by one dealer

11   directly or indirectly to another dealer are not eligible for

12   the transferring dealer, but are eligible for the receiving

13   dealer, if they otherwise qualify and are subsequently sold to

14   the ultimate customer."

15        So back to my sort of initial explanation is if an

16   individual comes into dealership A and inquires about a

17   vehicle, dealership A reaches out to dealership B, they do a

18   dealer trade.  Dealership A sells that vehicle to the

19   customer.  Dealership A qualifies for any appropriate

20   applicable incentives, while the dealership that did the

21   actual trade would not.

22   Q    I am going to replace your A and B.  If a Birmingham

23   dealership does not have the car, it's at Cullman dealership,

24   customer buys the car in Cullman, Birmingham reports the car

25   sold in Birmingham, is that in any way a dealer trade?

1    *A*    No.

2    *Q*    Would that car reported sold in Birmingham be entitled to

3    any incentive money?

4    *A*    No.

5    *Q*    If I could point your attention to Section 3-A.  Could

6    you read and explain that provision to the jury.

7    *A*    "NNA's financial system will automatically reconcile

8    eligible program incentive awards based on proper vehicle

9    delivery and reporting information submitted during the sales

10   quarter.  Debit/credit adjustments will appear on the

11   incentive payment for earnings statement, which is published

12   weekly.  Dealer is responsible for reviewing these weekly

13   statements for accuracy and must institute any appropriate

14   corrections during the sales quarter."

15          As we talked about earlier, Nissan gathers all the

16   information through our RDR system, and through that, we

17   verify what qualifies for an incentive.  And with that, on a

18   weekly basis, we send out an incentive payment for earnings

19   statement.

20   *Q*    And let me come back to the incentive payment for

21   earnings in a moment, okay?

22          What you just read, dealer is responsible for

23   reviewing these weekly statements for accuracy and has to

24   submit corrections -- who at the dealership is usually

25   responsible for that?

1   *A*     In most cases, it is the controller, or somebody in the

2   finance department.

3   *Q*     And I think under Section IV, is this what you were

4   referring to earlier, you mentioned that there was like a

5   hotline that they could call if they had questions?

6   *A*     That is correct.

7   *Q*     Okay.  And would this information have been available to

8   anyone at the dealership if there was something they were

9   confused about that they wanted to call and ask for

10  information on the incentives?

11  *A*     Yes.

12  *Q*     Did you ever get a call from the controller, Ms. Branch?

13  *A*     No.

14  *Q*     Did the official program rules discuss the Nissan audit

15  process?

16  *A*     Yes.

17  *Q*     Let me turn your attention to Section Roman Numeral V-A

18  on the next page, on page 3.  Can you explain what that

19  section is discussing.

20  *A*     Basically, if Nissan has the ability to come in at any

21  time and review the records of prior sales at a dealership.

22  *Q*     When it says, "...reported units that are not in

23  accordance with these rules or policies..." would that include

24  deals that are inaccurately reported in terms of which

25  dealership they were sold at?

1    *A*     Yes, they would.

2    *Q*     Let me turn your attention to the next two pages -- I

3    think it's on yours, but they are labeled at the bottom NNA

4    4683 and 84.

5    *A*     Yes.

6    *Q*     Do you recognize those documents?

7    *A*     I do.

8    *Q*     And what are they?

9    *A*     It is the dealer volume bonus program.

10   *Q*     When you say the dealer volume bonus program, is this the

11   same rules, or are these different rules than what you just

12   read?

13   *A*     It would be the same rules.

14   *Q*     So the official program rules that you were just talking

15   about would apply to this specific incentive program?

16   *A*     That is correct.

17   *Q*     So the dealer volume bonus is one of many Nissan

18   incentive programs?

19   *A*     Correct.

20   *Q*     What was the incentive period for the dealer volume bonus

21   in 2013?

22   *A*     From February 12th through April 1st.

23   *Q*     If we could call up that at least for now.  It would be

24   hard to read.  Just the top part.  Could we enlarge it?

25           So Mr. Byrnes, the sales start date and the sales end

1  date, what are those?

2  A    That's basically the date when the program begins.  So,

3  any vehicles that are reported with a sales date between

4  February 12th through April 1st would qualify for the payouts

5  laid out in this program.

6  Q    So to qualify, they had to sell all the cars during those

7  days?

8  A    Correct.

9  Q    What is the RDR add end date?

10  A    That Nissan allows a correction period.  So if there are

11  any errors made in the RDR reporting, they have basically to

12  the following quarter to go ahead and correct those.

13  Q    Can you explain to the jury what the FastStart program

14  was?

15  A    Yes, the FastStart was a program where the dealership was

16  given an objective, basically, from February 12th through

17  February 28th.  And if they hit that objective, they would

18  qualify for, basically, earnings, financial earnings per

19  vehicle sold at the end of the total program period, which

20  would be April 1st.

21  Q    So, it was like a beginning bonus period?

22  A    Yes, it was again, a FastStart, jump start was to

23  motivate the dealers to push sales.

24  Q    Do you know if Serra Nissan hit the FastStart during the

25  incentive period in 2013?

1  *A*    Yes, they did.

2  *Q*    Let me turn your attention to Government's Exhibit 37,

3  page 5, the chart.  I believe on the bottom of yours it's

4  marked NNA 4684.

5  *A*    Yes.

6  *Q*    Okay.  It looks like a tiered system?

7  *A*    That is correct.

8  *Q*    Can you explain that?

9  *A*    Basically, the two main tiers, you have a level one tier,

10  and then a level two tier.  The level one tier, just using

11  round numbers, was a payout tier that would be established for

12  a dealership based on hitting a set objective.  As an example,

13  a dealer could have been set with an objective of 75 units for

14  level one, and they would get paid out.  If they hit that 75

15  units from February 12th to April 1st, they would get paid out

16  a hundred dollars per car.

17  *Q*    In 2013, Serra Nissan hit its FastStart, so if they hit

18  level one, what amount would they get per car?

19  *A*    They would get an additional $200 per car.

20  *Q*    Level one with the FastStart?

21  *A*    Yes.

22  *Q*    They wouldn't get the top potential payout of $300 per

23  car?

24  *A*    It would be a total of $300.

25  *Q*    Okay.  So what would the total payout per car be if they

1   hit it?

2   A     It would be $300.

3   Q     Now if they hit their highest incentive level, how much

4   would they make per car?

5   A     $700.

6   Q     So do you know what incentive Serra Nissan ended up

7   hitting at the end of that incentive period?

8   A     They hit the level two with a FastStart.

9   Q     So they got the $700 per car?

10  A     Correct.

11  Q     If they had not hit that -- I think under the program

12  notes underneath this -- if we could do the call up at the

13  bottom part of the page -- it says, "All payouts are

14  retroactive to unit one."  Can you explain that?

15  A     Yes, basically, for any units that are sold beginning

16  February 12th, if at the end of that program period, they hit

17  the level two objective, that $700 payout would go back to the

18  first unit they sold.

19  Q     So for every car between that level one and level two, as

20  soon as they hit that level two, they were making $400 extra

21  per car for every car they sold?

22  A     That is correct.

23  Q     Earlier you said that part of your job as the DOM was to

24  communicate with folks at the dealership.  And I think you

25  said you sent them like reports on their standing for the

1    incentives?

2    *A*    Correct.  I would send them a retro tracker that would

3    show where they stood regarding their objectives for the

4    dealer volume bonus program.

5    *Q*    I am handing what has been previously marked as

6    Government's Exhibit 44.  Can you just take a moment and

7    review those documents and tell me if you recognize them.

8    *A*    (Witness complying.)  Yes, I do.

9    *Q*    What are those documents?

10   *A*    These were e-mails that I had sent to Serra Nissan, as

11   well as Serra Visser Nissan, providing them an update

12   regarding where they stood for hitting their objective for the

13   program period, February 12th through April 1st in the volume

14   bonus program.

15   *Q*    Those are retro trackers you are referring to?

16   *A*    Correct.

17   *Q*    And were those created in the normal course of Nissan's

18   business?

19   *A*    Yes.

20               MS. WICK:  Your Honor --

21   BY MS. WICK:

22   *Q*    Are those true and accurate copies of the retro trackers

23   you sent in February and March of 2013?

24   *A*    Yes.

25               MR. BROOME:  We have no objection, Your Honor.

1          THE COURT:  They're admitted.

2          MS. WICK:  Thank you, Your Honor.

3    BY MS. WICK:

4    Q    Did you do retro trackers -- I think you said those are

5    both from dealerships, Serra Nissan and Serra Visser Nissan?

6    A    Yes.

7    Q    Who received the retro tracker noted for the Serra Visser

8    Nissan in Cullman?

9    A    Greg Boyles, Harold Yelverton, Randy Visser, and Forest

10   Housner.

11   Q    Who received the retro tracker at Serra Nissan?

12   A    Randy Visser, Forest Housner, Abdul Mughal, and Gerald

13   Shepard.

14   Q    Looking at those retro trackers, can you tell me what did

15   Serra Visser Nissan, the Cullman dealership, have to sell to

16   hit their highest incentive level, the level two here?

17   A    Their level two tier was 77 units.

18   Q    So they only had -- if I'm understanding you, they only

19   have to sell 77 cars to get that level two big bonus $700 per

20   car?

21   A    Correct.

22   Q    Where was, based on your retro trackers, where was Serra

23   Visser Nissan, the Cullman dealership, in terms of meeting

24   their objective as of March 19th, 2013?

25   A    They had a balance to go of 19 units to report to hit

1   their level two objective.

2   Q    And where were they as of March 21st.

3   A    March 21st, they had balance to go of 14 units to hit

4   their objective.

5   Q    Where were they as of March 26th?

6   A    On March 26th, they had attained their level two

7   objective.

8   Q    So meaning that they had sold the 77 cars?

9   A    Correct.

10  Q    If they sold anymore cars over that 77, what extra bonus

11  did they get?

12  A    There would be no additional bonus.  They would just

13  continue accruing that $700 per car.

14  Q    Now can you tell me, what was Serra Nissan's sales

15  objective to hit their tier two at the Birmingham dealership?

16  A    It was 172 units to hit their level two objective.

17  Q    Can you explain the difference, why did Serra Nissan have

18  to sell so many more cars than Serra Visser Nissan?

19  A    Based on prior sales, and based on primary market area

20  opportunity.  Birmingham Serra Nissan being in Birmingham, so

21  larger population, more opportunity.

22  Q    So those individual numbers, the 77 versus the 172

23  mattered to Nissan?

24  A    Yes.

25  Q    Looking at your retro trackers, can you tell me where

1    Serra Nissan, the Birmingham dealership, was in terms of

2    meeting their objective as of March 19th, 2013?

3    A    Yes, they had a balance to go of 65 units to report to

4    hit their level two objective.

5    Q    Where were they on March 21st?

6    A    March 21st, they had a balance to go of 61 units.

7    Q    What about on the 26th?

8    A    The 26th, they had balance to go of 42 units.

9    Q    So, five days -- I think, roughly, five days away from

10   the end of the incentive period, they still needed to punch,

11   or excuse me, submit 42 cars in order to qualify for the

12   incentive?

13   A    That is correct.

14   Q    At 42, though, what would they have received in the

15   incentive if they were 42 away at the end of the incentive

16   period?

17   A    Then would have received zero dollars.

18   Q    So they wouldn't have gotten any incentives at all if

19   that was where they had ended?

20   A    Correct.

21   Q    How did you know if Serra Nissan hit its objectives?

22   A    I would have been provided with a report from Nissan.

23   Q    They would send you something?

24   A    A pure corrected update where they stood and where the

25   dealership stood regarding the dealer volume bonus.

1   Q     And you would just forward that information on to the

2   dealership?

3   A     Yes.

4   Q     In March 2013, when the dealer volume bonus was

5   happening, did you get any additional pay if they hit the

6   highest objective?

7   A     No.

8   Q     When they went from 42 away, five days before the end to

9   hitting the objective, were you surprised that they had sold

10  that many in five days?

11  A     No, not necessarily.

12  Q     Why not?

13  A     A lot of dealers have a process in place in regards to

14  how they report vehicles.  Some will wait to report vehicles

15  until the last day.  A lot of it is just sort of posturing in

16  the district to see who can be the big dog in the city from a

17  reporting standpoint, who sells the most vehicles.

18  Q     When they were 42 away, did you have any conversations

19  with anyone at the dealership -- and I'm sorry, early I used

20  the term punch but --

21  A     It's good.  You are catching on.

22  Q     So that's sometimes what people call when they RDR, they

23  punch a car?

24  A     Yes.

25  Q     So did you tell anyone at the dealership to punch rental

1    cars or RDR cars or do anything at the last minute in order

2    for them to hit their incentive?

3    A    No.

4    Q    Did you give them any instructions at all on what to do

5    to get that highest incentive?

6    A    No.

7    Q    I think earlier we were talking about the retail delivery

8    report or the RDR, in terms of that means that Nissan has to

9    know if a car was sold.  Can you tell the jury what,

10   specifically, is submitted in that retail delivery report to

11   Nissan?

12   A    Yes.  In the RDR system, the information collected there

13   is one, the actual sales date, the sales type, whether it is a

14   leased vehicle or it's just a flat retail sale, or if there's

15   any finance involved from our finance company, Nissan Motor

16   Acceptance.

17   Q    What other information?

18   A    The most important would be the customer information,

19   along with their address information.

20   Q    Would it also include information about who sold the

21   vehicle?

22   A    Correct.  The dealer that reports the vehicle would show

23   as the dealer of record when it came to the actual sales.

24   Q    Would it also include which dealership, if there was more

25   than one dealership -- would it also include which dealership

1  the vehicle was actually sold at?

2  A    Yes, it would.

3  Q    Let me go through each of those.  You said a moment ago,

4  importantly, why was it important the customer's name and

5  address?  Why is it that information important to Nissan?

6  A    Well, first off, if there's any recalls on a vehicle,

7  Nissan needs to be able to notify the customers.  The second

8  thing is it also comes into play regarding incentives.

9  Customers that live in New York, as an example, they may

10 qualify for different incentives than somebody that lives in

11 the state of Alabama.

12 Q    You also said the date of transaction.  Why would the

13 date of transaction be important to Nissan?

14 A    Because all of our programs and incentives have a start

15 date and an end date.  So that date that the sale actually

16 takes place is going to trigger what incentive that vehicle

17 qualified for.

18 Q    You said the type of sale, whether it was leased or

19 retail or financed, why would Nissan need that information to

20 be accurate?

21 A    Because again, we would have different incentives that

22 would be in place for a leased vehicle versus a retail sale

23 versus a sale that was financed through our finance company.

24 Q    You said it would also include the individuals who sold

25 the vehicle.  Would that affect the incentive that Nissan

1    paid?

2    A    It wouldn't impact the incentives for the vehicle.  But

3    Nissan does have incentive programs for sales consultants.  So

4    we keep track of each vehicle sold who the sales consultant

5    was.

6    Q    You also said that which dealership it was sold at would

7    be included.  Why would that information matter to Nissan?

8    A    Because again, at the end, that shows Nissan where the

9    incentives are to be paid and who earned the incentives.

10   Q    If Nissan wanted Cullman to sell 77 and Birmingham to

11   sell 172, why did it matter to Nissan North America which

12   dealership the vehicle was sold at?

13   A    Because Nissan -- again, these are incentive programs,

14   and Nissan puts out a large amount of money to incentivize the

15   dealers.  And depending on where the vehicles are reported,

16   there is basically a large sum of money that Nissan can be

17   impacted based on where the vehicles are reported sold.

18   Q    In this situation, if the Birmingham store had -- when

19   Cullman hit its 77, it was only getting $700 per car -- if the

20   Birmingham store had started taking the Cullman deals and just

21   reporting them as sold at the Birmingham store, why would that

22   be problematic to Nissan?

23   A    Our financial exposure would be greatened.  And as an

24   example, what I said before is if Serra hadn't qualified --

25   didn't get those extra 15 units, or whatever it is, we would

1   not have had to pay out.  Nissan would not have had to pay out

2   any reward to the dealership.

3   Q    So a minute ago when you said your exposure would be

4   greatened.  Can I maybe simplify that that you would have had

5   to pay money that you would otherwise have not had to pay?

6   A    Correct.

7   Q    Is there a name for that practice if two dealerships kind

8   of exchanged sales that way?

9   A    Yes.  It's called pooling of sales.

10  Q    Is it an acceptable practice to Nissan?

11  A    It is not.

12  Q    How would somebody at a dealership know that pooling of

13  sales is an unacceptable practice to Nissan?

14  A    It is common knowledge throughout the automobile

15  business.

16  Q    In addition to the program rules that we went over with

17  all of the language, you are saying it was common knowledge?

18  A    Correct.

19  Q    I am handing you what has been previously marked as

20  Government's Exhibit 29.  Please just take a moment and look

21  at that, and tell me if you recognize that document.

22  A    (Witness complying.)  Yes.

23  Q    What are those documents?

24  A    These are screen shots that show per vehicle what each

25  unit earned on an incentive basis.  It's what we call our vin

1  system.  It's the vehicle incentive management system.  It

2  provides a summary of what each reported vehicle earned from

3  an incentive base.

4  Q    Taking a look at those, can you tell me if those are true

5  and accurate copies of the vin screen shots with the 15

6  vehicles at issue in this case?

7  A    Yes.

8          MS. WICK:  Your Honor, at this time, the government

9  would move to admit Government's Exhibit 29.

10         MR. BROOME:  We have no objection.

11         THE COURT:  It's admitted.

12         MS. WICK:  Okay.

13 BY MS. WICK:

14 Q    If we could just -- we're not going to do all 15, but if

15 you could blow up, as an example, if you could pull up page 1

16 of Government's Exhibit 29.

17         If we could publish, Your Honor?

18         THE COURT:  Yes.

19 BY MS. WICK:

20 Q    Mr. Byrnes, who at the car dealership would have access

21 to the vin system you are talking about?

22 A    The executive management, which would be the executive

23 manager, general manager, and then usually the controller.

24 Q    I think you said that earlier that it was -- what is the

25 actual purpose of the vin system?

1   *A*    It allows the dealership to go ahead and reconcile each

2   vehicle that's sold to determine the actual amount of

3   incentive dollars that they receive.

4   *Q*    You said reconciling, can you explain what you mean by

5   that, what process?

6   *A*    Yes.  When Nissan pays out the earnings, it's sort of

7   just a batch or lump sum.  So when the payment is received,

8   the dealership can go through and reconcile X number of

9   vehicles that were sold in that period of time to verify that

10  the lump sum that they have received from Nissan added up to

11  the numbers that were reconciled through the vin system for

12  the number of vehicles that they sold.

13  *Q*    So if I am understanding you, for whatever period of

14  time -- let's say two weeks, and I don't know if you know the

15  period of time -- whatever the period of time was between

16  those batch, direct deposits of lump sums, every car that the

17  dealership sold, every incentive would be included in that?

18  *A*    Yes.

19  *Q*    And each of those cars, I am looking just at the one in

20  front of me, it's NNA 2170.  How many different incentives

21  were on this one vehicle?

22  *A*    Three.

23  *Q*    How can you tell that?

24  *A*    I can tell based on the program ID on left-hand column.

25  The first one that shows RKZ, which is actually the first,

1    second, and third that refers directly to the dealer volume

2    bonus program.

3    Q    Okay.  I have terrible eyesight.  Are you saying the one

4    that says RKZ is dealer volume bonus?

5    A    Correct.

6    Q    Do you know off the top of your head what RKK or RJS are?

7    A    I do not.

8    Q    How many different incentive codes were there?

9    A    There can be 20 or 30.

10   Q    We'll come back to those incentive codes in a moment.

11        You said there was lump sum that the dealership would

12   get.  Who would be responsible for kind of understanding what

13   that lump sum was in terms of the payment for each vehicle?

14   A    The controller.

15   Q    Did the controller -- or did the dealership get an

16   explanation with that lump sum?  Like, hey, this $150,000 is

17   for those ten cars?

18   A    No.

19   Q    So what would the only way a controller have in order to

20   understand what that money was for?

21   A    It's the vehicle incentive management system.

22   Q    Thank you.  I am handing you what has been previously

23   marked as Government's Exhibit 28.  Can you take a look at

24   that document and tell me if you can identify it.

25   A    (Witness complying.)  Yes.  It is a sheet that has the

1    IDs that were valid during that program period of February

2    12th, 2013, through March or April 1st of 2013.

3    Q    Can you looking at that tell the jury if that's a true

4    and accurate copy of the list of the incentive codes?

5    A    Yes.

6              MS. WICK:  Your Honor, at this time, the government

7    would move to admit Government's Exhibit 28?

8              MR. BROOME:  We have no objection, Your Honor.

9              THE COURT:  It's admitted.

10             MS. WICK:  May we publish Government's Exhibit 28,

11   Your Honor?

12             THE COURT:  Yes.

13   BY MS. WICK:

14   Q    If we could just call out just a couple at the top.  When

15   you, a moment ago, were looking at the vin screen shots --

16   A    Yes.

17   Q    --  and you were talking about the program IDs on the

18   left side --

19   A    Correct.

20   Q    -- so this would be a list of those program IDs and which

21   incentive program it corresponds to?

22   A    Yes.

23   Q    So if somebody was looking at those vin screen shots and

24   wanted to know what incentives were on this one vehicle, they

25   would have to kind of cross reference it with this?

1    *A*    That is correct.

2    *Q*    At some point in June 2014, did you have discussions with

3    anyone at Serra Nissan regarding the incentive program?

4    *A*    I did.

5    *Q*    Who did you have those conversations with?

6    *A*    It was Mr. Randy Visser.

7    *Q*    Did you ever have conversations with anyone else at Serra

8    Nissan about incentives prior to that?

9    *A*    No, not regarding this particular incentive.

10   *Q*    Did anyone at Serra Nissan have questions from the past

11   about whether they could do something under the dealer volume

12   program?

13   *A*    No.

14   *Q*    Now did you contact Mr. Visser, or did he contact you?

15   *A*    He contacted me.  I believe it was on the 18th of June.

16   He had sent me an e-mail.  And at that time, he had stated

17   that there were 15 RDR's that were incorrectly reported in the

18   name of Serra Nissan, and they should have been reported in

19   the name of Serra Visser Nissan.

20   *Q*    Okay.  I'm handing you what has been previously marked as

21   Government's Exhibit 22.  Can you take a look at that document

22   and tell me if you recognize it.

23   *A*    I do.

24   *Q*    What is that?

25   *A*    This is a dealer contact report.

1   *Q*    What is a dealer contact report?

2   *A*    Whenever you have any meetings or anything of importance

3   that is discussed with the dealer, I will go ahead as a dealer

4   operations manager and make note of that in our dealer 360

5   system which acts as a dealer contact report.

6   *Q*    So were those documents kept and maintained in the

7   regular course of Nissan's business?

8   *A*    Yes.

9   *Q*    Is that a true and accurate copy of your June 2014

10  contact report?

11  *A*    Yes, it is.

12          MS. WICK:  Your Honor, at this time, the government

13  would move to admit Government's Exhibit 22.

14          MR. BROOME:  We have no objection.

15          THE COURT:  It's admitted.

16  BY MS. WICK:

17  *Q*    If we could publish -- what page is the e-mail that you

18  were referring to?

19  *A*    829, or actually it was actually 830.

20  *Q*    So page 4 of the exhibit.  If we could call up the bottom

21  half.

22          A moment ago, you said that Mr. Visser e-mailed you in

23  June 2014.  Is this the e-mail that you are referring to?

24  *A*    Yes, it is.

25  *Q*    Can you read it to the jury?

1    A    "Patrick -- I need to inform you of a situation that

2    relates to the quarter bonus that ended in March 31st, 2013.

3    Serra Visser is over their objective and Serra Nissan was

4    under and there were, we believe, there were up to 15 deals

5    that were sold in Cullman but RDR'd at Serra Nissan.  Cars

6    were actually sold, but the selling dealer was incorrect on

7    the RDR.  What do you suggest I do in this situation?"

8    Q    Did you know of anything that had happened the day before

9    on June 17th, 2014?

10   A    No.

11   Q    Did he call you prior to sending you that e-mail?

12   A    No.

13   Q    Did you respond to his e-mail?

14   A    I did.

15   Q    How did you respond?

16   A    I responded with a phone call, I believe, on the 19th or

17   20th.

18   Q    Like a day or two after his e-mail?

19   A    Correct.

20   Q    What did you tell him during that phone call?

21   A    I told him that the proper way to correct these would be

22   to unwind the report themselves from Serra Nissan and then

23   report them correctly in Serra Visser Nissan's name.

24   Q    When you say unwind, not to get -- it's undoing it, just

25   backing them out?

1    A    Correct.

2    Q    Did you know at the time if the dealership actually had

3    the ability to unwind the sales?

4    A    I did not.

5    Q    What did Mr. Visser tell you in regards to deals on the

6    phone that day?

7    A    I believe he said that it was done accidentally.

8    Q    What happened after the phone call that you had, I think

9    you said a day or two to like the 19th or 20th, you said, what

10   happened after that?

11   A    On the 21st, which was a Saturday, I received a text

12   message from Mr. Visser.

13   Q    Can you look at page 5 of the government's exhibit and

14   tell me if that's a text that you are referring to?

15   A    That is the text.

16   Q    Can we call up page 5 of 22.  At the top it says Randy.

17   Who is that?

18   A    That is Mr. Randy Visser.

19   Q    What did he text you?

20   A    He said, "Do you think Nissan has a problem with leaving

21   their deals as they are since they were truly sold retail and

22   the two stores total objective was actually hit?  Did you

23   consider it to be an issue?  Is just leaving the deals as

24   reported okay?"

25   Q    What did you understand him to be asking you in that

1    text?

2    A    He was asking for confirmation from me to say it was

3    okay.

4    Q    Did you respond to his text?

5    A    Yes.

6    Q    How?

7    A    Via e-mail.

8    Q    When?

9    A    On Monday the 23rd.

10   Q    Take a look at the third page of Government's Exhibit 22

11   and tell me if that's the e-mail response.

12   A    That is the correct e-mail response, yes.

13   Q    Let's just take it at the top paragraph at a time.  If

14   you could just read maybe like the top, going up to example.

15   We'll do the call-outs at a time --

16   A    Okay.

17   Q    -- so that the jury can actually see it.

18   A    Okay.  "Randy, Just following up on a conversation we had

19   last week regarding the e-mail you sent below, as well as the

20   text you had sent on Saturday.  Even though reported vehicles

21   were actually sold retail units and the two stores (Serra

22   Nissan and Serra Visser Nissan) total combined objective for

23   March '13 was hit, the occurrence outlined would be considered

24   'pooling of sales'.  This is a practice that Nissan does not

25   allow.  Nissan's financial obligation regarding bonus payouts

1    can be affected considerably to 'pooling of sales'."

2    Q    You gave him an actual mathematical example underneath

3    that, right?

4    A    Correct.

5    Q    Let me see if we can call that out in some kind of

6    effective way.

7         So what were you trying to explain here?

8    A    The magnitude of Nissan's financial exposure.

9    Q    Can you just maybe try to summarize what you did here?

10   A    Yes, I provided two examples.  One was an example of

11   pooling sales where I showed where Serra Visser Nissan and

12   Serra Nissan, what their objectives were.  Again, these were

13   just truly examples.  I showed the number of units that they

14   had reported, what the payouts would be per vehicle, and what

15   the total payouts would be for each dealership.  As an

16   example, I showed that Serra Visser Nissan would have received

17   $24,000, while Serra Nissan would have been received $40,000.

18   Q    So basically, in the pooling of sales scenario, if the

19   two dealerships shift around the sales, then one is going to

20   get the huge dealer volume bonus that -- but for those who

21   wouldn't have otherwise qualified for it?

22   A    That is correct.  And Nissan in their exposure, this

23   example Nissan's total payout would have been $64,000.

24   Q    So you were about 15, but you were talking earlier about

25   172 cars that were required, which is $700 per car.  This is

1    huge exposure for Nissan?

2    A    Yes.

3    Q    So in the e-mail earlier, you said you told him to unwind

4    the deals.  You also told him that the correct way to undo

5    this would be to unwind them?

6    A    Correct.

7    Q    When you say subject to being charged back, what did you

8    mean by that?

9    A    That any money that they had previously earned, Nissan

10   would charge them back that amount of money that they had

11   earned under the dealer volume bonus program.

12   Q    So if they pooled sales and it was discovered, that money

13   would be taken back by Nissan?

14   A    Correct.

15   Q    And let me just go back.  You said Serra Nissan 2000,

16   Serra Nissan 5335.  What is that 2000 and 5335 number?

17   A    Those are the dealer codes.

18   Q    So any time you saw that on paperwork, that would

19   represent the Birmingham dealership versus the Cullman

20   dealership?

21   A    Correct.

22   Q    Right underneath the math example, there was a sentence

23   that says, "note."  Can you read that?

24   A    "Note:  The figures above are used purely examples do not

25   reflect the actual objectives or payouts for March 13th."

1   Q    So your $64,000, $30,000 number, do they in any way

2   reflect what the actual ramifications were of the dealer

3   volume bonus in '13?

4   A    Not at all.

5   Q    That was just numbers you had?

6   A    Correct.

7   Q    Did you have any conversations with anyone at the

8   dealership, either Birmingham or Cullman, about it being okay

9   to lie in the RDR?

10  A    No.

11  Q    Did you ever tell anyone at Serra Nissan or at the

12  Cullman dealership, that just punching cars to hit incentive

13  was okay regardless of whether it was true or not?

14  A    No.

15         MS. WICK:  Just one moment, Your Honor.

16         No further questions for this witness, Your Honor.

17         THE COURT:  All right.

18         Why don't we take a ten-minute break.  We'll get

19  started with cross examination.

20              (Recess at 3:49 p.m., until 3:54 p.m.)

21               (In open court.  Jury present.)

22                    CROSS EXAMINATION

23  BY MR. BROOME:

24  Q    Good afternoon, Mr. Byrnes.

25  A    Good afternoon.

1  *Q*    I appreciate you coming.  I tried to write down some of

2  the things that you said, and I got messed up right from the

3  beginning.

4         One of the first questions that Ms. Wick asked you was

5  who you generally dealt with at Serra Nissan in Birmingham.

6  Do you mind telling me those folks again.

7  *A*    The primary folks at Serra Nissan that I dealt with were

8  Randy Visser and Forest Housner.

9  *Q*    I think before you said a Gerald Shepard?

10  *A*    Two sales managers, Gerald and Abdul.

11  *Q*    Mr. Mughal or whatever his name was?

12  *A*    You can hack it up.

13  *Q*    I can't pronounce it either.  But you didn't mention Kim

14  Branch?

15  *A*    That is correct.

16  *Q*    You didn't deal with Kim Branch?

17  *A*    No.

18  *Q*    You ever met Kim Branch before?

19  *A*    I had met her in December of '13 at the grand opening of

20  Serra Visser Nissan in Cullman for their new dealership.

21  *Q*    Did y'all take a lot that day?

22  *A*    I think just pleasantries, hello, how are you doing, nice

23  to meet you.  Nice meeting a new face.

24  *Q*    You gave us some information about what controllers

25  generally do; is that right?

1    *A*    Correct.

2    *Q*    Do you know specifically what the controller does at

3    Serra Nissan?

4    *A*    I do not.

5    *Q*    Do you know specifically what the controller would do at

6    Serra Visser Nissan?

7    *A*    I do not.

8    *Q*    So you really don't know what Kim's job description or

9    duties were, do you?

10   *A*    That is correct.

11   *Q*    I have looked at Government's Exhibit 37.

12              MR. BROOME:  Judge, may I approach?

13              THE COURT:  Yes.

14   BY MR. BROOME:

15   *Q*    I believe that's the official program rules for the

16   program we're talking about?

17   *A*    Correct.

18   *Q*    And I tell you, I read it three or four times.  Anywhere

19   in those one, two, three -- it's just actually three pages of

20   rules, isn't it?

21   *A*    Yes.

22   *Q*    Anywhere in those three pages of rules, does it say no

23   pooling of sales?

24   *A*    It does not.

25   *Q*    Well, if I am a lawyer and I tell you I am a lawyer, and

1   I read through these three pages, how would I know it's

2   against your rules not to pool sales, if I just read these

3   three pages?

4   A    You would not.

5   Q    Also, in those rules, do your rules kind of presuppose or

6   assume that mistakes are going to be made in reporting RDR?

7   A    Yes, I believe it states that any errors, there's an

8   opportunity to go ahead and fix those.

9   Q    If we looked on page 1, number two on reporting, the

10  third sentence, what does that say?  Starting with "A $50..."?

11  A    Where were we?  Okay.  Two.  Okay.  "Proper vehicle

12  delivery information submitted in the..."

13  Q    No, I am sorry, it would be "I. Eligibility

14  Requirements," and under that, there's "A, B, C," and then

15  there's a "2. Reporting".

16  A    Yes.

17  Q    The third full side over there?

18  A    "A $50 administrative fee per unit may be assessed on any

19  unit reported within an incorrect sales type code."

20  Q    So if I made a mistake RDR'ing of cars, I would just pay

21  a $50 administrative fee?

22  A    Yes.  When you make the correction, then Nissan will go

23  ahead and catch where that correction has been made and you

24  will be billed back $50.

25  Q    That's it, right?  I just pay you $50 per mistake?

1   *A*    Correct.  Now, if there's any corresponding --

2   *Q*    Just answer my question.

3   *A*    Yes.

4   *Q*    That was it, right?  That's what your rules say?

5   *A*    Yes.

6   *Q*    Do you recall having any conversations either by text,

7   e-mail, or telephone with Randy Visser about making some

8   mistakes about RDR'ing some Cullman sales in for Birmingham?

9   Do you remember talking to him?

10  *A*    Yes.

11  *Q*    I think there was an e-mail where he e-mails you.  Did

12  you text or e-mail him back?

13  *A*    Initially, after his first e-mail, there was a phone

14  conversation.

15  *Q*    During that phone conversation -- I tell you, I have seen

16  some things that he said.  During any of those phone

17  conversations, did you tell him something like, just let

18  sleeping dogs lie or something like that?

19  *A*    I don't recall using that exact terminology.

20  *Q*    Well, what would you have said?

21  *A*    I would have said that the proper way to go ahead and fix

22  the errors is to unwind the units, then re-report them in the

23  correct dealership's name.  Or if you do nothing in the Nissan

24  audit system, that would be likely to be caught, and you would

25  be charged back any financial gains that you earned based on

1    those reported vehicles.

2    Q    And at some point in time, they tried to pay you guys

3    back, right?

4    A    I do not know that.

5    Q    Okay.  But Mr. Visser did talk to you about unwinding

6    some deals?

7    A    In that conversation we had, that's what I instructed him

8    to do, yes.

9    Q    And I noticed in your -- let me swap with you.

10   Government's exhibit -- which one did I hand you?

11   A    You handed me the 827 to 831.

12   Q    No, I am sorry.  It's on the front of the page?

13   A    Oh, 22.

14   Q    If you would look at Government's Exhibit 22, you give

15   Mr. Visser a lesson in pooling of sales, is it -- would that

16   be a fair statement?

17   A    I provided an example.

18   Q    And you tell him, Nissan is not going to allow this?

19   A    Correct.

20   Q    Is that the first time that you ever told anybody at

21   Serra Nissan that Nissan North America doesn't allow this?

22   A    Yes.

23   Q    This nice lady back here, Kim, did you ever tell her to

24   this day that Nissan doesn't allow that?

25   A    I haven't had a conversation with her regarding this.

1    Q    Thank you.  You also were talking about that it's not

2    unusual for dealers to kind of withhold sales to the end of

3    the month?

4    A    That is correct.

5    Q    And is that allowed by your rules?

6    A    Yes.

7    Q    But that's not being completely honest and open with when

8    they sold it, was it -- if I sold a car on the 10th of the

9    month but I didn't report it to you until the end of the

10   month, that wouldn't violate your rules, right?

11   A    Correct.

12   Q    But that's not breaking your rules, right?

13   A    No.

14   Q    That's just an acceptable practice?

15   A    Yes.

16   Q    Now you also talked about several things that you said

17   was common knowledge in the industry.

18   A    Yes.

19   Q    Since you never had any conversations with Ms. Branch,

20   you wouldn't know, what, common knowledge to Kim at all, would

21   you?

22   A    No.

23   Q    From your records that you have today, do you know how

24   many cars Serra Nissan in Birmingham sold during this

25   incentive program we're talking about?

1    A    I do not know the end number.

2              MR. BROOME:  Your Honor, I believe that's all I

3    have.  Thank you, sir.

4              THE COURT:  Thank you.  Any follow-up from the

5    government?

6              MS. WICK:  Yes, Your Honor.

7                        REDIRECT EXAMINATION

8    BY MS. WICK:

9    Q    Mr. Byrnes, earlier we talked about your extensive -- I

10   think you said you had been in the car dealership industry for

11   like 20-something years?

12   A    21 years.

13   Q    How much of that time was spent dealing with car

14   dealerships?

15   A    Seven years.

16   Q    Seven years as a DOM?

17   A    Two years as a DOM.  Two and a half years as a DOM.

18   Q    So seven years dealing with car dealerships.  In the

19   seven years, how many car dealerships do you think you dealt

20   with?

21   A    60, 70.

22   Q    Out of those 60 or 70, how many of them did you have a

23   working knowledge of what their controller did for their

24   dealership?

25   A    Pretty much all of them had working knowledge.

1   *Q*    So is it fair to say based on their extensive experience,

2   you have a pretty good idea of what generally controllers did

3   for their dealerships?

4   *A*    Yes.

5   *Q*    In terms of size, where is Serra Nissan in terms of the

6   size of the dealership that you generally deal with, small

7   medium, or large?

8   *A*    Medium.

9   *Q*    When you were talking about the roles and

10  responsibilities of a controller, was that based on your

11  extensive experience with the lot of medium-sized dealerships

12  that are comparable to Serra Nissan?

13  *A*    Yes.

14  *Q*    The 50-dollar fee that Mr. Broome mentioned under the

15  reporting, where it said, "a 50-dollar administrative fee per

16  unit need to be assessed on any unit reported with an

17  incorrect sales type code" --

18  *A*    Yes.

19  *Q*    -- that assumes an accident, not intentional fraud,

20  right?

21  *A*    Correct.

22          MR. BROOME:  I will object to that unless he is a

23  lawyer that wrote the rules.

24          MS. WICK:  I can --

25          THE COURT:  Why don't you rephrase your question.

1    BY MS. WICK:

2    Q    Mr. Byrnes, what situation does that 50-dollar

3    administrative fee per unit envision?

4    A    An accident.

5    Q    Do you actually know as the DOM what the ramification is

6    for a dealership that intentionally submits false information

7    for Nissan North America?

8    A    I do not.

9    Q    Earlier when Mr. Broome asked you about that 50-dollar

10   fee, you started to say that there was some corresponding, and

11   then you were cut off.  What were you going to say?

12   A    Then there would be a corresponding audit, depending on

13   the actual sales type or the error that was made.  If the

14   error was made in favor of the dealership, then they would be

15   charged back.

16   Q    So in addition to that 50-dollar fee, if it was in fact

17   wrong, the entire incentive would be charged back?

18   A    Any applicable incentives that did not count would be

19   charged back.

20   Q    Earlier when you were talking about vin system, my

21   understanding is you said that was what a controller would use

22   to kind of reconcile the massive lump sum payments that they

23   would get.

24   A    Yes.

25   Q    Do you know if there was an instruction manual for

1   controllers on how to like, line by line, use the vin system

2   in order to reconcile their accounting books?

3   *A*     I do not.

4   *Q*     Do you know how people like Ms. Branch, as controller,

5   figured out how to use the vin system without a manual

6   explicitly telling them, line by line, how to do their jobs?

7   *A*     I do not.

8   *Q*     Did you ever have -- I think you said you met Ms. Branch

9   once at that Visser or the Cullman store opening?

10  *A*     Yes.

11  *Q*     Did you ever have any conversations with her other than

12  that at that party?

13  *A*     I don't recall.  I do remember on a monthly basis, I

14  would provide her with basically RDR reports for what both

15  Serra Nissan, as well as Serra Visser Nissan had sold the

16  prior month, so she could go ahead and reconcile what they

17  showed as being sold for those months.

18  *Q*     Those were sent directly to Ms. Branch?

19  *A*     Correct.

20  *Q*     Did she ever call you with questions about not

21  understanding what she was supposed to do with those?

22  *A*     I don't recall.

23          MS. WICK:  No further questions, Your Honor.

24          THE COURT:  Anything else, Mr. Broome?

25          MR. BROOME:  Judge, just one, Your Honor.

1                         RECROSS EXAMINATION

2     BY MR. BROOME:

3     Q     Have you ever heard of the CMO?

4     A     CMO?

5     Q     Yes, sir.

6     A     I don't recall.

7     Q     Have you ever heard of continuous marketing operation?

8     A     No.

9     Q     Are there not some older Nissan dealerships -- and I mean

10    older that have contracts, franchise agreements from many,

11    many years ago that have three or four different -- own three

12    or four different Nissan dealerships in different areas that

13    are able to pool their car sales to meet their incentives?

14    A     I am not aware of that.

15    Q     It could be, though, couldn't it?  You are just not aware

16    of it?

17    A     I am not aware.

18    Q     Okay.

19              MR. BROOME:  That's all I have.  Thank you.

20              THE COURT:  All right.  Mr. Byrnes, you are excused.

21    Thank you.

22              THE WITNESS:  Thank you.

23              MS. WICK:  Your Honor, at this time, the government

24    would call Jeff Creecy.

25              THE COURT:  Thank you.

 1            THE COURTROOM DEPUTY:  Will you remain standing,

 2   please, and raise your right hand.

 3            Do you swear or affirm to tell the truth, the whole

 4   truth, but nothing but the truth so help you God?

 5            THE WITNESS:  I do.

 6            THE COURTROOM DEPUTY:  Thank you.  Please be seated.

 7   Will you state first and last name.

 8            THE WITNESS:  Jeffrey Creecy.

 9            THE COURTROOM DEPUTY:  Will you spell your last

10   name.

11            THE WITNESS:  C-r-e-e-c-y.

12            THE COURTROOM DEPUTY:  Thank you.

13                         DIRECT EXAMINATION

14   BY MS. WICK:

15   Q    Mr. Creecy, you may be a little too soft-spoken.  Can you

16   pull that microphone a little closer to you so the jury can

17   hear you.

18   A    Is that better?

19   Q    Okay.  Yes.  Thank you so much.

20            Could you tell the jury what your current position is.

21   A    I am currently a senior field auditor in the business of

22   auto sales department for Nissan North America.

23   Q    Can you tell me a little bit about your educational

24   background.

25   A    I have a bachelor's of business administration from the

1    University of Texas at Arlington.

2    Q    Did that have any accounting aspect to it?

3    A    It was specializing in accounting.

4    Q    What kind of experience do you have in the car industry?

5    A    I have worked for Nissan North America for 11 years, as

6    well as Nissan Motor Acceptance Corporation for 13 years prior

7    to that.

8    Q    How long have you been an auditor at Nissan North

9    America?

10   A    My whole 11 years.

11   Q    The whole 11 years was an auditor?

12   A    Yes.

13   Q    As an auditor, are you covering regions, or are you

14   assigned to specific car dealerships?

15   A    I am primarily assigned to a specific region with the

16   ability to travel as work load or as needed.

17   Q    What is your current region?

18   A    I am currently assigned to the central region.

19   Q    And what is that?

20   A    Primarily, Texas, Louisiana, Arkansas, all the states

21   from Texas north up to North Dakota, as well as Mississippi

22   and small smarts of Missouri and Iowa.

23   Q    What was your region in 2013?

24   A    It was the same.

25   Q    The same?  Who actually covered the state of Alabama in

1    2013, do you know?

2    A    The primary auditor was Richard Frieser.

3    Q    Did you sometimes assist him at times if he couldn't

4    cover an audit?

5    A    If he couldn't cover an audit or if my workload was too

6    small and I needed to pick up audits to augment my workload,

7    yes.

8    Q    Before we talk about this specific dealership, can you

9    explain the audit process generally.  Just walk me through

10   like -- start with how does Nissan North America decide to do

11   an audit.

12   A    Twice yearly we conduct what's called a risked base

13   analysis or what we refer to as RBA where we analyze risk

14   factors for our dealer body to determine who would be in a

15   higher risk of misreporting to look into scheduling an audit.

16   Q    What is that risk based analysis based on?

17   A    Analyzing data, such as registration date that we were

18   able to obtain, previous history in previous sales audits,

19   information related to possible exports, information related

20   to numerous back outs, things like that.

21   Q    When you say back outs, what does that mean?

22   A    Meaning when you report a car as being sold, you back it

23   out if the sale doesn't go through, or if it was incorrectly

24   reported as to the wrong customer.

25   Q    Is a back out the same as unwinding a deal?

1    *A*    Yes.

2    *Q*    Is your risk based analysis, is it in any way based on

3    the RDR information the dealership submits to Nissan North

4    America?

5    *A*    Yes.

6    *Q*    In what way?

7    *A*    There is a comparison aspect to the analysis comparing

8    the registration data that we are able to obtain to what the

9    dealer report as being sold.

10   *Q*    A minute ago, I think you said that it's also based on

11   past audit history?

12   *A*    Yes.

13   *Q*    What is a high risk dealership?

14   *A*    A high risk dealership would be somebody who within each

15   category scores a larger scoring in comparison to other

16   dealerships.

17   *Q*    So high risk meaning kind of more likely to not be doing

18   it correctly; is that fair?

19   *A*    That would be fair, yes.

20   *Q*    How often do most dealerships get audited?

21   *A*    It can vary by state, depending on state statutes.  There

22   can be a likelihood of being audited more frequently.  As far

23   as an average number.  I don't really know for sure what the

24   exact number would be.

25   *Q*    You said it could be limited by statute.  Do you know in

1    2013 if the audit period was limited by statute in Alabama?

2    A    Yes.

3    Q    To what?

4    A    12 months.

5    Q    Do you know from like what date?

6    A    I believe it was the most recent sales quarter.

7    Q    The most recent?

8    A    Sales quarter from that point.

9    Q    From what point?

10   A    The point we were beginning the audit process.

11   Q    Okay.  So it's one year from something?

12   A    Yes.

13   Q    Was Serra Nissan a high risk dealership in 2013?

14   A    They were on their list to be audited, so I would say

15   they would be, yes.

16   Q    You said earlier that there was a comparison aspect.

17   What kind of red flags are you looking for when you are doing

18   your comparison analysis?

19   A    Misreported sale dates, customers in the RDR not matching

20   what's on our registration information, or the information we

21   have available, incorrect addresses, possibility of being

22   flagged as exports.  Those sorts of things.

23   Q    When you say exports, you mean a car that's bought but is

24   being shipped out of the country?

25   A    Correct.

1    Q    You also said that there was a one-year limit on the

2    audit period.  What happened if you didn't catch something

3    until more than a year after that audit period?  What would

4    happen if you found something one year outside of that one

5    year audit period?

6    A    We wouldn't look at anything else on the audit.

7    Q    So you wouldn't even look at it?

8    A    No.

9    Q    Using the -- I think you said the risk-based analysis, is

10   that how you would pick audit candidates?

11   A    Correct.

12   Q    What would happen after you kind of came up with your

13   dealerships on the audit list?

14   A    Once they have conducted the RBA, risk-based analysis,

15   then they will notify the region of their intention to audit

16   selected candidates within the region.  I mean, the regional

17   offices.

18   Q    Is that somebody inside Nissan North America?

19   A    That would be the -- yes, the regional vice president and

20   the area general manager for that region.

21   Q    So this is still all internal processes at this point?

22   A    Correct.

23   Q    When do you kind of notify the dealership that they're

24   going to be audited?

25   A    Once we have them scheduled for a particular month.

1   *Q*     How did you notify them?

2   *A*     A letter is sent out by our management in the audit

3   department.

4   *Q*     What's the purpose of that letter?

5   *A*     To start the audit process with the actual dealer to let

6   them know we are intending to go audit them for whatever the

7   prescribed audit scope is.  Also to identify the auditor being

8   assigned to conduct the audit.

9   *Q*     What data would you need from the dealership at that

10  point when that letter goes out?

11  *A*     After the letter goes out, we contact them to verify,

12  advise them as stated in the letter what month we intend to

13  conduct an onsite review, as well as to conduct what we call

14  preliminary or pre-review work.  As part of that, we request

15  sales data from them to be obtained from their system -- their

16  dealership system, I should say.

17  *Q*     When you say their dealership system, are you referring

18  -- is that the same as their accounting system?

19  *A*     Yes.

20  *Q*     Do you know what accounting system Serra Nissan was using

21  in 2013?

22  *A*     I do not recall, no.

23  *Q*     What kind of accounting systems have you come into

24  contact with dealing with dealerships?

25  *A*     Primarily the ones are ADP, Reynolds and Reynolds are the

1    primary vendors.  We also have others like AutoSoft,

2    Dealertrack, as well as some other smaller players.

3    Q    So at some point after that letter goes out, you request

4    data from the dealership?

5    A    Correct.

6    Q    What data, specifically, do you request from the

7    dealership during that process?

8    A    We are looking for the information showing what vehicles,

9    new vehicles they showed and sold during the audit scope, as

10   such we request they provide the vin, the data of sale, the

11   customer's name, the customer's street address, the customer's

12   city, state, and zip, any rebate amount applied to the deal,

13   the finance, the APR rate, the salesman's name, and also the

14   lienholder financed.

15   Q    So like the source of financing, the lender?

16   A    Correct.

17   Q    Who at the dealership would send that information to you?

18   A    Normally, the office manager, controller, or the

19   executive manager, depending on who chose to forward that

20   information to me.

21   Q    What format would they send it to you in?

22   A    Excel.

23   Q    Like a spreadsheet?

24   A    Yes.

25   Q    Did that information come from the retail delivery report

1   like the actual RDR?  What I mean by that is that could they

2   have just sent the RDR information, or was the accounting

3   information that you asked for more extensive than the RDR?

4   A    The information used to report the RDR should match that,

5   so it could be similar.  However, when you receive reports,

6   depending on the system, you can see where this comes from.

7   Q    So I want to make sure I understand.  So the RDR

8   information that they submit directly to Nissan, you have that

9   in your system?

10  A    Yes.

11  Q    You then ask them to manually provide the information

12  that they have in their dealership's accounting system?

13  A    Yes.

14  Q    In the hopes that obviously those would match?

15  A    Yes.

16  Q    After you receive that data, then what happens?

17  A    We conduct an analysis comparing the RDR data to the data

18  received.  We call it the sales data report.

19  Q    The sales data report.  That's the information in the

20  Excel spreadsheet?

21  A    Yes.

22  Q    I just want to use the same term.  So the Excel

23  spreadsheet you call the sales --

24  A    -- data report.

25  Q    Okay.  After you get the sales data report, you compare

1  it to the RDR looking for what?

2  *A*    Discrepancies, differences, mismatched names, mismatched

3  dates, whether or not the vehicle or the RDR is showing up in

4  the data.  We also conduct an analysis comparing the amount of

5  sales incentives that were paid to what was applied to the

6  deal, as well as salesman analysis for salesperson's programs

7  to determine whether or not the person sold or who sold the

8  car reported is actually the person in the RDR.

9  *Q*    So at that point in time, you are just making sure sales

10  data report, their accounting system information matches what

11  they submitted through the RDR?

12  *A*    Correct.

13  *Q*    What happens next if you find discrepancies or red flags

14  in that process?

15  *A*    At that point, we look and see what types of

16  discrepancies we've got to determine how many that we are

17  going to need to look at to review in depth.  We contact the

18  dealer and let them know whether or not an onsite visit will

19  still be required because there's a large number of dealers,

20  or whether or not we will be able to conduct what we call an

21  office or mail-in audit if it's only a few discrepancies.

22  *Q*    I am assuming an office mail-in audit is literally either

23  a deal, just send them to us and we'll look at them, and we do

24  not need to come onsite?

25  *A*    Correct.

1   Q    Assuming you do have to come onsite, I think I said you

2   reach out to the dealership.  Who do you usually contact at

3   the dealership to schedule the onsite audit?

4   A    The primary contact dealer or the principal or executive

5   manager.

6   Q    Could it be other people at the dealership?

7   A    If the executive manager is -- they do not have one, it

8   could be a general manager.  If the people in charge determine

9   that such as an executive manager determines he did not want

10  to handle the audit, we'll refer it to the controller or

11  office manager.  It depends on how they have it structured.

12  Q    Who do you know who that contact was at Serra Nissan?

13  A    Randy Visser.

14  Q    He was the executive manager?

15  A    Yes.

16  Q    So let's assume that you find the red flags, it's more

17  than a mail-in audit, and you have to come onsite to do an

18  audit, what did that onsite process include?

19  A    The onsite process included reviewing the deal jackets

20  that were requested based on the list that we determined from

21  the analysis, the sales data analysis, which we will send to

22  them prior to arriving.  Once we get there, we have a brief

23  meeting with the management to discuss how long we expect it

24  to take, set up items such as who we will talk to if we have

25  questions during the process, who they plan on being able to

1    meet with at the end of the review process, as well as where

2    they have set us up to do the review.

3    Q    I think a moment ago you said you asked them to pull the

4    deal jackets as part of that?

5    A    Correct.

6    Q    Why do you ask them to pull the deal jackets?

7    A    Because the data we need to see in depth is in the deal

8    jackets.

9    Q    So bear with me, you have got the RDR information that

10   the dealership submits electronically, you have got the

11   accounting information that the dealership has given you,

12   which is their internal system, and then when you come onsite,

13   you are checking the paper from the process to make sure now

14   that all three of those match?

15   A    Yes.

16   Q    Who did you ask to pull the deal jackets for the 2013

17   audit?  Who did you contact?

18   A    As I recall, I submitted an e-mail to Kim Branch and

19   copied Mr. Visser, as well as I believe the DOM at the time.

20   Q    I am handing what has been previously marked as

21   Government's Exhibit 21.  Do you recognize that?

22   A    Yes.

23   Q    What is that?

24   A    This is the e-mail from me to Ms. Branch, Mr. Visser, Mr.

25   Housner and Mike James listing with the attachment for the

1   deals to be pulled.

2   Q    Is that a true and accurate copy of your e-mail to Ms.

3   Branch?

4   A    It does appear so, yes.

5           MS. WICK:  Your Honor, at this time, the government

6   would move to admit Government's Exhibit 21.

7           MR. BROOME:  We don't have any objection.

8           THE COURT:  It's admitted.

9           MS. WICK:  We request to publish, Your Honor?

10          THE COURT:  All right.

11  BY MS. WICK:

12  Q    Mr. Creecy, a moment ago you said you sent it to Kim

13  Branch, but you also copied some e-mails.  Who were those

14  people?

15  A    Randy Housner [sic], who was the executive manager,

16  Forest Housner, I believe his title is director of operations,

17  and Mike James, who was I believe the DOM at the time.

18  Q    A moment ago you said Randy Housner, but did you mean

19  Randy Visser?

20  A    Oh, I'm sorry, Forest Housner and Randy Visser.

21  Q    Yeah, for some reason it shows up as Randy, but I just

22  wanted to clarify that for the record.

23          So you e-mailed Ms. Branch, Randy Visser, Forest

24  Housner, and I think you said Mike James was the DOM at the

25  time?

1    A    Correct.

2    Q    And then what were the attachments that are listed there?

3    A    The attachments would have been the listed deal jackets

4    for the audit scope, as well as a list of deals titled NVDS.

5    Q    What are those?

6    A    New vehicle delivery system, which is a folder that's

7    processed with every new vehicle.  Once a vehicle is what they

8    call PDI, or processed as a predelivery inspection prior to

9    being put on the lot, dealerships are required to complete

10   that checklist.  All check boxes and items are required to be

11   completed as we call PDI, as well as any signature including

12   quality control.  The other half is a new vehicle delivery at

13   the time of sale items that we reviewed with the customer, set

14   up for service appointment, processes, walk through the

15   vehicle, that type of stuff, as well as assign that customer

16   new incentives.  All these copies, both these checklists are

17   provided to the customer.

18   Q    These are very kind of detailed, almost specific

19   nit-picky things that you were asking that they needed to

20   provide to you in these deal jackets as part of the audit,

21   otherwise they would be charged back, right?

22   A    More or less, yes.

23   Q    Why did you send the request to pull the deal jackets to

24   Ms. Branch?

25   A    Ms. Branch I believe was the person who sent me back the

1    sales data report.

2    Q    So earlier in the process when you were saying the

3    accounting data that would come from the dealership's

4    accounting system, you would have sent this to the person that

5    sent you that information?

6    A    Correct.

7    Q    How long did you schedule for the onsite audit in 2013?

8    A    I don't recall the exact length of time.  I can't

9    remember.

10   Q    I am asking in the e-mail, what did you tell them in

11   terms of how long you would be there?

12   A    Oh, I am sorry.

13   Q    That's okay.

14   A    I told them I would expect to arrive midday by between

15   2:00 and 2:30 on Wednesday the 13th of March, and I expected

16   to be done by late morning on Friday the 15th.

17   Q    Just out of curiosity, do you remember how many deal

18   jackets you asked them to hold for that time period?

19   A    No, I don't.

20   Q    What did you do during the onsite portion of that audit?

21   A    Reviewed the deal jackets, took each deal jacket and

22   compared it to the RDR data we referred to as that work bench

23   off of our computer to verify the sales data report and the

24   RDR matches the deal jackets, as well as the customer report

25   and the incentives apply to each deal as compared to what was

1    paid to the dealer.

2    Q    Is there any way for you to tell looking at a deal

3    jackets if it's the authentic deal jacket or a duplicate?

4    A    Definitively, no.

5    Q    I am going to give you a hypothetical situation.  Okay.

6    Based on what you have said in your process to get the RDR,

7    get the accounting information, you come look at the deal

8    jackets?  Am I straight so far?

9    A    Yes.

10   Q    If you came onsite during the audit and the RDR

11   information matched the accounting information and it matched

12   the deal jackets that you were provided, would you have any

13   way of determining if that information was false?

14   A    Not that I know of, no.

15   Q    Let's talk about the audits that you specifically did at

16   Nissan North America.  Oh, no, Serra Nissan, sorry.  I am

17   handing you what's been previously marked as Government's

18   Exhibit 27.  Take a look at that document and tell me if you

19   recognize it.

20   A    (Witness complying.)  Yes.

21   Q    What is that document, Mr. Creecy?

22   A    This is the audit report issued at the conclusion of the

23   audit of Serra Nissan in 2010.

24   Q    2010 audit report?

25   A    Yes.

1    *Q*    Did you prepare that report?

2    *A*    Everything but the letter.

3    *Q*    What letter?

4    *A*    The first three pages.

5    *Q*    Oh, the cover letter?

6    *A*    Correct.

7    *Q*    Can you tell me if that's a true and accurate copy of

8    your 2010 audit report?

9    *A*    To my knowledge, yes.

10            MS. WICK:  Your Honor, at this time, the government

11    asks to admit Government's Exhibit 27?

12            MR. BROOME:  Judge, the only objection I have there

13    is relevancy.  This is an August 31, 2010, audit.  Ms. Branch

14    didn't go to work there until December of 2013 -- 2012, excuse

15    me.  So I don't know how they're trying to attribute whatever

16    mistakes, if there were mistakes made to Ms. Branch when she

17    didn't work there.

18            THE COURT:  What is the relevance please, Ms. Wick?

19            MS. WICK:  Yes, Your Honor.  My understanding is

20    defendant's argument has been that she had no idea that these

21    were instructions from her supervisors.  These were all

22    meetings that her supervisors were present at where Nissan

23    told them not to submit false information.  So the relevance

24    is intrinsic to the people they worked with, co-conspirators.

25    These were meetings that they had in terms of their knowledge.

1          THE COURT:  Are you trying to attribute their

2     knowledge to Ms. Branch?

3          MS. WICK:  No, Your Honor, just that the people

4     that's he's about to say that were present at this audit

5     meeting were aware and were told, which are the people that

6     she is going to claim instructed her to do certain things.  So

7     their knowledge of what was acceptable to Nissan North

8     America, I think, would be relevant since defense has put into

9     play that it was her superiors who instructed her to do these

10    things, and it was her superiors that were at these audit

11    meetings.

12         THE COURT:  I am sorry.  I am still trying to track

13    you on the relevance of this evidence.

14         MS. WICK:  Yes, Your Honor.  So my understanding

15    from what Mr. Broome has alluded to so far is that her claim

16    was I didn't know my supervisors told me to do these things.

17         THE COURT:  Right.

18         MS. WICK:  These audit reports are meetings where

19    those supervisors were present, representatives from Nissan

20    North America that told them don't do these things.

21         THE COURT:  How does that have any bearing on what

22    these individuals allegedly told Ms. Branch?

23         MS. WICK:  Well, I think it goes to the fact that if

24    he is claiming -- I think it goes to the fact they were aware

25    that this was wrong that they would be charged back.  If he is

1    saying that the supervisors told her to do this, and they were

2    all told that it was wrong and that there were ramifications,

3    I would think that would be relevant to the likelihood that

4    they did, in fact, tell that to her or the ramifications of

5    what happened if they --

6              THE COURT:  It sounds like speculation.

7              MS. WICK:  Your Honor, the government would just

8    submit that it's relevant to the fact.  What he is trying to

9    put in.  But if Your Honor doesn't want to include the 2010,

10   there's two other audits that are relevant to the time period.

11             THE COURT:  Mr. Broome, do you have an argument?

12             MR. BROOME:  Judge, I just have one other thing,

13   unless I just completely misread it, Forest Housner is not

14   mentioned in this audit, as to her immediate supervisor that I

15   alluded to in opening statement.

16             THE COURT:  All right.  The Court sustains the

17   objection.

18   BY MS. WICK:

19   Q    Let me take that from you, Mr. Creecy.

20             MS. WICK:  Your Honor, just a moment.  We just want

21   to sync up the dates that she was employed with audit reports

22   to avoid that issue with the next audit.

23             THE COURT:  Sure.

24             MS. WICK:  Thank you, Your Honor.

25   BY MS. WICK:

1    *Q    Mr. Creecy, I am handing you what has been previously*

2    *marked as Government's Exhibit 25.  Can you take a look and*

3    *tell me if you recognize that document?*

4    *A    Yes.*

5    *Q    What is that document?*

6    *A    This is the final audit report for the audit I conducted*

7    *in 2013.*

8    *Q    Okay.  My understanding, without admitting the audit*

9    *reports, this was the third year in a row that Serra Nissan*

10   *had been audited?*

11   *A    That sounds correct, yes.*

12   *Q    This is your audit report for, I know it's dated April 1,*

13   *2013, but what was the period that you audited?*

14   *A    The audit scope was January 4th of 2012 through January*

15   *2nd of 2013.*

16          MS. WICK:  Your Honor, at this time we would move to

17   admit Government's Exhibit No. 25.

18          MR. BROOME:  Judge, again, she did not go to work

19   there until November of 2012.  So I don't know how you could

20   separate part of this audit from part of it, but I don't have

21   any objection to this.

22          THE COURT:  All right.  It's admitted.

23   BY MS. WICK:

24   *Q    Mr. Creecy, can you describe the results of your audit*

25   *from the January 4, 2012 to January 2nd, 2013 audit period?*

1   *A*     The results would be that after reviewing 1,204 total

2   vins, there were 17 adjusted errors of which there were 14

3   incorrect customers, two incorrect sales dates, and one

4   incorrect sale type resulting in a 1.4 error rate.

5   *Q*     How much was the dealership charged back as a result of

6   audit?

7   *A*     Total audit charge back was $24,780.

8   *Q*     Is that the highest amount that they had been charged

9   back in the last three previous audits?

10  *A*     I don't recall.

11  *Q*     In your experience, is that a high amount for a charge

12  back?

13  *A*     Yes, it is high.

14  *Q*     Based on your experience with the audit process in the

15  dealerships, would the controller of the dealership have been

16  told what charge back the dealership got from the audit?

17          MR. BROOME:  I am going to object to him speculating

18  what someone may have been told.

19          THE COURT:  All right.  Objection sustained.

20  BY MS. WICK:

21  *Q*     Mr. Creecy, based on your experience in the audit, who is

22  the entity in the dealership that financially deals with the

23  mechanism of a charge back?

24  *A*     That would normally be the controller or office manager.

25  *Q*     Somewhere in your paperwork, you had a closing meeting or

1   a closing conference?

2   *A*   Yes.

3   *Q*   I think it's on page 3 of the exhibit, Government's

4   Exhibit 25.  Just tell me if that's the right location.

5   *A*   Yes.

6          MS. WICK:  Your Honor, if we could publish that

7   exhibit to the jury?

8          THE COURT:  Yes.

9   BY MS. WICK:

10  *Q*   Looking at the top, who was present at your closing

11  meeting?

12  *A*   Randy Visser and Forest Housner.

13  *Q*   And you?

14  *A*   And myself, sorry.

15  *Q*   Was there anyone else present?

16  *A*   No.

17  *Q*   What date did you have this audit closing meeting?

18  *A*   March 15th.

19  *Q*   What year?

20  *A*   2013.

21  *Q*   I believe your closing report is two and a half pages?

22  So rather than read all of that, could you just maybe tell the

23  jury what the -- could you summarize it, or maybe hit the

24  highlights of kind of what the recommendations were.

25  *A*   The recommendations discussed were correct application

1    and procedures regarding rental car units, the continued use

2    of what we refer to as a vin lookup for purposes of incentive

3    application.  The reminder for the use of incentive claim

4    forms for anything requiring customer cash or receiving

5    customer cash.  The recommendation that any incentive schedule

6    be reconciled regularly at least once a month.  Reminder on

7    reporting special APR sales.  VIN/Zip as it uses the sale type

8    C.  The current rules and requirements under what is called

9    our Fleet-Tail program.  A reminder of reconciliation of

10   dealership, physical inventory with Nissan's inventory.  Any

11   questions they have, they may contact C & I directly.  The

12   requirements of accurate reporting via the RDR system all

13   sales.

14   Q    Let me pause you there, because that was a very good

15   summary.  I want to touch on that specific point.  If we could

16   call out on the next page where you just started to read under

17   other audit recommendations.  And the section, just that

18   section "Other audit recommendations to consider..." okay.

19   Could you read number one again.

20   A    "Dealership should accurately report via the RDR system

21   all sales.  Customer name, address, and date of sale reported

22   should match bills of sale and retail or lease finance

23   contracts."

24   Q    Okay.  Even though it says, "Customer name, address, and

25   date of sale reported should match bills of sale..."  When you

1    were talking with them about dealership should accurately

2    report the RDR system, would that have included which

3    dealership that the car was sold at?

4    A    That would be implied.

5    Q    Did you actually tell them, you need to accurately report

6    which dealership this car is sold at?

7    A    I never said that specifically.

8    Q    Why would you not say that specifically?

9    A    Because I have conducted an audit at that dealership.   I

10   would not bring another dealership into discussion.

11   Q    What is the focus of your audit in terms of the types of

12   errors that you are discussing with them?

13   A    I am not sure I understand the question.

14   Q    What I mean is is that all of the things that you just

15   listed, those are very specific like how to do this -- would

16   you say that the purpose of your audit is to make sure that

17   they RDR'd everything correctly?

18   A    Yes.

19   Q    Is the purpose of your audit to ferret out the fraud?

20   A    No.

21   Q    So a lot of your instructions were, here is how to do

22   this, here is how you do this, so they can do it correctly?

23   A    Correct.

24   Q    But would you have instruct them, you need to be honest

25   and not lie?

1    *A*    I think that would be implied, but I would not say that

2    specifically.

3    *Q*    How many times, taking a look at your summary, how many

4    times do you think you spoke with them about how important it

5    was to accurately report the RDR information?

6    *A*    I don't know the exact number, but I would say several.

7    *Q*    Okay.  Now, I know at this meeting, the controller was

8    not present.  In other audit meetings, closing meetings that

9    you have, have controllers been present at those meetings?

10              MR. BROOME:  Judge, again, I don't see the relevance

11   if somebody was present in a meeting five years ago.  Ms.

12   Branch was not there.

13              THE COURT:  Do you want to ask if there was any

14   audit meeting that Ms. Branch attended, that could be a

15   relevance question.

16              MS. WICK:  No, Your Honor, she was not present at

17   this meeting.  But I think given the witness's experience, he

18   could talk about his dealings with controllers.

19              THE COURT:  If you have a question about what

20   happened at Serra Nissan or Serra Visser Nissan or with

21   respect to Ms. Branch, that's relevant.  But what other

22   dealerships do, unless you can establish how that would be

23   relevant to the facts in this case, then the Court is not

24   going to allow that questioning.

25              MS. WICK:  In terms clarification, his background

1    and experience dealing with controllers at dealerships, can he

2    talk about the general job responsibilities and duties that

3    they do or not?

4              THE COURT:  Why is it relevant what other

5    dealerships do?  Why can't you focus on what Serra Nissan and

6    Serra Visser Nissan do?

7              MS. WICK:  I understand, Your Honor.

8    BY MS. WICK:

9    Q    Mr. Creecy, was Ms. Branch present at the audit closing

10   meeting?

11   A    No.

12   Q    Before that e-mail that we just showed, had you ever had

13   any conversations with Ms. Branch?

14   A    No.

15   Q    Earlier when we were talking, my understanding was that

16   the purpose of your audit process is finding errors in an RDR

17   process, but not necessarily intentionally misreported

18   information; is that fair?

19   A    Yes.

20   Q    Do you know of a way that Nissan North America can check

21   the information submitted in the RDR process outside of the

22   audits that you conduct?  You look confused.  That was a bad

23   question.  I can rephrase.

24   A    Yes, please.

25   Q    Other than the audit process that you just walked us

1    through, is there a way that Nissan has to verify the RDR

2    information submitted by dealerships?

3    A    Not that I'm aware of.

4    Q    Were you contacted by anyone at Serra Nissan in 2014?

5    A    Yes.

6    Q    Who were you contacted by?

7    A    Randy Visser.

8    Q    Do you remember how he contacted you?

9    A    I believe it was e-mail.

10   Q    I am handing you what has been previously marked as

11   Government's Exhibit 31.  Can you take a look at that document

12   and tell me if you recognize it?

13   A    Yes.

14   Q    What is that?

15   A    This is a letter received via e-mail from Randy Visser.

16   Q    Can you take a look at it and tell me if that's true an

17   accurate copy of the e-mail and the letter that you received?

18   A    It does appear so, yes.

19            MS. WICK:  Your Honor, at this time, the government

20   would move to admit Government's Exhibit 31?

21            MR. BROOME:  We have no objection.

22            THE COURT:  It's admitted.

23            MS. WICK:  Permission to publish, Your Honor?

24            THE COURT:  Granted.

25   BY MS. WICK:

1   *Q*   I think the e-mail that you were referring to is on page

2   20 of Government's Exhibit 31.  No.  Try three.

3            THE COURT:  I don't think there is a third page, is

4   there?

5   BY MS. WICK:

6   *Q*   No, I am sorry.  I apologize.

7            A moment ago you said that he e-mailed you.  What did

8   he attach to the e-mail?

9   *A*   He attached a letter.

10  *Q*   Is this the letter that you were referencing?

11  *A*   Yes.

12  *Q*   So let's pause for a moment because obviously I kind of

13  went in reverse here, and I apologize for that.  He said he

14  e-mailed you.  I am handing you what's been previously marked

15  as Government's Exhibit 32.  I apologize for the confusion.

16  Can you look at 32 and tell me if that's the e-mail that you

17  are referring to?

18  *A*   Yes, it is.

19  *Q*   What is on top of that e-mail?

20  *A*   The e-mail header showing my name, the date, who it was

21  to -- or no, this is not the e-mail I was referring to with

22  the letter.

23  *Q*   I am sorry.  I couldn't hear what you said.

24  *A*   The question was is this the e-mail I was referring to

25  regarding the letter.  This is not the e-mail referring --

1    *Q*    It's not.

2    *A*    No.

3    *Q*    What is that e-mail?

4    *A*    This is an e-mail response that I sent back to Randy

5    Visser after the letter was received.

6    *Q*    Okay.  At the bottom of your e-mail, is that his initial

7    e-mail to you?

8    *A*    No.

9    *Q*    What is that?

10   *A*    That is another follow-up that he sent to myself and Mr.

11   Jeff Zhang asking about the letter.

12   *Q*    Can you give me just one second.  Mr. Creecy, we got all

13   sorts of confusion here.  Let me go back for a moment.

14         You said your initial contact from him was what?

15   *A*    An e-mail.

16   *Q*    An e-mail.  Do you remember when the e-mail was sent?

17   *A*    On the 12th.

18   *Q*    On the 12th.  Given his initial e-mail to you, is that

19   the e-mail at the bottom of that page?

20   *A*    I do not believe so, no.

21   *Q*    What e-mail -- okay.  Why don't you walk us through the

22   sequence of contacts, okay, when did he contact you, when did

23   he send it, and then we'll figure out what happened with the

24   e-mails.

25   *A*    He sent an e-mail on the 12th with a letter attached

1    which is the one I referenced previously.  Then shortly later

2    that day, for another e-mail, copying myself and Mr. Zhang

3    asking about the letter again, which is the e-mail at the

4    bottom of this exhibit.

5    Q    Okay.  So I think I understand the confusion.  The e-mail

6    at the bottom of that is the second e-mail?

7    A    Yes.

8    Q    So the first e-mail that he sent, did it attach the

9    letter that you looked at that was Exhibit 31?

10   A    Yes.

11   Q    Okay.  So let's back up and look at Exhibit 31, again,

12   and I apologize for the confusion.  This was his first

13   communication to you, if I am understanding you right?

14   A    Yes.

15   Q    Okay.  So 31 has already been admitted.  What did he tell

16   you in his first communication?

17   A    In this letter?

18   Q    In Exhibit 31, if I understood you, he e-mailed you and

19   he attached that letter, and that was the first you heard from

20   him?

21   A    He stated that during the self audit, they had identified

22   15 deals that were RDR'd under the incorrect dealer number.

23   That the 15 deals were listed, and that they were RDR'd

24   incorrectly under dealer 2000 when they should have been RDR'd

25   under dealer 5335.  He then asked if I could please correct

 1   this in Nissan's records, and let him know what other steps

 2   were needed to resolve the discrepancy.

 3   Q    Was there anything else on the next page?

 4   A    A continued list of the 15, as well as a statement to

 5   please advise what we need to do to correct these.

 6                    (Cell phone ringing in courtroom.)

 7   Q    Okay.  So he sends the e-mail and he sends that letter.

 8   Now, if I understood you before, the e-mail that's in

 9   Government's Exhibit 32 was his second e-mail after this

10   letter; is that right?

11   A    Yes.

12   Q    And we're back on track.  Okay?  What was the date of the

13   second e-mail in Government's Exhibit 32?

14   A    On the 12th.

15   Q    So this letter is dated the 11th.  He sends the e-mail

16   the next day on the 12th.  And on the top of that e-mail is

17   what?

18   A    My response to Randy Visser.

19   Q    Looking at Government's Exhibit 32, is that a true and

20   accurate copy of his e-mail and your response?

21              MR. BROOME:  Judge, if this will speed up the

22   process, I will agree to admit Exhibit 32.

23              THE COURT:  I am sorry, you will agree to what?

24   It's admissible?

25              MR. BROOME:  Yes, Your Honor.

1      THE COURT:  It's admitted.

2      MS. WICK:  Thank you, Your Honor.  Actually, I

3  apologize.  It had nothing to do with the admission.  It was

4  just a confusion of dates.

5  BY MS. WICK:

6  Q    So 32 is his e-mail and your response?

7      MS. WICK:  Permission to publish, Your Honor?

8      THE COURT:  Granted.

9  BY MS. WICK:

10  Q    So if I am understanding you, he e-mails you on the 12th

11  saying what?

12  A    Saying please look at the letter attached and advise what

13  we need to do.

14  Q    Then what was your response on August 21st?

15  A    My response is that we have analyzed your request to

16  correct the 15 deals, identify them in the letter, but are

17  unable to do so among reasons because the 15 sales at issue

18  are well below the general sales audit period under the

19  Alabama dealer statute.

20  Q    Did you prepare that?

21  A    Yes.

22  Q    Did you e-mail that to Mr. Visser?

23  A    Yes.

24  Q    When you said the 15 sales at issue were well beyond the

25  general sales audit period, what did you mean by that?

 1    *A*     I meant they were outside the available audit scope.

 2              MS. MURNAHAN:  Your Honor, I believe the jury is

 3    having some technological difficulties with the monitors up

 4    there.

 5              All JURORS:  We don't have anything.

 6              THE COURT:  Okay.  Let me give y'all a couple of

 7    requests, please.  If you have trouble hearing a witness, let

 8    us know right away, please, because we want to make sure you

 9    hear everything.  If you have trouble with the monitor, let us

10    know, please.

11              And we're getting close to five o'clock.  Our goal is

12    to make you all as comfortable as possible and to be

13    considerate of any obligations you may have.  So anything that

14    you need to communicate about, I have a child I need to go pic

15    up, anything along those lines, please let Tammi know, and

16    we'll make sure we do our best to accommodate that.

17              Is there anybody who is going to have a problem today

18    if we run past five o'clock so that we can make sure we get

19    through Mr. Creecy's testimony?  Okay.  Terrific.  Thank you.

20              THE COURTROOM DEPUTY:  Are the monitors on now?

21              ALL JURORS:  Yes.  Thank you.

22              THE COURT:  Thanks for letting us know.  I

23    appreciate that.

24              MS. WICK:  Your Honor, just briefly, given that

25    these --

1           THE COURT:  You can retrace whatever you need to

2    retrace.

3           MS. WICK:  Well, given that it's 4:54, with the

4    Court's permission, these exhibits were admitted, and rather

5    than go back, I will leave the jury to review them during

6    deliberations, if that's okay with the Court?

7           THE COURT:  That's fine.  It sounds good.

8    BY MS. WICK:

9    Q    Okay, Mr. Creecy.  Sorry.  Let's go back.  So you told

10   him it was outside the scope of the audit period, and there

11   was nothing you could do?

12   A    Yes.

13   Q    What happened after that, did he contact you again?

14   A    After that, he sent an e-mail asking for an address to

15   mail a letter.

16   Q    Did he mail a letter after you sent him the mailing

17   address?

18   A    Yes.

19   Q    I am showing you what has been previously marked as

20   Government's Exhibit 33.  Do you recognize that document?

21   A    Yes.

22   Q    What is that document?

23   A    This is the letter that Randy Visser sent after sending

24   the e-mail address.

25   Q    In reviewing -- is that a true and accurate copy of the

1  letter that Mr. Visser --

2         MR. BROOME:  Judge, I will agree.  I have no

3  objection to 33 being admitted.  Or if it will save time,

4  well, that's fine.

5         THE COURT:  Okay.  It's admitted.

6         MS. WICK:  Permission to publish, Your Honor?

7         THE COURT:  Yes.

8  BY MS. WICK:

9  Q   What did he send in that letter, Mr. Creecy?

10 A    In that letter, he states that he, Understands Nissan's

11 decision and will abide by how Nissan wants to address this

12 issue.  However, if the audit period under the franchise act

13 is the issue, they are willing to waive that provision, or any

14 other technicality for regarding this issue to prevent this

15 issue from being corrected.

16        He also states that he has attached a sheet on how

17 they have calculated incentives paid versus incentives earned,

18 and that Nissan agrees with his calculation; please accept the

19 check to settle the issue.

20 Q   Attached to that letter are two attachments, the

21 calculation he is referencing in a check.  Prior to the

22 government showing you those -- had you ever seen the

23 attachment to that letter?

24 A    No.

25 Q   Where did that letter in fact go?

1    *A*    That went to the headquarters in Franklin, Tennessee, at

2    Nissan North America to the sales audit department.

3    *Q*    Was that the address that you had provided him?

4    *A*    Yes.

5    *Q*    In your careers as an auditor, have you ever seen a

6    dealer more than a year after the sale proactively correct RDR

7    information?

8    *A*    No.

9    *Q*    How often have you seen dealers conduct a self audit a

10   year and a half after the sale?

11   *A*    Never if ever.

12   *Q*    Have you seen a self charge back in return in funds year

13   and a half later?

14   *A*    No.

15   *Q*    How often do you get $64,800 checks from dealers?

16   *A*    Never.

17          MS. WICK:  No further questions, Your Honor.

18          THE COURT:  Mr. Creecy, do you need some water?

19          THE WITNESS:  If I could, please.

20                    CROSS EXAMINATION

21   BY MR. BROOME:

22   *Q*    It looks like Mr. Visser was trying to correct that

23   mistake and give you your money back, wasn't he?

24   *A*    It looks like it.

25   *Q*    Let me ask you this, in all these documents, carbon

1   copies -- I'm old.  I guess we don't have carbon copies

2   anymore, cc's -- was Ms. Branch mentioned in any of those

3   letters?

4   A    Not that I recall.

5   Q    If you want to look, is she ever carbon copied with any

6   of your responses, e-mails, or text messages, or anything?

7   A    Not that I recall.

8   Q    Now, let's look at it to be sure.  Government's Exhibits

9   32 and 33 and 34.  I don't want you to guess or assume.

10           Let's look at 33, your letters, or Mr. Visser's letter

11   to you.  Does it show who that letter was sent to?

12   A    It was sent to me.

13   Q    Sir?

14   A    It was sent to me.

15   Q    It's not carbon copied to Ms. Branch or cc'd to Ms.

16   Branch or anything?

17   A    No.

18           MR. BROOME:  Judge, if I could ask their assistance

19   in pulling those exhibits back up.  I don't see the exhibits

20   here.

21           THE COURT:  You need 32, Mr. Broome?

22           MR. BROOME:  Yes, Your Honor.

23           THE COURT:  The e-mail chain?

24           MR. BROOME:  Yes, Your Honor.

25           THE COURT:  Can we pull that up, please, Ms. Gold.

1    Thank you.

2              MR. BROOME:   Thank you.

3    BY MR. BROOME:

4    Q    On Government's Exhibit 32, does that show anything going

5    to Ms. Branch?

6    A    No.

7    Q    Can we pull up 33, please -- 31 where the deals are

8    listed.  Does that show that it went to Ms. Branch?

9    A    I am sorry?

10   Q    31, I believe that's what's on the screen?

11             THE COURT:   That's the two-page document, so you may

12   need to put up the second page.

13   By MR. BROOME:

14   Q    Please.  The second page, please.

15   A    No, it does not.

16   Q    During your audit process, you contacted Ms. Branch, I

17   think, on Government's Exhibit 21 on March the 8th, 2013?

18   A    Yes.

19   Q    And did she cooperate and furnish you all the information

20   you requested?

21   A    As I recall, yes.

22   Q    You recall having to call her back and say you left this

23   out, or did she get everything to you?

24   A    I don't recall whether any deals were missing or not when

25   I showed up.

1    Q    Okay.  When you showed up, did you ever talk to Kim

2    Branch when you came for the actual audit?

3    A    I recall having a conversation in the middle of the audit

4    regarding incentives, application of incentives.

5    Q    With Ms. Branch?

6    A    With Ms. Branch.

7    Q    And was she able to give you all the information that you

8    needed?

9    A    As far as I recall, yes.

10   Q    When you had your closing meeting, is that what you call

11   it --

12   A    Yes.

13   Q    -- was Ms. Branch present?

14   A    No.

15   Q    During your closing meeting, did you have any

16   conversations with Randy Visser or Forest Housner about the

17   pooling of sales?

18   A    No.

19   Q    Do you even know what I am talking about when I am

20   talking about pooling of sales?

21   A    I know the term, but I don't know what you are

22   referencing, but I know I did not say the words pooling of

23   sales.

24   Q    Have you ever heard the word or the term continuous

25   marketing operation, CMO?

1    *A*    Not that I can recall.

2    *Q*    Okay.  In any of your audits -- and you have been,

3    working there how long, doing the audit 11 years?

4    *A*    About 11 years.

5    *Q*    In any of your audits during the 11 years, did you have

6    other dealers that owned more than one Nissan franchise?

7    *A*    Yes.

8    *Q*    And isn't it correct that some of those franchises

9    combined their deals to meet their incentives?

10   *A*    Not that I am aware of.

11   *Q*    Have you ever audited two dealerships together -- that

12   were owned by the same person, two or more?

13   *A*    I don't conduct audits simultaneously.  Each audit is

14   conducted individually.

15   *Q*    So that wasn't a fair question.  I am sorry.

16         Other than talking to Ms. Branch, when you came for

17   the audit, did you have any other conversations with her about

18   that audit that you did in March of 2013?

19   *A*    Not that I recall.

20         MR. BROOME:  That's all I have.  Thank you, sir.

21         THE COURT:  Any follow-up?

22         MS. WICK:  Just one question.

23                    REDIRECT EXAMINATION

24   BY MS.WICK:

25   *Q*    Mr. Creecy, if you went onsite to do an audit and you

 1    were provided at Serra Nissan a Birmingham deal jacket,

 2    looking at that paperwork, would you have any way of knowing

 3    that that car had in fact been sold at the Cullman store?

 4    A    Not that I am aware of, no.

 5              MS. WICK:  Thank you, Your Honor.  No further

 6    questions.

 7              MR. BROOME:  I don't have anything else, Your Honor.

 8    Thank you.

 9              THE COURT:  All right, Mr. Creecy, you are excused.

10    Thank you.

11         Ms. Wick, is there anything else you want to try to

12    squeeze in this afternoon, or do you think that will wrap

13    things up for today?

14              MS. WICK:  We will like to wrap things up, thank

15    you.

16              THE COURT:  Thank you very much for your attention

17    today.  Let's plan -- we will start tomorrow morning at nine

18    o'clock.  So if you can please plan to be here at about ten to

19    9:00, so that we make sure we have everybody ready to get into

20    the jury box.  That would be great.

21         I am going to repeat my instruction that I gave you

22    earlier today.  You may not discuss this case with anyone.

23    You may not do any research independently.  Please don't look

24    on the internet for information.  Don't use your cell phone to

25    look for information -- yes, sir?  Did you raise your hand?  I

1    thought I saw a hand go up.  And if you should just be looking

2    at a newspaper and see anything that's even remotely related

3    to this case, please stop reading the article.  All right?

4    Again, thank very much for your attention today.  Have a nice

5    evening.

6                    (Jury released at 5:08 p.m.)

7                        (In open court.)

8              THE COURT:  Any business we need to discuss?

9              MS. WICK:  Your Honor, I think there appears to be a

10   missing exhibit, but I think it's just kind of somehow got

11   lodged in one of the other folders.  We're going to sort that

12   out.  I think it's already been admitted.  We're just finding

13   it for the folder.

14             THE COURT:  Okay.  Sounds good.  All right.

15             MR. BROOME:  Judge, I don't think I did it.

16             THE COURT:  Let's be ready to start in the morning

17   at 9:00, please.

18             ALL COUNSEL:  Thank you, Your Honor.

19             THE COURT:  Thank you.

20                (Proceedings concluded at 5:09 p.m.)

21

22

23

24

25