Case 2:15-cr-00167-MHH-TMP   Document 25-2   Filed 02/18/16   Page 1 of 222

FILED
2016-02-18 PM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

VOLUME II of V, page 143

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION


UNITED STATES OF AMERICA,          *
         Plaintiff,                *
                                   * Case No. CR-15-MHH-0154-S
         v.                        *
                                   *
KIMBERLY H. BRANCH,                *      Birmingham, Alabama
                                   *       August 11, 2015
         Defendant.                *          9:00 a.m.
*********************************   *


        TRANSCRIPT OF TRIAL BY JURY, VOLUME II OF V
     BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
              UNITED STATES DISTRICT JUDGE


Court Reporter:            Chanetta L. Sinkfield, CCR, RMR
                           United States Federal Courthouse
                           1729 Fifth Avenue North
                           Birmingham, AL 35203

1

2                              **APPEARANCES**


3

     FOR THE PLAINTIFF:        U.S. ATTORNEY'S OFFICE
4                              Assistant U.S. Attorney,
                               AMANDA SCHLAGER WICK
5                              JENNIFER SMITH MURNAHAN
                               1801 4th Avenue North
6                              Birmingham, AL 35203

7


8    FOR THE DEFENDANT:        WILLIAM H. BROOME, ESQ.
                               1110 Wilmer Avenue
9                              P.O. BOX 1952
                               Anniston, AL 36202
10

11

12

13

14

15

16

17

18

19

20

21

22

23
     Court Reporter:           Chanetta L. Sinkfield, CCR, RMR
24                             United States Federal Courthouse
                               1729 Fifth Avenue North
25                             Birmingham, AL 35203

I  N  D  E X

August 11, 2015; VOLUME II

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| GOVERNMENT'S WITNESSES | | | | | |
| LANA STRICKLAND | 167 | 186 | 192 | 195 | |
| RANDY VISSER | 196 | 273 | 292 | 316 | 320 |
| FOREST HOUSNER | 321 | 361 | 381 | | |

| GOVERNMENT'S EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| NO. 34 | 171 | 171 |
| NO. 35 | 172 | 172 |
| NO. 36 | 173 | 173 |
| NO. 38/39 | 210 | 210 |
| NO. 41 | 222 | 222 |
| NO. 40 | 226 | 226 |
| NO. 42 | 235 | 235 |
| NO. 24 | 240 | 240 |
| NO. 17 | 247 | 247 |
| NO. 19 | 252 | 252 |
| NO. 45 | 255 | 255 |

1           THE WITNESS:  Lana Strickland.

2           THE COURTROOM DEPUTY:  Will you spell your first

3   name.

4           THE WITNESS:  L-a-n-a.

5           THE COURTROOM DEPUTY:  Thank you.

6                       DIRECT EXAMINATION

7   BY MS. MURNAHAN:

8   Q    Good morning, Ms. Strickland.

9   A    Good morning.

10  Q    Where do you live?

11  A    I live in Spring Hill, Tennessee.

12  Q    Where did you go to college?

13  A    Auburn University.

14  Q    Did you graduate from there?

15  A    Yes.

16  Q    What was your degree in?

17  A    BA in English.

18  Q    Did you do any post-graduate work?

19  A    I did some post-graduate work at the University of South

20  Carolina in linguistics.

21  Q    Did you finish that?

22  A    No.

23  Q    Where do you work now?

24  A    Nissan North America.

25  Q    Where is that located?

1    A     Franklin, Tennessee.

2    Q     Is that near Spring Hill?

3    A     That's a little bit north of it, yes.

4    Q     What is your title at Nissan North America?

5    A     I am a senior audit analyst.

6    Q     What does that position do?

7    A     A lot of numbers work.  Various things from tracking

8    financials through the system, making sure that what we do in

9    audit goes through the system correctly.  It involves a

10   risk-based analysis, helping us select which dealers are going

11   to be audited.  We only audit a certain portion, so we do a

12   risk-based analysis, and I am in charge of that.  Numbers like

13   that.

14   Q     When did you start at Nissan North America?

15   A     February of 2000.

16   Q     You have been there the whole time since then?

17   A     Yes, ma'am.

18   Q     Did you start out as a senior analyst auditor, or did

19   you --

20   A     I began just as a title analyst.

21   Q     Okay.  And worked your way up?

22   A     Yes.

23   Q     Ms. Strickland, as part of your job as a senior auditor

24   analyst, analyst auditor, were you asked to do any sort of

25   analysis, the incentive payments that Nissan North America

1   paid to Serra Nissan in Birmingham?

2   A    Yes, ma'am.

3   Q    Who asked you to do that?

4   A    A paralegal for our legal department.

5   Q    What information were you given to perform that analysis?

6           THE COURT:  Can we have a time frame for this,

7   please?

8           MS. MURNAHAN:  Of the analysis?  Or when she was

9   asked to perform the analysis?

10          THE COURT:  Just generally, what are we talking

11  about?  Because yesterday, there was an attempt to put into

12  evidence some audit information from 2010.  So I am wondering

13  what audit information this is.

14          MS. MURNAHAN:  I understand, Your Honor.

15  BY MS. MURNAHAN:

16  Q    Were you asked to perform an analysis of incentive

17  payments that were paid in the March 2000, April 2013 time

18  frame to Serra Nissan?

19  A    Yes, ma'am.

20          MS. MURNAHAN:  Is that --

21          THE COURT:  Yes, ma'am.  Thank you.

22  BY MS. MURNAHAN:

23  Q    What information were you given to perform this analysis?

24  A    I was given a list of 15 vehicle identification numbers,

25  along with the customer information that went with them.

1    Q    What program did you use to do this analysis?

2    A    We have inhouse program called Vehicle Incentive

3    Management System, also known as VIMS.

4    Q    VIMS?  Is that a program you use on a day-to-day basis?

5    A    Daily basis.

6    Q    You are familiar with it?

7    A    Yes, ma'am.

8    Q    What specifically were you asked to do with this

9    analysis?

10   A    To take these 15 vehicles and take them out of their

11   sales for that time frame.

12   Q    By they, you mean Serra Nissan sales?

13   A    No, take it out of Serra's.

14            MS. MURNAHAN:  Okay.  I am going to show you what

15   has been marked as Government's Exhibit 34.  Permission to

16   approach the witness?

17            THE COURT:  Granted.

18   BY MS. MURNAHAN:

19   Q    If you could take a look at that.

20   A    (Witness complying.)

21   Q    Ms. Strickland, are you familiar with that document?

22   A    Yes, ma'am.

23   Q    What is that document?

24   A    This is a simulation of the effect of any changes in

25   audits to a vehicle's incentives -- I am sorry, to a

1   dealership's incentives.

2   Q    Did you create this document?

3   A    Yes, ma'am.

4   Q    Looking at it, does this appear to be a true and accurate

5   copy of the analysis you prepared?

6   A    Yes, ma'am.

7        MS. MURNAHAN:  Government moves to admit

8   Government's Exhibit 34.

9        MR. BROOME:  Judge, if this nice lady said she

10  performed all of these, I have no objection to it coming in.

11       THE COURT:  It's admitted.

12  MS. MURNAHAN:

13  Q    I am going to hand you what's been marked as Government's

14  Exhibit 35.  Hang on to that.  Do you recognize that document?

15  A    Yes, ma'am.

16  Q    What is that document?

17  A    These are the other vehicles that are affected by the

18  change of 15; those 15 affected the rest of these on this

19  list.

20  Q    Okay.  So this was another piece of the analysis that you

21  performed on Serra Nissan's incentive payments?

22  A    Yes, ma'am.

23  Q    You created that document?

24  A    Yes, ma'am.

25  Q    Does this appear to be a true and accurate copy of the

 1   analysis that you prepared?

 2   A    Yes, ma'am.

 3           MS. MURNAHAN:   We move to admit Government's Exhibit

 4   35.

 5           MR. BROOME:   Judge, the same, I went to law school

 6   to be a lawyer instead of a mathematician.   If she says these

 7   numbers are correct, I would agree with her.   We have no

 8   objection to it being admitted.

 9           THE COURT:   Government's Exhibit 35 is admitted.

10   BY MS. MURNAHAN:

11   Q    And finally, I am going to hand you what has been marked

12   as Government's Exhibit 36.   Do you recognize that document?

13   A    Yes, ma'am.

14   Q    What is that?

15   A    This is the list of the 15 audited vehicles that were

16   changed.

17   Q    So that was the information you were given --

18   A    Yes, ma'am.

19   Q    -- to perform your analysis -- and you may not have

20   created that document, but was it created through your system?

21   A    It was created through the VIMS system, yes, ma'am.

22   Q    This is what you used to do the analysis?

23   A    Yes, ma'am.

24   Q    Does that appear to be a true and accurate copy of the

25   analysis or of the listing that came out of the VIMS system?

1    *A*    Yes, ma'am.

2            MS. MURNAHAN:  Government moves to admit Exhibit 36.

3            MR. BROOME:  Judge, if Ms. Strickland says she did

4    this, we have no objection.

5            THE COURT:  It's admitted.

6    BY MS. MURNAHAN:

7    *Q*    Ms. Strickland, would you go back to Government's Exhibit

8    34.

9            MS. MURNAHAN:  Permission to publish, Your Honor?

10           THE COURT:  Granted.

11   BY MS. MURNAHAN:

12   *Q*    I am going to direct you -- Ms. Gold, would you call up

13   the very top portion of this (indicating).

14           Ms. Strickland, as this document indicates, what was

15   the scope of your audit?  What was the time frame of the deal

16   that you were looking at?

17   *A*    I pulled information for one quarter, which would

18   basically be January through the beginning of April.

19   *Q*    Of what year?

20   *A*    2013.

21   *Q*    Total vins, what is that number?

22   *A*    That is the number of sales they had during this time

23   frame.

24   *Q*    And again this is for Serra Nissan?

25   *A*    Yes, ma'am.

1    Q    Okay.  So if Serra Nissan sold 504 cars in the first

2    calendar quarter of 2013 --

3    A    Yes, ma'am.

4    Q    -- were those only new cars?

5    A    Only new cars, yes, ma'am.

6    Q    This doesn't count, used cars, or --

7    A    We're not interested in that part.

8    Q    Nissan, the manufacturer, is only concerned with new?

9    A    Yeah.

10   Q    And below that 504, there's a number 15.  What is that?

11   A    That's the number of vehicles that were adjusted, the 15

12   on the list.

13   Q    Okay.  If you could call out that middle section.  Thank

14   you.

15        "Program payments."  So I am going to take you down to

16   the "net amount."  What is that amount?

17   A    That is the grand total of the effect that all these

18   adjustments would have.

19   Q    Okay.  So is that the total amount of money that Serra

20   Nissan got for reporting these cars?

21   A    Yes, ma'am.

22   Q    Okay.  Let's break that amount down.  And just for the

23   jury's sake, would you please read out that number.

24   A    $82,750.

25   Q    So could we call out the bottom section of that and pull

1    it up.  Thank you.

2            So the section that has the dealer traded, and there's

3    15 vins, so those are the 15 cars?

4    A    Yes, ma'am.

5    Q    What does payments number, with that 23, what is that?

6    A    Each payment may have more than one payment on it,

7    different programs, different amounts.  So those 15 vehicles

8    had 23 payments on them.

9    Q    So, more than one incentive payment at any given time?

10   A    Mm-hm.

11   Q    So what was the total?

12   A    $17,950.

13   Q    Okay.  So to be clear, those 15 vehicles generated

14   $17,950 in payments of whatever type?

15   A    Yes, ma'am.

16   Q    Well now I am going to break that down a little bit.  So,

17   can we go to the page of that same Exhibit 4.

18            What does that page show?

19   A    This is a detailed listing.  It is breaking down the

20   adjustments according to program.  We have one, two, three,

21   four programs showing on this page.  Various small ones.  A

22   small program on the top for one vehicle.  It's kind of hard

23   to read that.

24   Q    Well, Ms. Gold, would you please call up the very -- the

25   top section.  If you could go down one more.  Yeah.

1    A    These are pretty straightforward, just payments on three

2    different vehicles, $500, $600, and a $1,350 payment.  Each of

3    these vehicles are what the debit would be for each of those

4    three different programs.

5    Q    So these are three other incentive programs that were

6    running on those 15 vehicles?

7    A    Yes, ma'am.

8    Q    Now I am going to jump to the next page.  Would you

9    please call that up, Ms. Gold.

10   A    We have one program on this page, March bonus cash.  It

11   affects one, two, three, four, five vehicles, and those five

12   vehicles have a total debit of $5,000.

13   Q    So that March bonus cash, as it says up here by the

14   program, that was another, yet another incentive program that

15   was running on those vehicles at the time?

16   A    Yes, ma'am.

17   Q    Can we get rid of that and go back to the previous page.

18   I am sorry I'm jumping around so much.  Ms. Gold, would you

19   please call out that bottom big section.  Okay.

20        What is this?  What does this section show?

21   A    This is labeled up at the top, February, March DVB.  DVB

22   is the dealer volume bonus.

23   Q    What was that a major incentive program that was running

24   at the time?

25   A    Yes, ma'am.  This was the most significant one.  And it

1    has the levels and tiers.  And the higher they go in the

2    levels is the more they get paid out.

3    Q    And so what does this analysis show?

4    A    This shows that the list of 15 vehicles, all 15 were in

5    this program.  But if those 15 were debited, that's what's

6    listed at the top, and each of those would be debited $700 in

7    this one program.  That's all that's on the top is that list

8    that are directly debited.  However, when these are debited,

9    it has an overall effect on the program.  They drop from one

10   level to a lower level.

11   Q    Okay.  We'll go through that in a minute.

12   A    Okay.

13   Q    When you say debited, you mean subtracted?

14   A    Yes.

15   Q    When these 15 cars were subtracted, how much was in

16   dealer volume bonus was subtracted?

17   A    For the other vehicles?

18   Q    Just for these 15.

19   A    Just for these 15, that would be the $10,500 that's

20   listed.  Audit adjustments.

21   Q    So if we added together the $10,500, the small amounts

22   $1,350, $600, $500 from the other programs, incentive programs

23   that were running, and the $5,000 from the March bonus cash,

24   is that how you arrived at that $17,950 figure?

25   A    Yes, ma'am.

1   *Q*    Okay.  So that's the breakdown of the incentive payments

2   that were made on those 15 cars?

3   *A*    Yes, ma'am.

4   *Q*    Now, I want to go to Government's Exhibit 35.

5          MS. MURNAHAN:  Permission to publish, Your Honor?

6          THE COURT:  Granted.

7          MS. MURNAHAN:  Thank you.

8   BY MS. MURNAHAN:

9   *Q*    Before we call out anything on this, you have mentioned

10  that removing those 15 cars impacted the dealer volume bonus

11  on other cars.  Can you explain what that meant?

12  *A*    Yes, on the dealer volume bonus, the more vehicles a

13  dealership sells, the higher they go, and it affects every

14  vehicle in the program.  So if they sell a certain amount,

15  they get a certain payment amount on every vehicle.  If they

16  go up a level, it gets increased for every single vehicle in

17  the program.  This adjustment dropped their levels.  So where

18  they were at a high level, every vehicle now is at a lower

19  level and gets paid less.

20  *Q*    Okay.  So when they hit the bonus initially, they were at

21  tier level two.  How much did they get per car for tier level

22  two?

23  *A*    In all total $700.

24  *Q*    Okay.  And removing these 15 cars impacted their

25  attainment of tier level two?

1    *A*      Mm-hm.

2    *Q*      Did it drop them down to tier level one?

3    *A*      Yes.

4    *Q*      How much did they get per car for tier level one?

5    *A*      $300.

6    *Q*      So how much needed to be subtracted for every car?

7    *A*      So they dropped $400 per car.

8    *Q*      So they got an extra $400 per car that they didn't

9    actually earn?

10   *A*      Yes, ma'am.

11   *Q*      So going to page 1 -- 4 of Government's Exhibit 35.

12   Would you please call out, Ms. Gold, the very totals at the

13   bottom.

14          How many cars were impacted by Serra Nissan's

15   inclusion of those 15 sales?

16   *A*      There were 162 other vehicles.

17   *Q*      Okay.  And how did you arrive at that amount of $64,800?

18   *A*      That is basically the 162 vehicles times $400 each.

19   *Q*      And $400 is the difference between the tier levels?

20   *A*      Yes, ma'am.

21   *Q*      I want to do a little high level math with you now, Ms.

22   Strickland.

23          Can we put that ELMO up?  Okay.  All right.  I am in

24   Mr. Broome's camp as far as technology goes.

25                MR. BROOME:  That's not a good thing.

1          (Laughter from the audience.)

2    BY MS. MURNAHAN:

3    *Q*    So looking at the analysis that you prepared and only

4    talking about the dealer volume bonus incentives, how much in

5    dealer volume bonus incentives on those 15 cars did Serra

6    Nissan receive?

7    *A*    Let's see, on 15 that, would be the $10,000 and

8    something.  $10,500.

9    *Q*    Okay.  All right.  Would that dealer volume bonus have

10   paid the same to Serra Visser Nissan in Cullman?

11   *A*    Yes.

12   *Q*    Did Serra Visser Nissan hit the tier two level?

13   *A*    Yes, ma'am.

14   *Q*    So they would have gotten the same amount of money for

15   those cars in dealer volume bonus?

16   *A*    Yes, ma'am.

17   *Q*    Okay.  Can you see what I am writing?

18   *A*    Yes, now I understand, yes.

19   *Q*    So you said Serra Visser Nissan had hit their dealer

20   volume bonus level?

21   *A*    Correct.

22   *Q*    So removing these 15 cars from their sales level did not

23   drop them down a tier, did it?

24   *A*    Correct.

25   *Q*    Okay.  So did they lose anymore money?

1    A    No, when they -- by not reporting these sales, they had

2    the $10,500 in question.

3    Q    All that Serra Visser Nissan lost was $10,000?

4    A    Correct.

5    Q    It did not impact any other cars?

6    A    Correct.

7    Q    So that's going to be a zero.  So their total -- but it

8    did impact Serra Nissan, correct?

9    A    Correct.

10   Q    And what was the total impact to other cars in the dealer

11   volume bonus to Serra Nissan?

12   A    That's the $64,800.

13   Q    Now I have to do the high level math.

14   A    You are on the right track.

15   Q    Auditor, am I correct?

16   A    You are correct.

17   Q    $75,300.  So would it be a fair statement to say that

18   reporting those 15 deals correctly at Serra Visser Nissan,

19   those cars were worth $10,500?

20   A    Yes, ma'am.

21   Q    Would it also be fair to say that by falsely reporting

22   those 15 deals at Serra Nissan, those cars were worth $75,300.

23   A    Yes, ma'am.

24   Q    That's the extent of my technology.  Can we pull up

25   Government's Exhibit 36?

1          MS. MURNAHAN:   Permission to publish, Your Honor.

2          THE COURT:   Granted.

3    BY MS. MURNAHAN:

4    Q    And this is simply the list of deals.

5    A    It is a list of 15 deals, yes.

6    Q    There's nothing -- we can take that down.

7          Ms. Strickland, are you familiar with the term

8    "pooling of sales"?

9    A    No, ma'am.

10   Q    Okay.  It's not something you typically hear?

11   A    That's not a term that I am familiar with.

12   Q    Okay.  In your experience with Nissan North America --

13   and you said you have been there for 15 years?

14   A    Yes, ma'am.

15   Q    Okay.  Is it permissible for a dealership to report a

16   sale of a vehicle that it didn't actually sell?

17   A    No, ma'am.

18   Q    Dealerships can do something called a dealer trade, can't

19   they?

20   A    Yes, ma'am.  That's fairly frequent.

21   Q    How would that work?

22   A    Basically, they find a dealership to trade with.  Very

23   frequently, this is to find the customer the precise vehicle

24   they want.  And they go through a process where they trade the

25   vehicle, they trade the asset, and they actually have to

1    contact some of our administrative people in the regions to do

2    a system change.  So that goes from one dealer's inventory to

3    the other dealer's inventory.

4    Q    Okay.  Would that transfer have to occur before the sale

5    to the end customer actually occurred?

6    A    Correct.  Our systems don't allow -- we can't just type

7    in any vehicle number.  It has to be within their inventory to

8    be reported.  So it has to be moved into their inventory by

9    Nissan.

10   Q    Okay.  Is that a quick process?

11   A    No, it's an overnight process.

12   Q    So if a dealer traded on one day, they could not actually

13   sell the vehicle until the next day?

14   A    Until the next day, or report it.

15   Q    By report it, what do you mean?

16   A    Actually put it in the system.  Then can sell it

17   whenever, and they can report itself days later, according to

18   how the paperwork is going.

19   Q    Report it to Nissan?

20   A    Report it through our Nissan systems, yes, ma'am.

21   Q    Through what process would they call that?

22   A    They call it an RDR.

23   Q    Okay.  Have you heard the term CMO?

24   A    Ages ago.  It's a very old term.  Old dealership style.

25   I came here to Nissan 15 years ago, and I think we had a total

 1    of six dealerships that were CMOs still, but they were on the

 2    way out.

 3    Q    What does that imply?

 4    A    We also call them sister stores.  Basically, two

 5    locations together have one sales objective, have one target.

 6    And it doesn't matter if a vehicle sold at one dealership or

 7    the other, it will count towards their objective.

 8    Q    Okay.  To be a sister store, can they have different

 9    parents, so-to-speak.  Can the owners be different?

10    A    It has to be the exact same owner.

11    Q    Exact same owner?

12    A    It's practically the same store.  It just has two

13    locations.  It's the same ownership, same person.

14    Q    So if there was an overlap of ownership but not

15    completely identical, would that count?

16    A    No.

17    Q    You said it's an old practice, does Nissan do this

18    anymore?

19    A    No.

20    Q    Okay.  When do you think it was phased out?

21    A    It was phased out before we left to California, so that

22    was in 2006.  I would guess, 2004 or five.

23    Q    Okay.  Were any CMO groups or sister store groups allowed

24    to keep that arrangement?

25    A    No, it took a little while to phase it out, but it was

1    all phased out.

2    Q    So there were no more CMO sister store groups after the

3    phase out?

4    A    Correct.

5    Q    And in December of 2012, were there any sister store

6    groups in North America or America?

7    A    No, ma'am.

8    Q    Were Serra Visser Nissan and Serra Nissan considered

9    sister stores?

10   A    No, ma'am.

11          MS. MURHANAN:   One moment, Your Honor.

12   BY MS. MURNAHAN:

13   Q    Ms. Strickland, you stated earlier that it was not

14   appropriate for a dealership to report that it sold a car that

15   was actually sold at another dealership?

16   A    Correct.

17   Q    How do you know that?

18   A    We have a set of rules.   We have both the sales and

19   service agreements that sets up the whole dealership

20   relationship with Nissan.   It has certain rules, as well as

21   the C & I rules, the contest and incentive rules, that are

22   published with all programs.

23   Q    Okay.   How would someone who worked at a dealership know

24   that?

25   A    They are required to read those rules.   If they don't

1   accept those rules, they can't even report vehicles.

2   Q   Going back to a dealership reporting a car sold when it

3   was sold at another dealership, could that be accidentally

4   done?

5   A   No, it requires a great deal of effort.  It's not

6   straightforward in any way, starting with the system dealer

7   trade.

8   Q   Are there are a lot of moving parts in that, essentially?

9   A   Yes, ma'am.

10  Q   You said it would start with the dealer trade.  So once

11  the dealer trade quote unquote had happened, what other

12  accounting entries or entries on the records would have to be

13  entered?

14  A   I can't tell you exactly, other than they do need to

15  trade the asset from one set of books to the other set of

16  books.  But they shouldn't be sharing books if it's two

17  separate dealerships, as well as there is paperwork involved

18  in the actual deal jackets.

19  Q   So it's an involved process?

20  A   Yes, ma'am.

21          MS. MURNANHAN:  Nothing further, Your Honor.

22          THE COURT:  All right.  Cross examination, please.

23          MR. BROOME:  Yes, Your Honor.

24                      CROSS EXAMINATION

25  BY MR. BROOME:

1   Q    Ms. Strickland, we appreciate you coming down from

2   Tennessee today.  Would it surprise you --

3            MR. BROOME:  May I approach, Your Honor?

4            THE COURT:  Yes.

5   BY MR. BROOME:

6   Q    I will show you what's been marked as Government's

7   Exhibit 37.

8            Mr. Byrnes testified yesterday those were the official

9   rules for this dealer volume program.  What do you call that,

10  I may have misspoke?

11  A    We call them C & I rules.  But yes, these are the rules.

12  Q    Well, take a second and read through there, and I will

13  tell you what you are not going to find.  You said it was not

14  permissible to pool stores and things, and that would be in

15  the rules.  You just testified to that, didn't you?

16  A    Yes, sir.

17  Q    It ain't in there, ma'am, but please look through there

18  and make sure.

19  A    Okay.  It does not say that directly.  It does imply it,

20  though.

21  Q    Well, it doesn't say it, though, does it?

22  A    No.

23  Q    Nowhere?

24  A    No, sir.

25  Q    The highlighted one is mine, I will tell you that.  In

1  the three pages, where does it even imply that?

2  A    I would say in 1-A where it says that the vehicle must be

3  available in the dealer inventory and delivered at the

4  dealership.

5  Q    Okay.  Well, you also told me that it was okay if we had

6  the dealer trades; is that right?

7  A    Yes, sir.  Absolutely.

8  Q    And you said that took a long time like two days?

9  A    It's an overnight process, yes, sir.

10  Q    Okay.  Well, I guess time is relative.  That's not a very

11  long time if you got a 30- or 45-day incentive program, is it?

12  A    Yes, that's fine.

13  Q    So it would have been perfectly okay with your rules --

14  and I call it the Cullman store and the Birmingham store

15  because I am pretty simple-minded?

16  A    Yes, it is easier.

17  Q    Yes, it is.  If the Cullman store had dealer traded all

18  15 cars to the Birmingham store, and let's say they did it on

19  -- let's make this easy -- they did it on March the 23rd.

20  Okay?

21  A    Okay.

22  Q    The Birmingham store could have sold those cars on March

23  the 24th, if they had done all the paperwork?

24  A    Reported them, yes.

25  Q    Okay.  And that would have been okay?

1    A    Yes, sir.

2    Q    And that's 24 hours, give or take, an hour or two?

3    A    Yes, sir.

4    Q    Now let me go back to Government's Exhibit 34.  Again,

5    the highlighting is mine.

6         The period of time we're talking about, January the

7    1st, 2013 to April the 2nd, this would just be the Birmingham

8    store?

9    A    Yes, sir.  This only pertains to the Birmingham store.

10   Q    Okay.  And during that three-month period, the Birmingham

11   store sold 504 cars?

12   A    Yes, sir.

13   Q    And you took out the 15 cars?

14   A    The 15, yes.

15   Q    And you have got here, sales misreporting.  What is that?

16   A    That's a percentage.  So if you take that 15 and say 2.97

17   percent to 504.

18   Q    Let's make it easy on me again.  Three percent.

19   A    Okay.

20   Q    Right.  So their error rate, three percent of their total

21   sales?

22   A    Yes.

23   Q    And your program payments, you got $2,660?

24   A    Yes, sir.

25   Q    Tell me what that is.

1  *A*    That is for that 504 vehicles, there were 2,000-some odd

2  payments on those vehicles.

3  *Q*    So with my simple math, that's about five incentive

4  payments per car?

5  *A*    Yes, sir.

6  *Q*    Give or take?

7  *A*    Yes.

8  *Q*    And that totaled how much?

9  *A*    Those are the big numbers, $648,800.

10  *Q*    Okay.  So just on incentive payments, the Birmingham

11  store for their 504 cars got $648,000?

12  *A*    Yes, sir.

13  *Q*    And correct me if I am wrong, they also got money from

14  the dealership for selling the car, right?

15  *A*    That would be on that list.

16  *Q*    No, I thought this was just program payments.  Don't I

17  get -- like if the car costs $30,000, and I sell it for 35, I

18  made $5,000?

19  *A*    I got you.  Yes, that's an addition.  That's separate

20  from Nissan.

21  *Q*    That's not included in that figure?

22  *A*    No.

23  *Q*    And when all is said and done, you guys are saying you

24  lost $64,800?

25  *A*    In the dealer volume bonus.

1   *Q*    Right.  I mean, that's the figure?

2   *A*    Right.

3   *Q*    Okay.  And at some point in time, the sister stores, it

4   was okay to pool sales?

5   *A*    Even when they were called sister stores, when we had

6   those, it was never called pooling.  As I said, I am not

7   familiar with that term.

8   *Q*    I may have come up with that term myself.  What do they

9   call it?

10  *A*    Well, they didn't have to dealer-trade vehicles.  They

11  can report them at their own stores.  It didn't really matter

12  where they were reported.

13  *Q*    But again, I could have dealer traded the Cullman 15

14  deals to Birmingham the next day, sold those cars in

15  Birmingham to the same customers from Cullman, right?

16  *A*    If they had driven up to Birmingham.

17  *Q*    Okay.  Well, they wouldn't have even had to have done

18  that, would they?  I could have gotten drivers to have carried

19  the cars to them to Cullman, couldn't I?

20  *A*    No, sir.  Actually, they do require delivery at the

21  dealership.

22  *Q*    Okay.  So they would have had to come -- I know you are

23  not from here -- but Cullman to Birmingham is 30 miles?

24  *A*    Yeah.

25  *Q*    Give or take.  And I may be wrong about that.

1   *A*     Yeah.

2   *Q*     And they would have RDR'd them in Birmingham, and they

3   would have been just fine for your incentive program?

4   *A*     Correct.

5   *Q*     That's all I have ma'am.  Thank you.

6              THE COURT:  Ms. Murnahan, anything else?

7              MS. MURNAHAN:  Yes, just briefly, Your Honor.

8                    REDIRECT EXAMINATION

9   BY MS. MURNAHAN:

10  *Q*     Ms. Strickland, I am going to hand you Exhibit 37.

11  Again, can you review that and tell the jury where it says in

12  that document not to steal money from Nissan?

13  *A*     It doesn't say that.

14              MR. BROOME:  Judge, I am going to object to that

15  question.

16              THE COURT:  Overruled.

17  *A*     It doesn't say that directly.

18  BY MS. MURNAHAN:

19  *Q*     Okay.  Could that be something that's implied?

20  *A*     I would believe so.

21  *Q*     Let me take that back.

22              Mr. Broome had you discussing the dealer trade

23  process.  Can you dealer trade a car that had already been

24  sold to an end customer?

25  *A*     Not within the rules, no.  No, ma'am.

1   Q    Okay.  So once the customer purchases the car, is that

2   car removed from inventory and it's not possible to dealer

3   trade it?

4   A    You can do it systematically.  However, it would be a

5   misreport.  We expect the reporting to reflect what actually

6   happened.

7   Q    Okay.  Mr. Broome also had you looking at Government's

8   Exhibit 34, the sales misreporting percentage.

9   A    Yes.

10  Q    And 2.97 is the percentage -- 15 is 2.97 percent of 504?

11  A    Yes, ma'am.

12  Q    If you know, what was the average misreporting rate for a

13  dealership of the size of Serra Nissan?

14  A    I would estimate somewhere around 2 percent, I would

15  guess.

16  Q    Okay.  So this is a little bit higher?

17  A    A little bit higher.  I would say this is not necessarily

18  an accurate number.  This only is about those 15 vehicles.  Of

19  course, there's no review of any of the rest of the vehicles

20  going on.

21  Q    So there could be other errors or misreporting that was

22  not accounted for in this analysis?

23  A    Correct.  Correct.

24  Q    And talking about the sister stores, and you said that

25  they were not required to dealer trade?

1    *A*    There would be no need to.  They have a shared objective,

2    or they had a shared objective.

3    *Q*    Are they considered one dealership?

4    *A*    Systematically, yes.

5    *Q*    They shared inventory?

6    *A*    Correct.

7    *Q*    So there would be no need to --

8    *A*    Let me back track.  If they conceptually shared

9    inventory, it would be, of course, in two separate locations

10   and marked in two separate locations.

11   *Q*    But the inventory available to each store would be the

12   same, it would be --

13   *A*    Yes, ma'am.

14   *Q*    -- across all of the sibling stores?

15   *A*    Correct.

16   *Q*    Okay.  And the sales objectives, when you talked about

17   that, would the sister stores only have one number?

18   *A*    Correct.  Only one.

19   *Q*    So one store wouldn't have 100 and the other store have

20   70?

21   *A*    Correct.

22   *Q*    The total for both stores would be 170?

23   *A*    It wouldn't matter if one store sold one and the other

24   sold 169, they had 170.

25   *Q*    Okay.

1          MS. MURNAHAN:  Nothing further, Your Honor.

2          MR. BROOME:  Recross examination.

3                    RECROSS EXAMINATION

4     BY MR. BROOME:

5     Q    Ms. Strickland, I am sorry I didn't ask you this to start

6     with, would it be fair to say that Nissan North America's a

7     multibillion dollar corporation?

8     A    Yes, sir.  Yes.

9     Q    Okay.  Thank you.

10         MR. BROOME:  That's all I have.  Thank you.

11         THE COURT:  Ms. Strickland, you may step down.

12         THE WITNESS:  Thank you.

13         MS. WICK:  Your Honor, may we gather some exhibits

14    for the next witness to expedite things before we call the

15    next witness?

16         THE COURT:  Yes.

17         Jurors, if you all want to stand up and stretch your

18    legs for a moment, you are welcome to do that.

19         MS. WICK:  Your Honor, at this time, the government

20    would call Mr. Randy Visser.  I believe he is being brought in

21    right now.

22         THE COURTROOM DEPUTY:  Will you remain standing and

23    raise your right hand, please.

24         Do you swear or affirm to tell the truth, the whole

25    truth, and nothing but the truth so help you God?

1          THE WITNESS:  I do.

2          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

3   Will you state your first and last name.

4          THE WITNESS:  Randy Visser.

5          THE COURTROOM DEPUTY:  Thank you.

6                    DIRECT EXAMINATION

7   BY MS. WICK:

8   Q    I'm sorry, Mr. Visser.  Just give me one second.

9          Mr. Visser, could you tell the jury where you are

10  originally from.

11  A    I am from Michigan.

12  Q    Where do you live now?

13  A    I live in Vestavia Hills.

14  Q    Can you tell the jury about your educational background.

15  A    I graduated from Michigan State University with a BS in

16  accounting in 1993.

17  Q    Did you have any post-graduate work?

18  A    No, I did not.

19  Q    Did you get any licenses or certificates?

20  A    I did receive my CPA license.

21  Q    What does that stand for?

22  A    Certified public accountant.

23  Q    Can you tell the jury what your experience in the car

24  industry is.

25  A    I have held many positions in the car business.  I

1   started as a salesperson.  I moved up to finance manager,

2   sales manager, general manager.  I have approximately 20 years

3   of experience in the car business.

4   Q    Are you married?

5   A    Yes, I am.

6   Q    Do you have any kids?

7   A    Yes, I do.

8   Q    How many?

9   A    Three boys, 14, 12, and 11.

10  Q    When did you start at Serra Nissan?

11  A    It was 2007.  I started at Serra Nissan as a general

12  manager.

13  Q    Who owned Serra Nissan at the time you started?

14  A    It was owned by Tony Serra and my wife Kristina Visser.

15       MS. MURNAHAN:  I am sorry, Your Honor, I apologize

16  for interrupting you.  We have just been alerted that the

17  audio from the court is being transmitted through the speaker

18  in Room 735.  And I don't believe there's anyone in there at

19  the moment, but we probably need to -- is that one of the

20  witness rooms?

21       THE COURT:  Tammi, would you go check on that,

22  please?

23       THE COURTROOM DEPUTY:  Yes, ma'am.

24       MS. MURNAHAN:  I apologize.

25       (Brief pause.)

1          THE COURT:  All right.  Are we ready to go, please?

2   BY MS. WICK:

3   Q    Mr. Visser, I am sorry.  What was your title at Serra

4   Nissan in March 2013?

5   A    I was a general manager.

6   Q    What were your job responsibilities as the general

7   manager?

8   A    I was to oversee all operations.

9   Q    What did that include?

10  A    Staffing, advertising, and all operations, general

11  service parts, sales, advertising, and staffing.

12  Q    In 2013, in March, who at the dealership reported

13  directly to you?

14  A    Forest Housner reported directly to me.

15  Q    Okay.  Did anyone else report directly to you?

16  A    Not directly.  They all reported to Forest Housner, the

17  director of operations.

18  Q    Were there ever times where anyone else came straight to

19  you before Forest?

20  A    Occasionally.

21  Q    Would one of those people be Ms. Branch?

22  A    Occasionally.

23  Q    You mentioned you were responsible for staffing.  Were

24  you responsible for hiring any of the Serra Nissan employees

25  in late 2012?

1   *A*    I don't recall specifically, but I am sure I was.  I have

2   handled primarily staffing managers.  The managers handled

3   staffing of salespeople and service advisors and people under

4   them.  But I primarily handled the staffing of managers all

5   throughout.

6   *Q*    Were you involved in hiring the defendant, Kimberly

7   Branch?

8   *A*    Yes, I was.

9   *Q*    And what was your involvement in that process?

10  *A*    I placed an ad, and I interviewed applicants, and I hired

11  Ms. Branch.

12  *Q*    So you interviewed Ms. Branch?

13  *A*    Yes, I did.

14  *Q*    Did you know her work experience prior to Serra Nissan?

15  *A*    Yes, I did.

16  *Q*    What was it?

17  *A*    She had worked at two dealerships, and I don't recall the

18  names, but she had significant experience as a controller.

19  *Q*    Do you remember when she started at Serra Nissan?

20  *A*    It was approximately three years ago.  I don't remember

21  the exact month, but it is approximately three years ago.  I

22  believe it was some time in 2012.

23  *Q*    Do you know if she was a controller at the dealerships

24  prior to Serra Nissan?

25  *A*    Yes, I believe she was, yes.

1   Q    What was Ms. Branch's pay structure when she started?

2   A    She was on salary of $100,000 a year, and she had 2

3   percent of the net profit as a bonus monthly.

4   Q    What is the net profit?

5   A    The net profit is money the dealership makes after

6   expenses.  So gross minus expenses is the net profit.

7   Q    Which dealerships did she make net profit off of?

8   A    Serra Nissan and Serra Volkswagen, that was one

9   corporation, and then Serra Visser Nissan in Cullman.

10  Q    Okay.  Serra Nissan VW was one corporation?

11  A    Correct.

12  Q    Was it called Serra Nissan Oldsmobile, Inc?

13  A    Correct.

14  Q    Then Serra Visser Nissan was a wholly separate company?

15  A    Yes.

16  Q    That was the dealership in Cullman?

17  A    That's correct.

18  Q    But she got net on both?

19  A    That's correct.

20  Q    Okay.  At some point, did that change and expand?

21  A    Yes, in 2013, I don't recall the month, but she came to

22  have some duties at Talladega Ford.

23  Q    But that was separate from the Birmingham and the Cullman

24  locations?

25  A    That's correct.

1   *Q*    Would the 2 percent net that you are talking about have

2   included incentive payments from Nissan North America?

3   *A*    Yes.

4   *Q*    What were Ms. Branch's job responsibilities as the

5   controller?

6   *A*    To oversee the office and to make sure that the paperwork

7   flow ran through the office, efficiently, and reconciled bank

8   statements, produced financial results, and submit them to

9   manufacturers, Nissan Volkswagen; submit tax returns, handle

10  all of the accounting duties of the dealership.

11  *Q*    How would she be involved with incentive payments from

12  Nissan North America?

13  *A*    She would have to reconcile the payments from what the

14  sales department set up; with what they told her that the

15  dealership was to earn, she would reconcile those payments as

16  they came in.

17  *Q*    Would that require interaction with people in the sales

18  department and the sales process?

19  *A*    If there was a discrepancy.  If they told her that we're

20  supposed to get one incentive and we get paid another

21  incentive, she would have to get with them and say, they paid

22  us short, can you look into it?

23  *Q*    But it was her job to make sure that what you were paid

24  in incentives is what you were entitled to in incentives?

25  *A*    No, that wasn't her job.

1    *Q*    Whose job was that?

2    *A*    That was my job.

3    *Q*    Okay.

4    *A*    Ultimately.

5    *Q*    I am sorry.  I didn't mean to interrupt you.

6          If there was a discrepancy between what you felt you

7    were entitled to and what Nissan paid you, whose job was it to

8    financially calculate that?

9    *A*    Well, if she had taken it to the sales manager first and

10   say, you set up this -- you set up X amount, we got paid Y

11   amount, why are we short?  I typically would get involved in

12   that, if there was a discrepancy, and we would see was it

13   right or was it wrong.

14   *Q*    What was her role in the audit process when Nissan

15   audited the dealership?

16   *A*    Very limited role.  We would give her the deals to pull

17   and she would pull the deals.  We would also -- the auditor

18   would typically request a list of deals pulled from our

19   accounting system, and they would typically request that in

20   Excel format, please give me your sales in Excel from this

21   period to this period, and that would normally be extracted

22   from our accounting system.  So Ms. Branch would do that.  She

23   would extract that list.

24   *Q*    So she would be responsible for sending the Excel

25   spreadsheet with all the accounting data in the primary phase

1    to Nissan, and she would be responsible when she requested a

2    list of deals for pulling those jacket to make sure that they

3    were ready for the onsite audit?

4    A    Yes, either -- or we would just tell her what deals we

5    needed, and she would make sure they got pulled.

6    Q    If there were charge backs or the results of the audit

7    were charge backs, was she responsible for reconciling the

8    incentive payments with the RDR sales data?

9    A    No.

10   Q    She wasn't responsible for reconciling the charge backs

11   with what was sold?

12   A    No, at the end of the audit, they would have a closing

13   meeting, I would be present, Forest Housner would be present.

14   And then we would tell Ms. Branch, I would tell her or Forest

15   would tell her, we got a charge back $19,000, it's coming up

16   next month, just be aware of it.  That's it.  That would be

17   her responsibility.

18   Q    Then you would go into the accounting system and

19   reconcile the line items of the books to account for those

20   charge backs, or would Ms. Branch do that?

21   A    It would just be one single entry.

22   Q    Would you make that entry, or was it Ms. Branch?

23   A    No -- yes, Ms. Branch would, yes.

24   Q    Okay.  So she sent the spreadsheet to accounting to

25   Nissan, she pulled the files for the audit, she would have

1   been responsible for reconciling accounting if there were

2   charge backs, and you felt that was a limited role in the

3   audit process?

4   A    That was her involvement, yes.

5   Q    Who was responsible -- oh, let me back up for a second.

6        When you got the incentive payments from Nissan, did

7   they come with notes, or was it a lump sum payment in March

8   2013, in that time frame?

9   A    I believe it was a lump sum payment.

10  Q    Do you know whether they came with instructions for what

11  that payment was for?

12  A    I don't know.

13  Q    Do you know who was responsible for reconciling those

14  lump sum deposits into the dealership's bank account with what

15  was being paid by Nissan North America for the accounting

16  process?

17  A    Well, I believe it would be -- the office would be

18  responsible.

19  Q    What office?

20  A    The office that Kim Branch was in charge of.

21  Q    Would it have been Ms. Branch that would have been in

22  charge of reconciling?

23  A    That I don't know.

24  Q    Was it your understanding that that was her

25  responsibility as controller was to insure that those amounts

1   were reconciled?

2   A    I would tell her exactly what money we are going to --

3   incentive program if it wasn't related to one specific car, if

4   it was just a bonus program, I would tell her, typically.  She

5   would send me an e-mail, did we earn any bonus money?  I would

6   send her an e-mail back saying, yes, we earned X amount, or

7   here is what we earned.  And she would make sure that we got X

8   amount, whatever I told her we would get.

9   Q    Did you tell her that $126,000 lump sum payment is for

10  these 500 cars, and those 500 cars, each of those cars got

11  these five incentives?  Did you break down to her how that

12  incentive payment was calculated for the purposes of

13  reconciling that?

14  A    No, I did not.

15  Q    So who would have had to have done that?

16  A    I would have done that or Forest would have done that.

17  We would have calculated how much we made.  Sometimes we would

18  e-mail our rep and say, how much did we earn in this program?

19  Sometimes these programs get complicated.  So we would say how

20  much would we earn?  They would send us an e-mail back saying,

21  you earned this amount.  We would tell Kim, set up this amount

22  as receivable.  This is the amount that they're going to pay

23  us.  I believe they would pay us in just a lump sum.

24  Q    So every day you would send her the information of how

25  each lump sum payment was broken down -- in one quarter, if

1  there were 500 cars sold, you were the one that told her how

2  to break down each of those lump sum payments into which cars

3  were sold and which five incentives applied to each car, so

4  that it can be entered into accounting?

5  A    Only once a month.

6  Q    So who would have been responsible, after you sent that

7  once a month, for actually making every entry into the

8  accounting required for where that money was coming from, how

9  it had to be applied, who had to be paid, which sales

10  representatives had to get commissions, who was responsible

11  for financially calculating that?

12  A    Well, sales people did not get paid on the dealer

13  incentives.  That was one inventory that would be made.

14  Q    Who was responsible --

15  A    Kim Branch was responsible for making that entry.

16  Q    Let's talk about the two car dealerships, Serra Nissan

17  and Serra Visser Nissan.  Can you explain what the ownership

18  structure was for Serra Nissan, the Birmingham store, in March

19  2013?

20  A    Yes.  Tony Serra owned 50 percent, and Kristina Visser,

21  my wife, owned the other 50 percent.

22  Q    Who owned Serra Visser Nissan, the Cullman store in March

23  2013?

24  A    I owned 49 percent, Tony Serra owned 49 percent, and my

25  wife Kristina owned 2 percent.

1    Q    So the ownership structures were not identical?

2    A    No.

3    Q    I have handed you what's been previously marked as

4    Government's Exhibit 38 and 39.  Let's start with 38.

5    A    Okay.

6    Q    Do you recognize that document?

7    A    Yes, I do.

8    Q    What is that?

9    A    This is the Nissan dealer sales and service agreement.

10   Q    Is that the Nissan sales and service agreement for the

11   Birmingham Serra Nissan dealership?

12   A    Yes, it is.

13   Q    Can you take a moment -- I know it's a large document.

14   Can you take a moment and review it and tell me if it's a true

15   and accurate copy of the Birmingham stores sales and service

16   agreement.

17   A    (Witness complying.)  There appears to be some other

18   documents in there, but it does appear to be the Nissan sales

19   and service agreement for Serra Nissan Oldsmobile.

20   Q    What other documents are in there that are not part of

21   the sales and service agreement?

22   A    This is a letter from Nissan to Tony Serra and Kristina

23   Visser about requests for relocation.  That's not part of the

24   dealer agreement.  This is another letter regarding

25   relocation.

1   Q    Are they addendums, or are they letters?

2   A    They're just letters.  This is a shipment request, FedEx

3   shipment request.  This is a floor plan system request.

4   That's not part of the agreement.  I am not sure what that's

5   for.  This is an e-mail.  I don't recall what that is.

6   Q    Hand me what's not part of the --

7   A    Okay.

8   Q    Is the rest of what you have in front of you the

9   Birmingham store sales and service agreement with Nissan North

10  America?

11  A    These documents are not part of the agreement.  I believe

12  everything else in here is part of the agreement.

13  Q    Okay.

14          MS. WICK:  Your Honor, pursuant to the stipulation

15  between the parties regarding the admissibility of this

16  without reading it to the jury, the government would, at this

17  time, move to admit under seal Government's Exhibit 38 because

18  it includes proprietary information from Nissan North America.

19  I conferred with defense counsel.

20          MR. BROOME:  Judge, I don't have any objection to

21  that.  I would like to know what documents were taken out of

22  the exhibit.

23          MS. WICK:  I will show you.

24          THE COURT:  Okay.

25          MS. WICK:  Just one moment, Your Honor.

1      (Brief pause.)

2           THE COURT:  Ms. Wick, are the documents that Mr.

3   Visser has removed from Government's Exhibit 38, because they

4   are not part of the sales and service agreement, are those

5   documents that were accidentally inserted into the sales

6   agreement?

7           MS. WICK:  No, Your Honor.  They were documents that

8   Nissan North America said were part of the sales and service

9   agreement, but this witness is saying they're not.  So if he

10  can't say they're a true and accurate copy, I can only move in

11  what he is saying.

12          THE COURT:  Okay.  All right.  With those documents

13  removed then, Government's Exhibit 38 is admitted into

14  evidence.  That document is sealed because of the proprietary

15  confidential information contained within the document.

16  BY MS. WICK:

17  Q    Mr. Visser, because you removed a number of the

18  documents, I am going to need you, for the record, and

19  actually so that defense counsel knows, I need you to read off

20  the ranges of the bates numbers in the bottom right-hand

21  corner.  Hopefully, they're still in kind of relatively some

22  order.

23  A    40 through 54.

24  Q    That's NNA 00040.

25  A    Through NNA 00054.

1    *Q*    What's the next range?

2    *A*    65 through NNA 000065 through NNA 000070.  And NNA 000073

3    through NNA 000074.  And NNA 000078 through NNA 000081 and NNA

4    000085.  That's a single document.  And then NNA 000087

5    through NNA 000088.

6              MR. BROOME:  Judge, we would have no objection to

7    the introduction of the bates numbers of Exhibit 38 which Mr.

8    Visser listed.

9              THE COURT:  Okay.  They've been admitted.

10             MS. WICK:  Thank you, Your Honor.

11   BY MS. WICK:

12   *Q*   Mr. Visser, at some point in time, that agreement was

13   amended and -- I apologize.  That agreement refers to standard

14   provisions, something that Nissan issues to everyone.  Can you

15   take a look at Government's Exhibit 39, and tell me if those

16   are the standard provisions that Nissan issues, that 38 refers

17   to.

18   *A*    Yes.

19   *Q*    Okay.

20             MS. WICK:  Your Honor, pursuant to the stipulation

21   between the parties, the government would move to admit

22   Government's Exhibit 39 under seal, as well.  That document

23   also contains proprietary Nissan information.

24             MR. BROOME:  We have no objection.

25             THE COURT:  Government's Exhibit 39 is admitted into

1    evidence.  It is sealed because it contains proprietary

2    information.

3             MS. WICK:  Thank you, Your Honor.

4    BY MS. WICK:

5    Q    Mr. Visser, did the two dealership, the Birmingham and

6    the Cullman dealership, did they share certain functions?

7    A    Yes, they did.

8    Q    What functions did they share?

9    A    We shared advertising, we shared inventory, we shared

10   some accounting staff.

11   Q    When you say you shared inventory, what did you mean?

12   A    If a customer came to one location and we had the car at

13   the other location, we would get that car from that location.

14   Q    Did you have to dealer trade that car into the system in

15   order to get it?

16   A    Yes.

17   Q    Was it your understanding that for a dealer trade, you

18   said, if the other store had the car -- but for the dealer

19   trade, for a car to be dealer traded to Birmingham, the

20   customer had to buy that car at the Birmingham store?

21   A    Repeat the question again.  I don't understand the

22   question.

23   Q    You said, if we didn't have the car in our inventory, the

24   car had to be dealer traded, right?

25   A    Correct.

1    Q    Okay.  For there to be a dealer trade, let's say a dealer

2    trade from the Cullman store to the Birmingham store?

3    A    Okay.

4    Q    For that to be a valid dealer trade, the customer had to

5    actually buy that car at the Birmingham dealership, correct?

6    A    If the customer came to Birmingham and the car was in

7    Cullman, the vehicle would have to be dealer traded from

8    Cullman to Birmingham before that customer could buy in

9    Birmingham.

10   Q    If the customer purchased the car in Cullman, and then

11   the car was dealer traded to Birmingham and RDR'd as sold in

12   Birmingham, is that a valid dealer trade?

13   A    Well, it's a valid dealer trade, but...

14   Q    Why is that a valid dealer trade?

15   A    Because it got traded.  A dealer trade is just

16   transferring it from one dealership's inventory to another

17   dealership's inventory.  So it appears under that instance.

18   It didn't get dealer traded.

19   Q    Okay.  I understand, I think, the confusion.  I

20   understand that there was a dealer trade that you did in the

21   system, but under Nissan's rules, is it a valid dealer trade

22   if the car is actually sold to a customer in Cullman, then

23   dealer traded to Birmingham and reported as sold in Birmingham

24   when it's already sold in Cullman?

25   A    That's not a valid RDR.  I mean it's still a valid dealer

1    trade.  I am just trying to answer the question properly.

2    Nissan would look at that as a car sold in Cullman.

3    Q    You said Nissan would look at that as a car sold in

4    Cullman.  Why?

5    A    Because that's where the car was delivered in Cullman.

6    That's where the customer signed paperwork.

7    Q    To the ultimate consumer?

8    A    Correct.

9    Q    Under their rules?

10   A    Correct.

11   Q    So no, it would not be a valid dealer trade if the dealer

12   trade was done after the car was sold to a customer in

13   Birmingham?

14   A    There's no stipulation -- a dealer trade is just going

15   from one inventory to another.  There's no rules on how a

16   dealer trade has to be done.  I mean, I don't know how to

17   answer that question.  If it was dealer traded, it was valid.

18   It got dealer traded.  Was it a valid RDR?  No, it was not a

19   valid RDR.  That would have been incorrect.

20   Q    Okay.  So, it would have been an invalid RDR if that car

21   was RDR'd in Birmingham, but it was sold in Cullman, and then

22   RDR'd to Birmingham?

23   A    Correct, yes.

24   Q    Okay.  You mentioned that the two dealerships shared an

25   accounting function.  How did they share accounting functions?

1   *A*    We had one office that would process all the deals.  So

2   that office was located -- originally, it was located upstairs

3   at our Volkswagen dealership, then we moved it to our Nissan

4   dealership.  But the cars that were sold in Cullman, we would

5   have a runner every day deliver the paperwork to Birmingham to

6   be processed.

7   *Q*    So Ms. Branch was the controller for both Serra Visser

8   Nissan and Serra Nissan?

9   *A*    That's correct.

10  *Q*    How did you keep the paperwork, the deal jackets

11  separated?

12  *A*    I believe they were separated by color.

13  *Q*    Do you know which colors the dealerships used?

14  *A*    I do not.

15  *Q*    What functions, specifically, did Ms. Branch perform for

16  both dealerships?

17  *A*    She was the controller.  So produce financial results to

18  the manufacturers.  I believe she reconciled bank statements.

19  She was over training and hiring all the staff, scheduling

20  operators.  She was over the office.

21  *Q*    Was she -- I'm sorry.  I didn't mean to interrupt you if

22  you weren't finished.

23  *A*    No, that was it.

24  *Q*    Was she also responsible for reconciling the incentives

25  of both stores based on the payments that the stores received?

1    *A*    That would be under her.  I don't know if she did that

2    personally or if she assigned that, I don't know.

3    *Q*    She would be responsible for overseeing if anybody else

4    did that?

5    *A*    Correct.

6    *Q*    Have you ever participated in a Nissan North America

7    audit?

8    *A*    Yes, I have.

9    *Q*    How many audits can you remember in the last three years?

10   *A*    The three last years?  I believe we had two audits in the

11   last three years.

12   *Q*    Going back to 2010, you remember two audits?

13   *A*    No, there was one year we did not get audited.  I believe

14   there was three audits in four years.

15   *Q*    2010, 2011, and 2013.  Because you are right --

16          THE COURT:  I think he said the last three years, so

17   that would be 2012 to 2015.  If you are trying to reach back

18   further, I think you need to redefine your time frame.

19   BY MS. WICK:

20   *Q*    Yeah, I realize my error, 2011 -- 2010, '11, '12, and '13

21   would actual be four years.  That was my mistake in the

22   question.  In the last four years, how many audits?

23   *A*    Three audits, I believe.

24   *Q*    Sorry.  I apologize for that.

25          Okay.  Were you familiar with the Nissan audit

1    process?

2    A    Yes, I was.

3    Q    I think earlier we talked about the request for the data,

4    the deal jackets being pooled, and then that process in terms

5    of Ms. Branch's involvement.  So I don't want to go back over

6    that.  But do you remember if in those audits, was Nissan

7    charged back in every audit?

8    A    Yes, there was some type of charge back in every audit.

9    Q    Were you present at all three closing audit meetings?

10    A    Yes, I was.

11    Q    I am going to show you what's been previously marked as

12    admitted as Government's Exhibit 25.  Can you take a moment

13    and look at that document.

14    A    (Witness complying.)  Okay.

15    Q    What is that document?

16    A    This is several documents related to the audit from the

17    period January 4th, 2012 to January 12th, 2013.

18    Q    I am sorry, you said the -- you were reading, what was

19    that, the scope of the audit period?

20    A    That's the period audit, yes.

21    Q    January 4 --

22    A    -- 2012 to January 2nd, 2013.

23    Q    When was the audit report actually prepared and sent to

24    Serra Nissan?

25    A    This letter was dated April 1st, 2013.

1  Q    That would have been the date that the dealership got

2  like the final summary report?

3  A    Yes.

4  Q    Who was it addressed to?

5  A    Kristina of Serra Visser.

6  Q    Why was it sent to her?

7  A    Because she was the dealer at the time.

8  Q    Do you remember who the auditor was that came to the

9  dealership for that audit?

10  A    This was Jeff Creecy.

11  Q    How did the audit work?  Do you remember specifically

12  what he did in terms of the audit process?

13  A    He would -- in advance, he would give us a list of the

14  deals that he requested.  We would pull those deals and put

15  them in the conference room, and he would go through those

16  deals and reviewed those deals, the paperwork.

17  Q    Did you discuss the results of the audit with him in

18  person?

19  A    Yes, I did.

20  Q    On what date?

21  A    It appears it was March 15th, 2013.

22  Q    What is it that you are looking at --

23  A    I'm sorry.  This is a closing meeting, a sales audit

24  report.

25  Q    Is that a summary of essentially the contents of the

1    meeting you had?

2    A    Yes, it is.

3    Q    What were the results of the audit?

4    A    The dealership got a charge back of $24,780.

5    Q    Can you tell me where in the summary of his audit

6    findings it says that it was important for you to accurately

7    report the RDR information?

8    A    Under other audit recommendations to consider -- number

9    one, dealership should accurately report RDR all sales.

10   Q    Can you tell me the page you are looking at the bottom

11   right corner so I can follow along with you.

12   A    NNA 000518.

13            MS. WICK:  Your Honor, these exhibits have been

14   admitted.  May we publish it again to the jury?

15            THE COURT:  Yes.  This is Government's Exhibit 25

16   page 4.

17   BY MS. WICK:

18   Q    Mr. Visser, where was it you were reading?

19   A    Under other audit recommendations to consider/continue,

20   number one.

21   Q    So that's what you are talking about?

22   A    Yes, I am.

23   Q    He would have discussed that with you?

24   A    I don't know if he would have discussed this.  He would

25   have talked over most of this.  I don't know if he

1    specifically said that.  That's kind of a given.

2    Q    Do you remember him discussing with you the importance of

3    accurately submitting information when you RDR'd cars?

4    A    Yes.

5    Q    How many times do you think he mentioned that during the

6    course of that closing meeting?

7    A    Several probably.  I don't recall exactly.

8    Q    If you look at page 3 of that exhibit, there are a list

9    of recommendations specific to issues noted during the audit.

10   Without calling them out, are all six of those related to

11   properly RDR'ing information in the system when you RDR'd

12   cars?

13   A    Yes, they are.

14   Q    And being accurate when you input the information in the

15   RDR system?

16   A    Yes, they are.

17   Q    Was the purpose of that so that you were given the

18   correct incentives that you were, in fact, entitled to under

19   Nissan's rules?

20   A    Yes, that's correct.

21   Q    Could you look at -- I am sorry, hold on one second --

22   page 5 of the exhibit.  In yours it is marked through the

23   bottom of NNA 519.  If you could call out that bottom

24   paragraph NNA.

25        If you could just read that first sentence.

1    *A*      "The importance of accurate sale reporting and the need

2    for timely inventory and incentive, reconciliations, error

3    corrections, and verification of correct sale type reporting

4    for all deals was stressed."

5    *Q*      Actually, if you could just keep reading.

6    *A*      "The requirement that all customer cash be specifically

7    disclosed, as such, with the amount clearly noted on the

8    buyer's order and finance contract, as well as the retention

9    of a completed and customer signed incentive claim form, as

10   per Nissan C & I policy was reiterated.  I stressed the

11   accurate and timely reporting of RDR's helps to insure the

12   monies earned are received, are not lost due to closed

13   programs, and reminded them that any corrections to RDR's

14   after program closure will not be manually adjusted by

15   national or the region.  Executive manager and director of

16   operations stated that they understood the adjustments and

17   recommendations presented and accepted the audit findings."

18   *Q*      Who were the executive manager and director of operations

19   that he is referring to there?

20   *A*      That would be myself, the executive manager, and Forest

21   Housner being the director of operations.

22   *Q*      What did you understand that instruction to mean?

23   *A*      Just reiterating the importance of accurate sale

24   reporting.  Report via the RDR system what is accurately sold.

25   *Q*      That meeting, I think, you said was held on March 15th,

1   2013?

2   A    That's correct.

3   Q    Do you still have that exhibit?

4   A    Yes.

5   Q    Let me just grab that so we don't lose track of it.

6   Thank you.  Let me come back to the audit date in a moment.

7   You were talking about the net profit that you and Ms. Branch

8   and I think others at the dealership are paid off, and you

9   mentioned that included incentives from Nissan North America.

10  Do you remember what incentives were, in fact, for the

11  dealership in March 2013?

12  A    Yes, there was an end of the year incentive program.  It

13  was a 45-day incentive program that Nissan had put on for the

14  dealership.

15  Q    The big end of year push?

16  A    It was a big end of the year stairstep incentive program,

17  the more you sold, the cheaper those cars would be for you.

18  They would give you a dealer discount on those vehicles.

19  Q    And there was also a larger incentive payment that you

20  got for each car sold during that period?

21  A    That was the incentive I was referring to.  It was either

22  different levels, but you could earn up to $700 as a dealer

23  discount, as a dealer incentive on those vehicles.

24  Q    Was the time period for that incentive longer than other

25  incentives they ran?

1  *A*    Yes, it was.  Typically, their incentive programs were

2  30-day incentives.  This programs was a 45-day incentive

3  program.

4  *Q*    I am handing you what's been previously marked as

5  Government's Exhibit 41.  Can you tell me if you recognize

6  that?

7  *A*    Yes.  This is an e-mail that I sent to Abdul, the general

8  sales manager on March 25th, 2013.

9  *Q*    And is that a true and accurate copy of the e-mail that

10  you sent to Mr. Mughal?

11  *A*    Yes, it is.

12            MS. WICK:  At this time, the government would move

13  to admit Government's Exhibit 41.

14            MR. BROOME:  We have no objection, Your Honor.

15            THE COURT:  It's admitted.

16            MS. WICK:  Permission to publish, Your Honor.

17            THE COURT:  Granted.

18  BY MS. WICK:

19  *Q*    Mr. Visser, who were you e-mailing here?

20  *A*    Abdul Mughal.  He was the general sales manager at the

21  time.

22  *Q*    What did you tell him?

23  *A*    I told him that we need 46 Nissans.

24  *Q*    What was that in reference to?

25  *A*    That was in reference to hitting our objective for the

1    45-day incentive program.

2    *Q*    So is it fair to say that your understanding was that as

3    of March 25th, you are 46 cars away from hitting the top level

4    two tier objective?

5    *A*    That's correct.

6    *Q*    Nissan sent you regular updates, didn't they?

7    *A*    Yes, they did.

8    *Q*    Do you remember what those were called?

9    *A*    I don't recall what they called them.

10            THE COURT:  Updates on what, please, Ms. Wick?

11   BY MS. WICK:

12   *Q*    Oh, I'm sorry.  I apologize.

13           Let me just show you.  It would be a lot easier.  Hold

14   on one second.  Let me swap that out.

15           If you could take a look at Government's Exhibit 44,

16   this has already been admitted.  Do you recognize those?

17   *A*    Yes, I do.

18   *Q*    What are those?

19   *A*    They call this the retro tracker, so it shows you how

20   many Nissans you are away from -- or new cars you are away

21   from hitting your objectives.

22   *Q*    Can you tell me if you recognize those specific retro

23   trackers?

24   *A*    Yes.

25   *Q*    When were they from?

1    *A*    There were several here.  This one is from March 15th,

2    2013, March 19, 2013.

3    *Q*    I'll tell you what, are those the March 2013 retro

4    trackers for the DVB program?

5    *A*    Yes, they are.

6    *Q*    Those are the retro trackers for Serra Nissan and Serra

7    Visser Nissan?

8    *A*    Yes, they are.

9    *Q*    So the Birmingham and Cullman store retro trackers are in

10   there?

11   *A*    Yes.

12   *Q*    Did you receive both stores' retro trackers from Nissan?

13   *A*    Yes, I did.

14   *Q*    What did you use those for?

15   *A*    We would just review them.  I would review about every

16   third one just to see if our numbers matched up with Nissan

17   set we had.

18   *Q*    At some point, did you realize that Serra Nissan was not

19   going to hit the highest incentive mark in March 2013?

20   *A*    Yes, I did.

21   *Q*    What did you do at that point?

22   *A*    I instructed -- I typed out a set of instructions to -- I

23   realized that Serra Visser Nissan was going to be over their

24   objective, so I instructed them to -- Forest to stop reporting

25   cars in Cullman and start reporting those cars at Serra Nissan

1    in Birmingham.

2    Q    Let me trade that out with you.  I am handing you two

3    exhibits.  Let's start with what's been previously identified

4    as Government's Exhibit 40.  And actually, I apologize, I did

5    that in reverse.

6         Let's start with Government's Exhibit 43.  A moment

7    ago, I think you said you typed out a list of instructions.

8    Is that your list of instructions that you were referring to?

9    A    Yes, it is.

10   Q    Is that an e-mail that you actually sent?

11   A    I don't recall it.  I have looked for this e-mail, I

12   could not find it.  I thought I actually e-mailed it.  I went

13   back and looked through my e-mails, I did not find it.  But

14   then I do have -- I did see the letter that was printed out.

15   Q    So is it possible that you typed that in like your

16   drafts, copied it, and then put it on different paper?

17   A    Yes.

18   Q    And if that was the case, that draft would still be in

19   your e-mails, just not in the sent folder?

20   A    Yes.

21   Q    Can you take a look at Government's Exhibit 43, which is

22   the e-mail form, and take a look at Government's Exhibit 40,

23   and tell me if those are identical in terms of the substance

24   of the instructions.

25   A    Yes, they are.  I believe they are identical.

1    Q    Okay.  Let me take 43 back from you.  Turning to

2    Government's Exhibit 40, is that the instructions that you

3    were referring to?

4    A    Yes, it is.

5    Q    And what format is that in?

6    A    I believe this would have been Word format.  Microsoft

7    Word.

8    Q    And how did you -- well, let me back up for a second.

9          Is that an e-mail, a letter, a fax, what's the format

10   of that?

11   A    This appears to be a fax received and printed out.

12   Q    Do you recognize that as the substance of the

13   information; when you say, I gave instructions, are those the

14   instructions that you gave?

15   A    These are the instructions.

16          MS. WICK:  Your Honor, at this time, the government

17   would move to admit Government's Exhibit 43?

18          MR. BROOME:  We have no objection.

19          THE COURT:  It's admitted.

20          MS. WICK:  I apologize, Your Honor.

21          THE COURT:  You want 40?

22          MS. WICK:  I did.  I am sorry, 40.

23          THE COURT:  Government's Exhibit 40 is admitted into

24   evidence.

25          MR. BROOME:  I have no objection to that one either.

1            MS. WICK:  One moment, Your Honor, I apologize.

2          Your Honor, permission to approach the bench?

3            THE COURT:  Yes.

4   (Ms. Wick retrieving the document.)

5   BY MS. WICK:

6   Q    Mr. Visser, does that document have two pages?

7   A    Yes, it does.

8   Q    Okay.  Do you actually recognize what's on the second

9   page?

10  A    No.

11  Q    So let's focus on the first page.  The first page is your

12  instructions?

13  A    That's correct.

14            MS. WICK:  I believe this has been admitted.  Your

15  Honor, may we have permission to publish just the first page

16  of Government's Exhibit 40?

17            THE COURT:  Yes.

18  BY MS. WICK:

19  Q    If we could just call out the top half, the text.  Can

20  you get all of the text in that top number?

21          Mr. Visser, do you recognize the (256) number at the

22  top of that?

23  A    I do not recognize that number.

24  Q    Do you recognize the handwriting?

25  A    I believe that to be Forest Housner.

1   Q    Do you recognize the handwriting of the 700?

2   A    That's my handwriting.

3   Q    Can you read the first paragraph of that to the jury.

4   A    "Birmingham store is 41 away from their objective.  Since

5   Cullman hit theirs already, we need to sell and RDR all

6   remaining Nissans for the month under the Birmingham store.

7   Cullman will get credit for the gross, plus Cullman will get

8   another $500 per deal for handling, but the RDR needs to go to

9   Birmingham.  Go ahead and contract the customer as you

10  normally would, but tell the customer we will FedEx the bill

11  of sale and title application to them.  Very important.  Tell

12  the customer the title application system is down and we will

13  overnight the paperwork.  They need to get a tag.  Do not tell

14  them we are shifting sales."

15  Q    Let me stop you there.  You said you typed these up.  Did

16  you also fax this to the Cullman store?

17  A    I did not fax this, no.

18  Q    Do you know who did fax it?

19  A    I don't know.

20  Q    Do you know what that 700 number is in reference to?

21  A    That's the top tier that we would earn as a dealer

22  discount.  The cars, we would get a $700 discount on the car

23  if we hit our top tier.

24  Q    I think you do not recognize the (256) number, is that

25  what you said?

1   A    I do not recognize that number, no.

2   Q    Can you explain, "Cullman will get credit for the gross,

3   and Cullman will get another $500 per deal for handling.  But

4   the RDR needs to go to Birmingham."  Can you explain what that

5   meant?

6   A    That meant that the managers in Cullman would get paid an

7   extra $500, not personally, but $500 would count to gross for

8   their pay and -- but got RDR'd in Birmingham.

9   Q    So at this time when you sent this, is it fair to say

10  that it was some time near the end of the incentive period,

11  but it hadn't ended yet?

12  A    That's correct.

13  Q    Okay.  Because at this point you are 41 away from your

14  objective?

15  A    That's correct.

16  Q    I think the e-mail that you looked at a moment before

17  that you sent Mr. Mughal that we were talking about on March

18  25th said that you needed 46?

19  A    That's correct.

20  Q    So is it fair to say that this fax was sent some time

21  after March 25th, 2013, but prior to the end of the incentive

22  period on April 1st, 2015; is that correct?

23  A    I believe that would be correct, yes.

24  Q    So you realize that you are 41 away, Cullman -- when you

25  say Cullman hit theirs already, do you mean their highest tier

1    two objective?

2    A    Yes.  They hit their highest objective.

3    Q    So the plan was now all cars that you sell in Cullman

4    were going to RDR in Birmingham?

5    A    That's correct.

6    Q    So you knew when you sent this that those vehicles that

7    you were going to RDR in Birmingham would actually be sold at

8    the Cullman store, just RDR'd in Birmingham?

9    A    Yes, I did.

10   Q    "So tell the customer we will FedEx the bill of sale and

11   title application.  We will overnight the paperwork.  Don't

12   tell them we're shifting sales."  Why was this important to

13   give that instruction?

14   A    I didn't want the customers involved in it.  I didn't

15   want to explain it to them.  I thought it confused them.  I

16   just didn't think that that was important to them.

17   Q    Was it a normal process for them to not make bill of

18   sales and title applications for the cars they sold in

19   Cullman?

20   A    Was it normal to not?

21   Q    Meaning like if a car was sold at the Cullman dealership,

22   was it part of the normal process that the Cullman guys would

23   make the bill of sale and title application?

24   A    Yes, it would be part of that, yes.

25   Q    When you said, "do not tell them we are shifting sales,"

1   what did you mean by shifting sales?

2   *A*    Shifting sales from Cullman to Birmingham.

3   *Q*    Okay.  So could you read, "so here is the process"?

4   *A*    "So here is the process, one, Cullman will contract

5   customers as they normally would with the exception:  Do not

6   print the bill of sale and title application.  Two, next day,

7   Center Point finance managers, print out the bill of sale, and

8   title application, and those will be overnighted back to the

9   customer.  Three, the bill of sale and title app will be added

10  to the deal when the deal comes across from Cullman.  The deal

11  will be booked into Nissan Birmingham accounting.  This is

12  important.  In audits, Nissan pulls the sales directly from

13  Reynolds.  So the sales must be booked into Reynolds for

14  Birmingham."

15  *Q*    Let's go back to the beginning of that.  Why was it

16  important that they not print the bill of sale or title

17  application in Cullman?

18  *A*    Because I was going to have a bill of sale and title

19  application printed at Birmingham.

20  *Q*    I think, is it the bill of sale, those were preprinted

21  with your store number on it, wasn't it?

22  *A*    Yes.

23  *Q*    Okay.

24  *A*    Store name.

25  *Q*    The store name.  Sorry.

1  *A*    Yes.

2  *Q*    And that bill of sale would have to say the Birmingham

3  dealership if Nissan audited?

4  *A*    That's correct.

5  *Q*    And the title application, similarly, that had to be made

6  in Birmingham otherwise Nissan would immediately see that

7  those deals were sold in Cullman?

8  *A*    That's correct.

9  *Q*    When you say the Center Point finance managers, who were

10  you referring to?

11  *A*    The finance managers that worked at the Center Point

12  location.  The Serra Nissan in Center Point.

13  *Q*    The Birmingham?

14  *A*    The Birmingham location, yes.

15  *Q*    In number three, it says, "the bill of sale and title app

16  will be added to the deal when the deal comes over from

17  Cullman."

18        Was it your understanding that those fake Birmingham

19  bill of sale and title applications would just be stuck in the

20  Cullman deal jacket, or would they have to make a new

21  Birmingham deal jacket to put them into?

22  *A*    Well, they would be stuck in a deal jacket that looks

23  similar to this (indicating).  This would be taken to

24  accounting.  Accounting would see that it's a Birmingham deal,

25  because it would be a Birmingham bill of sale, and just book

1    it as a Birmingham sale, and file it as a Birmingham sale.

2    That was my intention.

3    Q    So was it your understanding when you drafted these

4    instructions that they would have to create two separate deal

5    jackets -- the original in Cullman and a new one in

6    Birmingham?

7    A    No, that wasn't my original instructions, no.

8    Q    Okay.  When it says, "the deal will be booked into Nissan

9    Birmingham accounting.  This is important."  Why was it

10   important that they be booked into Nissan Birmingham

11   accounting?

12   A    Because in my mind, if we have Nissan Birmingham bill of

13   sale and they were booked in the Nissan Birmingham accounting,

14   that was a Nissan Birmingham deal.  That's why I wanted them

15   booked in accounting in Birmingham.

16   Q    I don't understand.  Maybe explain what you mean.  Did

17   you think that it made it a Birmingham deal if it was -- if

18   you just booked it into accounting in Birmingham?  I don't

19   understand what you are saying.

20   A    In my mind, that would have passed an audit.

21   Q    Okay.  So if it was booked into accounting in Birmingham,

22   and that information was submitted to Nissan, it had to match?

23   A    That's correct.

24   Q    So the purpose of booking it into Nissan Birmingham

25   accounting was so that when the controller submitted that

1    information, what we were talking about earlier, the

2    accounting information in step one of the audit, it would have

3    to say that car was sold in Birmingham for you to get the

4    incentive?

5    A    Right.

6    Q    Okay.  In fact, I think your next sentence says, "In

7    audits, Nissan pulls the sales directly from Reynolds.  So the

8    sale must be booked directly into Reynolds for Birmingham."

9    So I think that's explaining what you just said, right?

10   A    That's correct.

11   Q    Can you read the last part?

12   A    "It's very important that they get the title application

13   from Birmingham, as Nissan checks the registrations against

14   what we RDR.  So any discrepancy here would be a problem."

15   Q    Okay.  Are you referring there to the preliminary part

16   where when Nissan checks the RDR data to registration data,

17   their initial kind of red flag check?

18   A    Yes.

19   Q    Okay.  So by creating those fake title applications, the

20   hope was that this will keep it off their radar in step one?

21   A    That's correct.

22   Q    Let me take that back.  I am handing you what's been

23   previously marked as Government's Exhibit 42.  Do you

24   recognize that document?

25   A    Yes.

1   *Q*    Oh -- just one second.  Off the top of your head, do you

2   happen to remember where that fax was sent from and to where?

3   *A*    I don't know.

4   *Q*    By that I mean, was it sent from the Birmingham store to

5   the Cullman store?

6   *A*    I assume it would have been.  I don't know.

7   *Q*    Okay.  The document you have in front of you is, I

8   believe, Government's Exhibit 42?

9   *A*    Yes, that's correct.

10  *Q*    What is 42?

11  *A*    42 is copy of an e-mail that I sent to Greg Boyles, who

12  would have been the general sales manager in Cullman.  And

13  this was in reference to a program called Nissan Put Out For

14  Managers called the Lot a Loot tracker update.

15  *Q*    What was the date of that e-mail?

16  *A*    March 26th, 2013.

17  *Q*    Is that a true and accurate copy of the e-mail you sent

18  to Mr. Boyles on that date?

19  *A*    Yes, it is.

20          MS. WICK:  Your Honor, at this time, the government

21  would move to admit Government's Exhibit 42.

22          MR. BROOME:  We do not have any objection.

23          THE COURT:  It's admitted.

24          MS. WICK:  Permission to publish?

25          THE COURT:  Granted.

1   BY MS. WICK:

2   Q    So a minute ago you said it was in regards to the Lot a

3   Loot program?

4   A    That's correct.

5   Q    What was that?

6   A    I believe this was a program that Nissan -- it was a hit

7   and win program.  If you scored the highest number of points

8   in a Ford dealership group, that you would win some kind of

9   competition.

10  Q    So who was it an incentive for?

11  A    The managers of the store.

12  Q    The sales manager?

13  A    The sales managers, yes.

14  Q    And you said a moment ago Mr. Boyles was the sales

15  manager of which store?

16  A    The Cullman store.

17  Q    So let me call out the top part of the actual e-mail from

18  you to Mr. Boyles.  What did you e-mail him on March 26th?

19  A    I said, "If this costs you guys the Lot a Loot contest,

20  Nissan Birmingham will make it up to you."

21  Q    What were you referring to when you said, "If this costs

22  you..."?

23  A    If shifting the sales from Cullman to Birmingham.

24  Q    Because what would Mr. Boyles have gotten if he got to

25  keep the deals or actually RDR the deals in Cullman that they

1    were actually selling?

2    A    Well, he may have won the competition.

3    Q    What was it?

4    A    I don't know.  Actually, I don't know what the

5    competition is.

6    Q    Can you read what's on the paperwork?

7    A    It just said, "this is a fantastic program."  I don't

8    know the details of the competition.  It was a cash bonus and

9    some other things.  I don't know exactly.

10    Q    Can we call out the e-mail underneath it?  No, no, no,

11    from the e-mail from where it says from Patrick Byrnes down to

12    standings.  Okay.

13           This e-mail that you forwarded, where it says, "please

14    find attached the updated SER Lotta Loot tracker," where it

15    says, "let's make sure your dealership is striving to hit the

16    ultimate road bonus points, which could be the deciding factor

17    on which dealers are in Vegas."  Did that incentive have

18    something to do with a trip to Vegas?

19    A    I believe it does.  I found the trip award.  It was three

20    nights -- three days, two nights accommodation as the Cosmo in

21    Las Vegas.

22    Q    So that's what he would have lost that you were referring

23    to?

24    A    Yes.

25    Q    Mr. Visser, why did you type out the instructions in that

1  fax and send it to Cullman like that?

2  A    I typed them out and handed them to Forest.  I didn't

3  type them out.  I don't recall.  I thought I e-mailed them,

4  but I looked back, and I didn't e-mail them.  I just typed

5  them out.

6  Q    You gave them to who?

7  A    Forest.

8  Q    To do what?

9  A    To execute these instructions.

10 Q    Was it your understanding that he was going to have to

11 send that to Cullman?

12 A    Yes.

13 Q    Was the audience of that fax, in terms of who had to

14 follow those instructions, the people in Cullman?

15 A    Yes, but also some people in Birmingham, the finance

16 managers, everybody involved in that letter that I called out.

17 Q    And it was your understanding that Mr. Housner would be

18 responsible for kind of disseminating the instructions?

19 A    Correct.

20 Q    Mr. Visser, I am handing you what has been previously

21 marked as Government's Exhibit 24.  Do you recognize page 1 of

22 that document?

23 A    Page 1, I don't recognize page 1.

24 Q    Do you recognize page 2 of the document?

25 A    Yes, I do.

1   *Q*    What is page 2 of the document?

2   *A*    This is three e-mails that were exchanged between -- sent

3   by me, sent to Forest Housner and Kim Branch.  And this is a

4   chain of e-mails.

5              MS. WICK:  One moment, Your Honor.

6   BY MS. WICK:

7   *Q*    Mr. Visser, would you -- hold on just one moment.

8              MS. WICK:  Your Honor, at this time, the parties

9   would like to read into the record one of the stipulations

10  with the Court's permission.

11             THE COURT:  Mr. Broome?

12             MR. BROOME:  That's fine, Your Honor.

13             THE COURT:  Please go ahead.

14             MS. WICK:  Do you want it -- I don't if you want to

15  give an instruction, or I can just read it.  Whatever the

16  Court would prefer.

17             THE COURT:  Sorry.  Let me grab the stipulations.

18        For the members of the jury, the parties in advance of

19  trial have agreed to certain facts, and those facts are

20  recorded in a document that are called the stipulation of the

21  parties.  When those stipulations are relevant to a particular

22  witness's testimony, the parties have agreed that the

23  stipulation that is relevant to that witness's testimony will

24  be read into the record.

25        So Ms. Wick has indicated that there is a stipulation

1   that is relevant to Mr. Visser's testimony.  So that

2   stipulation will be presented to you now.

3           MS. WICK:  Thank you, Your Honor.  Stipulation

4   Number Three, the documents identified as Government's Exhibit

5   24 were found on the defendant, Kimberly H. Branch's desk

6   during the execution of a search warrant at Serra Nissan.

7   BY MS. WICK:

8   Q   Mr. Visser, in regards to page 2 of that document, you

9   said you recognized that.  What is that document?

10  A   Page 2, I don't recognize the document.  I have seen it.

11  You have shown it to me before, but...

12  Q   Page 2 is what you are looking at?

13  A   Oh, I am sorry.  I am sorry.  Wrong page.  Yes.  This was

14  an e-mail, string of e-mails that I sent on June 1st to Forest

15  and to Kim.

16  Q   Take a look at the three e-mails, and tell me if those

17  are true and accurate copies of the e-mails that you exchanged

18  during that time period?

19  A   Yes, they are.

20          MS. WICK:  Your Honor, at this time, pursuant to the

21  stipulations and Mr. Visser's testimony, the government would

22  move to admit Government's Exhibit 24.

23          MR. BROOME:  We have no objection, Your Honor.

24          THE COURT:  It's admitted.

25          MS. WICK:  If we could publish the first page.  If

1    we could just call up the top half.

2    BY MS. WICK:

3    Q    Okay.  Mr. Visser, a moment ago I asked you had you ever

4    seen this first page prior to the government showing it to

5    you?

6    A    No, I have not.

7    Q    Okay.  Let me turn to the second page that you could

8    identify.

9         Mr. Visser, because of how small it is, let's just

10   start with the earliest e-mail, the top one on June 1st, 2013.

11   If we could call that one out.  Can you read the e-mail you

12   sent on June 1st, 2013?

13   A    "When Birmingham missed their objective two months ago

14   and we used Cullman sales, did we book these units in Reynolds

15   accounting under Birmingham?  I just wanted to make sure we

16   did.  When Nissan audits us, they get a log of every deal

17   booked in Reynolds."

18   Q    Who did you send this e-mail to?

19   A    To Forest and to Kim.

20   Q    Okay.  In the first sentence, when you say, "when

21   Birmingham missed their objective two months ago and we used

22   Cullman sales," did you assume that they both knew about that

23   when you sent this e-mail?

24   A    Yes.

25              MR. BROOME:  Judge, I am sorry, I hate to interpose

1   an objection, but what he assumed what somebody else thought,

2   we would object to that, Your Honor.

3          THE COURT:  Well, I think the question is just what

4   did Mr. Visser assume.  It doesn't mean that somebody else

5   actually had the knowledge.

6          MR. BROOME:  We concede these e-mails were sent to

7   these folks.

8          THE COURT:  Right.  And I believe Mr. Visser is

9   testifying to what his thought process was.  I don't think he

10  is testifying to what anyone else's actual knowledge was.

11         MR. BROOME:  Then I would withdraw the objection, if

12  that's what he is going to testify.

13         THE COURT:  Is that correct, Ms. Wick?

14         MS. WICK:  Yes, and I can rephrase in terms of --

15  BY MS. WICK:

16  Q   Mr. Visser, what was your understanding of when you

17  wrote, "when Birmingham missed their objective two months ago

18  and we used Cullman sales," was it your understanding that the

19  two people you sent this to already knew what you were

20  referring to?

21  A   Yes.

22  Q   Okay.

23         MS. WICK:  Does that clarify that?

24         MR. BROOME:  Yes, that's fine, Your Honor.

25  BY MS. WICK:

1  Q    So then you said, "Did we book these units in Reynolds

2  accounting under Birmingham?"  Who were you addressing that

3  question to?

4  A    Both of them.

5  Q    Who would have been responsible for booking those units

6  in Reynolds accounting under Birmingham?

7  A    Kim would have been over that.

8  Q    You said, "I just wanted to make sure we did.  When

9  Nissan audits us, they get a log of every deal booked in

10 Reynolds."  When you referred to the log, what are you

11 referring to there?

12 A    The Excel spreadsheet that I talked about earlier.

13 Q    If we could call up the second e-mail in the middle.

14 What was Mrs. Branch's response to you two days later?

15 A    Would you like me to read it?

16 Q    Yes, please.

17 A    "These deals were not booked in accounting, but I have

18 list of these deals and can manually add them to any report

19 that Nissan requires.  Jeff also created a Birmingham deal

20 jacket for each of these deals so we would have it if they

21 ever request the deal to be pulled."

22 Q    So your instructions were that the deals be booked in

23 accounting in Birmingham.  Did she follow those instructions?

24 A    It does not appear those instructions were followed.

25 Q    Okay.  When she says, "but I have a list of these deals

1    and can manually add them to any report that Nissan requires,"

2    do you know if that's the list that was attached to those

3    e-mails, the first page?  Is that the list she is referring

4    to?

5    A    I believe it is.

6    Q    Okay.  Why would she need to manually add them,

7    functionally, if you know, based on the audit process -- I am

8    not asking you to read her mind, I am say functionally -- why

9    would she need to manually add them to any report that Nissan

10   requires?

11   A    My next e-mail speaks to that because if they audit it,

12   those customers need to be in that Excel file.  Otherwise...

13   Q    Let me call that one out.  If you could call out the

14   third e-mail.

15        This is the e-mail you responded, I think, on July

16   27th?

17   A    Yes.

18   Q    You said -- go ahead and read that one.

19   A    "Okay.  Just manually add them or manually remove them if

20   they audit Cullman when they do the next audit.  In Alabama,

21   the factory has 12 months from date the incentive was paid to

22   conduct an audit."

23   Q    So when she said, "but I have a list of these deals and

24   can manually add them to any report that Nissan requires," and

25   you say, "okay, just manually add them or remove them," you

1    are specifically talking about how to hide it during the

2    Nissan audit?

3    A    Yes.

4    Q    Okay.  Let me go back to the middle e-mail.  I think in

5    the fax that we talked about earlier, it said something to the

6    effect of the bills of sale and the title applications going

7    into the Cullman jackets.  And I asked you did you know that

8    two deal jackets would have to be created.  You said no?

9    A    That's correct.

10   Q    So where she wrote to you, "Jeff also created a

11   Birmingham deal jacket for each of these deals so we would

12   have it if they ever request the deal to be pulled."  Was that

13   part of your initial instructions?

14   A    No.

15   Q    Did you know that that had been done prior to this

16   e-mail?

17   A    No.

18   Q    Okay.  Was it a common practice for the dealership to

19   make two sets of deal jackets for one car sale?

20   A    No.

21   Q    If we could go back to the third e-mail.  We talked about

22   the manually adding and removing if you got audited.  But

23   where you write, "in Alabama the factory has 12 months from

24   the date the incentive was paid to conduct on audit."  What

25   were you referring to there?

1   A   I was referring to the Alabama dealer franchise law.

2   Q   Which says, what, to your knowledge?

3   A   Which says that the factories have 12 months to audit you

4   for incentives paid.

5   Q   So that was the scope in which Nissan could essentially

6   catch this?

7   A   Correct.

8   Q   So you would have had -- I want to make sure I have this

9   right.

10          If the cars had to be sold, I think you said March

11   31st or April 1st, 2013, you would have had until March 31st

12   or April 1st, 2014, for Nissan to essentially catch this?

13   A   Not necessarily.  It's from when they were paid, not when

14   they were sold.

15   Q   Okay.  So --

16   A   So when Nissan actually paid the money.

17   Q   Okay.  Let me show you what's been previously marked as

18   Government's Exhibit 17.  Hold on to that other exhibit.

19          Do you recognize Government's Exhibit 17?

20   A   Yes.

21   Q   What is that?

22   A   It's a bank statement from April of 2013.

23   Q   Is that one of the accounts that Serra Nissan had?

24   A   Yes.

25   Q   For that account, for that statement period, is it a true

1  and accurate copy of the bank statement?

2  A    I believe it is.

3         MS. WICK:  Your Honor, at this time, the government

4  would move to admit Government's Exhibit 17.

5         MR. BROOME:  We have no objection.

6         THE COURT:  It's admitted.

7         MS. WICK:  Permission to publish, Your Honor?

8         THE COURT:  Granted.

9  BY MS. WICK:

10  Q    If we could call out at the very bottom just the chunk

11  under that -- that's perfect.

12        Okay.  So can you tell me what the time period for

13  this bank statement is?

14  A    It just says statement date, April 30th, 2013.  This page

15  appears to be from April 5th to April 10th, 2013.

16  Q    The section that I called out, what is that $175,450

17  payment on April 10th?

18  A    That's an incentive payment that Nissan paid the

19  dealership.

20  Q    Would that have included the March DVB bonuses?

21  A    I believe it would have.

22  Q    So based on what you said a moment ago, if it was

23  deposited on April 10th, 2013, Nissan would have had until

24  April 10, 2014, to catch it during an audit?

25  A    That's correct.  That's my understanding.

1    Q    Okay.  Let me take that.  Thank you.

2         If you could go back to Government's Exhibit 24, page

3    2, please.  If we could call out e-mail one again.

4         Mr. Visser, the top e-mail that you sent on June 1st,

5    when you referred to, "did we book these unit in Reynolds

6    accounting under Birmingham," what is the Reynolds accounting

7    you are referring to?

8    A    That's the dealership software.  That is our accounting

9    software.

10   Q    Is that the accounting software that you would have had

11   to use to import the Excel data to Nissan?

12   A    Yes.

13   Q    Does that information get submitted to Nissan

14   automatically?

15   A    No.

16   Q    It has to be manually sent to them?

17   A    For an audit, yes.

18   Q    In terms of her second e-mail where she references that,

19   "Jeff also created a Birmingham deal jacket for each of these

20   deals, so we would have it if they ever requested the deal to

21   be pulled..." When you got that e-mail and became aware, what

22   did you understand her to mean by that?

23   A    Just exactly that, that there was a Birmingham deal

24   jacket created for these deals.

25   Q    For what purpose?

1   A     In the event of an audit.  We would pass an audit.

2   Q     The third stage where they come on site and actually look

3   at the deal jackets?

4   A     Correct.

5   Q     So it was your understanding that those Birmingham deal

6   jackets that they created would be what was given to Nissan if

7   they came to do an on site audit, not the Cullman deal

8   jackets?

9   A     Correct.

10  Q     Did you discuss with Ms. Branch the purpose of creating

11  the Birmingham deal jackets?

12  A     No.

13  Q     Did you have any discussions with Ms. Branch other than

14  these e-mails about the process or how things are going to be

15  done?

16  A     No.

17          MS. WICK:  Your Honor, there are a number of

18  questions and exhibits for this witness, and I don't know if

19  we're at stopping point, if you wanted to release the jury for

20  lunch.  I just kind of didn't want to keep rolling on if you

21  wanted to break around noon, because this is kind of a natural

22  breaking point.

23          THE COURT:  How do y'all feel?  Do you want to keep

24  going for a little bit, or would you all prefer to take a

25  lunch break now?  You are the boss.

1                ALL JURORS:  Lunch break.

2                THE COURT:  All right.  Let's come back at one

3     o'clock, please.  If you will come back to the jury room.  I

4     will see everybody at 1:00.

5                MS. WICK:  Your Honor, I apologize for the

6     inconvenience, but because of the way we broke, would you mind

7     if the witness receives an instruction not to discuss with

8     anyone the contents of his testimony during the lunch break?

9                THE COURT:  Yes.  As Ms. Wick said, please not to

10    discuss the contents of any of the testimony that has gone on,

11    any of the questions that have been presented, or your

12    responses to any of those questions.  Thank you.

13               MS. WICK:  Thank you, Your Honor.

14                    (Luncheon recess at noon.)

15          (In open court at 1:00 p.m.  Jury not present.)

16         (The following proceedings were held at the bench:)

17               THE COURT:  Tammi brought to my attention that as

18    you were walking out of the juror room to go to lunch, you saw

19    Mr. Visser's attorney.  Is that correct?

20               JUROR LAZENBY:  Mr. David McKnight, his attorney, I

21    did.

22               THE COURT:  Do you know Mr. McKnight?

23               JUROR LAZENBY:  We went to church together, probably

24    25, 35 years ago.

25               THE COURT:  Did you greet him?

1    JUROR LAZENBY:  I did.  I said, how you doing?

2    THE COURT:  Did y'all talk about the case at all?

3    JUROR LAZENBY:  No.  The only thing we talked about,

4  he said, how are your kids?  I said fine.  And then he said,

5  you know, we don't need to be talking, and I said, fine.

6    THE COURT:  Okay.  My fault, I told you and all the

7  jurors that I was going to remind you every time we took a

8  break not to discuss the case.

9    JUROR LAZENBY:  Well, no, I didn't even think about

10  it.

11    THE COURT:  I failed on my responsibilities there.

12  You all need to remind me when I forget to tell you because I

13  know you remember.  But unless anybody has a concern about

14  that, that sounds completely innocuous to the Court.

15    MS. WICK:  No concerns from the government, Your

16  Honor.

17    MR. BROOME:  We do not, Your Honor.

18    THE COURT:  It's important for us when there could

19  potentially be any question to put it on the record.

20    JUROR LAZENBY:  Well, that's why I came back here.

21    THE COURT:  Thank you so much for letting Tammi know

22  what happened, and I appreciate it.  We're ready to get

23  started, I think.

24    JUROR LAZENBY:  Okay.

25    THE COURT:  Thanks.

 1              (Conclusion of bench conference.)

 2          (In open court.   Jury present at 1:15 p.m.)

 3          THE COURT:  Ms. Wick, I believe you have the floor.

 4          Mr. Visser, please take the witness stand again.  You

 5    are still under oath.

 6          MS. WICK:  Your Honor, I apologize.  The government

 7    needed to file the stipulations.

 8          THE COURT:  Go ahead.  Please proceed.

 9          MS. WICK:  Thank you, Your Honor.

10    BY MS. WICK:

11    Q    Mr. Visser, right before the lunch break, we were talking

12    about, I think, a number of e-mails that you had exchanged

13    with Ms. Branch in June 2013.  I would like to show you what's

14    been previously marked as Government's Exhibit 19.  Can you

15    take a look at that document and tell me if you know what it

16    is.

17    A    (Witness complying.)  This is a check from Serra Nissan

18    Volkswagen paid to Serra Visser Nissan.

19    Q    When?

20    A    Dated June 5th, 2013.

21    Q    Is it a true and accurate copy of that check?

22    A    I believe it is.

23          MS. WICK:  Your Honor, at this time, the government

24    would move to admit Government's Exhibit 19.

25          MR. BROOME:  We have no objection, Your Honor.

 1              THE COURT:  It's admitted.

 2    BY MS. WICK:

 3    Q    Mr. Visser, what was -- permission to publish?

 4              THE COURT:  Granted.

 5    BY MS. WICK:

 6    Q    If we could call up the top check portion.

 7          So I think you said that was a check from Serra Nissan

 8    to who?

 9    A    To Serra Visser Nissan.

10    Q    So they had separate bank accounts?

11    A    Correct.

12    Q    And that $19,950, can you tell what that payment was for?

13    A    Not by looking at this check, but I believe it to be

14    customer incentive money.

15    Q    Let me call out -- if we could out the bottom half.

16          Mr. Visser, does that bottom part of the check -- I

17    think you started to say you can't tell from the check.  Can

18    you tell from that portion what that payment is for?

19    A    I believe it to be customer incentive money that was paid

20    to Serra Nissan that was for cars sold at Serra Visser Nissan.

21    Q    Okay.  So is it your understanding that this check is for

22    -- in any way related to the 15 deals at issue in this case?

23    A    I assume it to be.

24    Q    So this included at least some portion, if not all of the

25    incentive money for the 15 deals that we've been talking

1    about?

2    A    I believe it's just the customer incentive portion, not

3    the dealer incentive.

4    Q    Where it says created by, who is Kim B?

5    A    That's Kim Branch.

6    Q    That marked, does that come when somebody -- is that in

7    your system when somebody creates these checks?

8    A    I believe that's her log in to the Reynolds system.

9    Q    What is the last six for vin of March incentive money?

10   A    The last six of vin is how the customer incentives are

11   kept up with.  So, for instance, the first one is 019010, that

12   would be the vin number for that vehicle.

13   Q    Was it a common practice for Serra Nissan Birmingham to

14   have to pay Serra Visser Nissan for any incentive?

15   A    No.

16   Q    Let me take that from you.

17           At some point in time, did you become aware that the

18   dealership at Serra Nissan had received a subpoena from the

19   grand jury in the Northern District of Alabama regarding the

20   15 deals at issue in this case, yes?

21   A    Yes, I did.

22           MS. WICK:  Your Honor, at this point in time, the

23   government would like to read one of the stipulations on the

24   government's -- the parties' additional stipulations list that

25   was filed, specifically, stipulation one.

1              THE COURT:  All right.  Please go ahead.

2              MS. WICK:  Government's Exhibit 45 is a grand jury

3    subpoena issued by the grand jury of the Northern District of

4    Alabama on June 16, 2014.  And actually, could we read

5    Stipulation Two, as well?

6              THE COURT:  You may.

7              MS. WICK:  Government's Exhibit 45 was served on

8    counsel for Serra Nissan on June 17th, 2014.

9    BY MS. WICK:

10   Q    Mr. Visser, could you take a look at Government's Exhibit

11   45 and tell me, have you ever seen that document before?

12   A    Not before you showed it to me, no.

13   Q    Take a look at the dates and the contents and tell me if

14   the content of that is the subpoena that you were aware of in

15   June 2014?

16   A    Yes, I believe this is the subpoena.

17             MS. WICK:  Your Honor, pursuant to the stipulations

18   between the parties, we would move to admit Government's

19   Exhibit 45 at this time.

20             MR. BROOME:  We have no objection.

21             THE COURT:  It's admitted.

22             MR. BROOME:  Your Honor, can we just clarify one

23   thing that was in that stipulation?  It says that it was

24   served on counsel.  That's not me.  That would be the counsel

25   for the dealership.

1          THE COURT:  All right.  And is the government going

2     to make sure it serves a copy of the stipulations on counsel

3     for the dealership?

4          MS. WICK:  Oh, yes.  I'm sorry, yes, Your Honor.

5          THE COURT:  Because you just filed them in court, I

6     assume you will follow up on that at some point following our

7     proceedings today.

8          MS. WICK:  Yes, Your Honor.  We will e-mail the

9     copy.  Thank you.

10          THE COURT:  Mr. Broome, anything else?

11          MR. BROOME:  Judge, what I think that number two

12     means that the exhibit, the subpoena was served on the counsel

13     at the time, not this --

14          THE COURT:  Oh, I see.  I'm sorry.  I misunderstood

15     what you were saying.

16          MS. WICK:  Actually, we may be able to question that

17     from the witness for clarification, if the Court would find

18     that helpful.

19          THE COURT:  Let me just make sure, I think I am a

20     bit confused now.  Mr. Broome, would you please repeat your

21     point, please.

22          MR. BROOME:  Judge, paragraph two of our stipulation

23     says Government's Exhibit 45 was served on counsel for Serra

24     Nissan on June 17th, 2014.  I didn't want the jury to be

25     confused that it was served on me.  I represent Ms. Branch

1    only and not the dealership.

2              THE COURT:  Right.  Okay.  I understand now.  Thank

3    you for clarifying.

4    BY MS. WICK:

5    Q    Mr. Visser, at the time that you learned about this

6    subpoena, you had counsel -- excuse me, the dealership had

7    counsel; that was not Mr. Broome, correct?

8    A    That's correct.

9    Q    For stipulation two where it says, this subpoena was

10   served on counsel for Serra Nissan, it's referring to that

11   other attorney that represented the dealership entity, right?

12   A    That's correct.

13             MR. BROOME:  Yes, I am fine with that.  Thank you.

14   BY MS. WICK:

15   Q    You said a moment ago that prior to me showing you that

16   document, you had never seen it?

17   A    No.

18   Q    Without disclosing any conversations that you had with

19   counsel, do you remember how you became aware of the existence

20   of that subpoena?

21   A    I don't believe I am able to do that without saying it

22   came from my counsel.

23   Q    Okay.  So nobody at the dealership, not attorneys, nobody

24   at the dealership spoke with you about the existence of that

25   subpoena?

1   *A*    I do not believe so from -- I learned of it -- I did not

2   learn of it from anybody at the dealership.  My initial

3   learning of this document, I did not learn it from anybody at

4   the dealership.

5   *Q*    Okay.  So you did not have a call or a conversation with

6   Mr. Housner regarding the existence of this?

7   *A*    After I was made aware of its existence, I did have a

8   conversation with Mr. Housner.

9   *Q*    And I apologize.  So you learned of this from some other

10  method?

11  *A*    Correct.

12  *Q*    Then subsequent to becoming aware of the subpoena, you

13  had conversations with Mr. Housner?

14  *A*    That's correct.

15  *Q*    What were those conversations, and do you remember when

16  you had them?

17  *A*    I believe it was the same day that we got served.  The

18  conversation originally was we didn't know why they wanted to

19  look at these deals, and I had to figure out what's going on

20  with these deals, what's the common element of these deals.

21  That was the initial talk with Forest Housner.

22  *Q*    At some point did you understand that that subpoena

23  requested the deal jackets related to the 15 deals at issue in

24  this case?

25  *A*    Yes, I did.

1    *Q*    When did you come to understand that?

2    *A*    Mr. Housner told me that he believed that this came from

3    a document that was found -- when he told me, I thought it was

4    Kim's computer, but he said desktop.  I meant I thought that

5    was her computer desktop, but he said these were the deals

6    that was -- a list of deals were on her desktop.  That's how

7    he -- we realized these are the Cullman deals that were RDR'd

8    to Birmingham.

9    *Q*    And when you realized that, what did you do next?

10   *A*    I texted my Nissan rep and told him the situation and

11   asked him what we needed to do.

12   *Q*    I am showing you what's been previously admitted as

13   Government's Exhibit 22.  Take a moment and tell me if you

14   recognize that document.

15   *A*    (Witness complying.)

16   *Q*    Sorry.  Let me be clear.  Take a look at page 3 or 4 of

17   the exhibit.

18   *A*    Well, there's three different documents in here.  Page 3.

19   Look at page three?  Yes.  I recognize this.

20   *Q*    Do you recognize page 3?

21   *A*    Yes.

22           MS. WICK:  May we publish page 3, Your Honor?

23           THE COURT:  Yes.

24   BY MS. WICK:

25   *Q*    Let's start with page 4.  So for you that's the document

1   on the bottom that says DISC 000830?

2   A    Yes.

3   Q    Do you recognize the e-mail that's kind of in the middle

4   of that page?

5   A    I do.

6   Q    What is that?

7   A    This is the e-mail that I sent to my district dealer

8   operation manager, Patrick Byrnes, and I told him.  So my

9   initial was an e-mail, then it was a text, and then it was his

10  follow-up e-mail.  So this was my first e-mail to Patrick

11  Byrnes informing him of the situation.

12  Q    Can you read your e-mail to Mr. Byrnes?

13  A    "I need to inform you of a situation that relates to the

14  quarter bonus that ended on 3/31/13.  Serra Visser was over

15  their objective, and Serra Nissa was under, and legally there

16  were up to 15 deals that were sold in Cullman, but RDR'd at

17  Serra Nissan.  Cars were actually sold, but the selling dealer

18  was incorrect on the RDR.  What do you suggest I do in this

19  situation?"

20  Q    So you sent that June 18, and that was the date after you

21  found out about the subpoena?

22  A    Correct.

23  Q    Mr. Byrnes was who to you at the dealership?

24  A    He was my main contact for Nissan.  He was what they

25  called dealer operations manager or DOM for short.

1   Q     Did Mr. Byrnes respond to you immediately?

2   A     No.

3   Q     What did you do when he didn't respond to you?

4   A     I called him the following day.

5   Q     And do you remember what you discussed with him during

6   that phone call?

7   A     Yes, I do.

8   Q     What did you discuss?

9   A     I followed up on this e-mail.  I said, Patrick, I am

10  calling to follow up on this e-mail.  What do you suggest I

11  do?  He said, why are you bringing this up to me?  I said,

12  well, we need to fix the situation.  He said, just let it lie.

13  I don't care.  He said, well -- I said, well, I do care.  We

14  have to straighten this out.  He said, well, let me run up the

15  ladder.  Let me talk to somebody and see what I got to do.

16  Q     Prior to having that call with him, did you text him when

17  he didn't respond -- was there a text that you sent to him?

18  A     I believe I texted him after I had the phone call,

19  because when he first told me no big deal, just let it lie,

20  why even bring it up, it was sold?  He said, that's sold.  Why

21  even bring it up?  Let it lie.  Let sleeping dogs lie was his

22  exact words.  Then he didn't respond.  He said he was going to

23  check with somebody.  He didn't respond so I sent him a text.

24  I believe this was on Saturday.  I sent him a text, and he

25  didn't respond.  Then he responded with an e-mail on Monday.

1  *Q*    So, your e-mail is Wednesday, June 18?

2  *A*    Correct.

3  *Q*    And your timeline is that you e-mailed him on Wednesday

4  June 18, then you had the call, and then you sent the text?

5  *A*    Correct.

6  *Q*    And then he e-mailed his response?

7  *A*    Correct.

8  *Q*    Okay.  Let me go to the next page of that exhibit.  Page

9  5, maybe.

10         So you e-mailed him on Wednesday.  You said, you think

11  the call with him was before this text and you texted him on

12  Saturday.

13  *A*    Yes.

14  *Q*    And this is your text?

15  *A*    Yes.

16  *Q*    Okay.  So it's your testimony that after you had a call

17  in which he said, let sleeping dogs lie, you then texted him

18  to ask again, do you think Nissan has a problem with leaving

19  their deals as they are since they were truly sold retail, and

20  the two stores' total objective was actually hit.  Do you

21  consider it to be an issue?  Is just leaving the deals as

22  reported okay?

23         It's your testimony that you asked these questions

24  again after the call with him?

25  *A*    Yes.  I asked him the question.  He said, let it lie.

1    Let sleeping dogs lie.  I said, Patrick, I cannot let this

2    lie.  He said, well, let me run it up the ladder.  And that's

3    where we left it.  I was expecting a response back from him

4    because he said -- after he told me, let it lie, I told him I

5    couldn't.  Then he said let me run this up the ladder and run

6    it by somebody else is what he told me.  Then this is me

7    following up on that.

8    Q    And that's why you texted him on Saturday?

9    A    Correct.

10   Q    Okay.  And did he respond to your text?

11   A    He e-mailed the response.  He did not text the response.

12   Q    Okay.  And if we go back to page 3 of this exhibit.  Is

13   that his e-mail response to you on the Monday after he sent

14   the text?

15   A    Yes, it is.

16   Q    Okay.  And without reading the entire thing, essentially,

17   what was his response to you?

18   A    His response was you can't pool sales.  If they were

19   from -- if they were sold in Cullman, they have to be RDR'd in

20   Cullman.  You can't use those RDR's in Birmingham.

21   Q    He gave you a mathematic explanation of why that was an

22   unacceptable practice to Nissan?

23   A    Correct.

24   Q    What did you do after you received the e-mail from Mr.

25   Byrnes that discussed the pooling of sales?

1   *A*    We contacted -- I sent a letter to Jeff Creecy, asking

2   him to correct these sales.  I told him that they were RDR'd

3   in Birmingham.  They needed to be corrected and RDR'd in

4   Cullman.  Because so far after the fact, we cannot change the

5   RDR.  He would have to do it in his system.

6   *Q*    I am handing you what's been previously marked as

7   Government's Exhibit 31.  Can you tell me if you recognize

8   that document?

9   *A*    Yes, I do.

10  *Q*    What is that?

11  *A*    This is a letter that I sent to Jeff Creecy identifying

12  the 15 deals and tell him if he would like the RDR corrected

13  to Serra Visser Nissan.

14  *Q*    That's the e-mail you sent to Creecy on August 11th?

15  *A*    That's correct.

16  *Q*    Did he respond to your letter?

17  *A*    He did.

18  *Q*    I am showing you Government's Exhibit 32.  Can you take a

19  look at that document and tell me if you recognize that?

20  *A*    Yes, I do.

21  *Q*    What is that?

22  *A*    This is the e-mail response to my letter to him.

23  *Q*    What did he say in that response?

24  *A*    He said, "Randy, we have analyzed your request to correct

25  the 15 deals identified in your August 11th letter, but are

1   unable to do so.  Among other reasons, this is because the 15

2   sales at issue are well beyond the general sales audit period

3   under the Alabama dealer statute.  Thanks."

4   Q   And what did you understand him to mean by that?

5   A   That this was past the one-year period, and that and

6   other reasons, he can't correct the sales.  He can't correct

7   the RDR location of the sales.

8   Q   So what did you do in response to that e-mail from Mr.

9   Creecy?

10  A   We calculated the amount that we would have earned had

11  the cars been RDR'd correctly in Cullman, and we cut a check

12  and sent a letter to Jeff Creecy for that amount.

13  Q   I handing what's been previously admitted as Government's

14  Exhibit 33.  Do you recognize that document?

15  A   Yes.

16  Q   What is that?

17  A   This is the letter that I sent to Jeff Creecy, along with

18  the calculation and a copy of the check for the deals that

19  were incorrectly RDR'd to Serra Nissan.

20  Q   Can you look at --

21       MS. WICK:  Your Honor, this has been already

22  admitted.  May we publish this exhibit?

23       THE COURT:  You may.

24  BY MS. WICK:

25  Q   Let's look at page 2.  Can we call out just the

1    flowchart?

2            Mr. Visser, do you recognize the attachment to that

3    letter, the second page?

4    A    Yes, I do.

5    Q    What is that?

6    A    That's a calculation of how the incentive was paid and

7    how the incentive should have been paid.

8    Q    Okay.  And what was your calculation -- and I'm sorry.

9    This is a terrible copy.  I don't know if it's any better on

10   yours.

11           Are you able to actually read what your calculation of

12   what you calculated you owed Nissan was?

13   A    Yes.  $64,800.

14   Q    Okay.  And who prepared this?

15   A    I did.

16   Q    Can you look at page 3 of the exhibit.

17   A    Yes.

18   Q    Do you recognize that?

19   A    Yes, I do.

20   Q    Can we call up page 3?

21           What is that?

22   A    That's a check that was cut to pay back the incentive.

23   Q    Could you call up just the bottom portion of the check?

24           Who are the two people that signed that check?

25   A    Melissa Yates and Kim Branch.

1    *Q*    Is that the check that you attached with the calculation

2    and sent in with the letter?

3    *A*    Yes.

4    *Q*    And based on the date of the check, when do you think you

5    sent that letter?

6    *A*    I believe on August 27th, 2014.

7    *Q*    Mr. Visser, at the time that you were shifting the sales,

8    based on your instructions in that fax we looked at earlier,

9    did you understand that it was an unacceptable practice to

10   Nissan to shift the sales from Cullman to report them in

11   Birmingham?

12   *A*    Yes.

13   *Q*    Did you understand that when you were saying to Ms.

14   Branch, book these in accounting in case they audit, what was

15   your understanding of the purpose of that?

16   *A*    To pass an audit.

17   *Q*    To hide this from Nissan?

18   *A*    To pass an audit so they wouldn't charge us back.

19   *Q*    Okay.  Mr. Visser, can you tell the jury what your status

20   in this case is?  Have you been charged?

21   *A*    Yes, I have been charged, and I have pled guilty.

22   *Q*    What were you charged with?

23   *A*    Conspiracy.

24   *Q*    To commit what?

25   *A*    Conspiracy to commit fraud.

1    Q    Do you know what kind of fraud?

2    A    I think it's just conspiracy to commit fraud.

3    Q    Wire fraud, mail fraud?  Do you know what type of fraud?

4    A    I believe it's wire fraud.

5    Q    Okay.  Did you have a plea agreement with the government

6    in this case?

7    A    Yes.

8    Q    And as part of that plea agreement, did you agree to a

9    certain set of facts?

10   A    Yes.

11   Q    Do you remember what those facts were?

12   A    Yes.

13   Q    Can you tell the jury what they are, or do you remember

14   them?

15   A    The facts were that I conspired to transfer these sales

16   from Cullman to Birmingham.  My involvement in it was a

17   hundred percent my idea.  It was nobody else's idea.  I gave

18   the instructions to Forest Housner, and it got done.  Forest

19   directly reported to me -- he to -- I met with every day at

20   the dealership -- he is the only person I met with at the

21   dealership, and he is the one I gave the instructions to.

22   Q    As part of your plea agreement, did you agree that at the

23   time that you gave the instruction, you knew that it would

24   entail misrepresenting to Nissan North America that cars sold

25   at Serra Visser Nissan were sold at Serra Nissan when in fact

1    they were not?

2    A    Yes.

3    Q    And as part of your agreement, did you agree that, "K.B.,

4    the controller of Serra Nissan, created a list of the 15

5    relevant deals to be given to J.G. to make the false deal

6    jackets"?

7    A    I agreed that in the event of an audit, she was to create

8    that list.  That was the --

9    Q    Mr. Visser, I am not paraphrasing.  I am reading from the

10   your plea agreement.

11   A    Could I read that plea agreement?

12   Q    Absolutely, if this would refresh your recollection.

13   A    "In the event Serra Nissan was audited by Nissan North

14   America, K.B., the controller created a list of 15 deals

15   relevant to be given to J.G. to make false deal jackets."

16   Q    Oh, Mr. Visser, can you read that full sentence at the

17   bottom of page 4, the entire sentence?

18   A    "As part of the scheme, J.G., a sales manager at Serra

19   Volkswagen, was instructed to create false documents showing

20   the cars were sold at Serra Nissan, in the event Serra Nissan

21   was audited by Nissan North America, Inc.  K.B., the

22   controller of Serra Nissan, created a list of 15 relevant

23   deals to be given to J.G. to make false deal jackets."

24            MS. WICK:  Hold on one second.  He is missing some

25   pages.  Is there another copy of the plea agreement?  Okay.

1          THE COURT:  Ms. Wick, what is the case number there,

2   please?

3          MR. BROOME:  Judge, it's 15-CR-167.

4          THE COURT:  Thank you.

5   BY MS. WICK:

6   Q    So those are two separate sentences.  What you were just

7   reading -- here, read with me.  I have all the pages.

8          THE COURT:  Ms. Wick, give me a second to pull it

9   up, please.

10          MS. WICK:  Oh, sure, Your Honor.

11   A    I did not take them to be two separate sentences.  I

12   thought the period was the abbreviation for Inc.

13   Q    So do me a favor, Mr. Broome did not have the pages when

14   you were reading.

15          MR. BROOME:  Actually, I did, Your Honor.  I just

16   had them out of order.  Judge, I am fine now.

17          MS. WICK:  Are you good?

18          MR. BROOME:  I am good.

19   BY MS. WICK:

20   Q    Okay.  I want to make sure I understand.  You were just

21   reading the sentence, "As part of the scheme, J.G., a sales

22   manager at Serra Volkswagen, was instructed to create false

23   documents showing the cars were sold at Serra Nissan, in the

24   event Serra Nissan was audited by Nissan North America, Inc."

25   A    I didn't know that was a new sentence.  I thought Inc.

1   was just a period abbreviating incorporated.  I thought that

2   was one sentence.

3   Q    Then it says, "K.B, the controller of Serra Nissan

4   created a list of the 15 relevant deals to be given to J.G. to

5   make the false deal jackets."  That is a separate sentence.

6   A    When I signed this, I did not realize that.

7   Q    Do me a favor, if you could read on the bottom of page 5

8   in bold, the star point where it says, "the defendant hereby

9   stipulates".

10  A    "The defendant hereby stipulates the facts stated above

11  are substantially correct, and the Court can use these facts

12  in calculating the defendant's sentence.  The defendant

13  further acknowledges that these facts do not constitute all of

14  the evidence of each and every act that the defendant and/or a

15  co-conspirator may have committed."

16  Q    Is that your signature below that paragraph?

17  A    Yes, it is.

18  Q    Did you review this before signing the plea agreement?

19  A    Yes, we did.  We made several changes to it.

20  Q    Is this version that you are reading the version that you

21  signed that was filed in your case?

22  A    Yes, it is.

23  Q    Did the Court, at your plea colloquy, ask you if you

24  agreed to these facts as stated as you just read?

25  A    Yes, I did.

1   *Q*    Did you say yes?

2   *A*    Yes, I did.

3   *Q*    As part of your plea agreement, did you have a

4   cooperation provision with the government?

5   *A*    Yes.

6   *Q*    What is your understanding of that cooperation agreement?

7   *A*    That I have agreed to accept responsibility for what I

8   have done.  I have agreed to cooperate and testify.

9   *Q*    What is your understanding of what you get in exchange

10  for testifying?

11  *A*    I don't get anything for testifying.  I don't get

12  anything for testifying.

13  *Q*    Do you understand the 5K provision in your plea

14  agreement?

15  *A*    Yes, I do.

16  *Q*    What is your understanding of that provision?

17  *A*    My understanding is that is -- that's at the discretion

18  of the government.  If they issue a recommendation to the

19  judge to issue a departure for normal sentencing guidelines.

20  *Q*    So you could theoretically get a reduction in your

21  sentence for cooperating?

22  *A*    Correct.

23  *Q*    Did you meet with the government several times prior to

24  your testimony today?

25  *A*    I believe I met with them three times.

1   *Q*   And during those meetings with the government, what

2   instructions did anyone from the government give you regarding

3   your testimony today?

4   *A*   Just to tell the truth.

5   *Q*   Did you understand that you could cooperate and get

6   nothing in return?

7   *A*   Absolutely.

8   *Q*   Do you understand, pursuant to your plea agreement, what

9   happens if you were to come here today and lie in any way to

10  the jury?

11  *A*   That the plea agreement would be null and void.

12  *Q*   And what else would happen?

13  *A*   I'd probably be charged with perjury.

14          MS. WICK:  Just a moment.

15       No further questions, Your Honor.

16          THE COURT:  Mr. Broome, cross examination.

17                      CROSS EXAMINATION

18  BY MR. BROOME:

19  *Q*   Good afternoon, Mr. Visser.

20  *A*   Good afternoon.

21  *Q*   Mr. Visser, in listening to your testimony today, it

22  seems like you like for your dealerships to win and be on top

23  in your district; is that right?

24  *A*   Yes, sir.

25  *Q*   And unfortunately sometimes in our overzealousness, we

1    cross the line to win, don't we?

2    A    Yes, sir.

3    Q    And you crossed the line to win in this situation?

4    A    Yes, I did.

5    Q    Now, I believe you already said this, it was your idea?

6    A    One hundred percent.

7    Q    How did you come up with the idea?

8    A    In my mind, I justified that it was okay at the time.

9    Q    I mean, have you heard of it being done before, or you

10   just came up with the idea on your own?

11   A    I had heard of it being done before.  In our industry, I

12   have heard about it being done before.

13   Q    And reading through all of these documents that the

14   government's been nice enough to give me, I think there's six

15   or 7,000 pages, do you recall talking to Forest Housner about

16   how the sales department had incentives with parts?

17   A    I don't recall the conversation specifically.

18   Q    Would you have had a specific conversation with Mr.

19   Housner about, yeah, we buy the parts in Birmingham to meet

20   our incentives, but we sell the parts to the Cullman store?

21   A    No, I don't recall that conversation.

22   Q    I won't talk to you about that.  I will talk to Mr.

23   Housner about that.

24   A    Okay.

25   Q    But it was your plan to transfer the deal, which I

1    believe your word was shift the deals from Cullman to

2    Birmingham?

3    A    Yes, it was.

4    Q    And you communicated that to Forest Housner?

5    A    That's correct.

6    Q    Did you communicate that plan to Kim?

7    A    No.

8    Q    Before it happened?

9    A    No.

10   Q    Y'all didn't have a meeting in a smoke-filled room, you,

11   Forest, and Kim and decided that this is what we're going to

12   do?

13   A    No.

14   Q    You decided on your own?

15   A    Yes.

16   Q    And then instructed Mr. Housner to do it?

17   A    Yes.

18   Q    Now, you gave some instructions on how to accomplish

19   this; is that right?

20   A    That's correct.

21   Q    Did you personally talk to Kim about those instructions?

22   A    No.

23   Q    Never?

24   A    No.

25   Q    Speaking of talking to Kim, we've talked about some

1    audits today, also.  Was Kim involved in those audits?

2    *A*    Just to the point that I have talked about earlier today.

3    *Q*    She was pulling deals they requested?

4    *A*    That's correct.

5    *Q*    She was not in any of these closing meetings or exit

6    meetings -- what do you call them?

7    *A*    Closing meetings.  No, she was not involved in the

8    closing meetings.

9    *Q*    Tell the ladies and gentlemen of this jury how the

10   physical plant there is at the Birmingham store.  I mean,

11   where is the accounting office or the controller's office

12   located?

13   *A*    I believe at the time it was located upstairs in

14   Volkswagen.

15   *Q*    This would be March of April of 2013?

16   *A*    Yeah, at that time, it would have been upstairs in our

17   Volkswagen dealership.

18   *Q*    And help me out, upstairs, big as this courtroom, smaller

19   area?

20   *A*    It's probably about half the size of this courtroom.

21   *Q*    How many employees would you have up there?

22   *A*    We had --

23   *Q*    At the time.

24   *A*    At the time, we had approximately seven or eight, nine

25   employees in there.

1    Q    Where would the salesmen be located at the time?

2    A    For which dealership?

3    Q    The Nissan dealership?

4    A    They would be in a different building.

5    Q    Across the street?

6    A    Across the street.  Yeah, across the street.

7    Q    But in a different building?

8    A    In a different building.

9    Q    As far as you know, was Kim ever involved in any of the

10   sales meetings?

11   A    No.

12   Q    When you first got notice that the government or the IRS

13   was investigating Serra Nissan, it wasn't about these 15

14   deals, was it?

15   A    No, sir.

16   Q    Was it about some financial documents?

17   A    Yes.

18   Q    Okay.  Would Kim Branch have had anything to do with

19   those financial documents?

20   A    No.

21   Q    Would she have even seen those financial documents before

22   they were submitted to the bank?

23   A    No.

24   Q    Would Kim have been involved in the day-to-day sales of

25   the cars there?

1  *A*    No.

2  *Q*    Would she be involved -- or was she involved in the

3  day-to-day keeping up with how close you were to the

4  incentives?

5  *A*    No.

6  *Q*    There's been some documents the government has introduced

7  about that you would get from your DOM, that's what the

8  director of district --

9  *A*    Dealer operations manager.

10 *Q*    Thank you.  Would those have ever gone to her?

11 *A*    No.

12 *Q*    They would go to you?

13 *A*    That's correct.

14 *Q*    They would go to Mr. Housner?

15 *A*    Yes.

16 *Q*    So Kim would have no idea, at the time, we're 41 units

17 short or we're ten units short?

18 *A*    No, she would not know.

19 *Q*    While I'm on that subject, talking about reconciling the

20 incentives that Nissan received, I believe you said you and

21 Kim would talk about the reconciliations, or how would y'all

22 do that?

23 *A*    Well, if it was a dealer incentive --

24 *Q*    Just the dealer.

25 *A*    Okay.  The dealer incentive, she would have to get that

1    from either Forest or I; how much we earned in dealer

2    incentive, she would not know.  So either we would just send

3    her an e-mail saying, here is how much we earned.  If we

4    didn't send her an e-mail, she would send us an e-mail saying

5    how much do we earn in Nissan money, and we would send her an

6    e-mail back.

7    Q    Would it have been for an individual car or just the

8    total number?

9    A    Total number.

10   Q    So there really wasn't any reconciliation other than

11   putting that total number in the accounting?

12   A    That's correct.

13   Q    So she didn't look at, well, this car number one should

14   have been this amount and this is what we got?

15   A    Not for dealer incentives, no.

16   Q    Okay.  While we're talking about other incentives, were

17   there customer incentives?

18   A    Yes, there were.

19   Q    Without going into too much detail, would there be a lot

20   of different customer incentive programs?

21   A    Yes.

22   Q    At the same time?

23   A    Yes, there were.

24   Q    This lady would like you and I both a lot better -- I

25   will finish the question, and you answer, and she'll like you

1    better.  Okay?

2         And sometimes I don't know when I am going to stop, so

3    it's not all your fault.

4         If I showed you, I think let's just talk about

5    Government's Exhibit 19.  What does that purport to be?

6    A    This appears to be a check that was cut from Serra Nissan

7    to Serra Visser Nissan for the customer portion of incentives.

8    I believe this relates to the 15 deals.

9    Q    Okay.  The customer portion?

10   A    Customer portion.

11   Q    This has nothing to do with the monies we're talking

12   about today?

13   A    No.

14   Q    And how would Kim have got these numbers, if you know?

15   A    The sales department would have set it up; would have

16   told her how much each one was.

17   Q    This was to pay the Cullman store back for the customer

18   incentives they didn't get because of the deals got

19   transferred to Birmingham?

20   A    This was -- that the Cullman store gave the customer.

21   This is the because the Cullman store gave the customer that

22   rebate, so this is the refund that the Cullman store -- for

23   the rebate that they gave the customer.

24   Q    Right.  Just to put them back to even?

25   A    Correct.

1   Q    On Government's Exhibit 33.  Which is your letter to Jeff

2   Creecy, who came up with those figures?

3   A    I did.

4   Q    How did you do that?

5   A    I read through the program and put these figures in an

6   Excel spreadsheet and calculated how much we earned, but I

7   knew how much we earned, but I calculated it, and then I

8   calculated how much we should have earned had the sales been

9   reported correctly.

10  Q    Then there's a check there?

11  A    That's correct.

12  Q    And that check was for how much?

13  A    $64,800.

14  Q    Who actually made out that check?

15  A    I instructed it to be made out.

16  Q    Who actually made it out?

17  A    I don't know who -- I don't know.

18  Q    Would Kim have more likely than not been the person to

19  make this out?

20  A    Most likely.  Somebody in the office.  There are several

21  people that can cut a check.  This one does not show who

22  actually wrote this check.  I would assume Kim.

23  Q    Well, let's say Kim did it, she would have got the

24  figures from you?

25  A    Correct.

1    *Q*    She wouldn't have calculated the figures herself?

2    *A*    No.

3    *Q*    Okay.  Thank you.  Before the deals were transferred, I

4    believe you have already told me your instructions, you didn't

5    have any conversation with Kim or send Kim those instructions?

6    *A*    No, I did not.

7    *Q*    You told Mr. Housner to send the instructions to the

8    Cullman store?

9    *A*    Yes, that's correct.

10   *Q*    Okay.  Do you know who at the Cullman store would have

11   gotten them?  Did you give Mr. Housner any instructions who to

12   send them to?

13   *A*    I believe I would have told him to get with Greg.

14   *Q*    And Greg would have been the --

15   *A*    -- general sales manager.

16   *Q*    General sales manager.  Okay.  So you and Kim didn't have

17   some meeting before all of this happened, and say, this is

18   what we have got to do to hide this from everybody.  You

19   didn't do that?

20   *A*    No.

21   *Q*    Now, at some point in time -- well, I will just ask this,

22   generally, are you there at the dealership in Birmingham every

23   day at the time back in March of 2013?

24   *A*    Not every day.

25   *Q*    Okay.  You tell me how many days a week you would be

1    there?

2    *A*    It depends on the time of the year.

3    *Q*    Let's go to March.

4    *A*    Okay.  March would have been -- school was in.  I would

5    have been there probably at least four days a week.

6    *Q*    Okay.  And every day that you were there, those four days

7    a week on an average, would you see Kim, or would you go over

8    to the accounting office?

9    *A*    No.

10   *Q*    In your best judgment, did you go over there once a week

11   to check on her or never check on her?  Or is neither one of

12   those fair?

13   *A*    I believe I have been to the Kim's office twice in two

14   years.

15   *Q*    Twice?

16   *A*    Twice.

17   *Q*    Two years?

18   *A*    Two years.

19   *Q*    Okay.  Would it be fair to say that to this jury that the

20   controller was kind of a separate entity from the sales and

21   the rest of the organization?

22   *A*    It was a separate department, yes.

23   *Q*    And a department that you necessarily didn't have a

24   hands-on daily contact with?

25   *A*    No, my contact was more e-mails and just reviewing the

1   financials.

2   Q     Well, you got my next question.  How would you

3   communicate with Kim the majority of the time?

4   A     Mostly e-mails.

5   Q     And when you are talking about going over financials,

6   what are we talking about?

7   A     Reviewing the financial statement, the month-end

8   financial statement.

9   Q     Are we talking about things like light bills,

10  advertisement?  What are we talking about?

11  A     Yes.  Everything on the financial statement:  Expenses.

12  Why is this expense so high?  What is in this account?  Can

13  you take a look at this?  This looks high.  Those type of

14  things.

15  Q     You gave Ms. Wick an idea of what Ms. Branch's job

16  descriptions were.  You hired her, right?

17  A     That's correct.

18  Q     And she came with very good recommendations, I guess?

19  You hired her?

20  A     Yes, she did.

21  Q     And was your dealership larger than the other dealerships

22  she has worked at, if you know?

23  A     I don't know.  I don't know.

24  Q     Okay.  But that really didn't play in your decision to

25  hire her?

1    *A*    No, she came with very high recommendations.  And so, I

2    hired her.

3    *Q*    What would you say if you had to list a number one or

4    number two reason why you hired her as a controller?

5    *A*    Because her references said, if you can hire her, she is

6    excellent.  That was their words, and that's primarily what

7    made my mind up.

8    *Q*    And she did you a good job?

9    *A*    Yes, she did.

10   *Q*    And she is still employed, if you know, isn't she?

11   *A*    Yes, that is correct.

12   *Q*    Now, back to her responsibilities, I don't really know

13   how to ask this question.  You are CPA, right?

14   *A*    I was.

15   *Q*    How would you describe the controller's office or the

16   accounting office before Ms. Branch got there?

17   *A*    It was a disaster.

18   *Q*    That's good description.  What do you mean by that?

19   *A*    Well, I didn't know how bad it was until Ms. Branch got

20   there, but there was un-deposited checks from a year ago,

21   there was -- it was just a complete disaster.  Nothing had

22   been reconciled.  Nothing had been -- it was a mess.  It was a

23   very large job getting it clean.

24   *Q*    With your CPA background, would it have been a difficult

25   task to have gotten the disaster up to acceptable levels?

1  A    Yes.

2  Q    How would you describe her performance doing that?

3  A    She did great.  Very good.  Excellent.

4  Q    Is it something you could have done in 40 hours a week?

5  A    No.  It took months to fix our problems.

6  Q    Was she able to get things -- I think she started --

7  well, you tell me, she got started in November 2012?

8  A    I believe that is correct.

9  Q    Does that sound right?

10 A    Yes, I believe that's correct.

11 Q    What we're talking about here happened in March in, what,

12 the first week of April of 2013?

13 A    That's correct.

14 Q    Had she gotten the office, I guess, back manageable by

15 that time?

16 A    I don't recall when we got it manageable.  It was a very

17 long process.  It took months.  I don't recall when.  But she

18 would just give me updates that we're still cleaning

19 schedules.  We're still getting things up-to-date and current.

20 Q    Would it have been a stressful situation for her with a

21 lot of things to do or for any person in that situation?

22 A    Yes, it would have been.

23 Q    Back tracking or going forward to March of 2013, you

24 realize you are not going to make the big money -- I think

25 that's Ms. Wick 's description -- for the $700 payouts.  Would

1    it be fair to say that one of your mottos at your dealerships

2    are Go Big Or Go Home?

3    A    I don't know if that's our motto.  I don't know if I --

4    Q    I have read that somewhere.  But that's not something you

5    said?

6    A    No.

7    Q    Forget I asked that.  But some time March of 20

8    something, the end of the month of March, you realize we're

9    not going to make our quota?

10   A    That's correct.

11   Q    Is that the word quota?

12   A    That's accurate.  We're not going to hit our target

13   objective.

14   Q    Okay.  And you come up with this plan, transfer the

15   shift, the Cullman deals to Birmingham?

16   A    Yes, I did.

17   Q    And that's going to entail shifting a lot of paperwork,

18   sales tax.  What all would it entail shifting around?

19   A    I thought we were just going to do the bill of sale and

20   the title application, and that was it.  It would be booked in

21   Birmingham as a Birmingham sale.  It would have paid

22   Birmingham tax.  It would have been a Birmingham deal.

23   Q    You instructed Mr. Housner to basically get this done?

24   A    Correct.

25   Q    Not Kim?

1    A    No.

2    Q    Now, later on, there are e-mails which have been

3    admitted, and I am not really sure what number.  Oh, thank

4    you.  An e-mail from you to Forest Housner and Kim dated June

5    the 1st.  Again the highlighting is mine.  That's Government's

6    Exhibit 24.  And it says what it says.  Right?

7    A    Yes, sir.

8    Q    And I can't see it that far away.

9            MR. BROOME:  Judge, I don't think he minds if I

10   stand this close to him.  Is it all right with the Court?

11           THE COURT:  Is there an objection, Mr. Visser?

12           THE WITNESS:  No.  That's fine.

13   BY MR. BROOME:

14   Q    It says, I just -- well, when Birmingham missed their

15   objective two months ago and we used Cullman sales, did we

16   book these unit in Reynolds accounting under Birmingham?

17   That's your accounting system, right?

18   A    That's correct.

19   Q    "I just wanted to make sure we did.  When Nissan audits

20   us, they get a log of every deal booked in Reynolds..."

21           This would have come back to you from Kim, right?

22   A    Correct.

23   Q    And she tells you they were not booked in accounting?

24   A    That's correct.

25   Q    But that she had the list, and she could manually add

1    them.  What does manually add them?  I will ask her, but what

2    does it mean to you?

3    A    It means that the Excel spreadsheet -- in the event of an

4    audit, she could manually add those 15 deals if we are

5    audited.  In event we were audited, she would extract the

6    information, she would manually add these deals, and then send

7    that.

8    Q    Like manually, is that typing on a computer?  Keying it

9    on a keyboard?

10   A    Keying it, yes.

11   Q    Okay.  Jeff also created a Birmingham deal jacket?

12   A    That's correct.

13   Q    And you didn't know that was going to happen?

14   A    No.

15   Q    Okay.  So we would have them in case they ever need to be

16   pulled.  My question is, a long way to get there, from June

17   the 3rd, you e-mailed her back on a Saturday June the 27th,

18   some --

19   A    No, that's July.

20   Q    July.  Yes.  Thank you.  Some six weeks later, give or

21   take?

22   A    Yes.

23   Q    If you remember, what prompted you that day to do that?

24   A    I do not recall why it took me so long.  I don't know.

25   Q    And you just told her, okay, just manually add them, or

1    manually remove them from Cullman --

2    A    Yes.

3    Q    -- when they do the next dollar.  Was this the last real

4    conversations or e-mails back and forth you had with Kim about

5    those 15 deals?

6    A    Yes.

7    Q    Until the subpoenas came?

8    A    Yes.

9    Q    Okay.  While I'm on those deal jackets, did you ever

10   actually physically -- I can't remember if it was blue or

11   green -- but did you ever see a deal jackets?

12   A    If there was problem deal, I would request the deal to be

13   pulled, and then I would look at it at that time.

14   Q    This is not a deal jacket, but it's -- do they look like

15   this (indicating) with an expandable folder like this?

16   A    They're not expandable.  Just like that, but not

17   expandable on the sides.

18   Q    Again, this is not a deal jacket either.  Is it more like

19   this (indicating)?

20   A    But the sides are.  It's enclosed.  It's a pocket.

21   Q    Now, later on, once you -- how did you become aware that

22   the government had subpoenaed the 15 deal jackets?

23   A    I believe I was made aware of it by someone not at the

24   dealership.

25   Q    Don't tell me what your lawyer said.  Did your lawyer

1   tell you?

2   A    I can't tell you.  My lawyer told me, yes.

3   Q    That's all I am going to ask about that.  What did you do

4   then?

5   A    We instructed Forest to figure this out.  Let's look at

6   these deals, figure this out.  Why do they want these deals?

7   Q    You didn't instruct Kim to do anything?

8   A    No.

9   Q    Did you even talk to Kim about it at that point in time?

10  A    I don't -- no, I did not.

11  Q    No.  Okay.

12          MR. BROOME:  Your Honor, I know I missed something I

13  wanted to ask him.  Could I have about 30 seconds?

14          THE COURT:  Sure.

15  BY MR. BROOME:

16  Q    Mr. Visser, once you learned about the subpoena for the

17  deal jackets, is that when you contacted your district

18  operations manager?

19  A    Yes, after I learned what the 15 sales and that they were

20  from Cullman, RDR'd to Birmingham, that's when I contacted my

21  DOM.

22  Q    Would it be fair to say you did just about everything you

23  could to get them their Nissan -- their money paid back and

24  this resolved?

25  A    Yes, I did.

1   *Q*    And if I paraphrased you right, you said Mr. Byrnes said,

2   let sleeping dogs lie, or something like that.

3   *A*    Yes, he did say that.

4              MR. BROOME:  That's all I have.  Thank you, Your

5   Honor.

6              THE COURT:  Ms. Wick.

7              MS. WICK:  Thank you, Your Honor.

8                        REDIRECT EXAMINATION

9   BY MS. WICK:

10  *Q*    Mr. Visser, I am handing you what's been previously

11  marked as Government's Exhibit One.  Do you recognize that?

12  *A*    I recognize it as a deal jacket.  I don't recognize this

13  exact deal.

14  *Q*    When Mr. Branch [sic] earlier was holding up the file

15  folder --

16             THE COURT:  Mr. Broome.

17  BY MS. WICK:

18  *Q*    Mr. Broome, I apologize.  Sorry.

19             MR. BROOME:  It's okay.  I've been called a lot

20  worse.

21  BY MS. WICK:

22  *Q*    When Mr. Broome handed you the folder, and you were

23  talking about the deal jackets, is that what a deal jacket

24  looks like?

25  *A*    Yes, this is a deal jacket.

1  Q    Can you just show the jury -- just it's just a folder

2  with a bunch of paperwork in it?

3  A    This is the paperwork that the sales department would

4  have created.   And then this is deal jacket -- once it gets

5  booked in accounting and put in a deal jacket and filed in a

6  filing cabinet.

7  Q    Once it gets booked in accounting, that's when it gets

8  the color-coded deal jacket?

9  A    That's correct.

10 Q    Do you know what color that is what dealership that deal

11 jackets came from?

12 A    I do not.

13 Q    Let me take that back from you.

14       Earlier when Mr. Broome was asking you questions

15 about, I think, pooling of sales, you said you did it because

16 you had heard of the process of it being done before.  Who did

17 you hear doing that process prior to this?

18 A    I have just read about it in the automotive news.  That's

19 not why I did it.  I just felt I was wronged by Nissan, and so

20 I felt it was just justified at the time to do it.  I know

21 it's wrong.  But two wrongs don't make a right, but I did it.

22 Q    What did you say at the beginning of your answer just

23 now?  You thought you were --

24 A    I said I didn't do it because I had heard about it

25 somewhere else.  I have said I did it because I felt like I

1    was wronged by Nissan.

2    Q     You were wronged by Nissan?

3    A     Yes.

4    Q     How?

5    A     That I thought our objectives were way too high.  I was

6    told our objectives were very high for the Center Point store.

7    Q     So you felt the 170-something cars that Birmingham had to

8    get was unfair in comparison to the 70 cars --  and I think it

9    may have been 77 -- but 70 cars or so versus 77 or so cars

10   that Cullman had to sell?

11   A     It wasn't Cullman, I felt it was unfair because of the

12   objective that our competition got.  So if they got a lower

13   objective than we got, yeah, they should have been selling

14   more cars than we sold.

15   Q     Did you contact Nissan and tell them that you felt that

16   was unfair?

17   A     Every month I would tell them it's unfair.

18   Q     Did they do anything about it?

19   A     They told me they would help me.  They would do what they

20   could.  They know it's unfair, and that's all they said.

21   Q     You decided to steal $64,800 from them?

22   A     Yes.

23   Q     When you read about it in Automotive News -- what is

24   Automotive News?

25   A     It's just our publication for the automobile industry.

1   Q    When you read about the pooling of sales practice in the

2   Automotive News, was it an article that said, this is a good

3   practice or an unacceptable practice?

4   A    I don't recall.  I don't know exactly where I learned

5   about it.  I have read about --

6   Q    Well, you just said very specifically that you heard

7   about it in Automotive News.  So when you heard about it from

8   Automotive News, what was the context of what you heard?

9   A    I don't recall.  I don't recall.

10  Q    Did you have the ability to book these deals in

11  accounting in Birmingham?

12  A    No.

13  Q    So when -- in your e-mail, when you were e-mailing Ms.

14  Branch and Mr. Housner, who had the ability to book those

15  deals in accounting in Birmingham?

16  A    The deal coster would have booked those deals.

17  Q    Who was responsible for overseeing that process?

18  A    Kim was over the office.

19  Q    Were you aware that Ms. Branch booked deals in

20  accounting?

21  A    I was not aware of.

22  Q    You were not aware of that?

23  A    No.

24  Q    When you reminded her in June and said, "when we booked

25  these deals in Cullman and Nissan missed its objectives," your

1  very first sentence presumed that she and Mr. Housner were

2  already aware of that, didn't it?

3  A    That's correct, yes.

4  Q    So, earlier you said you didn't personally have

5  conversations with Ms. Branch, but is it fair to say that by

6  the time you sent that e-mail, were you aware that somebody

7  had had conversations with Ms. Branch about those Cullman

8  deals being booked in Birmingham?

9  A    Yes.

10  Q    Earlier you said that Mrs. Branch's involvement in the

11  audit process was -- I think you use the word limited.  But if

12  I understood you correctly, you also said that she was

13  responsible for preparing the Excel report that would go to

14  Nissan for them to find discrepancies to determine if they

15  needed to come to do the onsite audit?

16  A    That's correct.

17  Q    And in your e-mail to her, I think it was your response

18  e-mail in July, you said, okay, we'll just manually add them

19  or remove them when they audit.  So, is it fair to say you

20  were instructing her when it is your job to send these, make

21  sure that you either hide it or take them off from the

22  information that you submit to Nissan?

23  A    Yes.

24  Q    Did she ever respond to you in e-mail, I don't want to do

25  this, I'm not comfortable, I don't understand your

1    instructions?

2    A    I don't believe I got a response.  I don't believe I got

3    a responding e-mail.

4    Q    When she responded to you two days after your initial

5    e-mail, was there any impression that you got that she didn't

6    understand exactly what you were asking her to do?

7              MR. BROOME:  Judge, I have been very lenient, but I

8    have to object to that.  Is there any -- it calls for a mental

9    operation of his interpreting a mental operation of --

10             THE COURT:  Sustained.

11   BY MS. WICK:

12   Q    Were there any other communications that you had with Ms.

13   Branch, other than the e-mails that we've been discussing in

14   terms of explaining the process, clarifying things, were there

15   any other communications that you had with her about this

16   other than those e-mails?

17   A    No.

18   Q    I think you also said her involvement in the audit in

19   addition to being responsible for compiling all the accounting

20   data.  Was she responsible for pooling the deal jackets that

21   Nissan would request if they came onsite?

22   A    We would give her the list, and I believe -- I don't

23   think she would pull them directly, but she would assign it to

24   somebody to pull the deals.

25   Q    Was it her job to make sure that all of the deals that

1    they requested were present for the audit?

2    A    Yes.

3    Q    If they requested the deals for these 15 Cullman deals,

4    based on her e-mail that said, "Jeff created Birmingham deal

5    jackets," what was your understanding of which deal jackets

6    she would have to pull if Nissan audited?

7    A    The deals that were sold in Cullman but RDR'd in

8    Birmingham.

9    Q    But I'm talking about the deal jackets.  You said earlier

10   they would be responsible for pulling the deal jackets if

11   Nissan audited, right?

12   A    That's correct.

13   Q    The e-mail that she responded to you said, and "Jeff made

14   a set of Birmingham deal jackets in the event that they asked

15   the deals to be pulled."  After reading that e-mail, what was

16   your understanding of which deal jackets she would have to

17   pull if Nissan audited, the Birmingham deal jackets or the

18   Cullman deal jackets?

19   A    The Birmingham deal jackets.

20   Q    Mr. Broome asked you about where her office was located.

21   I think you said it was across the street at the Volkswagen

22   store and that Serra Nissan was across the street?

23   A    That's correct.

24   Q    What did you estimate was the distance between those two

25   stores?

1    *A*    150 yards.

2    *Q*    Did you ever see her make that walk?

3    *A*    Yes.

4    *Q*    So she was capable of walking between the two stores if

5    she needed something?

6    *A*    Yes.

7    *Q*    Did you ever see her pick up the phone and call people at

8    the Birmingham store if she needed something in order to do

9    her job?

10   *A*    She's called me before.  I can't speak on her to call

11   anybody else.  I am sure she has.

12   *Q*    Earlier -- actually, let me come back to that.  You said,

13   no, she wouldn't have had to do like a reconciliation when she

14   got the lump sum.  On the check that we were referring to, I

15   think it was Government's Exhibit 19.  Can we pull that back

16   up?

17          Under the description where it says SVN incentive,

18   then control number, and account number, and the amount, where

19   would that information come from when this check is printed?

20   *A*    It would have had to been keyed in.

21   *Q*    What does that mean?

22   *A*    Just typed in a computer into the accounting system -- or

23   into this check.  The detail for this check.

24   *Q*    Would it have to be keyed in by a person where it says

25   "Created by:  KimB"?

1    A    Yes.

2    Q    So somebody would have had -- Ms. Kim B, which I think

3    earlier you said Kim Branch -- would have had to key in each

4    of these descriptions, each of those SVN incentives for each

5    of those control numbers for each of those accounts with each

6    of those amounts?

7    A    That's correct.

8    Q    Is that reconciling the incentive payments in order to

9    send them to Cullman?

10   A    This is a customer incentive.  The question Mr. Broome

11   asked me was about dealer incentives.

12   Q    I am asking you is that reconciling incentives in order

13   to make a payment from the Birmingham dealership to Cullman?

14   A    Yes.

15   Q    You are a CPA, as well, right?

16   A    I was a CPA.

17   Q    You were a CPA.  Would you say that you were familiar

18   with Ms. Branch's day-to-day responsibilities?

19   A    Fairly.  I could not do her job but fairly responsible.

20   I was an auditor.  I was not a bookkeeper.  I was an auditor

21   for two years.  That's it.

22   Q    When you say you were an auditor and not a bookkeeper,

23   what would you -- how would you describe her responsibilities

24   as the bookkeeper?  What was she responsible for doing at

25   Serra Nissan -- for Serra Nissan, Serra Volkswagen, and Serra

1    Visser Nissan?

2    A    She was responsible for keeping the books clean.

3    Q    When you say keeping the books clean, do you also mean in

4    order?

5    A    Yes.

6    Q    Do you know what goes into that in terms of the line by

7    line management of the books, reconciliation -- you said

8    preparing tax returns?

9    A    I can give you overview.  I couldn't tell you exactly,

10   no.

11   Q    Is it fair to say that her responsibilities for $120,000

12   base salary plus 2 percent of the net were extensive as the

13   controller of Serra Nissan?

14   A    Yes.

15   Q    In 2013, do you happen to know what the net profit was?

16   A    I don't recall the exact amount.  I could guess.  I could

17   get close.  It was about $1.8 million, I believe.

18   Q    And she would have received 2 percent of that in addition

19   to her $120,000 base salary?

20   A    It was $100,000 base salary, yes.  She would have been

21   paid 2 percent of $1.8 million.

22   Q    Earlier you said this was in relationship to customer

23   incentives, not dealer incentives.  But why would Serra Nissan

24   Birmingham have to pay Cullman for customer incentives?

25   A    If the vehicle was RDR'd under Serra Nissan, Serra Nissan

1    would receive the incentive.  But in reality, Serra Visser

2    Nissan gave this incentive to the customer.  So Serra Nissan

3    received it, and Serra Visser Nissan gave it away, so they had

4    to pay them to reimburse them for that.

5    Q    So this was related to the shifting of the 15 sales -- is

6    it fair to say it was just a by-product of what happened when

7    you shifted the sales?

8    A    Yes.

9    Q    So the controller, when she created this, Kim B, would

10   have had to understand that this was required in the

11   accounting process in order to make sure that when we shifted

12   those sales, financially, we did what needed to balanced

13   between the stores and the book --

14            MR. BROOME:  I am going to object to that question,

15   when we shifted the sales.  I think that's what this whole

16   case is about, Your Honor.  If she would rephrase the question

17   when Mr. Visser shifted the sales or Mr. Housner.  I will

18   object.

19            THE COURT:  Why don't you restate the question,

20   please, Ms. Wick.

21   BY MS. WICK:

22   Q    When you and others involved in the scheme shifted sales,

23   there were accounting details that had to be done in order to

24   make sure that Cullman got paid, Birmingham paid Cullman,

25   right?

1   *A*    Correct.

2   *Q*    So these customer incentives were paid because you

3   shifted the sales, right?

4   *A*    Well, these were paid to the wrong dealership.  That's

5   because we shifted the sales, that's correct.

6   *Q*    When you say they were paid to the wrong dealership, what

7   do you mean?

8   *A*    Because they were paid to Serra Nissan when they were

9   actually -- these cars were actually sold at Cullman.

10  *Q*    Right.  Why wasn't Nissan paid for those customer

11  incentives?

12  *A*    Because they were RDR'd at Birmingham Nissan.

13  *Q*    So when somebody falsely RDR'd those cars to Nissan,

14  Birmingham got customer incentives it was not entitled to?

15  *A*    Correct.

16  *Q*    I want you to correct me if I am wrong.

17  *A*    That's correct.

18  *Q*    Then somebody had to go in, because Cullman was in fact

19  entitled to those customer incentives and in the accounting

20  moved that money from Birmingham to Cullman?

21  *A*    That's correct.

22  *Q*    If I understood you earlier, based on this document, the

23  person who did that is created by Kim B, that was Kim Branch?

24  *A*    That's correct.

25  *Q*    Earlier Mr. Broome was asking you about the larger or

1    other -- let's say the other fraud investigation at Serra

2    Nissan that involved other employees.  He asked you if Ms.

3    Branch was involved in that fraud.  Do you actually know

4    whether Ms. Branch was aware of the false financial documents

5    or the fraud that was being committed at Serra Nissan?

6    A    I don't believe she was aware, if that was the question.

7    Q    Do you actually know for sure?

8    A    I don't know.

9           MR. BROOME:  Judge, that question has been asked and

10   answered.

11          THE COURT:  Move on, please.

12   BY MS. WICK:

13   Q    Mr. Visser, how many times did you e-mail or text Ms.

14   Branch per day?

15   A    I would say, it would be a guess, but on average I would

16   -- very little.  I would say maybe once a week.

17   Q    Once a week.

18   A    That would be my guess.  I would have to go back and

19   count the e-mails.  It wouldn't be a lot.  We would have a

20   conversation, and then maybe we could send three or four back.

21   But unless there was something that I needed, I would get with

22   Forest.  I would have to go back and look, but that's just my

23   estimate.

24   Q    I just want to remind you that you are under oath.  I am

25   going to ask you again.

1           THE COURT:  I think the witness knows that he is

2    under oath, Ms. Wick.

3    BY MS. WICK:

4    Q    Earlier you talked about that it was a very large job --

5    that your dealership -- I think the words you used was a

6    disaster, financially, before Ms. Branch came in, and that it

7    was a very large job getting it cleaned.  Would you say it was

8    difficult?

9    A    Yes.

10   Q    Would you say that it required an extensive knowledge of

11   accounting?

12   A    Yes.

13   Q    Would you say it required an attention to detail?

14   A    Yes.

15   Q    Would you say it required an understanding of how sales,

16   incentives, and reconciling worked?

17   A    Yes.

18   Q    Would it have been possible for somebody who did not

19   understand any aspect of the dealership to do what she did in

20   terms of cleaning up your dealership?

21   A    No.

22   Q    What was your current relationship with Ms. Branch?

23   A    I still -- I no longer have an interest or a position at

24   Serra Nissan or Serra Visser Nissan.  I still am an owner at

25   Talladega Ford.  And currently, she still does some things

1    that -- accounting-wise at Talladega Ford.  We've been in the

2    process of moving them back.  We have our own office at

3    Talladega Ford.  We're just in the process of moving all the

4    accounting back to Talladega Ford.

5    Q    Earlier you mentioned something that one of the things

6    that she would do as part of the cleanup process was cleaning

7    schedules.  What is cleaning schedules?

8    A    Just getting rid of receivables that are no good.  If we

9    don't have the money coming, we need to write that money off.

10   So that would be cleaning a schedule.

11   Q    Do you know what a dollar car is?

12   A    A dollar car is a car we've appraised for a dollar.

13   Q    Do you know what a ghost trade is?

14   A    No, I had never heard that term until you told me, showed

15   it to me.

16   Q    What is your understanding -- can you explain to the jury

17   what a dollar car is?

18   A    A dollar car -- before you told me, otherwise, was a car

19   that we appraised for a dollar.  The customer traded it in.

20   Maybe it wasn't running, it was in their yard, and we maybe

21   allowed them a thousand dollars.  But the ACV, the actual cash

22   value was one dollar.  We would appraise that car for one

23   dollar, putting it into accounting for one dollar.  Because we

24   would have to hire a tow truck to go get it, take it to the

25   auction and sell it, and then we would appraise it for one

1    dollar.

2    Q    When you structured deals for customers that required

3    financing, and you put that the car was worth a dollar, did

4    you tell the lender that the car was worth a dollar?

5            MR. BROOME:  Your Honor, I am going to have to

6    object.  I really don't see the relevance to this case if

7    we're going into -- I did bring it up, I will concede that

8    about there was another investigation, but that doesn't

9    involve Ms. Kim.  I really don't see the relevance to this

10   case.

11           THE COURT:  All right.  Why don't we do this.  Let's

12   take a ten-minute break, please, and I would like to talk to

13   counsel.

14        I am going to remind the jury not to discuss any of

15   the evidence that you have heard this afternoon while you are

16   in the jury room on break.

17              (A jury recess was taken at 2:27 p.m.)

18   (The following proceedings were held in the hallway, out of

19   the hearing of the jury:)

20           THE COURT:  Ms. Wick, explain to me what I am

21   hearing testimony about because you have had some initial

22   questions, and I don't know what this is leading to or what

23   it's about.

24           MS. WICK:  Yes, Your Honor.  So one of the things

25   that I told defense counsel, when we were producing the

1    information from Mr. Visser and some of the other cooperating

2    witnesses, was that it was our understanding that the cleaning

3    of the schedules was one of the things that the dealership did

4    to clean off the fraudulent deals.  And I told him that that

5    line of discussion opens the door for us to ask either Ms.

6    Branch or a witness that discusses that process that that

7    would have been knowledge of fraud at the dealership.  So she

8    would have had knowledge of other fraud at the dealership.

9    And I explicitly had that discussion with him to say, if you

10   bring up the other fraud and we go into what her role was, and

11   cleaning schedules is referenced, that process cleaning

12   schedules, wiping off the dollar cars and ghost trades that

13   were fraudulent.

14          THE COURT:  Okay.  Now, let me make sure you I

15   understand why you think you are entitled to go into this.

16   Because Mr. Visser raised cleaning schedules in response to

17   your questioning originally.

18          MS. WICK:  No --

19          THE COURT:  Yes, he did.  He used the term cleaning

20   schedules when you were examining him.

21          MS. WICK:  Oh, I am sorry.  I apologize.  I did not

22   hear that.  I heard it on cross.

23          THE COURT:  We can go back and read the transcript

24   to make sure that I'm not mistaken.

25          MS. MURNAHAN:  We do not doubt, Your Honor.

1              MS. WICK:  Trust me, she would have heard better.  I

2    probably didn't hear it.

3              THE COURT:  Do you agree with me, Ms. Murnahan, that

4    Mr. Visser used that language?

5              MS. MURNAHAN:  I did not hear it, Your Honor, but

6    I --

7              THE COURT:  Then let's make sure.  Let's make sure

8    because I don't want to -- if you're entitled to it -- and I'm

9    not there yet, but -- Chanetta, is there a way to search?

10             THE COURT REPORTER:  Yes, Your Honor.

11                          (Record Read.)

12             THE COURT:  Chanetta, you looked that up, and the

13   first time Mr. Visser mentioned cleaning schedules, that was

14   actually during Mr. Broome's examination; is that correct?

15             THE COURT REPORTER:  Yes, Your Honor.

16             THE COURT:  All right.  So we know now that the

17   topic of cleaning schedules came up in Mr. Broome's cross

18   examination.

19         So Ms. Wick, the government's point is...

20             MS. WICK:  Oh, that Mr. Broome opened the door to a

21   question of what is cleaning schedules.  Because Mr. Visser

22   said, I don't think she knew anything about the fraud.  But

23   cleaning schedules was actually cleaning off cars that had

24   been fraudulently sold and wiping out those dollar deals off

25   their books.

1          MR. BROOME:  Are you finished?

2          MS. WICK:  Oh, yes, sir.

3          MR. BROOME:  Cleaning a schedule would be -- I

4   assuming, I guess, we could ask him some voir dire questions,

5   or ask her -- if I am -- I am not an accountant.  So I don't

6   know what cleaning a schedule means.  I would assume it would

7   mean taking things out, like, if -- I don't know what it

8   means.  But I don't think going into the facts we're talking

9   about ghost deals, which she said he never heard the term

10  until they asked him, and dollar deals, I think they're trying

11  to throw enough up on the wall that something sticks, and

12  that's not what I am charged with.

13          THE COURT:  Ms. Wick, let me ask you this.  Part of

14  the Court's concern, if we go down this road, is a 403

15  concern.  All right.  It seems to the Court that if we're

16  going to get into this, we're essentially going to have to

17  have a minitrial on what the other fraud is that the

18  dealership has been charged with.  And it creates a great deal

19  of confusion potentially, and the prejudicial effect of that

20  confusion could, in this instance, far outweigh the probative

21  value.

22          I am inclined to ask you not to go any further because

23  of the Rule 403 considerations, but if you disagree with that,

24  then help me understand how to do that and how we can protect

25  the record.

 1              MS. WICK:  We had limited the scope of this case to

 2    only those 15 deals.

 3              THE COURT:  Right.

 4              MS. WICK:  The documents -- the dealership's

 5    accounting records, when they cleaned these schedules actually

 6    say, clean up of dollar cars.  They actually reference the

 7    dollar cars.

 8              MR. BROOME:  None of this, incidentally, I have or

 9    were furnished.

10              THE COURT:  And I am essentially going to have to

11    give Mr. Broome an opportunity to create a defense to conduct

12    with which Ms. Branch has not been charged.

13              MS. WICK:  Yes.

14              THE COURT:  So I don't know whether I have to give

15    him additional, whether we have to take a break in the trial.

16              MS. WICK:  No, I think we will not reference it.  We

17    will not reference it.  To the extent that Your Honor -- would

18    it be permissible -- let's just not reference it, and let's

19    not make the issue.

20              MR. BROOME:  That conduct has not been charged

21    against anybody so far, right?

22              MS. WICK:  You mean?

23              MR. BROOME:  The dollar deals or the ghost deals?

24              MS. WICK:  Let me think before I answer that.  No.

25              THE COURT:  Okay.  Well, then I am still confused

1    because I thought you were explaining to me earlier that the

2    dollar deals and the ghost deals were part of the separately

3    indicted conduct.  That's conduct that is all together

4    separate from -- there's a third category.  Okay.  The

5    financials that we've heard about, that's the conduct that has

6    been charged already, and certain people have already been

7    convicted and sentenced on that conduct.

8              MS. WICK:  The financial documents that I am

9    referring to was part of those cases.  What I understand Mr.

10   Broome was saying was that the specific dollar trades, ghost

11   trades, that specific fraud has not been charged against the

12   eight defendants that have already pled.

13             THE COURT:  All right.  If we're not going into it,

14   I don't need to understand all of the specifics any further.

15   Is that where we are?

16             MS. WICK:  I will not go into it any further.  I

17   think that makes the most sense.

18             THE COURT:  Good enough.

19             MR. BROOME:  Judge, the only thing I would ask the

20   Court to do is maybe instruct the jury that's a separate

21   investigation that's not -- she asked a question, and I

22   objected, and we're here.  I think the jury is going to want

23   to know whether you overruled or sustained.

24             THE COURT:  I am just going to say on the record

25   that I sustained the objection.  They already understand that

1    there's a separate investigation.  If I try to explain that

2    there's another investigation, I think I probably will make it

3    worse and just add to the confusion.  So, you have the

4    opportunity now to request that I do that, but my sense is

5    that that will only amplify this and make it more confusing

6    and make the jurors wonder what all the investigations are

7    that were going on.

8             MR. BROOME:  The only concern I have is they're

9    going to think that I am trying to hide something by

10   objecting.

11            THE COURT:  Well, I have explained to you all how

12   we're going to proceed based on Ms. Wick's response to my

13   question.  If we just get up and get going again and Ms. Wick

14   starts with a new question, that may be the best way to

15   proceed.

16            MR. BROOME:  Yes, Your Honor.

17            THE COURT:  All right.

18               (Conclusion of hallway conference.)

19         (A recess was taken at 2:42 p.m., until 2:50 p.m.)

20              (In open court.  Jury not present.)

21            THE COURT:  On the record.

22        Would you please state your full name for the record.

23            MR. MARIC:  Alen, A-l-e-n.  Maric, M-a-r-i-c.

24            THE COURT:  All right.  Ms. Marshall, do you

25   represent Maric?  Do you just represent the --

1        MS. MARSHALL:  I represent the dealership.  He is an

2   employee of the dealership.  He is the director of operations

3   for Serra Nissan, Volkswagen, Serra Visser Nissan, and the

4   Talladega Ford store, which we do not represent.

5        THE COURT:  Okay.

6        Ms. Marshall and with one other attorney, the

7   attorneys in this case have invoked the rule, which means that

8   one witness cannot listen to what another witness says because

9   you have a connection through work with some of the witnesses

10  in this case.  I just need to make clear to you that you may

11  not communicate to anyone who could share information with a

12  witness in this case anything that you hear in the courtroom.

13  Do you understand that?

14        MR. MARIC:  Yes, ma'am.

15        THE COURT:  Thank you.

16        MS. MARSHALL:  Thank you, Your Honor.

17        THE COURT:  Tammi, we can bring the jury back in.

18  Everyone can be seated except for counsel for the jury coming.

19        (In open court.  Jury present at 2:53 p.m.)

20        THE COURT:  I apologize for the length of the break.

21  I spoke to the attorneys a few minutes, when I spoke with the

22  attorneys, that means Chanetta is still working the entire

23  time, and I need to give her a break to rest her fingers for a

24  few minutes.  So, we are ready to resume.

25  BY MS. WICK:

1    Q    Mr. Visser, prior to the break, I believe you said that

2    your best guess for the net in 2013 was $1.8 million?

3    A    I believe that's correct.

4    Q    Was that just for the Serra Nissan store, or would that

5    include Serra Nissan VW?

6    A    That was just for Serra Nissan.

7    Q    Just Serra Nissan?

8    A    Just Serra Nissan, yes.

9    Q    So over the break, I had some time to do some math

10   because I cannot do that in my head.  Two percent of that 1.8

11   would be $36,000?

12   A    That's correct.

13   Q    She got two percent of the net of Serra Nissan, Serra VW,

14   and Serra Visser Nissan?

15   A    Serra Nissan and Serra --

16             MR. BROOME:  Your Honor, again, I object.  What her

17   salary was I really see is irrelevant.  I could see the 2

18   percent maybe of the extra money that one dealership got that

19   they wouldn't have got, but I see no relevance of the 2

20   percent of the whole net profit of both stores.

21             THE COURT:  Overruled.  You can deal with that if

22   you need to in examination.

23             MS. WICK:  Chanetta, I'm so sorry, could you read

24   back the question?

25                     (The last question was read.)

1    A    Yes, Serra Nissan Volkswagen was one entity.  So that 1.8

2    included Volkswagen.

3    Q    Oh, it did include Volkswagen?

4    A    Oh, yes.

5    Q    But it did not include Serra Visser Nissan?

6    A    No.

7    Q    So her salary, I think you said earlier, would have been

8    $100,000 in 2013, plus the roughly $36,000 for the net of

9    those two, and then whatever net Serra Visser Nissan got?

10   A    Correct.

11   Q    I think earlier you said that the accounting process at

12   Talladega Ford has not yet been moved.  So, Ms. Branch -- the

13   Serra Nissan is still doing the accounting for that?

14   A    There's some functions that are still being done at Serra

15   Nissan in Birmingham, yes.

16   Q    You still own a portion of Talladega Ford?

17   A    Yes.

18   Q    So she still technically works for you, doesn't she?

19   A    She doesn't get a salary, but she is over some functions

20   still at Talladega Ford, yes.

21            MS. WICK:  No further questions, Your Honor.

22            THE COURT:  Mr. Broome, do you have any follow up?

23            MR. BROOME:  Just briefly, Your Honor.

24                         RECROSS EXAMINATION

25   BY MR. BROOME:

1  Q    There's been some mention and some showing of deal

2  jackets.  Did you actually ever see the 15 deal jackets for

3  the 15 deals from Cullman that we've been talking about all

4  day?

5  A    Yes, I have.

6  Q    Have you ever actually seen the 15 deal jackets that -- I

7  believe it would be testified to -- Jeff Green or someone may

8  have created for the Birmingham store?

9  A    I had never seen them.

10  Q    Do you know if they ever existed?

11  A    I don't know if they ever existed.

12  Q    But the Cullman ones did?

13  A    The Cullman ones I saw, yes.

14        MS. WICK:  Briefly redirect, Your Honor?

15        MR. BROOME:  I hadn't finish yet.

16        MS. WICK:  Oh, I'm sorry.  I'm so sorry.

17  BY MR. BROOME:

18  Q    We've been talking about the customer rebates or

19  incentives.  That's what that check in Exhibit 19 is for?

20  A    Can I restate my prior answer?

21  Q    Sure.

22  A    I saw the 15 deals.  I don't recall what the name on the

23  deal jacket was.  I don't recall if it is Serra Nissan or

24  Serra Visser Nissan.  I would have to look it up again.  I saw

25  the actual 15 deals, though.

1    *Q*    You saw one set of jackets or one --

2    *A*    Yes, and my best recollection is that they were Serra

3    Visser Nissan deal jackets.

4    *Q*    In the Cullman store?

5    *A*    Yes.

6    *Q*    Okay.  But you only recalled seeing one set?

7    *A*    Yes, I did not see two sets.

8    *Q*    And you think it was the Cullman store?

9    *A*    I am 90 percent sure it was the Cullman store.

10   *Q*    Okay.  Thank you.

11          Now, customer rebates or incentives go directly to the

12   customers, right?

13   *A*    That's correct.

14   *Q*    So that money would have been money that the Cullman

15   Nissan store would have either given the customer credit

16   toward a down payment or actually given the customer money,

17   right?

18   *A*    That's correct.

19   *Q*    Is that the two ways that customers get rebates or

20   incentives?

21   *A*    Yes.

22   *Q*    You either add it on to my down payment or you just give

23   me a check?

24   *A*    Correct.

25   *Q*    Okay.  So to get Cullman back to even, the Birmingham

1    store had to pay Cullman?

2    A    Correct.

3    Q    It was also warranties probably, too, weren't they?

4    A    I don't know how that would have been handled.  I don't

5    know.  I am sure there was warranties sold, I just don't know

6    how the accounting in that would have worked.

7    Q    But if the warranty, you would agree with me, was sold on

8    the car in Cullman, but RDR'd in Birmingham, Birmingham would

9    get charged for the warranty?

10   A    I believe Birmingham would have got charged for the

11   warranty, yeah.

12   Q    Speaking of RDR'ing, tell me again what that is.

13   A    Retail delivery report.  That's the slang we use to key a

14   deal in and register that vehicle with the manufacturer.

15   Q    And who would have been responsible for doing that at the

16   Birmingham store?

17   A    One of the sales managers.

18   Q    In March of 2013, would have been whom?

19   A    It could have been one of any people, Gerald Shepard,

20   Abdul Mughal, Jeff Green, Scott Burton, anybody.  Any of the

21   sales managers.  Maybe even some of the finance managers could

22   have done it.

23   Q    But it would not have been Kim's job to do that?

24   A    No, no.

25   Q    She wouldn't have done that?

1    *A*    No.

2              MR. BROOME:  That's all I have.  Thank you, sir.

3              MS. WICK:  Just briefly, Your Honor.

4                    FURTHER REDIRECT EXAMINATION

5    BY MS. WICK:

6    *Q*    Exhibit 24.  Page 2, please.  Can we call up the middle

7    e-mail?

8              Mr. Visser, a minute ago you said that -- I think Mr.

9    Broome asked you if you had ever seen the Birmingham deal

10   jackets or if you even knew if they existed.

11   *A*    Yes.

12   *Q*    And I think you said you had never seen them?

13   *A*    I don't think I have seen the Birmingham deal jackets.  I

14   saw the 15 deals, but I believe they were in Cullman deal

15   jackets.

16   *Q*    Okay.  When he asked you if you knew they existed, what

17   did you say?

18   *A*    I said I don't know if they exist or not.

19   *Q*    In the e-mail that Ms. Branch sent you on June 3rd, when

20   she said Jeff also created a Birmingham deal jacket for each

21   of these deals so we would have it if they ever request a deal

22   to be pulled, what was your understanding after this e-mail

23   whether Birmingham deal jackets existed?

24   *A*    It was my understanding that one was created.

25   *Q*    Okay.  From Ms. Branch?  The e-mail from Ms. Branch?

1    *A*    I learn that from the e-mail -- from this e-mail from Ms.

2    Branch, yes.

3            MS. WICK:  No further questions, Your Honor.

4            MR. BROOME:  I don't have anything else, Your Honor.

5    Thank you.

6       All right, Mr. Visser, you may step down.  Thank you.

7            MS. WICK:  Your Honor, the government would call

8    Forest Housner.

9            THE COURT:  All right.

10           THE COURTROOM DEPUTY:  Will you step into the box

11   and remain standing, please.  Will you raise your right hand.

12      Do you swear of affirm to tell the truth, the whole

13   truth, and nothing but the truth so help you God?

14           THE WITNESS:  I do.

15           THE COURTROOM DEPUTY:  Thank you.  Please be seated.

16   Will you state your first and last name.

17           THE WITNESS:  Forest Housner.

18           THE COURTROOM DEPUTY:  Will you spell your first and

19   last name.

20           THE WITNESS:  F-o-r-e-s-t, H-o-u-s-n-e-r.

21           THE COURTROOM DEPUTY:  Thank you.

22                      DIRECT EXAMINATION

23   BY MS. WICK:

24   *Q*    Good afternoon, Mr. Housner.  Could you tell the jury

25   where you are from?

1    A    I live in Clanton, Alabama.

2    Q    And where did you go to school?

3    A    I am sorry?

4    Q    I'm sorry.  Where did you go to school?

5    A    High school?

6    Q    Sure.

7    A    Howell, Michigan.

8    Q    Where did you go to college?

9    A    I did not complete college, but I took classes at

10   University of Michigan.

11   Q    Okay.  Can you tell the jury a little bit about your

12   background in the car industry?

13   A    I started in parts and service in 1976.  That's what I

14   have done.  Since then, parts and service in various different

15   manufacturers and stores up to, probably, January or February

16   of 2012, I went from fixed operations director, which is parts

17   and service, to director of operations, which is parts,

18   service, facilities, buildings, and expense control.

19   Q    And I think you said that happened in 2012.  What job was

20   that that you transitioned into as director of operations?

21   A    From parts and service director to director of

22   operations.

23   Q    Was it at the same dealership?

24   A    It was a group I had -- at that time at four dealerships.

25   Q    Okay.  Let me -- I am sorry, I am making this more

1    confusing than it needs to be.  How many prior dealerships

2    have you worked at?

3    *A*    Oh, I -- probably 15.

4    *Q*    15.  If you need water, we have it.  I understand you

5    said that some of your prior positions where you were the

6    fixed ops manager, which had to do with parts and service?

7    *A*    Yes.

8    *Q*    Would you say that your -- because I don't want to

9    necessarily -- I understand you have a lot of experience.  I

10   don't necessarily want to cover all 15 years.  But would you

11   say that most of your experience in those 15 years was in the

12   fixed ops parts and service side or in the sales side of the

13   dealership?

14   *A*    It was all parts and service.

15   *Q*    Prior to coming to work for Serra Nissan in Birmingham,

16   how much experience did you have on the sales side of the

17   dealership?

18   *A*    I had none.  I never worked -- I have never sold a car.

19   I have never been a sales manager.  I have never been a

20   finance and insurance manager in any of the positions.  In

21   sales, I have not held.

22   *Q*    Can you explain -- let me back up.  When did you go to

23   work for Serra Nissan in Birmingham?

24   *A*    It was approximately October of 2011.

25   *Q*    And do you remember when you left?

1    *A*    Early February of 2015.

2    *Q*    Okay.  While you were at Serra Nissan, during the entire

3    time, was your position director of operations?

4    *A*    No, in the beginning, it was parts and service director

5    or fixed operations director.

6    *Q*    So at some point, you became the director of operations

7    at Serra Nissan?

8    *A*    Correct.

9    *Q*    Do you remember when that was?

10   *A*    Yes, that approximately was January or February 2012.

11   *Q*    I understand now.  So October 2011, you started in the

12   other position, then you became director of operations in

13   January or February of 2012?

14   *A*    After I opened the Serra Visser Nissan in Cullman, which

15   I spent a couple of months to three months up there in

16   Cullman, getting the store, the building up and running, when

17   I got back, that's when Randy Visser asked me to take care of

18   the facilities at all locations, along with helping him with

19   expense control.

20   *Q*    Can you explain to the jury what your day-to-day

21   responsibilities were as the director of operations starting

22   in January or February of 2012?

23   *A*    Well, I still worked with parts and service.  So that was

24   a large portion of it.  I met with my service managers.  The

25   locations were an hour apart.  I mean, Serra Nissan and Serra

1    Volkswagen were together.  Serra Visser Nissan was an hour

2    north.  Serra Honda Sylacauga was an hour southeast.  So I

3    wouldn't be at every store every day.  I would divide it by

4    week and spend a lot of time with the service managers.  All

5    of my service managers at that time were new.  They were --

6    none of them had held positions as service managers before, so

7    they were green and that took a lot of work.  My parts

8    director was experienced, and he was a lot of help.  I did not

9    have to spend as much time in parts that I did in service.

10   Then the facility being new in Cullman, I still had a lot of

11   time that I spent getting that facility -- we had got started.

12   But to find out I need this, this needs more computers.  We

13   needed to have a couple more offices built.  So those things

14   took up time, as well as we immediately had to start on

15   building a new facility for Cullman.  We were in a lease

16   facility, so we had 24 months to be in a new building.

17   Q    Let me ask you, if I could ask you very specifically,

18   what did you do for Serra Nissan Birmingham starting in

19   January and February 2012, when you were at the Birmingham

20   store?

21   A    Worked with the parts and service.  That facility had a

22   lot of upkeep.  It was an old building -- it was a 30-year-old

23   building that had not been kept up.  So there were things that

24   needed to be addressed in that.  And then I also started

25   working with some other receivables that Randy had asked me to

1    work with.  I worked with the warranty receivable in service,

2    but his biggest concern was contracts and transits.  So I

3    started working with that schedule.

4    Q    Prior to those things that you were saying, the contracts

5    and transit and the receivables, had you dealt with that

6    previously in your job?

7    A    No.

8    Q    Did you know how to do any of that?

9    A    No.

10   Q    Was there somebody at the dealership who kind of trained

11   you or helped explain to you the receivables in the contract

12   and transit?

13   A    Randy Visser.

14   Q    Was there anyone else who helped kind of explain to you

15   the accounting process?

16   A    Kim Branch helped me a lot with the schedules.  I didn't

17   have an accounting background.  She was very good at breaking

18   them down into more layman's terms where it is easier for me

19   to understand.

20   Q    How often did you meet with her for her to kind of

21   explain the accounting process at Serra Nissan?

22   A    At that time, maybe once or twice a week, very short

23   meetings.

24   Q    Well, let me be clear, I think you said you started --

25   you took over as director of operations in January and

1    February of 2012.  Ms. Branch wasn't an employee then, was

2    she?

3    A    No, you are right.  I worked with another controller who

4    was just awful.

5    Q    I am sorry.

6    A    She didn't help me much at all.

7    Q    So do you remember when Ms. Branch started?

8    A    Not exactly.

9    Q    Okay.  At some point, Ms. Branch starts after you, let's

10   just go with that.  When you were saying, she would help you

11   and have conversations, how often do you think you had those

12   discussions with her after she started where she kind of

13   helped explain the accounting to you?

14   A    I think it was a couple of times a week.  I mean, I was

15   out of the store a lot, so I couldn't be at the other

16   locations.

17   Q    When you were present in the Birmingham store, how often

18   were you having these meetings with her; daily when you were

19   there or weekly?

20   A    Not daily, but more often than weekly.  It was kind of as

21   needed.  I only was required to go over the contracts and

22   transits twice a week.  So, there was no reason for more often

23   than that.

24   Q    Okay.  Do you remember what your pay plan was in March

25   2013?

1    A    No.

2    Q    Without knowing numbers, do you know if it included some

3    percentage of the net?

4    A    I eventually was given a percentage of the net, but I

5    could not tell you the month and date that that happened.

6    That's not how it was when I started.  It was some time past

7    before that happened.

8    Q    Could you describe your relationship -- who did you

9    report to at the dealership in Birmingham?

10   A    Randy Visser.

11   Q    Actually, did you report -- who did you report to for all

12   the dealerships that you were the director of operations for?

13   A    Randy Visser.

14   Q    Could you describe your relationship with him?

15   A    It was good.  When he offered me or asked me to take on

16   more than just fixed ops, I told him that I did not know

17   anything about sales and I didn't want to.  And I remember him

18   saying, don't worry about it, you don't have to because I am

19   an expert on it.  And I felt he was.  I totally felt he was.

20   Q    How often did Mr. Visser e-mail you?

21   A    Nonstop.  I mean it was his -- some of them were

22   meaningless, some of them I didn't know why he sent them to

23   me, but I would get a lot.  Early on, I would ask him about

24   why did you send this?  He said, I don't know, just ignore it.

25   It's nothing.

1   Q    How often did he copy Ms. Branch on those e-mails to you?

2   A    I think we were sent the same e-mails quite a bit.

3   Q    Did he ever text you?

4   A    Yes.

5   Q    How often?

6   A    Not as much.  Five or six times a week.  I'm not very

7   tech savvy.  I never had an e-mail before I started there.  I

8   am all paper, handwritten, take it somewhere and give it.  And

9   I don't know how to text, in all honesty.

10  Q    How did you communicate back to Mr. Visser?

11  A    I would try to call him because I felt an e-mail was a

12  one-sided conversation and not -- some of those e-mails are

13  very vague.  I would not understand them, and I wanted

14  clarity.  So, I would always try to call him.  If not, I would

15  try to communicate with him via e-mail.

16  Q    When you were at the Birmingham store, how often was he

17  present at the store?

18  A    It varied through the seasons.  There was times of the

19  year that he was there.  He was very much a family man when

20  his kids were out of school.  He would spend a lot of time

21  with them.  So in the summer months, he will not be there.

22  And he liked being there in the morning for a couple of hours.

23  But he was always available.  I mean, he always -- up until

24  the end when I quit and why I quit, he directed me through

25  everything, and then he just wasn't there anymore, and I

1    couldn't get ahold of him.  I really didn't know what to do.

2    Q    Do you remember conversations -- excuse me, in March

3    2013, what conversations do you remember having with Mr.

4    Visser about hitting the dealer volume bonus incentive at the

5    end of the year?

6    A    I remember him telling me that he was going to use the

7    Cullman car deals to meet the Birmingham objective, and that

8    -- I don't know his exact words, but it was do you know how to

9    do it?  I said I know how to do it.  And he was asking me,

10   telling me to get this done.

11   Q    Do you remember what instructions he gave you?

12   A    No.  They would have had to have been detailed because

13   other than the RDR on the cars, I don't know what else needed

14   to be done.

15   Q    Mr. Housner, I have handed you what has been previously

16   admitted as Government's Exhibit 40.  When you get a moment,

17   can you just take a look at those documents and tell me if you

18   recognize them?

19   A    This one.  There's actually two.

20   Q    Let me break it up.  Do you recognize page 1?

21   A    Yes, you showed it to me a week ago.

22   Q    Do you recognize page 2?

23   A    No.

24   Q    So let's just talk about page 1.  This has already been

25   admitted.

1           MS. WICK:  Permission to publish, Your Honor?

2           THE COURT:  Yes.

3    BY MS. WICK:

4    Q    Mr. Housner, can you see that on your screen?

5    A    Yes.

6    Q    Do you recognize the (256) number at the top?

7    A    I don't know what the number is.  I know (256) was

8    Cullman, and I know that's my handwriting.

9    Q    That's your handwriting?

10   A    That is my handwriting.

11   Q    Okay.  Do you recognize that document, what it is?

12   A    It's a document explaining what to do for the vehicles

13   that were going to be reported in Birmingham from Cullman.

14   Q    Do you remember seeing that document back in March 2013?

15   A    No, I don't.

16   Q    Do you know who wrote that information?

17   A    It looks like documents that I would get from Randy

18   Visser, the bold the numbering.  It looks like it's

19   something -- it looks very similar to a lot of the paperwork

20   when everybody was explaining to someone the process or

21   something, that looks like his documents.

22   Q    Would you say it's his style of writing?

23   A    Yes.  It's definitely not mine.  It would be handwritten

24   and would not be as proper.

25   Q    Do you understand the instructions that are contained in

1  here?

2  *A*    60, 70 percent of it.  I mean, some of the stuff, it

3  looks like something an F & I manager would deal with.  I

4  never worked in F & I.  So I...I pretty much know what it's

5  saying.

6  *Q*    Do you know whether it's -- earlier, you said you had a

7  conversation with Mr. Visser about using Cullman's deals for

8  Birmingham in March 2013.

9  *A*    Yeah.

10 *Q*    Can you tell if this is related to that?

11 *A*    Oh, absolutely.

12 *Q*    Okay.  And I think you said that during your conversation

13 with him that he told you that we were going to do this?

14 *A*    Yeah, he told me that he wanted this done, and he also

15 told me, he knew how to do it.  I mean, he knew I didn't know

16 how to do it.

17 *Q*    Do you remember whether you received -- do you remember

18 receiving these instructions from Mr. Visser?

19 *A*    No, I don't.  I would get a lot of stuff from him.  And

20 most of the stuff would -- stuff to do with sales.  It would

21 pass right through my desk.  I didn't know it, and it wasn't

22 my area.  I would worked off a list that I made every day, and

23 I would try to get it off my list as quickly as possible and

24 to the right person.  I would ask him like where -- no, I

25 would always ask him where it went to because my concern was

1    when I get something to the wrong person.

2    Q    I know the type on that is really tiny, so we're going to

3    call out, at the bottom of that, there's like a little footer,

4    and unfortunately, it's at the very bottom.  And it's actually

5    upside down.

6         So you may have to turn your paperwork upside down.

7         Can you call it all the way from the left?

8    A    Yes, that's my fax number.

9    Q    I am going to read it because it's very hard for us to

10   change the direction.  But the upside down number is 205 --

11   I'm going to try to read it -- 856-6274.  You said that's your

12   fax number?

13   A    That's my fax number.

14   Q    Okay.  Do you remember faxing this document to the

15   Cullman store?

16   A    No.

17   Q    After Mr. Visser told you what you were going to do with

18   the Cullman sales and moving them to Birmingham, did you have

19   any other conversations with him?

20   A    I had conversations with him every day that he was there,

21   but...

22   Q    I should have been more specific.  About the shifting?

23   A    I am sure that I did.  I mean, I didn't know that there

24   would have been a lot of things that had been done, and I am

25   sure that he gave me several other documents.  I do remember

1    him saying, telling me that Jeff Green would do the deal

2    jackets.  I do remember him saying that.  I don't know why

3    that stands out.  I worked with Jeff Green on the contracts

4    and transits.  I don't know if --

5    Q    Okay.

6    A    -- that's why, I don't know.

7    Q    I'm sorry, I did not mean to interrupt you.  Do you

8    remember having conversations with Ms. Branch about the

9    shifting -- shifting the Cullman sales to Birmingham?

10   A    I don't remember actual conversations with -- I know that

11   we talked about it.

12   Q    Do you remember any conversations with Gerald Shepard at

13   the dealership regarding the shifting of sales?

14   A    Gerald Shepard, that's the one thing that I do know about

15   to do this process was reporting of cars, and Gerald Shepard

16   reported cars.  I am sure I went to Gerald to tell him to

17   report the cars.  He is the one that I knew did that.

18   Q    Do you remember any of the actual conversations that you

19   had with Mr. Shepard?

20   A    No, it was a long time ago.

21   Q    I understand.  Did you have any conversations with a man

22   at the Cullman store named Harold Yelverton?

23   A    Harold was the GM of the store.  I had went to that

24   store.  Randy did not.  And yes, I would have gone over --

25   whenever I went to that store, which is at that time at least

1    twice a week, I would ask Randy, do you have anything for me

2    to take to the Cullman store?  I am going to the Cullman

3    store, do you have anything?

4    Q    I am sorry.  Let me be more specific.  Did you ever have

5    conversations with Mr. Yelverton about the shifting of sales

6    in March 2013?

7    A    I am sure I did.  I don't remember the conversations, but

8    I was the one that would go to Cullman, and he was the GM.  He

9    would have to be involved.

10   Q    Do you remember in June 2000 -- I am not going to guess.

11        Do you remember e-mails between you, Mr. Visser, and Ms.

12   Branch in June 2013?

13   A    I remember seeing this e-mail.

14   Q    I apologize, I forgot when I handed it to you to say that

15   I handed you what was previously marked and admitted as

16   Government's Exhibit 24.  If you look at the front of the

17   folder, is that what you are looking at, Government's Exhibit

18   24?

19   A    Yes.

20   Q    So, looking at those e-mails, do you remember getting

21   those e-mails in June, 2013?

22   A    I remember the first one.  It is one of those e-mails

23   that I chose to ignore.

24   Q    Why did you choose to ignore it?

25   A    It talks about booking deals in Reynolds in accounting.

1  I would not book deals in accounting.  So, typically any time

2  I got an e-mail, I didn't totally understand it.  If I saw two

3  names up there, then I assumed it was for the other one.

4  Because of the word "accounting," I would ignore it.  Many

5  times he would, when he'd do them below, he would actually put

6  my name, and say, Forest, and then he would say something he

7  wanted me to do.

8  Q    So you didn't think that was addressed to you in terms of

9  something to be done?

10  A    No.

11  Q    Who, to the best of your knowledge at the Serra Nissan

12  dealership, did have the ability to book deals in accounting?

13  A    I know that Kim could, and there may be other people.  I

14  would think there were -- I would think Melissa Gates was like

15  an assistant office manager, I am guessing.  I mean, I don't

16  know.

17  Q    Let me phrase it better.  Did you know for sure whether

18  Ms. Branch had the ability to book the deals in accounting?

19  A    Yes, yes.

20  Q    Did you know for sure whether anyone else in accounting

21  had the ability to book deals?

22  A    No.

23        THE COURT:  Mr. Housner, just so you'll know, if you

24  can't recall something or you don't know, it's perfectly fine

25  for you to say, I don't know, or I can't recall.  Please don't

1    guess at any answers to questions that Ms. Wick or Mr. Broome

2    may present to you.  Okay?

3              THE WITNESS:  Okay.

4              THE COURT:  Thank you.

5              MS. WICK:  Thank you, Your Honor.

6    BY MS. WICK:

7    Q    Did you ever have a conversation with Mr. Visser about

8    whether it was okay to pool sales?

9    A    Pool sales -- you mean this process right here, pool

10   sales from one?

11   Q    Good point.  What is your understanding of what the term

12   "pooling of sales" means?

13   A    It's not a term that I hear used throughout.  Is that

14   what it is?  Randy never said the word "pooling sales" ever to

15   me.

16   Q    Okay.  How about shifting sales.  Shifting sales --

17   shifting of sales from one dealership to the other?

18   A    Yeah, yeah, okay, yeah.

19   Q    Did you ever have -- prior to March 2013, did you ever

20   have any conversations with Mr. Visser about shifting sales?

21   A    Yes.  I asked him if it could be done.  There was a

22   question because it can be done in parts, and it was just done

23   in parts.  Nissan parts and service rep had reminded or

24   suggested to my parts director that they shifted Birmingham's

25   parts sales to Cullman because Cullman was tied in a contest

1    or a trip, and to make sure they got over -- if they took the

2    sales from Birmingham and put them in Cullman, it would assure

3    that they would win the contest.

4    Q    Do you know if that parts incentive process had anything

5    to do with the sales incentive process?

6    A    Were they related?

7    Q    Yes.

8    A    Not to my knowledge.  I asked Randy, it was a question,

9    can you -- can you move sales?  And I didn't even tell him

10   why.  The reason was because -- for me, it was because we just

11   did it in parts and were told we could do it in parts, and it

12   was -- occasionally, I would just ask Randy questions about

13   sales.

14   Q    What was his response when you asked if you could shift

15   sales like that on the sales side like you did in parts?

16   A    It was something like, yes, but it's complicated.

17   Q    I am handing you --

18              MS. WICK:  Permission to approach?

19              THE COURT:  Granted.

20   BY MS. WICK:

21   Q    -- what's been previously marked as Government's Exhibit

22   25, and actually, it's already been admitted.  But can you

23   just take a look at that document and tell me if you recognize

24   it.

25   A    Yes.

1    Q    What is that?

2    A    It's like a closing statement after the Nissan auditor

3    has been there for car deals.

4    Q    When was that closing meeting for that audit?

5    A    March 15th.

6    Q    Of what year?

7    A    2013, I am sorry.

8    Q    Okay.  Were you present at that closing meeting?

9    A    I believe I was.  Yes, because the only thing I remember

10   is that number two in the recommendations of the vin, the zip,

11   we'll look up because I wasn't aware of that before.

12   Q    Do you remember what the kind of the nature of -- what's

13   the purpose of that audit closing meeting?

14   A    It's to go over things that they found in the audit, kind

15   of a training.  My understanding was a training to know what

16   to look for to improve.

17   Q    To improve what?

18   A    Improve your reporting and your incentive charge backs.

19   Q    So, it was your understanding that the purpose of that

20   was how to correctly RDR or report in order to avoid charge

21   backs?

22   A    Yes.

23   Q    Okay.  Can you tell me, looking at that closing meeting,

24   how many times the auditor told you -- and who else was

25   present with you?  You, the auditor, and?

1    A    Randy Visser.

2    Q    Can you look at that closing report and tell me how many

3    times the auditor told you and Mr. Visser how important it was

4    to accurately report the RDR information?  You don't have to

5    give me an exact number.

6    A    I mean, I see it talked about fleets and -- and most of

7    it type C and D went over my head because I never reported,

8    and I just I didn't even notice things -- different reporting

9    types existed.  I knew about the rental cars.  I talked to

10   Jeff about the vin, zip.  That's mainly what I remember

11   because I thought it was a great tool that I didn't know

12   existed.

13   Q    Is it fair to say -- and I want you to go from your

14   recollection, do you remember Mr. Creecy, at that meeting,

15   telling you and Mr. Visser that it was important to accurately

16   report the RDR information when it was submitted to get

17   incentives?

18   A    Yes, it's very important.

19   Q    The date of that meeting you said was March 15, 2013,

20   right?

21   A    Correct.

22   Q    If I understood you earlier, you had conversations with

23   Mr. Visser in March 2013 about shifting the sales from Cullman

24   to Birmingham to hit the incentive?

25   A    Correct.

1    *Q*    Do you remember whether your conversation with Mr. Visser

2    was before that audit closing meeting or after the audit

3    closing meeting?

4    *A*    No, I don't.

5    *Q*    At the time that Mr. Visser told you that you were going

6    to shift the sales from Cullman to Birmingham, what was your

7    understanding of whether that was an acceptable practice to

8    Nissan?

9    *A*    I knew it was for parts.  But my car deals, I just -- I

10   felt Randy knew what he was doing.  I believe -- Nissan had

11   told me themselves that he was their best dealer.  I really

12   felt Randy knew what he was doing.

13   *Q*    At the point that you became aware that Mr. Green was

14   going to have to create false Birmingham deal jackets as part

15   of this process, what was your understanding of that point,

16   whether this was an acceptable practice?

17   *A*    It didn't seem correct to me.

18   *Q*    Why?

19   *A*    I just didn't think you would have to redo a bunch of

20   documents and parts to do this, and parts -- you just reported

21   them.  You just sold the parts to -- like I take Nissan parts,

22   and I just sold them to the Cullman store.  You didn't have to

23   recreate anything or do anything.

24   *Q*    So you didn't have to create any false documents in order

25   to pool parts just for simplicity for the parts incentive?

1    *A*    Correct.

2    *Q*    Do you remember in October of 2013, a search warrant

3    being executed at the Serra Nissan dealership in Birmingham?

4    *A*    Yes, I wasn't there when it happened, but I actually

5    heard about it the next morning.

6    *Q*    Do you remember hearing about -- did you have any

7    conversations with anyone about anything that was taken off of

8    Mrs. Branch's desk during the search?

9    *A*    Could you repeat that?

10    *Q*    Do you remember having any conversations with anyone

11    about documents that were taken off of Ms. Branch's desk

12    during the search?

13    *A*    I remember after the search, there were some current

14    deals that were still in the process of being worked that Kim

15    needed back so she could finish, but they were never taken off

16    her desk.  That part of it, I don't remember.  I just assume

17    they were current stuff that was still being worked on.

18    *Q*    Do you remember in June 2014, do you remember becoming

19    aware of a grand jury subpoena that had been issued to the

20    dealership?

21    *A*    I never knew the subpoenas were issued.  I know they were

22    looking for deals at different times.  But no one -- that

23    would -- they were probably served to the company's lawyer.

24    *Q*    Okay.  I don't want you to tell me any conversations that

25    you had with any of those attorneys.

1   *A*      And I didn't.  I wouldn't talk to those attorneys.  But I

2   mean, the word "subpoena," I was never told, hey, we got a

3   subpoena for those deals.  It was like, we needed to turn in

4   some deals to the government.  And I had been told to help

5   with anything that the government wanted.

6   *Q*      Do you remember when you became aware -- well, let me

7   rephrase that.

8           Were you ever aware that the government had requested

9   those 15 Birmingham deal jackets that were created as part of

10  the shifting sales?

11  *A*      Yes.

12  *Q*      When did you become aware of that?

13  *A*      I couldn't give a date.  I would be wildly guessing, and

14  I am not going to.

15  *Q*      As the Court said, please don't guess.

16          Do you remember having conversations with anyone at

17  the dealership -- not attorneys -- anyone at the dealership

18  about the government's request for those 15 Birmingham deal

19  jackets?

20  *A*      I never came looking for the deals.  It seems like there

21  was one or two that they were struggling to find.  I think

22  everyone was looking.

23  *Q*      Do you know if they ever found those?

24  *A*      Yes, to my knowledge, they did.  I think they found a

25  couple that were missing in an F & I manager's office, or

1    something.

2    *Q*    Do you know if those deals that they found were, in fact,

3    the 15 Birmingham deal jackets that were related to the

4    shifted sales?

5    *A*    I thought they were.

6    *Q*    Again, I am going to -- if you don't know -- do you know

7    whether the deals they found were the 15 Birmingham deal

8    jackets that were created for the deals that we've been

9    discussing, the shifted sales?

10   *A*    I can't say I don't want to -- I was asked not to.  I

11   don't want to do that.

12           THE COURT:  Sir, that's fine.  If your answer is I'm

13   not sure, that's fine.

14           THE WITNESS:  I am not sure.

15   BY MS. WICK:

16   *Q*    Mr. Housner, are you familiar with the dealership's sales

17   and service agreement?

18   *A*    I have never seen this one for the Nissan, but I know

19   what the sales and service agreement is.

20   *Q*    What is it?

21   *A*    It's an agreement that every store has between the

22   dealership and the manufacturer.  It usually has a term on it.

23   They really vary quite a bit by manufacturers.  I worked

24   through many manufacturers.  Some of them, it's just an

25   ongoing agreement that will just last forever.  They just sign

1    it every few years.  Those are more on a domestic side.  On

2    the foreign side, they generally can be shorter, one year to

3    five years.  And it has all the rules that you want to abide

4    by, facility size -- just guidelines, just guidelines for what

5    a dealer has to do.

6    Q    Okay.  Do you remember at some point federal agents

7    coming to your house to talk with you?

8    A    Yes.

9    Q    After that, did you have conversations with Mr. Visser?

10   A    Yes.

11   Q    What conversation with Mr. Visser -- what did you talk

12   about with Mr. Visser after the agents came to your house?

13   A    He had sent an e-mail that said if anyone comes to your

14   house or just tries to talk to you, to let him know and that

15   he had an attorney for us, the employees.

16   Q    Okay.  Did he tell you anything else?

17   A    He said we shouldn't talk to them without an attorney.

18   Q    Do you remember receiving a target letter from the

19   government?

20   A    No.

21   Q    At any point, did you become aware that a target letter

22   had been sent to you?

23   A    My attorney --

24   Q    I don't want you to tell me about conversations with your

25   attorney.  If you -- do you remember when you became aware --

1    at some point -- I don't want to you tell me about

2    conversations with your attorney.

3              At some point, did you become aware that a target

4    letter had been sent to you?

5    A    Yes.

6    Q    Okay.

7    A    Well, no, I am sorry.  I became aware that I had become a

8    target, but I didn't know anything about a letter.

9    Q    Okay.  Have you ever read a target letter addressed to

10   you from the government?

11   A    No.

12   Q    At some point, did you come in and meet with the

13   government?

14   A    Yes.

15   Q    Okay.  Why?

16   A    I had always wanted to.  It's hard because I can't say.

17   My attorney --

18              THE COURT:  That's all right.  So if you were

19   meeting because of some advice that your attorney gave you,

20   you do not have to discuss any advice that you received from

21   an attorney.

22   BY MS. WICK:

23   Q    Let me rephrase.  What was the purpose -- what did you

24   understand the purpose to be of meeting with the government?

25   A    I wanted to cooperate with the investigation.  I always

1   had wanted to.  I was somewhat disappointed when the agents

2   never came back.

3   Q    When you came in to meet with the government, do you

4   remember if there was a document or an agreement that dictated

5   the terms of that meeting?

6   A    I remember there were several pages I signed.  Is that

7   what you are...

8   Q    Do you remember a proffer letter or a letter that you

9   signed prior to that meeting?

10  A    Yes.

11  Q    Okay.  Do you remember the terms of that letter?

12  A    Yes.

13  Q    What did you understand the terms of that letter to mean?

14  A    That I was speaking to you of my own free will, and that

15  if I had done anything wrong, I could be charged.

16  Q    What did you understand that you would get in exchange

17  for cooperating with the government?

18  A    I would get nothing.

19  Q    Have you been charged in this case?

20  A    No.

21  Q    What is your understanding of whether you could still be

22  charged in this case or not?

23  A    I understand I could be charged.

24  Q    Okay.  How many times did you meet with the government?

25  A    Three.

1   Q    What instructions did the government give you during

2   those meetings?

3   A    Repeatedly, tell the truth, tell the truth, tell the

4   truth.

5   Q    Did the government explain in any way what would happen

6   if you came in and lied in any way on the stand, either to the

7   government or to a defense counsel?

8   A    That I would be committing perjury.

9   Q    Okay.  Let me ask you one more question.  Was there

10  anyone at the dealerships that you worked with that you had a

11  really close relationship with that you mentored?

12  A    Yes.

13  Q    Who was that?

14  A    Shantelle.

15          MS. WICK:  No further questions, Your Honor.

16          THE COURT:  Before we do cross examination, let's

17  take a quick five-minute break, please.  And I will advise

18  members of jury, please not to discuss any of the testimony

19  that you've heard so far.

20              (A recess was taken at 3:56 p.m.)

21  (The following proceedings were held in the hallway, out of

22  the hearing of the jury:)

23          THE COURT:  I have been listening to Mr. Housner's

24  testimony.  I need to have a sense from counsel -- Ms. Wick,

25  earlier today you advised me that Mr. Housner may have

1  problems with his memory because of some health issues that he

2  has had.  I need to understand from counsel what Mr. Housner's

3  -- how Mr. Housner's demeanor and memory today compares with

4  what his demeanor and memory may have been five months ago, a

5  year ago, back in 2013.

6       Mr. Bell, I would venture to guess that you didn't

7  know Mr. Housner in 2013.  When did you first become

8  associated with him?

9            MR. LANCE BELL:  In March of this year.  I will say

10  when I met with him then, and in the first time -- I don't

11  have my file with me -- and we met in their office, I would

12  say Mr. Housner was a lot sharper.  He could remember things a

13  lot better.  He could critique little things that today he

14  can't do.

15       We met last week in the U.S. Attorney's Office, and

16  you know, he wasn't as clear about certain things.  And then

17  yesterday is when we met with him Friday -- I met with him in

18  my office Friday, and I was asked, I --

19            THE COURT:  And I don't want to know any --

20            MR. LANCE BELL:  I know, but I carried him --

21  because he was so nervous, I carried him up to our state

22  courthouse because nobody was there, it was a Friday

23  afternoon.  State judges, they've gone on Fridays after lunch.

24  There is nobody around.  So, I walked down there, and we just

25  sat in there, and I stayed there two hours, and I was asking

1    him questions, like both sides, just a little bit to --

2            THE COURT:  -- prepare him?

3            MR. LANCE BELL:  -- prepare him, and I cut it short.

4    I was like, well, he is just having a bad day or something --

5    yesterday we met at 5:30 in the U.S. Attorney's Office, and

6    within a couple of minutes in there -- I don't know if that's

7    the latest, but I've been around him.  I wrote a letter, it

8    was to you, Jennifer (AUSA Murnahan), and I said, something is

9    not right.  It's just -- and then I got him to -- I called him

10   outside.  I actually -- Katie, the IRS agent, I think, picked

11   up the same thing -- and she was writing a letter to the FBI

12   or to Jennifer too.  So there's two separate people that are

13   sitting there looking at it.

14           I had experience in that with my mother, and that's

15   where I started picking up on it yesterday.  I think she had a

16   family member that she had been through the same thing.  So I

17   called Amanda out in the hallway, and I said something is just

18   not right.  And I knew he had had a lot of medical -- he had

19   spent four days in hospital, got out, four days back in the

20   hospital.  He has last 30 pounds.  I know his strength is not

21   where it was.  He don't look as good as he did.  He is

22   prepared to get his strength up to have colon surgery where

23   they're going to take out a section of his colon.  He's got a

24   perforated colon.

25           He has been on some pretty heavy medicine during a lot

1    of this.  And he's had some different testing.  I don't know

2    if that's put an effect on him or what's really happened.  But

3    I got him -- he couldn't remember his wife's number.  So

4    Amanda walked him downstairs to his car.  And I got his number

5    and talked him into letting me call his wife.

6         I talked to her for just a minute, and told, first, he

7    is okay.  I am not calling because something is wrong, but let

8    me talk to you for a minute.  Have you noticed anything?  And

9    then she was real quiet.  And she said, well, Forest is like a

10   recluse in the house.  He just don't like to go anywhere now.

11   He don't like to do anything.  She said, I am noticing things

12   that he just don't remember or recall some simple things.  She

13   says, but I haven't said a word to nobody.  She said I have

14   not said a word to Forest or the children or not anybody.

15        I will say this , this morning, that I think he was a

16   little bit better, but as the day goes on as he sat there, I

17   could see a different Forest from ten o'clock this morning

18   until right now.

19        THE COURT:  All right.  I don't think it's fair, in

20   this proceeding, to have the jury have the impression that the

21   Mr. Housner they see right now is the Mr. Housner who was

22   Randy Visser's right-hand man, for all intents and purposes,

23   from everything I have heard in these proceedings.  And that

24   he is the person who was communicating with Ms. Branch.

25        MS. WICK:  I am sorry.  I didn't mean to interrupt.

 1          THE COURT:  I am curious to hear what you think, but

 2    please go ahead.

 3          MS. WICK:  I think we have told him in every one of

 4    our meetings -- and I was glad you said it on the record,

 5    because we have told him over and over and over, do not guess,

 6    if you don't know the answer, say, I don't remember, I don't

 7    recall.  I think there was a significant portion of his

 8    testimony that he legitimately recalled, that he remembered

 9    conversations.  And there was value in the sense of he was a

10    participant that could contribute information to the jury.

11          I don't know what the best thing is in terms of like a

12    curative instruction, but I would hate for the value of what

13    he could remember to be lost because there were so few people

14    in some of those discussions, in some of those meetings, and

15    some of them were one on one, some of them were his word

16    against the other person -- I just don't think it would be

17    fair to the government, or to Mr. Housner, for what he did

18    remember and what he did testify to under oath for that to be

19    not considered by the jury.  I know that's a delicate balance

20    for the Court.

21          THE COURT:  Mr. Broome.

22          MR. BROOME:  I am more concerned about the damage to

23    Ms. Branch.  I plan on asking him about his health problems,

24    and I will do it in a professional and gentlemanly manner.  I

25    do not plan on beating the table and going after him.

1          THE COURT:  I would not expect you to.

2          MR. BROOME:  Well, I might to somebody, maybe later

3    on with some of your other witnesses.  I am not going to say

4    that I won't.  But not to him, because number one, that's not

5    going to endear to these 12, 14 folks.  Over here, and number

6    two, that's just not the way to treat a person.  Although we

7    are lawyers, we are still people.  But I do have some

8    questions to ask him, and I would not think the cross would be

9    more than 15, 20 minutes.

10          MR. LANCE BELL:  I will say this about Mr. Housner,

11    he is going to try to mask his health problems to a certain

12    degree.

13          MR. BROOME:  I can get around that.

14          MR. LANCE BELL:  I know.  I know.  I just am

15    saying --

16          MR. BROOME:  Do I have a HIPAA problem if someone

17    has told me what his medical problems are?

18          THE COURT:  That's what I'm wondering, whether I

19    need to let Mr. Bell do some examination of Mr. Housner.

20          MR. BROOME:  I learned his health problems from

21    unnamed sources.

22          MS. WICK:  Prior to us notifying you last night?

23          MR. BROOME:  Yes.

24          MS. WICK:  Okay.  And I am not prying I just want to

25    clarify.

1          MR. BROOME:  It's a small dealership in the big

2    picture of things, and people know people.  And people around

3    the Birmingham car dealership have said, I have heard from A,

4    B, and C as far as this.

5          MS. WICK:  I just wanted verification for the Court.

6          MR. LANCE BELL:  I have been asked, how is Forest's

7    health, is Forest okay?  People worry about him at the

8    dealership.

9          MR. BROOME:  It's not been from me.

10         MR. LANCE BELL:  Right, right, but I have had that

11   somebody would know, well, say, look, how is Forest, we heard

12   is ill, we just want to make sure he is okay.

13         THE COURT:  Well, here is my greatest concern -- I

14   am concerned about everything we've discussed so far -- but

15   the evidence until Mr. Housner took the stand was that he was

16   very much in the center -- or part of all of the discussions

17   that were going on with respect to the 15 deals, and more

18   broadly, was -- Mr. Visser had testified that he only

19   communicated with Mr. Housner, and that Mr. Housner carried

20   out all of his instructions.

21         I want to say this delicately, as delicately as I can,

22   but Mr. Housner's demeanor today is that he is a simpleton who

23   would essentially be a puppet of Mr. Visser and has suggested

24   that he couldn't even carry out many of the instructions that

25   he had been given.  If this is not the Mr. Housner who was

1    working with Mr. Visser and the jury is left with that

2    impression, that is extremely prejudicial and problematic, and

3    we need to address it.

4         I need help understanding the lawyers' positions about

5    how the Court should address it because I don't think I can

6    leave this prejudicial impression on the jury in light of the

7    nature of this case and all the testimony that has come before

8    Mr. Housner's testimony.

9         MR. BROOME:  Your Honor, obviously, I don't think

10   anybody would -- and I have never met the man and never seen

11   him before lunch.  I don't think it's the same person,

12   physically or mentally.

13        MS. WICK:  And I obviously never knew Mr. Housner in

14   March 2013 or prior to our first meeting with him.  I will say

15   this, I do not think that Mr. Housner is going to be the last

16   witness that will testify that he was Mr. Visser's puppet and

17   that what Mr. Visser testified to is not in fact what Mr.

18   Housner's role at the dealership was.  I think that part of

19   the problem here is sequence, because all we have right now is

20   Mr. Visser and then Mr. Housner.  And had we known before last

21   night that this was going to be an issue, we maybe could have

22   changed the order of the witnesses so that other people before

23   Mr. Housner were coming in and contradicting and testifying so

24   there wasn't suffer such a glaring difference between the two.

25        MR. BROOME:  So you are saying you are impeaching

1    your own witnesses already?

2              MS. WICK:  We do that with cooperators all the time,

3    Bill.  All the time.  And let me be clear, no matter how many

4    times I tell a witness in a proffer, you need to come in here

5    and tell the truth, every trial, they always get up and they

6    always tell some part that's not the truth.

7              MR. BROOME:  I will say what Mr. Housner has

8    testified to today is not in as much detail as material that

9    the government has provided to me.

10             MS. WICK:  Some of that's questions that we may have

11   asked him in a proffer that we didn't ask him today, and if

12   you want to cross him on that, I think that's --

13             MR. BROOME:  I am just saying he didn't remember

14   things today which he talked about in detail.

15             MS. MURNAHAN:  In reports.

16             MS. WICK:  If that was the case, I would let it go,

17   I didn't try to refresh his recollection.  I wasn't going to

18   put a paper in front of him if he didn't remember sitting

19   there today.  And frankly, with his health issues, I didn't

20   want to --

21             MS. MURNAHAN:  Scare him?

22             MS. WICK:  -- scare him for lack of a better word.

23             MR. LANCE BELL:  I am going to leave it up to the

24   Court.  I think I can waive any HIPAA violations or anything

25   of that nature that anybody wants to do.  If you go out there

1    and try to ask him questions about his medical, he is going to

2    tell you he was in the hospital.  He is going to kind of tell

3    you, I don't think I forget anything.

4            MR. BROOME:  That would be one of the questions:  Is

5    your memory as good today as it would have been a month or two

6    ago?

7            MS. WICK:  That I think he could answer is that he

8    has --

9            MR. LANCE BELL:  I asked him earlier, I said, you

10   know I talked to anyone -- how do you feel?  He said, I just

11   really don't think I -- I think I remember everything.  You

12   tell me I don't, but I kind of think I do.

13       I guess, dealing with that with my mother, it was back

14   something three times in the last week, something is going on.

15   Everything is fine.  I remember everything.  Nobody told me.

16           THE COURT:  It was difficult.

17           MR. LANCE BELL:  It was so difficult they wouldn't

18   admit it all that they were forgetting things or not doing

19   certain things.  Or you know, you didn't take a bath

20   yesterday.  Oh, and I took a bath yesterday, and I remember

21   it.  But they were so -- and I guess I see the early stages,

22   and I don't know if it's what he has been going through.  I

23   don't know the answer.  I wish I knew that.  If I knew the

24   answer, I would be a millionaire.

25           MR. BROOME:  I would probably more personal

1    experience than all of you.  My dad died in January of 2014.

2    And medical experts may tell you that dementia does not kill

3    you, I would beg to differ.

4            MR. LANCE BELL:  That's what killed my mother in

5    September of 2014.

6            MR. BROOME:  Well, I am sorry.

7            For six months my dad went downhill.  He was sharp as

8    a tack in October, and then in January, he is lying in a

9    diaper in a bed.

10           THE COURT:  Let's do this.  Let's do cross

11   examination, and then somehow the Court is going to address

12   this on the record with the jury.  I am going to see how we

13   handle it in cross examination, Mr. Broome.  And then if the

14   Court feels that additional instructions need to be given to

15   the jury.  Or it may be that it would be appropriate for Mr.

16   Bell to ask a few questions of Mr. Housner, let's cross that

17   bridge when we come to it.  Let's take this in stages and see

18   where we end up.  I am also concerned about having Mr. Housner

19   on the stand for too long because of his health.

20           MR. BROOME:  Judge, 20 minutes probably at the most.

21           THE COURT:  I also have to be fair to everybody and

22   let them ask the questions they have to ask.

23           MR. BROOME:  No, Judge, that's all I planned on

24   doing.

25           MS. WICK:  I will say just so the Court knows, I

1  know it's kind of telling the future, but you know, obviously,

2  Mr. Broome knows from the 302s and MOIs, that the other

3  witnesses that we are going to be calling that work with Mr.

4  Housner, Mr. Shepard and Mr. Green, they will be able to

5  testify what their experience with his role, his sharpness, at

6  the time in March 2013 in terms of -- and able to compare in

7  terms of --

8            THE COURT:  But they won't have been in the

9  courtroom today to see his demeanor today.  That's part of the

10 problem.  Because they're excluded from the courtroom, they

11 can't comment on how he is in the courtroom today.  And the

12 contrast is significant for purposes of the jury's

13 appreciation of what was happening in 2013, which is what is

14 relevant.

15            MS. WICK:  Right -- and yes.  I am sorry, I just

16 wanted you to know that there would be additional relevant

17 information from other witnesses.

18            THE COURT:  Understood, but --

19            MS. WICK:  But it is not --

20            THE COURT:  -- business they can't address all of

21 the issues that we're discussing because they aren't here to

22 observe Mr. Housner.

23            MS. WICK:  I just wanted to throw that out there

24 because it is not a complete --

25            MS. MURNAHAN:  I don't believe any of them has

1    probably seen him.

2            MS. WICK:  And probably not because all of them are

3    represented by counsel, and likely they've all been

4    instructed --

5            THE COURT:  -- instructed not to talk to each other.

6            MR. LANCE BELL:  And I don't have a clue.  I saw the

7    reaction of two people today that have not seen him, and the

8    reaction --

9            THE COURT:  I am watching it, too.

10           MR. LANCE BELL:  -- when they put us in a room, then

11   your client when he came in --

12           MR. BROOME:  She was crying when he took the stand.

13           MR. LANCE BELL:  From the time I met him until when

14   I saw him, I was just like, holy cow, how much weight have you

15   lost?  Because I really haven't had any conversations with him

16   in the meantime.

17           MS. WICK:  And whatever the Court thinks is best and

18   most important to make sure the jury understands.  Like the

19   government definitely wants to make sure they understand that

20   change.

21           THE COURT:  All right.  Let's go back and we'll do

22   cross examination and then see where we end up.  Thank you for

23   your time.

24               (Conclusion of hallway conference.)

25               (A recess was taken at 4:18 p.m.)

1          (In open court.  Jury present at 4:23 p.m.)

2              THE COURT:  Mr. Broome, cross examination, please.

3                        CROSS EXAMINATION

4    BY MR. BROOME:

5    Q    Ms. Housner, my name is Bill Broome, and I represent Kim,

6    and I have some questions to ask you this afternoon, sir.  I

7    think you and I are probably about the same age.  How old are

8    you, sir?

9    A    Old?

10   Q    I feel that way, too.  Sometimes?

11   A    62.

12   Q    62.  I am 63.  Sir, in the last few months, since maybe

13   January, have you had some health problems?

14   A    Yes.

15   Q    What these folks would like to know, what are what are

16   your health problems?

17   A    Easter, I was in severe pain so much pain that I couldn't

18   stand up.  My wife took me to the emergency room.  They did a

19   CAT scan and found out I had a perforated colon.

20   Q    That was Easter of 2015?

21   A    Correct.

22   Q    Of this year?

23   A    Yes.

24   Q    And have you been getting treated for that since then,

25   sir?

1    *A*    I was in a hospital for four days at that time, and they

2    treated it with -- temporarily treated it with antibiotics to

3    stop the infection.  About approximately maybe two weeks

4    after, they let me out.  I just was really sick.  And I went

5    back in after my white blood cells were very high, I did a CAT

6    scan.  I had a baseball-sized abscess on my colon where the

7    perforation was.  It was infected.  I was in there four days

8    while they had to -- but they had to first use antibiotics to

9    calm it down a little bit, and then they had to go in and

10   drain it.

11   *Q*    Hopefully, they gave you some medication for the pain,

12   too, didn't they, sir?

13   *A*    Oh, yes, I didn't feel anything after.

14   *Q*    Are you still taking some pain medication?

15   *A*    No, I am not.

16   *Q*    Okay.  Back to Easter --

17   *A*    I do still have to go back in and to have a piece of my

18   colon removed.

19   *Q*    And you are looking at a surgery some time; is that

20   right?

21   *A*    I would go in on the 25th of this month.  If I'm healthy

22   enough, then they'll probably schedule the surgery.

23   *Q*    So right now, your doctors have told you you are not

24   healthy enough to have this surgery?

25   *A*    They wanted me stronger.

1    *Q*    Okay.  And you have been working on that since Easter,

2    April?

3    *A*    Well, I went back in and it was -- when I wind up the

4    second time in the hospital, it was actually May.  So, yes.

5    *Q*    And how did you feel?  I mean, can you walk around?

6    *A*    Yeah, I don't feel bad.  I mean, the doctors scare you,

7    telling you if it comes back, you'll die.  But I mean, I

8    don't, they say if I have this surgery, that I will be okay.

9    *Q*    Mentally, as far as thinking, did you read the newspaper

10   or books or things back in -- or automotive reports back

11   earlier this year, the start of 2015?

12   *A*    Did I read?

13   *Q*    Yeah.  Did you read a lot of things?

14   *A*    No.

15   *Q*    Okay.  Well, I was going to ask you if you were reading

16   more now or less now than you did back in January?

17   *A*    Back in January, I was working, so -- I definitely read a

18   lot more than I do now.

19   *Q*    Okay.  So, you would be able to read these reports

20   they've shown -- daily reports and RDR's and all of these

21   reports that have to be filed in the car business.  You were

22   able to do that back in January of 2015, weren't you?

23   *A*    I am not sure what all reports you mean.  I don't know

24   what an RDR is but...

25   *Q*    Did you have daily reports on the sales?

1   *A*    No, absolutely -- no, on sales?

2   *Q*    Yes.

3   *A*    No, I had daily reports on schedules and receivables.

4   *Q*    Okay.  And you were able to look through and understand

5   all of those back in January of 2015?

6   *A*    Yes.

7   *Q*    How about now?  Do you think you could do it today?

8   *A*    I had to have Kim's help with some of them.  I try to get

9   her to help now with some of them.

10  *Q*    Do you think you would be a little slower now in doing

11  it?

12  *A*    Yeah, I probably would.

13  *Q*    Okay.  And that's to be expected with all you have been

14  through the last eight or nine months, since April, five or

15  six months?

16  *A*    Well, yeah.

17  *Q*    Okay.  Do you mind answering some questions for me?

18  *A*    No, I don't mind at all.

19  *Q*    Thank you.  Are you on any medication today?

20  *A*    Yes.

21  *Q*    What medications are you on today?

22  *A*    Metformin for my diabetics.

23  *Q*    So am I.

24  *A*    I am on -- I couldn't tell you the other -- oh, Lipitor

25  for cholesterol.  And there's another one I am on for

1   cholesterol.  And then there's a blood pressure pill that I am

2   on.

3   Q    Anything related to your colon or antibiotics?

4   A    No.

5   Q    When you said the doctors are waiting for you to get

6   stronger for your surgery, what have they told you they want

7   you to get stronger at?

8   A    They haven't.  They just said they want me healthy to --

9   they felt I couldn't make it through this surgery like when I

10  was having the episode -- both episodes, they did not want to

11  do surgery.

12  Q    They still don't want to do surgery; is that correct?

13  A    Well, they're going to on the 25th.  I have a bunch of

14  tests, and at that time, I guess if everything is good, we'll

15  schedule surgery.

16  Q    Let's go back to March of 2013, over two years ago, would

17  you say you are a little slower today than you were in March

18  of 2013?

19  A    Yes, I am a little older.

20  Q    Don't keep reminding me.  Do you think your memory was

21  better back in March of 2013 than it is today?

22  A    That's a hard question.  I don't --

23  Q    Yes, sir.

24  A    -- I don't have to remember much now.

25  Q    Okay.

1    A    I am not working, so I don't have --

2    Q    You hadn't been testing yourself that much?

3    A    No, I haven't.

4    Q    Okay.  Well, let's do the best we can and see if we can

5    get through this together?

6    A    Absolutely.

7    Q    I believe you told Ms. Wick, you got hired as the

8    director of -- what did you get hired as?

9    A    Fixed ops director.

10   Q    And in January of 2012, you got a promotion?

11   A    I got more duties.

12   Q    More work?

13   A    More work.

14   Q    You get more pay?

15   A    Right then when it happened, I don't believe I did.  I

16   never been real good at dates.  So I mean, I don't know --

17   since then, I did get more, after that, but I don't believe at

18   that point.

19   Q    But in January of 2012, if I wrote this down right, you

20   became the director of operations?

21   A    Correct.

22   Q    Of how many dealerships?

23   A    At that time, four.

24   Q    That would be -- I have been calling it the Cullman

25   Nissan store, would that be one?

1    A    Yes.

2    Q    And the Birmingham Nissan store?

3    A    Correct.

4    Q    And the Birmingham Volkswagen store?

5    A    Correct.

6    Q    And did you have the Talladega Ford place at the time?

7    A    No, I had Sylacauga Honda.

8    Q    Sylacauga Honda.  Okay.  So there were four dealerships

9    that you were, basically, you were the main man there in those

10   four dealerships, weren't you?

11   A    No.

12   Q    Randy was?

13   A    Yes, I handled -- since Randy didn't not want to -- I

14   handled parts and service.  He did not like working with the

15   facilities and vendors.  I handled facilities.  And then he

16   asked me to work with the receivables.  But the only one early

17   on was contracts and transits.

18   Q    But at some point in time, didn't you get directly

19   involved in the sales part of the stores?

20   A    No.

21   Q    You were never involved in the sales part of the stores?

22   A    No.

23   Q    Okay.  Do you remember -- if I told you that Kim was

24   hired and came to work in November of 2012, would you agree

25   with me or disagree with me?

1   *A*    I would say that sounds right.

2   *Q*    Okay.  And when she first came, who did she report to --

3   who would have been her immediate supervisor or boss?

4   *A*    Randy Visser.

5   *Q*    And were you -- did she report to you, also?

6   *A*    We worked together very closely.  I mean, I felt we were

7   co-workers.  She helped me tremendously.  I helped her with

8   anything I could help her with.

9   *Q*    And she is a nice lady, isn't she?

10  *A*    Well, she is a great person.  She is the best controller

11  I ever worked with.

12  *Q*    And you like her?

13  *A*    Absolutely.

14  *Q*    And would you say you kind of took her under your wing

15  there at the dealership and introduced her around to all the

16  people when she was new?

17  *A*    No.

18  *Q*    No?  Okay.

19  *A*    That's not -- I am a very antisocial, quiet person.

20  That's not something I would do.

21  *Q*    When she had questions about things, would she come to

22  you first?

23  *A*    Yes, most people came to me because they were somewhat

24  afraid of Randy.

25  *Q*    Afraid of him?

1  *A*    A lot of people were.  I don't know if Kim was.  Kim is

2  pretty strong.  But I mean, Kim knew that I talked to Randy

3  every day, and she would bring things to me if it was --

4  basically, I would have to get the answer from Randy.  Unless

5  it was parts and service, then I pretty much knew the answer.

6  *Q*    How about the other sales managers and general managers,

7  would they come to you with questions?

8  *A*    At that time, no.

9  *Q*    How about in March of 2013?

10  *A*    No.  When Abdul was there, Abdul would spend more time

11  with Randy than I did.

12  *Q*    Okay.  Do you recall in March of 2013 Mr. Visser talking

13  to you about Birmingham is not going to meet their sales

14  objectives?

15  *A*    Yes.

16  *Q*    And do you remember what Mr. Visser, Randy Visser told

17  you?

18  *A*    Yes, he told me that he wanted to use the Cullman deals

19  in Birmingham for them to meet their objective.

20  *Q*    And did you and he talk about that you did that in parts

21  and --

22  *A*    No.

23  *Q*    -- in parts back and forth?

24  *A*    No, we did not.

25  *Q*    But you know about switching the parts, selling the parts

1   back and forth, didn't you?

2   A    Yes, we had done that.

3   Q    I believe you testified earlier the director of

4   operations for Nissan had told you that that was all right?

5   A    They suggested it to my parts director, and he did, and

6   then he came and told me that they told him it was okay, and

7   he did it.

8   Q    So you okayed that, the parts?

9   A    No, he had already done it.

10  Q    He was already doing it?

11  A    He told me because he didn't want me to get upset.

12  Q    Okay.

13  A    He was assuring me that he didn't buy parts that he

14  didn't need; that the parts that he bought were parts that he

15  could use and that he wasn't overinflating the inventory.

16  Which is something I would have been upset with.

17  Q    How did that actually work as far as getting the parts to

18  Cullman?  Would the Birmingham store buy the parts or the

19  Cullman store buy the parts?

20  A    The Cullman store would buy the parts --

21  Q    Okay.

22  A    -- which would give them a higher parts number.

23  Q    So they could win a prize or incentive?

24  A    Yes, the incentive contest that was going on.  And then

25  the parts would be delivered to Birmingham.

1    Q    From Cullman or directly from the factory?

2    A    From Cullman.

3    Q    Okay.  So the parts would be delivered to Cullman?

4    A    Correct.

5    Q    Kind of like these cars were delivered to Cullman, right?

6    Is that what we're talking about?

7    A    Yes.

8    Q    But then the parts would be shipped to Birmingham?

9    A    Yes.  The parts that -- my parts director had ordered

10   that were actually for Birmingham -- he needed them for

11   Birmingham, but he ordered them through Cullman to get

12   Cullman's number up, would then be shifted back to Birmingham.

13   Q    How would they transport them, in a truck or a van?

14   A    A truck.  I mean, I --

15   Q    I guess it would depend on how big the part was, would

16   it?

17   A    There was maintenance parts.  All of their contests had

18   to do with maintenance items.  That's the items that Nissan

19   would push.  So it would be oil filters and air filters.  That

20   type.  Not large items.  Brake pads.

21   Q    Okay.  And if you know, how would Cullman get paid for

22   those parts?

23   A    Birmingham would pay for them.

24   Q    The Birmingham store would write the check and pay

25   Cullman?

1   A      Yeah.

2   Q      Kind of like they did for these incentives and these 15

3   deals we've been talking about?

4   A      All about how the deals were actually done, but on the

5   parts, I know absolutely, the parts were purchased from

6   Cullman.

7   Q      Birmingham store would write Cullman a check, or transfer

8   money into their account?

9   A      In a company, yeah.  Yes.

10  Q      Okay.  Now, so when Mr. Visser, Randy Visser told you

11  we're going to transfer, did he use the word "transfer" or

12  "shift" or best you remember?

13  A      I have been told not to guess.

14  Q      Right.  The best you remember?

15  A      I don't know the term that he actually would use, but I

16  knew that it meant move the sales from Cullman to Birmingham.

17  Q      Right.  Were you given a list of instructions as to how

18  to accomplish that?

19  A      I would have, yeah -- he would have had to give me a

20  list.  I did not know how.  He had told me that he knew how.

21  When he told me move -- we're going to move the deals, I know

22  how to do it.  I don't remember him saying and here is how you

23  do it.

24  Q      But he told you -- did he infer to you or tell you it was

25  okay to do this, he knew how to do it?

1   *A*    Yes.  Yeah, absolutely.  I mean, those are his words.  I

2   know how to do this.

3   *Q*    And did you ask him if it was okay?

4   *A*    I had already asked him.  Back before when we did the

5   parts thing, I had asked him can you move car sales from one

6   store to another.  And he told me, yes, it's complicated.  It

7   was something like that.  But I asked because when the parts

8   were done, it wasn't let's do this or can we do it?  It was

9   like, can we do this?  Can this be done?  That was my question

10  to him.

11  *Q*    And Randy Visser told you, yes, but it's complicated?

12  *A*    Complicated.  I don't know if it was those exact words,

13  but it was something of that nature that it was complicated.

14  *Q*    Do you remember what you told Kim to do in transferring

15  or shifting these deals from Cullman to Birmingham?

16  *A*    No, I don't.

17  *Q*    Okay.  Could you have told her you need to keep a list of

18  the deals that come from Cullman to Birmingham?

19  *A*    Someone would absolutely have to have a list of the

20  vehicles.

21  *Q*    Is that something that Mr. Visser would have told you to

22  tell Kim to do?

23  *A*    It's something that Mr. Visser would have told me.  The

24  whole -- everything but RDR, he would have had to told me

25  because I did not know the process, I did not know actually

1    what needed to happen.

2    Q    You would have known to do -- to tell Kim to do back in

3    March of 2013 when it happened, wouldn't you?

4    A    I am sorry.  Repeat that.

5    Q    If Randy Visser told you in March of 2013 to tell Kim to

6    do certain things to shift these deals, you would have known

7    that in March of 2013?

8    A    Yeah, I would have.  I would have had them put it on

9    paper or got notes from him.  Because in parts and service, I

10   have been doing this since '76, you don't have to make notes.

11   I know what to do.  In building and facilities, I have been

12   working with -- I have been involved with building probably at

13   least eight, ten dealership facilities.

14   Q    You talking about from the ground up?

15   A    From the dirt, piece of land.

16   Q    You had to tell the architects and the contractors what

17   to do, didn't you?

18   A    Well, obviously an architect knows what he is doing.  But

19   I would start by getting a survey of the dirt.  I mean, so,

20   yes, I knew -- so I knew that.  In sales related items, I

21   would ask him to either -- either he needed to sit and give me

22   detailed instructions while I wrote it down.  I'd handwrite.

23   Q    If Randy had told you say A, B, and C -- tell Kim to do

24   A, B, and C?

25   A    I would have done it.

1   Q    You would have told Kim?

2   A    Yes.

3   Q    And Kim trusted you, didn't she?

4   A    I think she did.

5   Q    And you gave her no reason not to trust you?

6   A    I did not try to.

7   Q    Okay.  But as you sit here today, you cannot remember

8   exactly what maybe A, B, or C was?

9   A    No.

10  Q    And that's fine --

11  A    It was a long time ago, and it wasn't an area that I was

12  familiar.

13  Q    And plus you have had, sir, your very serious health

14  problems?

15  A    With or without that.  I still wasn't familiar with the

16  process.

17  Q    Yes, sir.  Now I believe you told us about some e-mails

18  that you would get and a lot of e-mails you just ignored?

19  A    I got -- sometimes Randy would send five e-mails in five

20  minutes.  I would scan them and see if there's anything that I

21  felt was real.

22  Q    That related to parts or service, you'd pay attention --

23  A    Or billing or something that we had, you know, that I

24  would normally do.  Something that wasn't a part of my duties,

25  then, many times I would call him after I got them because I

1   just didn't understand his e-mails.

2   Q    Okay.  Do you recall ever having anymore conversations

3   with Kim about these 15 deals shifted from Cullman from

4   Birmingham?

5   A    No -- I mean, whatever I was asked to do by Randy, I

6   trusted Randy.  Also, just like I trusted Kim, I trusted

7   Randy.  I would have taken it to her, if it needed to be done

8   by accounting.

9   Q    Okay.  There has been some discussions about Birmingham

10  deal jackets and Cullman deal jackets.  Do you know what I am

11  talking about when I am talking about a deal jacket?

12  A    Yes, I mean, if you held a deal jacket up, I would say

13  that's a deal jacket.  That looks like a deal jacket.

14  Q    You messed me up.  Because I was going to pick this up

15  and ask you if this looked like a deal jacket?

16  A    That looks like a service file.

17  Q    A service file?  And then I was going to ask you if this

18  looks like a deal jacket (indicating)?

19  A    From the back, I don't know if I would have recognized

20  it.  But once you turn it over, I would.

21  Q    So my demonstration might have worked.  This is a deal

22  jacket?

23  A    Yes.

24  Q    Do you remember which color was Cullman and which color

25  was Birmingham?

1    A    No.

2    Q    Do you recall if you -- do you even recall the 15 deals

3    that we're talking about that were actually shifted or

4    transferred from Cullman to Birmingham?

5    A    The actual deals, like the cars?

6    Q    Well, no, I am not talking about the names of the folks,

7    or do you remember there were 15 deals that were transferred?

8    A    I remember 15.

9    Q    Okay.

10   A    But I couldn't tell you what they were, or if they were

11   cars, trucks.  I don't recall.

12   Q    Some of these e-mails, if I showed you in Exhibit 24 --

13   if I showed you what's been admitted as Government's Exhibit

14   24, just the middle e-mail, it says it came from Kim Branch,

15   doesn't it, sir?

16   A    Yes.

17   Q    And it says it's to Randy?  And then it's got a -- I used

18   to call it carbon copy -- but nobody knows that except me or

19   you.

20   A    I know what that is.

21   Q    I do, too.  But a CC came to you; is that right?

22   A    Yes.

23   Q    Do you remember even looking at this?

24   A    No, after I looked at this one, I kind of just didn't

25   bother with any of them.  They would have come through in the

1    stack because it goes back and forth on my computer screen.

2    You will see them all.  I wouldn't want to look at that one

3    again.

4    Q    Do you ever recall seeing any Birmingham deal jackets for

5    those Cullman deals?

6    A    No.

7    Q    Okay.  Do you know if they ever even existed?

8    A    Yeah, because the FBI picked them up later, 2014 or

9    something.

10   Q    When they came with a search warrant?

11   A    Yeah.

12   Q    Did you know where they kept the deal jackets, physically

13   kept the deal jackets at the dealership in Birmingham?

14   A    They were upstairs over in our accounting office.

15   Q    So they would have been in Ms. Branch's office or up

16   where?

17   A    It would have been -- not in her office but outside on a

18   rack.  They were kept there until they were a certain age, 12

19   months -- I don't know what the age was -- and then they were

20   put in boxes and put in storage.

21   Q    We're talking about a rack, somebody tried to describe it

22   for me.  I would like for to you try to describe it for these

23   good people.  When you are talking about a rack, what are you

24   talking about?

25   A    It was on the wall, kind of like where you see the

 1   doctor's office where they keep patient files and stuff.

 2   Q    But you said it was on the second floor?

 3   A    Yes.

 4   Q    Was it a solid floor, the bottom, like this floor is here

 5   with a rug on it and things?

 6   A    The second floor?

 7   Q    Yes, sir.

 8   A    Yeah, it was the accounting office.

 9   Q    Where the deal jackets were, was that where they were,

10   too?

11   A    Yes.

12   Q    But it was over the Nissan -- over the Volkswagen?

13   A    The accounting office was the upstairs at the Volkswagen

14   store, initially.  Then it was later moved.

15   Q    Where did it move to?

16   A    It moved over to where my office was, my office and the

17   -- like a conference room.

18   Q    Do you remember when --

19   A    When?

20   Q    -- when they moved?

21   A    No, I can't tell you right off.

22   Q    Okay.  We'll ask her that.

23        When Randy Visser told you to shift all of the rest of

24   the Cullman sales, did he tell you for what particular time

25   frame?

1    *A*    If it was the end of an incentive program, then

2    apparently they were at the end of that program, they were

3    short 15.  I don't know which 15.

4    *Q*    At the end of that incentive program?

5    *A*    Yes, it would have been at the end of an incentive

6    program.

7    *Q*    I believe you testified earlier that you trusted Randy?

8    *A*    Absolutely.

9    *Q*    Ms. Wick asked you about target letters and whether you

10   were going to be charged, and this, that, and the other.  You

11   have not been charged with anything related to those 15 deals,

12   have you, sir?

13   *A*    No, I haven't.

14   *Q*    Because if you had, you would be sitting down here with

15   me probably or somebody instead of being --

16              MS. WICK:  Objection, Your Honor.

17              MR. BROOME:  I will withdraw that question.

18   BY MR. BROOME:

19   *Q*    That's all I have, sir.  And I would think I speak for

20   everybody in the room, we certainly hope your surgery is a

21   success.

22   *A*    Thank you.

23              THE COURT:  Ms. Wick, do you have redirect?

24              MS. WICK:  I promise it will be less than six

25   minutes of redirect.

1          THE COURT:  Beware of promises about time.

2      (Laughter from audience.)

3          MS. WICK:  Good point, Your Honor, I will be

4  careful.

5                      REDIRECT EXAMINATION

6  BY MS. WICK:

7  Q    Mr. Housner, earlier you said that there was a parts

8  incentives program that you were familiar.  Was there an audit

9  process for that parts incentives program?

10  A    Not to my knowledge.  I never went through an audit for

11  parts.  I went through a warranty but not parts audit.

12  Q    Okay.  Were there official program rules that you were

13  familiar with for that parts incentives program?

14  A    There was rules, but I was not familiar with them.

15  Q    When you participated in the audit in 2013 and you sat

16  through that audit conference, do you remember any mention of

17  there being, I think, like, $24,000 in change in charge backs

18  as a result of that audit?

19  A    Yes.

20  Q    Who would you have talked to -- well, did you have any

21  conversations with anyone at the dealership about those charge

22  backs?

23  A    Not that I recall.

24  Q    Based on your understanding of how the dealership was

25  run, would anyone at the dealership have had to deal with the

1   accounting of those charge backs?

2   A    I guess the office would.  Someone would have to post

3   those charge backs to the financial statement.

4   Q    What was your understanding of whose responsibility that

5   was?

6   A    I would have taken that to Kim, if she would have done

7   it, or to one of her -- she had nine clerks.  Everything I did

8   in the office I went through Kim.

9   Q    Okay.  A minute ago when Mr. Broome asked you about the

10  15 Birmingham deal jackets, I think you said, yes, those --

11  you were familiar with them because the FBI had taken them.

12  How did you know or where did you hear that the FBI had taken

13  the 15 Birmingham deal jackets that we've been discussing?

14  A    I think we might be talking about two different things.

15  There was two times.  Originally, when -- I was not there when

16  the FBI came in and took all the deals -- when they originally

17  came in.  At that time, after I was back, I think I was at one

18  of the other stores in the morning, I had heard that they had

19  taken the Cullman deals by mistake.  I believe they were

20  supposed to just take Birmingham, maybe, and they took

21  Cullman.  The reason I was told is because they were being

22  brought back, and Randy just had told me that the FBI maybe

23  bringing some deals back, just to bring them back -- just get

24  ahold of them, and make sure you keep track of them.  And then

25  the other time was maybe a year later when the FBI wanted to

1    see those specific deals.  So there was two times.

2    Q    And I want to talk with you about that second time.  Do

3    you know if it was in June, 2014?

4    A    No.

5    Q    Do you know if the request was in regards to a subpoena

6    that was issued to the dealership?

7    A    As I stated before, I never heard the word subpoena.  I

8    just heard that the FBI wanted 15 deals.

9    Q    Do you actually know whether the dealership gave the

10   government the 15 Cullman deal jackets or the 15 Birmingham

11   deal jackets?

12   A    I don't know.

13           MS. WICK:  No further questions, Your Honor.

14           MR. BROOME:  I don't have anything else, Your Honor.

15           THE COURT:  All right.  Mr. Housner, thank you very

16   much.  You are excused.

17            Ms. Wick, does the government intend to call any other

18   witnesses today?

19           MS. WICK:  Your Honor, the next one would, I think,

20   be long enough where I would not want to do that to the jury.

21   The only thing I would ask, maybe if we could squeeze in, is

22   just to read some of the stipulations that may be relevant to

23   some of the testimony.  I think there were six left.

24           THE COURT:  If they are relevant to Mr. Housner's

25   testimony?

1              MS. WICK:  Mr. Housner and Mr. Visser's, they were

2      in relationship -- but the additional stipulations.

3              THE COURT:  Okay.  Let's go ahead and put those in

4      the record, please.

5              Again, members of the jury, these are facts to which

6      the parties have agreed.

7              MS. WICK:  In regards to the additional

8      stipulations, Stipulation Number Three, Government's Exhibit

9      45 requested original deal jackets for the 15 deals at issue

10     in this case.  Number Four, there were a total of two grand

11     jury subpoenas issued to Serra Nissan in 2014.  Number Five,

12     the June 16th, 2014, subpoena was the second grand jury

13     subpoena issued in 2014.  Number Six, the first subpoena

14     requested information unrelated to this matter.  Number Seven,

15     the defendant, Kimberly Branch, was responsible for gathering

16     the documents responsive to the subpoena.  And Number Eight,

17     the defendant, Kimberly Branch, provided Government's Exhibits

18     One through Fifteen in response to the June 16th, 2014

19     subpoena.  Thank you, Your Honor.

20             THE COURT:  Thank you.

21             All right.  We will take a break for today then.  We

22     will start again tomorrow morning at 9:00 a.m.  We will do our

23     best to actually start at 9:00 a.m. tomorrow morning.  So

24     please be here by ten minutes to 9:00.

25             Please remember that you are not to discuss any of the

 1    evidence that you have heard in the case.  Please also

 2    remember that you are not supposed to do any independent

 3    research.  And should you run across any media coverage of the

 4    case, if there is some, then please make sure you don't read

 5    it.  All right?  Thank you very much.  Have a good night.

 6                        (Jury out at 5:03 p.m.)

 7                        (In open court.)

 8              THE COURT:  All right.  I would like to begin by

 9    seeing counsel and the government's agents at the bench,

10    please.

11         (The following proceedings were held at the bench:)

12              THE COURT:  There was some inappropriate laughter.

13    It seems you all were laughing at some of Mr. Housner's

14    responses, and the jurors didn't appreciate what the nature of

15    your laughter was.  I believe it had to do with a comment that

16    Mr. Housner made about Mr. Visser.  You all need to be very

17    careful about that.  That can easily convey the wrong message

18    to the jury.  You all should not be laughing about anything.

19    This is a serious proceeding.  All right?  There's some

20    natural places for laughter where it's intended, and all of us

21    are going to respond to that.  But if you see he marred

22    someplace because of something involved in this case, you may

23    not express that in the courtroom.  All right?

24              MS. WICK:  Yes, Your Honor, the government

25    apologizes profusely.