Case 2:15-cr-00167-MHH-TMP   Document 25-3   Filed 02/18/16   Page 1 of 304

FILED
2016 Feb-18  PM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

VOLUME III of V, page 400

1

2                    UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF ALABAMA

4                         SOUTHERN DIVISION

5

6   UNITED STATES OF AMERICA,        *
             Plaintiff,              *
7                                    * Case No. CR-15-MHH-0154-S
                v.                   *
8                                    *
    KIMBERLY H. BRANCH,              *   Birmingham, Alabama
9                                    *     August 12, 2015
             Defendant.             *        9:00 a.m.
10  *********************************

11

12  TRANSCRIPT OF TRIAL BY JURY, VOLUME III OF V, WITNESS EXCERPTS
            BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
13                 UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23
    Court Reporter:            Chanetta L. Sinkfield, CCR, RMR
24                             United States Federal Courthouse
                               1729 Fifth Avenue North
25                             Birmingham, AL 35203

1
                              APPEARANCES
2

3

   FOR THE PLAINTIFF:        U.S. ATTORNEY'S OFFICE
4                            Assistant U.S. Attorney,
                             AMANDA SCHLAGER WICK
5                            JENNIFER SMITH MURNAHAN
                             1801 4th Avenue North
6                            Birmingham, AL 35203

7

8  FOR THE DEFENDANT:        WILLIAM H. BROOME, ESQ.
                             1110 Wilmer Avenue
9                            P.O. BOX 1952
                             Anniston, AL 36202
10

11

12

13

14

15

16

17

18

19

20

21

22

23
   Court Reporter:          Chanetta L. Sinkfield, CCR, RMR
24                           United States Federal Courthouse
                             1729 Fifth Avenue North
25                           Birmingham, AL 35203

```
 1                        I  N  D  EX

 2                 August 12, 2015; VOLUME III

 3
                 Direct Cross  Redirect Recross Further Redirect
 4
     GOVERNMENT'S
 5   WITNESSES

 6   ─────────────────────────────────────────────────────────

 7   HAROLD YELVERTON  403   419     420      422

     ALLISON TICE      424
 8
     GERALD SHEPARD    428   449     454
 9
     GREG BOYLES       458   476
10
     JEFFREY GREEN     477   529     562      566
11   ─────────────────────────────────────────────────────────

12   DEFENSE WITNESS

13   KIMBERLY BRANCH   572   622

14   ─────────────────────────────────────────────────────────
     GOVERNMENT'S EXHIBITS          OFFERED       ADMITTED
15   ─────────────────────────────────────────────────────────

16   NO. 23                          425           425

17   NO. 1-15                        486           486

18   ─────────────────────────────────────────────────────────

19   DEFENSE EXHIBIT ONE             590           590

20   DEFENSE EXHIBIT TWO             593           593

21   DEFENSE EXHIBIT THREE           595           595

22

23

24

25
```

1

2                     P R O C E E D I N G S

3                     (Jury in at 9:11 a.m.)

4          THE COURT:  Good morning.

5          ALL JURORS:  Good morning.

6          THE COURT:  I hope y'all are doing well this

7   morning.  All right.  I believe we're ready to get started.

8          Are we ready for the government's next witness?

9          MS. MURNAHAN:  Yes, Your Honor.  The United States

10   calls Harold Yelverton.

11          THE COURTROOM DEPUTY:  Will you step in the box,

12   please, and remain standing, please, and raise your right

13   hand.

14          Do you swear or affirm to tell the truth, the whole

15   truth, and nothing but the truth so help you God?

16          THE WITNESS:  I do.

17          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

18   Will you state your first and last name.

19          THE WITNESS:  Harold Yelverton.

20          THE COURTROOM DEPUTY:  Will you spell your first and

21   last name.

22          THE WITNESS:  H-a-r-o-l-d, Y-e-l-v-e-r-t-o-n.

23          THE COURTROOM DEPUTY:  Thank you.

24                     DIRECT EXAMINATION

25   BY MS. MURNAHAN:

1   Q     Good morning, Mr. Yelverton.

2   A     Good morning.

3   Q     Where do you live right now?

4   A     I live in Michigan.

5   Q     Were you born there?

6   A     Pardon me or pardon?

7   Q     Were you born there?

8   A     No.

9   Q     Where were you born?

10  A     Tuscaloosa.

11  Q     Okay.  Did you go to high school in Tuscaloosa?  Did you

12  grow up there?

13  A     No, I grew up in south Alabama in the Linden, Demopolis

14  area.

15  Q     Did you go to college?

16  A     Yes.

17  Q     Where did you go?

18  A     University of Montevallo.

19  Q     Were you on some sort of sports -- did you play sports?

20  A     Yes, baseball.

21  Q     You played baseball?

22  A     Yes.

23            THE COURT:  Mr. Yelverton, can you speak up just a

24  little bit?  And if you need to, you can pull the microphone a

25  little bit closer to you.

```
 1                 THE WITNESS:  Okay.

 2                 THE COURT:  Thank you.

 3    BY MS. MURNAHAN:

 4    Q    Did you finish college?

 5    A    No, I did not graduate.

 6    Q    Where are you working now?

 7    A    I work in Michigan at a Nissan dealership.

 8    Q    What is your position there?

 9    A    I'm general manager.

10    Q    How long have you been in the car business total?

11    A    37 years.

12    Q    I want to take you back to March and April of 2013, where

13    were you working then?

14    A    At Serra Visser in Cullman.

15    Q    What was your position in Cullman?

16    A    General manager.

17    Q    What were your job responsibilities as general manager?

18    A    To oversee all of the departments, work with all of the

19    managers, and also I took care of the used car lot myself.

20    Q    Who hired you to work -- I'm just going to call it the

21    Cullman store.

22    A    Okay.

23    Q    Who hired you to work in the Cullman store?

24    A    Randy Visser.

25    Q    Was Randy Visser your direct boss?
```

1   *A*    Correct.

2   *Q*    So in March, April of 2013, was there a time when you

3   were instructed not to report anymore cars that were sold in

4   Cullman?

5   *A*    Yes.

6   *Q*    What is that report called?

7   *A*    RDR.

8   *Q*    What does that stand for?

9   *A*    I think it stands for retail delivery report.  I think.

10  I am not sure.

11  *Q*    Okay.  Was it known in the business as an RDR?

12  *A*    RDR.

13  *Q*    Okay.  Who told you not to RDR anymore cars in Cullman?

14  *A*    Forest.

15  *Q*    How did he tell you that?

16  *A*    By phone call.

17  *Q*    That was the initial contact?

18         THE COURT:  Forest who, please, for the record?

19         THE WITNESS:  Forest Housner.

20         THE COURT:  Thank you.

21  BY MS. MURNAHAN:

22  *Q*    Tell me about Mr. Housner a little bit.  How much contact

23  did you have with him?

24  *A*    A good bit.

25  *Q*    How many times a week did you talk to him?

1    A    Several.

2    Q    Did you mainly talk to him by phone, or did he come to

3    the store?

4    A    Both by phone, and he'd usually come once a week.

5    Q    But when Forest Housner told you something, who did you

6    understand the instructions were coming from?

7    A    Randy Visser.

8    Q    About Mr. Housner, what was your impression of him?  Did

9    he seem competent?

10   A    Sure.

11   Q    Did he seem knowledgeable about what his job was?

12   A    Yes.

13   Q    Did he seem knowledgeable about the car business?

14   A    Yes.

15   Q    Have you had any contact with Forest Housner since you

16   left the dealership in Cullman?

17   A    Maybe a phone call or two.  Just wishing me well.

18   Q    Was it recent?

19   A    No.

20   Q    When did you leave the dealership in Cullman?

21   A    In September of '14.

22   Q    September 2014?

23   A    Yes, I am sorry.

24   Q    Okay.  So I am going to go back, take you back to the

25   time when you were told not to RDR anymore cars.  Did you

1    understand the reason for why you were told that?

2    A    Yes.

3    Q    What was that reason?

4    A    That we had already hit our objective.

5    Q    "We" meaning?

6    A    Serra Visser.

7    Q    In Cullman?

8    A    In Cullman.  And that Birmingham was short of their

9    objective.

10   Q    Their objective for what?

11   A    Incentive monies, programs.

12   Q    Was there an incentive program running at that time?

13   A    Yes, it was.

14   Q    Okay.  Did you ever get any other instructions -- did you

15   get any written instructions about not RDR'ing cars?

16   A    Yes, I did.

17   Q    I am going to show you what's already been admitted as

18   Government's 40.

19             MS. MURNAHAN:  Permission to approach the witness?

20             THE COURT:  Granted.

21   BY MS. MURNAHAN:

22   Q    Take a look at that document, Mr. Yelverton.  Do you

23   recognize it?

24   A    Yes, I do.

25   Q    What is that?

1    A    This is the fax that Forest Housner sent me.

2    Q    How do you know Forest Housner sent it to you?

3    A    He told me by phone it was on its way.

4    Q    Do you recognize that (256) number at the top?

5    A    Yes, I do.

6    Q    What is that number?

7    A    That was my fax number.

8    Q    At the Cullman store?

9    A    At the dealership.

10   Q    Okay.

11             MS. MURNAHAN:   Permission to republish this?

12             THE COURT:   Granted.

13   BY MS. MURNAHAN:

14   Q    Would you please pull up that top portion.   (Speaking to

15   Ms. Gold, paralegal specialist.)

16             Mr. Yelverton, you had said these were the

17   instructions that you got from Forest Housner?

18   A    Yes.

19   Q    What did you do when you got these instructions?   Did you

20   tell your employees about them?

21   A    Yes, I told the other managers.

22   Q    What other managers would that be?

23   A    That would be my sales manager and my two F & I managers.

24   Q    Who was the sales manager?

25   A    His name is Greg Boyles.

1    Q     Who were the F & I -- let me back up.  What does F & I

2    stand for?

3    A     Finance and insurance.

4    Q     Who were the two F & I managers?

5    A     Chris Scroggins and Brent Worley.

6    Q     When you told them about these instructions, how did they

7    react?

8    A     Concerned.

9    Q     Concerned in what way?

10   A     They were worried about would they get credit for the

11   sales that we do, as well as our dealership getting the

12   incentive monies in which they got paid on.

13   Q     So, they were selling cars -- they were afraid they were

14   going to be selling cars they wouldn't get credit for?

15   A     Correct.

16   Q     Okay.  Would they still get their commission on the car

17   when they sold it?

18   A     Yes.

19   Q     If the car was reported in Birmingham, how would that

20   salesmen who sold it in Cullman get credit for the car?

21   A     If there was -- when he sold the car, he or she, I don't

22   think we had any females on the sales team then, but if when

23   they sold the car, they knew what their commission would be on

24   the recap of the deal.

25   Q     Okay.  Would that go into the paperwork of the deal?

1    A    Yes, ma'am.

2    Q    At that time, did Cullman have any sort of administrative

3    offices on site?

4    A    No, we did not.

5    Q    So, all of the paperwork had to be sent to Birmingham?

6    A    Yes.

7    Q    Okay.  Would that recap that you just mentioned go in the

8    paperwork?

9    A    Yes.

10   Q    Would that be how the accounting office knew to credit

11   that salesman for the sale?

12   A    Yes.

13   Q    Who was over the accounting office at that time?

14   A    Pardon?

15   Q    Who was in charge of the accounting office at that time?

16   A    Kim.

17   Q    Kim?

18   A    Kim was the controller.

19   Q    What's her last name?

20   A    Oh, Kim Branch.  I am sorry.

21   Q    Do you see her in the courtroom today?

22   A    Pardon?

23   Q    Do you see her in the courtroom today?

24   A    Yeah, I see Kim.

25   Q    Can you point her out?

1    A      (Pointing).

2    Q      She is sitting with a pink shirt at the table right here?

3    A      Right here.

4            MS. MURNAHAN:   The record would reflect that Mr.

5    Yelverton has identified Ms. Branch.

6    BY MS. MURNAHAN:

7    Q      Who was normally in charge of RDR'ing cars in Cullman at

8    that time?

9    A      The sales manager, Greg.

10   Q      Greg Boyles?

11   A      Yes.

12   Q      Okay.  Did you ever RDR cars in Cullman?

13   A      Never.

14   Q      Okay.  Had you ever -- hate to use this as a verb -- have

15   you ever RDR'd a car?

16   A      Sure.  At another dealership.

17   Q      But you never did?

18   A      Not Serra Visser.

19   Q      Okay.  How much contact did you have with Ms. Branch on a

20   regular basis?

21   A      Not much contact at all.

22   Q      What type of contact -- if you had contact from her, what

23   would it be?

24   A      It would mostly be about salesmen's commission or a

25   manager's bonus or spiff, or something like that.

1    *Q*    What is spiff?

2    *A*    Like if I put on a bonus -- or you know, if I put on a

3    bonus with a salesman or managers, and they hit it, I would

4    have to explain it.

5    *Q*    Okay.  Would the accounting office double check the

6    paperwork that came over from Cullman to make sure everything

7    was included in it?

8    *A*    Yes.

9    *Q*    Going back to Government's Exhibit 40, would you please

10   read out that Instruction Number One under, "So here is the

11   process."

12   *A*    The first paragraph?

13   *Q*    The number one.

14   *A*    Oh, number one.  Okay.  I am sorry.

15   *Q*    That's okay.

16   *A*    "Cullman will contract customers as they normally would

17   with the exception:  Do not print the bill of sale or title

18   application."

19   *Q*    Please read number two.

20   *A*    "The next day, Center Point finance managers will print

21   out the bill of sale and the title application, and those will

22   be overnighted that to the customer."

23   *Q*    Okay.  Number three, would you please read that.

24   *A*    "The bill of sale and title app will be added to the deal

25   when the deal comes over from Cullman.  The deal will be

1    booked into Nissan Birmingham accounting.  This is important.

2    In audits, Nissan pulls for sales directly from Reynolds, so

3    the sale must be booked into Reynolds for Birmingham."

4    Q    Mr. Yelverton, you just said that if there was paperwork

5    missing from a Cullman deal when it was sent over to

6    Birmingham, you would get a call from Ms. Branch or someone in

7    the accounting office?

8    A    Usually, it was the ladies who broke the deals down.  But

9    sometimes, yes.

10   Q    Sometimes it was Ms. Branch?

11   A    Yes.

12   Q    Or sometimes?

13   A    I talked with Kim on a few deals from time to time, yes.

14   Q    Okay.  At this point in time in March of 2013 when

15   Cullman was sending deals over to Birmingham without a bill of

16   sale and without the title application, did you get any calls

17   from the accounting office in Birmingham about that?

18   A    No, ma'am, I didn't.

19   Q    Did anyone ever contact you and say, hey, where is the

20   title application?

21   A    No.

22   Q    Were a title application and a bill of sale documents

23   that would normally be sent over in a deal to Birmingham?

24   A    Yes.

25   Q    In your 30-plus years of experience in the car industry,

1    have you ever seen a dealership transfer sales like this?

2    A    No, ma'am.

3    Q    Have you ever been asked not to RDR or report cars

4    before?

5    A    No, ma'am.

6    Q    At any dealership?

7    A    No, ma'am.

8    Q    Have you ever heard the term "pooling of sales"?

9    A    Pooling?

10    Q    Pooling.

11    A    Not really until now because I never saw it.  I never

12    witnessed it.

13    Q    Okay.  Do you understand what that term means?

14    A    Yes, I do.

15    Q    Based on your experience in the car industry, did you

16    believe -- or do you believe, or did you at the time believe

17    that what this fax was instructing you to do was permissible?

18    A    No.

19    Q    Why did you think it was wrong?

20    A    Being in the car business as long as I have, if the store

21    sells the car, then the store RDR's the car.

22    Q    So, would it be fair to say that the store that sells the

23    car is important information to the manufacturer?

24    A    Yes, it is.

25    Q    Why is it important?

1    A    It's important for the customer's warranty.  And if there

2    is incentive monies, then that's the only way the dealer can

3    claim it.

4    Q    Okay.  Mr. Yelverton, how many times have you met with

5    the government prior to your testimony today?

6    A    Twice.

7    Q    And did you have any telephone calls with the government?

8    A    Yes.

9    Q    How many, roughly, if you remember?

10   A    Two.

11   Q    Okay.  Did you receive what's called a proffer letter

12   from the government in connection with this case?

13   A    Yes, ma'am.

14   Q    To the best of your knowledge, what did that proffer

15   letter say to you?

16   A    What did it say to me?

17   Q    Yes, sir.  What do you understand that letter to mean?

18   A    That if -- number one, for me to tell the truth.  And I

19   understood if I come in to meet you with a dead body in the

20   car, you couldn't do anything to me.  That's the way I

21   understood it.  I am sorry.

22   Q    Okay.  That is fair.  You did not come in with a dead

23   body, did you?

24   A    No, ma'am.

25   Q    Okay.  Did the government promise you anything in that

1   letter?

2   A    No.

3   Q    Did the government promise you anything in your meetings

4   or phone calls with the government?

5   A    No.

6   Q    Did the government instruct you to do anything?

7   A    No.

8   Q    Did the government instruct you to do anything about your

9   testimony?

10   A    Yes, tell the truth.

11   Q    Was that the only instruction you got from the

12   government?

13   A    Yes, tell the truth.

14   Q    I want to go back to Government's Exhibit 40.  This is a

15   copy of a fax you received?

16   A    Yes, this is a copy.

17   Q    Okay.  Did you provide this fax to the government?

18   A    Yes.

19   Q    I want you to look at the second page of that document.

20        Julie, would you pull up page 2.

21        Do you recognize the handwriting on that?

22   A    Yes.

23   Q    Whose is it?

24   A    It's mine.

25   Q    So you wrote that on the document?

1    A    Yes.

2    Q    That document that you have in your hands is two pages.

3    Was the original one page?

4    A    Yes, it was.

5    Q    Had you written that on the back of it?

6    A    Yes.

7    Q    It was folded up?

8    A    Yes, it was folded.

9    Q    You received that fax in March of 2013?

10   A    Yes.

11   Q    Somewhere in that time frame?

12   A    Yes.

13   Q    That was almost two and a half years ago.  Why did you

14   keep this document?

15   A    I kept this document in case Nissan ever questioned me

16   about it.

17   Q    For what reason?  Why would they question you about it?

18   A    Well, if RDR's and paperwork don't add up right, you will

19   get a charge back; the dealership would get a charge back.

20   Q    Okay.  So, you hung on to this fax for what reason?

21   A    Again, in case Nissan ever questioned me, they knew I had

22   nothing to do with it.

23   Q    Okay.

24        MS. MURNAHAN:  Nothing further at this time.

25        THE COURT:  Mr. Broome.  Cross examination, please.

1            MR. BROOME:  Yes, Your Honor.

2                    CROSS EXAMINATION

3    BY MR. BROOME:

4    Q    Good morning, Mr. Yelverton.

5    A    Good morning.

6    Q    Did Kim Branch ever tell you not to RDR cars in Cullman

7    during this time period?

8    A    Did Kim ask me to?

9    Q    Yes.

10   A    No, sir.

11   Q    Forest Housner asked you --

12   A    Yes, sir.

13   Q    -- or told you?

14   A    Yes, sir.

15   Q    In Government's Exhibit 40, you knew these instructions

16   came from Forest Housner, right?

17   A    Yes, sir.

18   Q    You knew these instructions did not come from Kim Branch,

19   right?

20   A    Yes, sir.

21   Q    You were telling us you weren't real happy because you

22   were afraid your salesmen weren't going to get paid what they

23   deserved; is that right?

24   A    No, sir, it was the other managers.

25   Q    Now your salesmen -- in that letter or those instructions

1    -- I don't have any fancy equipment, so I am just going to

2    show it to you.

3    A    Okay.

4    Q    Well, actually I do.

5              MR. BROOME:  Judge, I think I know how to use this.

6              THE COURT:  You can use the Elmo.  Sure.

7              MR. BROOME:  That's about all I know how to use.

8    BY MR. BROOME:

9    Q    On the second sentence there, and I will confess, the

10   highlighting is mine.  Would you read that second, third

11   sentence to us, please.

12   A    "Cullman will get credit for the gross, plus Cullman will

13   get another $500 per deal for handling."

14   Q    So, Cullman was going to get paid even more than they

15   would have gotten paid for the deal, right?

16   A    Yes, sir.

17   Q    An extra $500?

18   A    Yes, sir.

19   Q    At any time in March or April or May of 2013 during this

20   time period, did you have any direct contact or conversations

21   with Kim Branch about these instructions we've just talked

22   about?

23   A    No, sir.

24   Q    Sir, thank you, and I hope you have a safe trip home.

25   A    Thank you.

1                        REDIRECT EXAMINATION

2    BY MS. MURNAHAN:

3    Q     Just a few more questions, Mr. Yelverton.  You stated in

4    your previous testimony that you were working in Michigan.

5    Are you at a car dealership?

6    A     Yes.

7    Q     Which dealership is it?

8    A     It is Grand Blanc Nissan.

9    Q     Who owns that?

10   A     Tony Serra.

11   Q     Going back to Government's Exhibit 40, that portion where

12   it says that Cullman will get credit for the gross and Cullman

13   will get another 500 per deal for handling -- did Cullman get

14   paid that extra money?

15   A     I am not sure, but I think we did.

16   Q     Okay.  If you know, who would have responsibility for

17   booking deals into accounting in Birmingham?

18   A     The ladies in the office.

19   Q     Okay.  Which office?

20   A     In the accounting office --

21   Q     Okay.

22   A     -- where all our deals went.

23   Q     Okay.

24              MS. MURNAHAN:  Nothing further.

25              MR. BROOME:  Judge, I need to get something marked,

1    please.

2              THE COURT:  Tammi, will you help with that?

3              MS. MURNAHAN:  Your Honor, before this is admitted,

4    we were not produced this.  So could we have a moment to look

5    at it?

6              THE COURT:  You may.

7              MR. BROOME:  I was just going to ask him about it.

8    I didn't even offer it.

9              THE COURT:  They can take a look at it real quickly.

10             MR. BROOME:  Judge, I never really thought this

11   would come up is why I didn't furnish them.

12             THE COURT:  That's fine.

13             MR. BROOME:  I don't know if he can recognize it or

14   not.

15                        RECROSS EXAMINATION

16   BY MR. BROOME:

17   Q    Mr. Yelverton, I am going to show you what's been marked

18   for identification as Defendant's Exhibit One.  In your

19   duties, would you go over what was paid to your store from

20   Cullman?  Would you see checks that came into the Cullman

21   store or invoices that came into the Cullman store?

22   A    No, sir, I wouldn't.

23   Q    Have you ever seen that document before?

24   A    No, sir.

25   Q    Okay.  If my math is right, Cullman would get -- there

1    are $700 you guys lost because the deals were RDR'd in

2    Birmingham; is that right?

3    A    I can't remember what the amount was per unit.

4    Q    Okay.  That's fair enough.

5            MR. BROOME:  That's all I have, Your Honor.

6            THE COURT:  Okay.

7            MR. BROOME:  Thank you.

8            THE COURT:  Mr. Yelverton, you are excused.  Thank

9    you.

10            THE WITNESS:  Thank you.

11            THE COURT:  Who is the government's next witness,

12    please?

13            MS. WICK:  Your Honor, at this time, the government

14    will call Allison Tice.  I believe she is on her way into the

15    courtroom.

16            THE COURT:  Okay.

17            THE COURTROOM DEPUTY:  Can you step in the box?

18    Will you remain standing, please, and raise your right hand.

19       Do you swear or affirm to tell the truth, the whole

20    truth, and nothing but the truth so help you God?

21            THE WITNESS:  I do.

22            THE COURTROOM DEPUTY:  Please be seated.  Will you

23    state your first and last name.

24            THE WITNESS:  Allison Tice.

25            THE COURTROOM DEPUTY:  Will you spell your first and

```
 1    last name.
 2              THE WITNESS:  A-l-l-i-s-o-n, T-i-c-e.
 3              THE COURTROOM DEPUTY:  Thank you.
 4                      DIRECT EXAMINATION
 5    BY MS. WICK:
 6    Q    Good morning, Ms. Tice.
 7    A    Good morning.
 8    Q    I'm really sorry that we had to get you from work for
 9    this.  And I hope you are feeling okay.  Can you tell the jury
10    where you currently work?
11    A    I work for Serra Nissan.
12    Q    In what department do you work in at Serra Nissan?
13    A    In the accounting.
14    Q    Who is your supervisor?
15    A    Kim Branch.
16    Q    Do you recognize her in the courtroom?
17    A    Yes, I do.
18    Q    Can you describe an article of clothing that she is
19    wearing?
20    A    Black shirt, I can't tell, light pink.
21              MS. WICK:  Your Honor, the government would ask that
22    the record reflect that the witness has identified the
23    defendant Kimberly Branch.
24              THE COURT:  Okay.
25    A    Blonde hair.
```

1    BY MS. WICK:

2    Q    Thank you, Ms. Tice.

3         Ms. Tice, while you worked at -- did you work at Serra

4    Nissan in March 2013?

5    A    Yes.

6    Q    I believe you said you still work there?

7    A    I do.

8    Q    At some point in time -- excuse me.  On August 1st, 2014,

9    were you a notary in the state of Alabama?

10   A    Yes.

11   Q    Can you a take a look at the document that I have given

12   you and tell me if you recognize the first page.

13   A    I recognize my notary.  My name.

14   Q    Could you tell me if that's a document that you

15   notarized?

16   A    It appears to be.

17   Q    Okay.

18        MS. WICK:  Your Honor, pursuant to the stipulations

19   between the parties, the government would move to admit

20   Government's Exhibit 23 at this time.

21        MR. BROOME:  We have no objection.

22        THE COURT:  It's admitted.

23        MS. WICK:  Thank you, Your Honor.  Permission to

24   publish?

25        THE COURT:  All right.

1          MS. WICK:  If we could call up at the bottom portion

2    underneath "The State of Alabama."  All the way down.

3          THE COURT:  I am sorry.  Ms. Wick, just real

4    quickly, which stipulation does that pertain to?

5          MS. WICK:  The original Stipulation Number Four,

6    Your Honor.

7          THE COURT:  Okay.  I am sorry.  I was looking under

8    "additional".  Thank you.

9    BY MS. WICK:

10   Q    Ms. Tice, a moment ago you said you notarized this

11   document.  Whose signature is it on the line that says "notary

12   public"?

13   A    Mine.

14   Q    It says, "affix seal," this is not the original.  But the

15   original had your little stamp?

16   A    Stamp.

17   Q    Whose signature is it above that where it says "Signature

18   of declarant"?

19   A    Kim's.

20   Q    Ms. Branch's?

21   A    Yes.

22   Q    Okay.  Can you take a look at that document -- do you

23   understand any of the substance had you read it?

24   A    No.

25   Q    So your sole purpose was just to notarize this document?

1    *A*    Correct.

2              MS. WICK:  Your Honor, at this time, the government

3    has no further questions for Ms. Tice.

4              THE COURT:  Mr. Broome.

5              MR. BROOME:  I don't have any questions, Your Honor.

6    We have stipulated to the document.

7              THE COURT:  All right.  Ms. Tice, you may be

8    excused.  Thank you.

9              MS. WICK:  Your Honor?

10             THE COURT:  Yes, ma'am.

11             MS. WICK:  Before we call our next witness, may we

12   read the stipulation that Your Honor referenced, number four,

13   to the jury.

14             THE COURT:  Yes, ma'am.

15             MS. WICK:  Stipulation Number Four:  The

16   certification and acknowledgment included in Government's

17   Exhibit 23 was signed by the defendant Kimberly H. Branch and

18   was produced to the government, along with the documents

19   identified as Government's Exhibits One through Fifteen.

20   Thank you, Your Honor.

21             THE COURT:  Sure.

22             MS. MURNAHAN:  The United States calls Greg Boyles.

23        I am sorry, Mr. Boyles is still on his way.  We are

24   going to call Gerald Shepard.

25             THE COURT:  Okay.  Let me ask, I have heard a couple

1    of phones buzz, I know it's inconvenient, but if any of those

2    are yours, that can just sometimes be a little distracting.

3    So if anybody has a phone on vibrate, if you can turn it off

4    while we're in the courtroom, please, that will be great.

5    Thank you.

6            THE COURTROOM DEPUTY:  Remain standing and raise

7    your right hand.

8        Do you swear or affirm to tell the truth, the whole

9    truth, and nothing but the truth so help you God?

10           THE WITNESS:  Yes.

11           THE COURTROOM DEPUTY:  Have a seat, please.  Will

12   you state your first and last name.

13           THE WITNESS:  Gerald Shepard.

14           THE COURTROOM DEPUTY:  Will you spell your first and

15   last name.

16           THE WITNESS:  G-e-r-a-l-d, S-h-e-p-a-r-d.

17           THE COURTROOM DEPUTY:  Thank you.

18                        DIRECT EXAMINATION

19   BY MS. WICK:

20   Q   Mr. Shepard, I have a tendency to talk fast, and I know

21   you have a tendency to talk fast, but if we can try to slow it

22   down, the court reporter is trying to take down everything

23   that you say.  I promised her I would do better at that, and I

24   would try to do better.  So just slow it down if we can a

25   little bit.

1    A    Okay.

2    Q    Can you tell the jury where you are from?

3    A    Military born.  Tokyo, Japan.  But I call Florida home.

4    Q    Where do you currently live?

5    A    In Pinson, Alabama.

6    Q    Where do you currently work?

7    A    In Birmingham, Wholesale Auto.

8    Q    Can you tell the jury a little bit about your background

9    in the car industry?

10   A    I started in the business in October of 1985.  I have

11   worked at several dealerships in management, from finance

12   manager to used car manager, sales manager, general sales

13   manager.  Almost 30 years.

14   Q    How many dealerships would you say you have worked at in

15   those 30 years?

16   A    Probably 14.

17   Q    At some point in time, did you come to work for a

18   dealership called Serra Nissan?

19   A    Yes, ma'am.

20   Q    When was that?

21   A    It was June of '09.

22   Q    What was your position when you started there?

23   A    Used car sales manager.

24   Q    What was your position in the March 2013 time frame?

25   A    Sales manager.

1    Q    Was that above used car sales manager?

2    A    About the same.

3    Q    More duties, same pay?

4    A    Yes, ma'am.

5    Q    Can you tell me what your job responsibilities were as

6    sales manager?

7    A    I direct the sales of the dealership, inventory control.

8    Supervising salespeople.

9    Q    Did your job include having to RDR cars?

10   A    Yes, ma'am.

11   Q    At some point in time how did your -- you no longer work

12   for Serra.  How did that relationship end?

13   A    I was terminated.

14   Q    When?

15   A    It was in October of '13, I think.

16   Q    Why were you terminated?

17   A    I saw an e-mail that said I was terminated on advice of

18   counsel.

19   Q    I don't want you to tell us any discussions you may have

20   had with any attorneys, but what was your understanding of the

21   reason for why you were terminated?

22   A    It was an investigation by the FBI.

23   Q    What was your relationship when you left the dealership

24   with the dealership?

25   A    It was good.

1   *Q*     Did you get a target letter from the government at some

2   point?

3   *A*     Yes.

4   *Q*     What did you understand that target letter to mean?

5   *A*     That I was a target of investigation by the FBI, and I

6   was invited to come to the grand jury.

7   *Q*     Can you tell the jury, what was the culture at the Serra

8   Nissan dealership in March 2013?

9   *A*     Upbeat.  Selling cars.

10  *Q*     In comparison to other car dealerships you worked at, how

11  would you describe Serra Nissan?

12  *A*     High volume.

13  *Q*     Would you say it was high pressure to sell?

14  *A*     Yes.

15  *Q*     Who at the dealership set the tone of that culture?

16  *A*     It would be the dealer.

17  *Q*     Who was that?

18  *A*     Ran Visser.

19  *Q*     I want to discuss with you some transactions that

20  occurred in the March 2013 time frame.  Specifically 15 car

21  deals.  We've heard a lot about the retail delivery report,

22  the RDR that you said that was one of your job

23  responsibilities.  How was that RDR actually submitted to

24  Nissan?

25  *A*     Electronically.

1   Q    Do you actually know the mechanism of transmission from

2   the dealership to Nissan?

3   A    Not the specifics.

4   Q    Just the internet?

5   A    Internet, yes.

6        MS. WICK:  Your Honor, at this time, would the Court

7   permit us to read Stipulation Number One agreed to by the

8   parties?

9        THE COURT:  Yes.

10       MS. WICK:  The transactions in each of Count Two

11  through Sixteen, the wire fraud count, involve the

12  transmission of certain signals, certain signs and signal in

13  interstate commerce; that is, the electronic transfer of data

14  from Serra Nissan in Birmingham, Alabama to Nissan North

15  America in Franklin, Tennessee, caused an interstate wire

16  communication between Alabama and another state.  Thank you,

17  Your Honor.

18  BY MS. WICK:

19  Q    Mr. Shepard, when you submitted the RDR information, what

20  information was contained in that report?

21  A    It would be the customer information, the vehicle

22  information, and the type of sale.

23  Q    Would it have included information on whether the

24  customer bought an extended service contract?

25  A    Yes, ma'am.

1    Q     Can you tell the jury what an extended service contract

2    is?

3    A     It's in the service contract.  It's going to take over

4    when the warranty expires, or concurrent with the warranty

5    with some benefits.

6    Q     What was Nissan's extended service contract program

7    called?

8    A     Security+Plus.

9    Q     Was that sometimes called SEC plus for short?

10   A     Yes.

11   Q     Who was primarily responsible for RDR'ing cars at the

12   Serra Nissan dealership in March 2013?

13   A     I was.

14   Q     Why was that information the RDR information important to

15   Nissan?

16   A     It was important to Nissan that the sales were reported

17   correctly with the correct information.  The incentives and

18   the customer cash followed the vin number.

19   Q     Why was the RDR information important to Serra Nissan?

20   A     The same answer, the incentive money and the customer

21   cash follow the vin number.

22   Q     In March 2013, did you have any discussions with anyone

23   at the dealership regarding shifting sales from Cullman to

24   Birmingham?

25   A     Yes.

1   Q    Tell me about the first conversation you remember having

2   about that.

3   A    That we were going to take deals from Serra Visser in

4   Cullman and report them under our number at Serra Nissan.

5   Q    Was that an in-person conversation you had with someone?

6   A    Yes.

7   Q    What people were present for that conversation?

8   A    I believe Forest Housner; Abdul Mughal.  That's who I

9   could remember.

10  Q    And you were there?

11  A    Okay.

12  Q    So it was you, Mr. Mughal, and Mr. Housner?

13  A    Yes, ma'am.

14  Q    During that conversation, did you talk about anything

15  regarding whether the dealership was going to hit that top

16  tier for the incentive?

17  A    Yes.

18  Q    At that point in time, what was the understanding of how

19  the dealership was doing in terms of hitting that top tier?

20  A    We were a little short.

21  Q    Was that the reason you were going to shift the sales?

22  A    Yes, ma'am.

23  Q    At some point in time.  Did you have any conversations

24  with Jeff Green about shifting the sales?

25  A    Yes, ma'am.

1   Q     What were those conversations?

2   A     Pretty much, did I have the information to RDR the cars.

3   Q     Did you talk with Mr. Green about fake deal jackets

4   having been created?

5   A     Yes, he said he had to do it.

6   Q     Let me come back to that in a moment.  A moment ago you

7   mentioned that that conversation you had with Mr. Housner.

8   Who was Mr. Housner to you at the time in March 2013?

9   A     He was director of operations at the dealership.

10  Q     Was he your supervisor, or did you report to him?

11  A     Yes, ma'am.

12  Q     How would you describe your relationship with Mr.

13  Housner?

14  A     Good.

15  Q     Can you describe his demeanor in 2013?

16  A     Calm.  Business-like.

17  Q     Would you have said he was very competent at his job?

18  A     Yes.

19  Q     Did he seem capable of directing the operations of the

20  dealership?

21  A     Yes.

22  Q     How often was Mr. Visser present at the dealership in

23  that time frame around March 2013?

24  A     I don't remember.

25  Q     Who would you have said was primarily your contact for

1    day-to-day operations at the dealership?

2    A    It would be Forest Housner.

3    Q    In your experience, was Mr. Housner more familiar with

4    the parts and service department, or was he more familiar with

5    the sales process?

6    A    He was fixed operations when he came there, but I believe

7    he knew both.

8    Q    Did you think he knew the sales process before he got to

9    Serra Nissan, or did he learn it as he went?

10    A    I don't know.

11    Q    Okay.  You said you had conversations with people about

12    the 15 deals.  Did you have conversations with anyone named

13    Greg Boyles?

14    A    Yes, ma'am.

15    Q    What conversations did you have with Mr. Boyles?

16    A    It was pretty much, there was a trip involved, I think it

17    was called Lot a Loot with Nissan, and I felt kind of bad that

18    he wasn't going to get it and I got it based on those sales.

19    Q    So by shifting the incentives, you got an incentive that

20    he would have gotten because he was the manager in Cullman?

21    A    Yes.

22    Q    Do you remember what the incentive actually was?

23    A    It was a trip to Vegas.

24    Q    Did you go on the trip?

25    A    Yes.

1   Q    Did you ever have conversations with Ms. Branch during

2   that time period about the shifting of the 15 sales?

3   A    I don't remember.

4   Q    Did you have any conversations with her about how the

5   incentives from those 15 sales would have to be paid out to

6   people?

7   A    No.

8   Q    Other than the discussion about the 15 sales, did you

9   ever have any conversations with Ms. Branch during the time --

10  or around the time period of March '13, or while you both

11  overlapped at the dealership?

12  A    Probably.  I mean...

13  Q    Do you remember any of those conversations?

14  A    No, ma'am.

15  Q    Did you ever discuss with Ms. Branch the audit process,

16  the Nissan audit process?

17  A    Yes.

18  Q    What were those discussions?

19  A    Generally, we would prepare a form.  Nissan gives us

20  instructions on the audit.  They generally choose so many

21  deals that, you know, we went through the deals to make sure

22  they were ready for audit.

23  Q    What was your role in the audit process?

24  A    Just going through the deals and making sure the

25  paperwork was accurate and correct.

1    Q    Before they came on site to check it?

2    A    Yes, ma'am.

3    Q    So, if I am going to try to figure out the timeline --

4    after they would send the list of deals that had to be pulled

5    in preparation for the audit, is that when you would have a

6    conversation with Ms. Branch about those deals?

7    A    Yes, ma'am.

8    Q    And your job was to make sure that the paperwork was in

9    order before they came on site?

10   A    Yes, ma'am.

11   Q    You would have had conversations about that directly with

12   Ms. Branch?

13   A    Yes, ma'am.

14   Q    Did you ever have conversations with her about charge

15   backs that resulted from the audit?

16   A    No.

17   Q    Did you understand what her responsibilities were in

18   terms of the audit process?

19   A    Yes.

20   Q    What did you understand her responsibilities to be?

21   A    To provide the deals, follow the instructions of the

22   audit, and follow the rules.

23   Q    Do you know what her responsibilities would have been in

24   regards to the charge back that Nissan would have assessed?

25   A    We have to audit those and make sure that they were

1    genuinely valid, you know.  We have an appeal process.

2    Q    When you say "we," would you do the audit of the charge

3    backs?

4    A    No.

5    Q    Who would?

6    A    Ms. Branch.

7    Q    Did she seem knowledgeable as a controller?

8    A    Yes.

9    Q    Did she seem very good at her job?

10   A    Yes.

11   Q    Did she seem capable?

12   A    Yes.

13   Q    In your discussions with Ms. Branch, what was your

14   impression of her understanding of the sales process of the

15   dealership?

16   A    I don't know.

17   Q    If you don't understand my question, please feel free to

18   tell me I am wording it poorly.

19        In your discussions with her, did she ever have

20   questions about the sales process or did it seem like like she

21   didn't understand how the sales process worked?

22   A    No, she understood.

23   Q    How many controllers did you go through while you worked

24   at Serra Nissan?

25   A    At least four.

1    Q    Earlier you said you had discussions with Mr. Housner

2    about shifting the sales, the 15 sales.  What specifically did

3    Mr. Housner tell you to do for that process?

4    A    Just make sure that the RDR's got reported correctly.

5    Q    Were there any discussions about making sure that the

6    deal jackets were straight?

7    A    Not with me.

8    Q    Were you aware of discussions with others?

9    A    Yes.

10    Q    What is your understanding of those discussions?

11    A    Jeff Green was making sure the documents and the deals

12    were transferred from -- it would have to be on our bill of

13    sale, and Serra Nissan, if the paperwork was right.

14    Q    Do you remember how you became aware that Jeff Green was

15    making the fake Birmingham deal jackets?

16    A    He told me.

17    Q    He told you?

18    A    Yes, ma'am.

19    Q    Can you tell the jury about that conversation with Mr.

20    Green?

21    A    I don't remember.

22    Q    What do you remember of the conversation?

23    A    I just remember he told me he had to get these deal

24    jackets done.  And he was doing --

25    Q    Were you aware of Mr. Green making other false documents

1    for the dealership?

2    A    Yes.

3    Q    What documents did he make?

4    A    Check stubs, bank statements.

5    Q    You pled guilty to charges related to that fraud,

6    correct?

7    A    Yes, ma'am.

8    Q    Can you tell the jury about that.

9    A    The charges or --

10    Q    Specifically, what were you charged with?

11    A    Bank fraud, conspiracy to commit bank fraud, and filing a

12    false tax statement.

13    Q    For the conspiracy and the bank fraud, can you tell the

14    jury what were the facts?  What was that case in relation to?

15    A    I was part of a scheme to inflate income, what we call

16    power booking, inflating the value of a car represented to the

17    bank.

18    Q    At the time, was that fraud happening in or around March

19    2013?

20    A    Yes.

21    Q    Do you know why false deal jackets had to be created in

22    Birmingham?

23    A    In case of an audit.

24    Q    What would happen during the audit if those false deal

25    jackets hadn't been created?

1   *A*   Well, first, it would be a charge back.

2   *Q*   And then what?

3   *A*   I believe it would be a violation of the dealer

4   agreement.

5   *Q*   What could happen if there was a violation of the dealer

6   agreement?

7   *A*   You terminate your franchise.

8   *Q*   Do you know if that actually happened in this case?

9   *A*   I don't.

10  *Q*   As part of your job, did you have to be familiar with

11  Nissan's official program and rules?

12  *A*   Yes, ma'am.

13  *Q*   What was your understanding of those rules in terms of

14  submitting information in the RDR system?

15  *A*   I had to be accurate and truthful.

16  *Q*   What was your understanding of Nissan's position on false

17  RDR'ing?

18  *A*   It's not allowed.

19  *Q*   Was it your understanding that Nissan would have been

20  okay if they had known that those 15 cars had actually been

21  sold in Cullman prior to them being dealer traded and RDR'd in

22  Birmingham?

23  *A*   No.

24  *Q*   You said you were in the car industry for, I think, 30

25  years.  Had you, ever, aside from the fraud that you were

1   discussing a moment ago, had you ever created false deal

2   jackets, or knew of anyone that created false deal jackets as

3   part of a car sales transaction?

4   A    No, ma'am.

5   Q    Was that an acceptable process at a dealership?

6   A    No, ma'am.

7   Q    When you reported the 15 cars when you actually did the

8   mechanical RDR'ing process, what did you need in order to do

9   that?

10  A    Customer information, vehicle information, and the type

11  of sale.

12  Q    Where did you actually get that information for those 15

13  deals?

14  A    Probably out of our DMS system, Reynolds and Reynolds.

15  Q    Where would that information have come from?

16  A    Someone would have to put it in there.

17  Q    So it was input before you got to the system?

18  A    I believe so.

19  Q    At some point in time, did Jeff Green bring you the 15

20  fake deal jackets?

21  A    I don't remember.

22  Q    So do you remember ever actually seeing those 15 deal

23  jackets, the Birmingham ones, to be clear?

24  A    I think I did, yes.

25  Q    Could you tell the jury, if you know, what the colors of

1    the different deal jackets were -- the Birmingham deal jackets

2    versus the Cullman deal jackets?

3    A    Ours were yellow.  I don't remember Cullman's.

4    Q    But it was a different color?

5    A    I don't remember.

6    Q    Okay.  A minute ago you said that the information was

7    input in the Reynolds and Reynolds.  If you think the

8    information was inputted in Reynolds and Reynolds before you

9    would have gone in to RDR, would you have even needed the deal

10   jackets if the information was already in Reynolds and

11   Reynolds?

12   A    No.

13   Q    When you went into RDR the 15 deals, would you have been

14   able to RDR them if they had already been RDR'd in Cullman?

15   A    No.

16   Q    You couldn't RDR a car a second time?

17   A    No.

18   Q    When you RDR'd those 15 deals, which were sold in

19   Cullman, would you have had to input the extended warranty

20   contract information that the Cullman customers ordered?

21   A    Yes.

22   Q    Would that have included their bill of sale, contract

23   number, or what information would that have included?

24   A    There is a control number on the service contract

25   application.

1  Q     When you hit the incentives at the end of the incentive

2  period, I think, I guess, at the end of March 2013, do you

3  remember having any conversations with Pat Byrnes or Mike

4  James, the DOMs for Serra Nissan?

5  A     Several.

6  Q     Did you tell them about the shifting the 15 sales in

7  order to hit the incentive?

8  A     No.

9  Q     Why didn't you tell them?

10 A     Because it wasn't allowed.

11 Q     A moment ago you were talking about your plea in the

12 other case.  You had a plea agreement that you signed with the

13 government in that case?

14 A     Yes, ma'am.

15 Q     What was your understanding of the terms of that plea

16 agreement?

17 A     That I would cooperate with the government.

18 Q     What did you understand that cooperation to mean?

19 A     Just tell the truth.

20 Q     Have you met with the government in preparation for your

21 testimony today?

22 A     Yes.

23 Q     And as part of that other case?

24 A     Yes.

25 Q     How many times would you say you have met with the

1    government?

2    *A*    Seven or eight.

3    *Q*    During those meetings with the government, were some of

4    them about the other case?

5    *A*    Yes.

6    *Q*    And some of them were about this case?

7    *A*    Yes.

8    *Q*    In any of those meetings, what instructions did the

9    government give you?

10   *A*    To tell the truth.

11   *Q*    What did the government tell you would happen if you lied

12   on the stand either during direct or cross?

13   *A*    I'd get in trouble.   I mean, they'd terminate my plea

14   agreement.

15   *Q*    Can you tell the jury what you were promised in exchange

16   for your cooperation?

17   *A*    Nothing.

18   *Q*    I want to talk to you briefly about the scale of Serra

19   Nissan in comparison to the other dealerships you worked at.

20   What was your pay structure when you worked at Serra Nissan?

21   *A*    Commission.

22   *Q*    You didn't get a base salary?

23   *A*    No.

24   *Q*    Was it related to the net?

25   *A*    No.

1   Q    So just strictly some percentage of the sum amount of the

2   cars that you actually sold?

3   A    The amount of the gross profit we produced.

4   Q    Sorry?

5   A    Percentage of the gross profit we produced.

6   Q    How much did Serra Nissan make on average in terms of

7   gross per year, if you know?  Per month?

8   A    The sales department?

9   Q    Mm-hm.

10  A    I would say on average 350 to $400,000.

11  Q    Per month?

12  A    Per month.

13  Q    So that's just gross sales.  That doesn't include parts

14  or service.  That doesn't include anything other than just

15  gross sales in the Serra Nissan portion?

16  A    No, ma'am.

17  Q    Does that include VW?

18  A    Yes.

19  Q    In comparison to the other dealerships that you worked,

20  would you describe Serra Nissan as a high gross store?

21  A    Yes.

22  Q    Would you describe it as high volume?

23  A    Yes.

24  Q    What does high gross store mean?

25  A    It means we make a lot of money on the cars we sale.  I

1   means, it's above the norm.

2   Q    Is it fair to say that for each car you sell, if that

3   same car was sold at another dealership, Serra Nissan was

4   making more money per profit per car?

5   A    Yes, I would say.

6   Q    Did you have any familiarity with the accounting

7   department at Serra Nissan?

8   A    Yes.

9   Q    What was your understanding that they did in the

10  accounting department?

11  A    I mean all the deals, when the deals are finished, they

12  go to accounting, we get inventory, receivables, payables,

13  basic accounting, yes.

14  Q    Was your understanding that the accounting for a

15  dealership of that size was complex or relatively simple?

16  A    I would say complex.

17  Q    Were you familiar with the statements that the dealership

18  received from Nissan in terms of the payment statements?

19  A    The incentive payments?

20  Q    Yes.

21  A    Yes.

22  Q    Can you describe those?

23  A    It's a graft.  I mean, it would have the level that you

24  had, whether it be tier one, tier two, tier three, FastStart,

25  and it would give us an amount that were due.

1    Q    Did you ever have any conversations with Ms. Branch about

2    using the vin -- Nissan's vin system to reconcile the

3    incentive payments?

4    A    Sure.

5    Q    Was it your understanding that she used that system

6    regularly?

7    A    Yes.

8            MS. WICK:  Just a moment, Your Honor.

9    BY MS. WICK:

10   Q    Mr. Shepard, a moment ago you said you had conversations

11   with Mr. Green about these fake deal jackets.  I asked you if

12   you remembered if he actually brought you the fake deal

13   jackets.  When you were inputting the information for the 15

14   deals, what's your best recollection of whether the

15   information was already in the system or you actually used

16   those 15 fake deal jackets?

17   A    I don't remember.

18   Q    Sitting here today, can you actually remember if Mr.

19   Green ever brought you those 15 fake deal jackets?

20   A    I don't remember.

21   Q    Thank you.

22           THE COURT:  Mr. Broome, cross examination.

23           MR. BROOME:  Yes, Your Honor.

24                     CROSS EXAMINATION

25   BY MR. BROOME:

1   Q     Good morning, Mr. Shepard.

2   A     How are you doing?

3   Q     We have never met before, my name is Bill Broome, and I

4   represent Kim.

5          Let me just go back over a few things with you.  The

6   first conversation you ever had about shifting sales from

7   Cullman to Birmingham was with Forest Housner; is that right?

8   A     Yes, sir.

9   Q     It was not with Kim Branch?

10  A     No.

11  Q     In fact, you never had any conversations with Kim Branch

12  about shifting sales from Cullman to Birmingham, did you?

13  A     No.

14  Q     Now, was Forest in charge of everything in both those

15  dealerships at that time, or do you know?

16  A     Yes, sir.

17  Q     And who did he report to directly?

18  A     Randy Visser.

19  Q     Did you ever see what's been admitted as Government's

20  Exhibit 40, some instructions of how to shift the sales from

21  Cullman to Birmingham?

22  A     I have seen this.

23  Q     And did you see it at the time, or is it something the

24  government's shown you later?

25  A     Both.

1   Q    Well, let's go back.  Did you see it --

2             MR. BROOME:  Judge, may I use the Elmo again?

3             THE COURT:  Yes, sir.

4   BY MR. BROOME:

5   Q    Sir, can you see that on your screen there?

6   A    Yes, sir.

7   Q    And does that look like a document that you would have

8   received some time around March of 2013?

9   A    I have seen it.

10  Q    How did you come to see it in 2013?

11  A    I don't remember, but I remember seeing the document.

12  Q    And did you have any discussions with Forest Housner

13  about that document?

14  A    I don't remember.

15  Q    Reading through there, is that the way it had to work for

16  the shifting to work?  I mean you couldn't write the bill of

17  sales in Cullman and then write the bills of sales and input

18  it in Birmingham, could you?

19  A    I don't understand you.

20  Q    If the bill of sales and the title app had been booked

21  into Reynolds accounting for Cullman and you double booked it

22  in Birmingham, that wouldn't work, would it?

23  A    Would I have access to their DMS?

24  Q    Right.

25  A    No.

1    Q    But who was the person that RDR'd the cars?

2    A    Me.

3    Q    And you got the information for these 15 deals that we're

4    talking about, you got it from Jeff Green?

5    A    I believe -- I don't remember whether I got it from

6    Reynolds and Reynolds or Jeff Green.

7    Q    If it was in Reynolds and Reynolds, would Jeff Green have

8    put it in there?

9    A    I don't know.

10   Q    Well, if Jeff Green made the bill of sales and made the

11   title apps, would it have automatically gone into the

12   accounting system when you make those title apps and bill of

13   sales?

14   A    I don't know who inputted it, but you would have to have

15   that information to retrieve it.

16   Q    But I mean if I manually typed in a bill of sale, that

17   would go automatically under Reynolds and Reynolds, wouldn't

18   it?

19   A    If you inputted it in Reynolds and Reynolds, yes.

20   Q    So if Jeff did that, it would be in the system?

21   A    Yes, sir.

22   Q    And if Jeff did the Birmingham bill of sale, it would be

23   in the system, right?

24   A    Yes.

25   Q    Do you recall when Ms. Branch went to work at Serra?

1    A     Some time in 2012.

2    Q     If I helped you, I think it's already been testified, it

3    was around November of 2012, does that sound correct to you?

4    A     I think so, yeah.

5    Q     So if my math is right, she would have been there

6    November, December, January, February, and March when all of

7    this happened; is that right?

8    A     Yes, sir.

9    Q     Okay.  And during that time, do you remember how many

10   audits that you participated in from Nissan during that

11   five-month period?

12   A     I don't remember.

13   Q     It could have been none?

14   A     It could have been none.

15   Q     Well, you answered the question a few minutes ago that

16   you and Ms. Branch talked about the audit process?

17   A     I believe we had one later in that year.

18   Q     So this might have not been during the same time period

19   we're talking about?

20   A     Okay.

21   Q     There's no question in your mind Jeff Green told you he

22   made Birmingham deal jackets?

23   A     Yes, no doubt.

24   Q     Sir?

25   A     No doubt in my mind.

1    Q    Well, you just don't recall whether or not you actually

2    physically saw them or not?

3    A    I don't.

4              MR. BROOME:   Judge, can I have just one second?

5    BY MR. BROOME:

6    Q    Sir, I hate to ask you about some unpleasant things, but

7    Ms. Wick has already asked, you pled guilty to several

8    charges; is that right?

9    A    Yes, sir.

10   Q    And I have got a copy of your plea agreement.   I have

11   looked through them, and I can't find it.   It doesn't mean

12   it's not there.   I just don't see it.

13        Did you plead guilty to RDR'ing those cars, these 15

14   deals, did you plead guilty to doing that?

15   A    No, sir.

16   Q    Did you plead guilty to any conspiracy to commit fraud to

17   Nissan by RDR'ing those cars from Cullman to Birmingham?

18   A    No, sir.

19   Q    Okay.   So I didn't miss it.   Thank you.   That's all I

20   have.

21                      REDIRECT EXAMINATION

22   BY MS. WICK:

23   Q    Mr. Shepard, earlier we talked about some of the meetings

24   that we had dealing with the earlier fraud case and then some

25   of the meetings dealing specifically with this case.   Was it

1    during the course of the meetings of the other fraud case that

2    you told us about the 15 deals being shifted from Cullman to

3    Birmingham?

4    A    We have discussed it.

5    Q    Why did you tell the government that?

6    A    I believe you asked me about it earlier.

7    Q    Do you remember if the government asked you to talk to us

8    about any criminal activity that you ever been involved in?

9    A    No.

10   Q    You don't remember that?

11   A    Yes.

12   Q    I am asking you what your recollection is.  Okay?  So I

13   only want you to testify to what you remember.  Okay.  So

14   don't guess if you don't remember.

15   A    Okay.

16   Q    What is your memory of what the government requested in

17   terms of asking you about criminal activity that you were

18   involved in?

19   A    The fraud that was going on at Nissan, the bank fraud.

20   Q    Did the government ask you about any other criminal

21   activity?

22   A    Yes.

23   Q    Okay.  A moment ago Mr. Broome was asking you about the

24   information in the Reynolds and Reynolds system.  Were you

25   familiar with how that system worked?

1    *A*    Yes.

2    *Q*    Were you familiar with the different -- I think it's the

3    three different statuses of inputting information in Reynolds

4    and Reynolds, pending versus booked?

5    *A*    Yes.

6    *Q*    Can you explain that to the jury.

7    *A*    When you first input a deal, of course, it's pending

8    until we finalize it -- when we book the deal is when we sell

9    the car, and the paperwork is finished, it's delivered, and

10   who finalizes the deal is the accounting department.

11   *Q*    Did you have the authority -- okay.  Let me back up for a

12   second.

13          If you or Mr. Green put information into the Reynolds

14   and Reynolds system, what status did it go into as?

15   *A*    Booked.

16   *Q*    You had the authority to book --

17   *A*    Sold.  I think it's sold.

18   *Q*    Okay.  So you had the authority to actually book a deal

19   in the Reynolds and Reynolds accounting system?

20   *A*    Yes, ma'am.

21   *Q*    Did the accounting department have that?

22   *A*    It went to accounting.  That's when it went to the

23   accounting.

24   *Q*    So then what was their part of the process?

25   *A*    The finalize it.

1    Q     So let me back up, maybe I got this mixed up.   There's

2    pending, booked, and then finalized?

3    A     Yes, ma'am.

4    Q     Okay.   And you had the authority to do what?

5    A     Sell the vehicle and book it.

6    Q     Pending and booked?

7    A     Right.

8    Q     Did you have the authority to finalize it?

9    A     No.

10   Q     A moment ago you were saying that information could have

11   been in the system.   If somebody input the information in

12   Reynolds and Reynolds and left it in pending status, in

13   Birmingham, could those cars have been booked in Cullman?

14   A     Yes.

15   Q     Because they were a separate system?

16   A     I think they were separate systems.

17              MS. WICK:  No further questions, Your Honor.

18              MR. BROOME:  I don't have anything else, Your Honor.

19   Thank you.

20              THE COURT:  Mr. Shepard, you are dismissed.   Thank

21   you.

22         Why don't we go ahead and take about a ten-minute

23   mid-morning break, please.

24                   (Jury recess at 10:32 a.m.)

25              (In open court.   Jury present at 10:48 a.m.)

1          THE COURT:  All right.  Is the government ready with

2     its next witness?

3          MS. MURNAHAN:  Your Honor, the government calls Greg

4     Boyles.

5          THE COURTROOM DEPUTY:  Can you remain standing,

6     please, and raise your right hand.

7          Do you swear or affirm to tell the truth, the whole

8     truth, and nothing but the truth so help you God?

9          THE WITNESS:  I do.

10          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

11     Will you state your first and last name.

12          THE WITNESS:  Greg Boyles.

13          THE COURTROOM DEPUTY:  Will you spell your last

14     name?

15          THE WITNESS:  B-o-y-l-e-s.

16          THE COURTROOM DEPUTY:  Thank you.

17                    DIRECT EXAMINATION

18     BY MS. MURNAHAN:

19     Q    Good morning, Mr. Boyles.

20     A    Good morning.

21     Q    Where do you live?

22     A    In Cullman, Alabama.

23     Q    Where were you born -- do you want some water?

24     A    That would be great.  Thank you.

25          I am from Lubbock, Texas.

1   Q      Did you grow up in Lubbock?

2   A      I was born and raised, yes, ma'am.

3   Q      So you went to high school there?

4   A      Yes, ma'am.

5   Q      Did you go to any college?

6   A      No, ma'am.

7   Q      Where do you work now?

8   A      Serra Visser Nissan in Cullman, Alabama.

9   Q      What's your position?

10  A      I am the general manager now.

11  Q      How long have you been in the car business?

12  A      25, 28 years.

13  Q      So a long time?

14  A      A long time, yes, ma'am.

15  Q      When did you first start at Serra Visser Nissan?

16  A      December 2012.

17  Q      Was that the first Serra affiliated dealership you worked

18  at?

19  A      No, ma'am, I used to work at the Serra Nissan in

20  Birmingham.

21  Q      When did you work there?

22  A      From '08 until the end of '11, somewhere right in there,

23  I believe.

24  Q      What was your position at Serra Nissan?

25  A      Sales manager.

1   Q    Having worked at both of the dealerships, was the

2   culture -- was the atmosphere of the dealerships different?

3   A    With me being there, no, ma'am.  I tried to keep it

4   steady everywhere I go.

5   Q    Okay.

6   A    Because you kind of bring your rhythm with you that sets

7   the pace of the store.

8   Q    Were they both -- would you consider them high pressure?

9   A    No, not high pressure.

10  Q    No pressure to sell?

11  A    Oh, pressure for us to make numbers, yes, ma'am.  There's

12  pressure to sell.

13  Q    Okay.  Who set that culture at Serra Nissan when you were

14  there?

15  A    Randy Visser.

16  Q    Okay.  What about at Serra Visser Nissan?

17  A    Now it's me, but then it was Harold.

18  Q    Okay.  But who was the one who set the culture that

19  pushed the sales?

20  A    Yes, ma'am, it's Randy.  He owned the dealerships.

21  Q    Okay.  Where did you work in the March, April time frame

22  of 2013?

23  A    At Serra Visser Nissan.

24  Q    In Cullman?

25  A    Yes, ma'am.

1    Q    You were sales manager?

2    A    I was sales manager.

3    Q    Tell me again what your position now is.

4    A    General manager, sales manager, car washer.  I kind of do

5    a little bit of everything.

6    Q    You wear a lot of hats?

7    A    Yes, ma'am.

8    Q    When did you formally ascend to the position of general

9    manager?

10   A    Probably close to eight, ten months ago.  I am not sure

11   of the exact date.

12   Q    So some time maybe this year, maybe late last year?

13   A    It was late last year, I believe.

14   Q    In March and April of 2013, are you aware of an incident

15   in which certain car sales were transferred from Cullman to

16   Birmingham?

17   A    Yes, ma'am.

18   Q    How did you find out about it?

19   A    When we didn't win my contest to the Vegas trip that I

20   should have won.

21   Q    Was that a dealership contest or was it --

22   A    No, ma'am, it was a sales manager contest for Nissan.

23   Q    Sales manager.  And I know you want to answer my

24   question, but let me get it out first.

25   A    Yes, ma'am.  I am sorry.

1    Q    Slow down just a little bit, Mr. Boyles.

2    A    I am sorry.

3    Q    So you lost a trip?

4    A    Yes, ma'am.

5    Q    That's how you found out about car sales being

6    transferred to Birmingham?

7    A    Yes, ma'am.

8    Q    Who was your boss at the time?

9    A    Harold Yelverton.

10   Q    Okay.  Yelverton -- what was his position?

11   A    General manager.

12   Q    How did you find out you had lost the trip?

13   A    From when Nissan, they sent out the winnings, and we did

14   not win.

15   Q    Had you won that trip before?

16   A    Once before, yes, ma'am, at the Nissan store in

17   Birmingham.

18   Q    Okay.  Was it always the same trip?

19   A    Usually, at that period that's what they were doing was

20   run through the warehouse, called Lot a Loot, yes, ma'am.

21   Q    What kind of prize was that?

22   A    What they do, they take you to Vegas, room and board you,

23   load you on a bus, take you to a warehouse, and you put a

24   whole -- like all the prizes -- there's just a whole warehouse

25   full of prizes.  You stack them on a cart, and you have a

1    minute and a half to get as many as you can on the cart and

2    get back across the finish line.

3    Q    Okay.  What kind of stuff would it be?

4    A    It could be anywhere from mixers, iPads, stereos, golf

5    clubs, just about anything.

6    Q    Okay.

7    A    Coolers.

8    Q    So would it be fair to say you were kind of ticked off

9    when you didn't get this trip?

10   A    Absolutely, ma'am.

11   Q    So going back to the transferring of sales, did Mr.

12   Yelverton ever tell you to stop RDR'ing cars in Cullman?

13   A    Yes, ma'am.  He told me they would finish them out.  Yes.

14   Q    They would finish them out?

15   A    They would.

16   Q    Who is they?

17   A    He said he would take care of them from that point.

18   Q    Okay.  Were you normally responsible for RDR'ing cars in

19   Cullman?

20   A    Yes, ma'am.  Me and the finance manager did some, too.

21   Q    Who is the finance manager?

22   A    Chris Scroggins.

23   Q    What was your relationship like with Mr. Yelverton?

24   A    We butted heads most of the time.

25   Q    Did you agree with his management decisions a lot?

1   A    No, ma'am.

2   Q    You disagreed with his?

3   A    Yes, ma'am.

4   Q    So y'all weren't buds who went and had a beer after work?

5   A    No, ma'am.

6        MR. BROOME:  Judge, this is very entertaining, but I

7   am going to object to the grounds of relevancy whether he

8   liked Mr. Yelverton or not and whether they were buds and had

9   beers together.

10       THE COURT:  Is this going somewhere?

11       MS. MURNAHAN:  Yes, Your Honor, but I can move on.

12       THE COURT:  Okay.

13  BY MS. MURNAHAN:

14  Q    When Mr. Yelverton told you to stop RDR'ing cars in

15  Cullman, did you follow his instructions?

16  A    Yes, ma'am.

17  Q    Did he tell you why you were not RDR'ing cars?

18  A    No, ma'am.

19  Q    If he had told you why you were not to RDR any cars

20  anymore --

21       MR. BROOME:  Judge, I am going to object to the

22  question, "if he told you why," what would you have done?

23       THE COURT:  Is that going to be the question Ms.

24  Murnahan.

25       MS. MURNAHAN:  Yes, Your Honor.

1          THE COURT:  Okay.  Sustained.

2    BY MS. MURNAHAN:

3    Q    So for the rest of March 2013 after Mr. Yelverton told

4    you to stop RDR'ing cars, you stopped?

5    A    Yes, ma'am.

6    Q    What sort of paperwork did you put together when you sold

7    the car?

8    A    My job as sales manager is you get the customer's

9    information, you send it into the bank, you get the approval,

10   and then you send everything back to the finance office to

11   book the cars and close and sign the customer's paperwork.

12   Q    Were you in charge of doing bills of sale or title

13   applications?

14   A    No, ma'am.

15   Q    Who would do that?

16   A    The finance manager.

17   Q    Would that typically be done before the deal went to

18   Birmingham?

19   A    Normally, yes, ma'am.

20   Q    Okay.  So, let me back up, you did not have an accounting

21   office or an administrative office in Cullman?

22   A    No, ma'am.

23   Q    All your deal paperwork had to go to Birmingham?

24   A    Yes, ma'am.

25   Q    In March and April of 2013 when you were sales manager,

1    did your pay structure include a percentage of sales?

2    A    I got paid a percentage of the net profit of the store.

3    Q    Of which store?

4    A    Serra Visser Nissan.

5    Q    Only that store?

6    A    Yes, ma'am.

7    Q    What percentage was that?

8    A    I get ten percent of the net profit.

9    Q    Of net profit.  Was incentive money included in the net?

10   A    It should be, yes.

11   Q    So when deals were transferred or sales were transferred

12   to Birmingham, would that have an impact on the net?

13   A    Yes, ma'am.

14   Q    Would that have impacted your pay?

15   A    Yes, ma'am.

16   Q    I am going to show you what has already been admitted as

17   Government's Exhibit 42.

18            MS. MURNAHAN:  Permission to approach the witness?

19            THE COURT:  Granted.

20   BY MS. MURNAHAN:

21   Q    Mr. Boyles, please take a look at that document.  Do you

22   recognize it?

23   A    It's the Lotta Loot tracker.

24   Q    Okay.  Could you pull that up, please, the first page.

25            Mr. Boyles, this is an e-mail.  Is this to you?

1    A    Yes, ma'am.

2    Q    Who is it from?

3    A    Mr. Visser.

4    Q    Can you tell the date that you got it?

5    A    March 26th, 2013.

6    Q    Do you remember, specifically, getting this e-mail?

7    A    Not necessarily, no, ma'am.

8    Q    When you looked at it, would you have really seen the top

9    part of it?

10   A    No, ma'am.  He forwards a lot of stuff for me or used to

11   in the past.  It's just Nissan information.  And this is an

12   updated -- tracker update, so I thought he was just sending

13   the tracker, so I'd know where we were for the dealership.

14   Q    Mr. Visser e-mailed you a lot?

15   A    From time to time.  At that point when I was a sales

16   manager, he forwarded the Nissan information at that time.

17   Q    Okay.  Is this -- can you pull that down?  Just call out

18   that box at the bottom.  The whole thing.

19        The Lotta Loot, is that the trip?

20   A    Yes, ma'am.

21   Q    Okay.  Do you know if somebody else got that trip?

22   A    I believe Gerald Shepard got it at the Nissan store.

23   Q    In Birmingham?

24   A    Yes, ma'am.

25   Q    At the very top that e-mail says, If this cost you the

1    trip -- something to the effect of, If this costs you the

2    trip, I'll make it up to you.  Well, read it out so the jury

3    can hear it.

4    A     Absolutely.  "If this costs you guys the Lotta Loot

5    contest, Nissan Birmingham will make it up to you."

6    Q     Okay.  Did anybody in Birmingham ever make it up to you?

7    A     No, ma'am.

8    Q     How much contact did you have with Forest Housner?

9    A     He visited Harold most of the time.  He just said hello

10   to make sure I was doing okay when he came to the dealership.

11   Q     Did he come out there, how frequently?

12   A     Usually, weekly.

13   Q     What was your impression of Mr. Housner?

14   A     I liked Forest.

15   Q     Did he seem sharp?

16   A     He was real sharp.  He is a good numbers, dealership

17   numbers guy.  He knows what the percentages need to be to make

18   it a profitable dealership.

19   Q     Okay.  If you know, was he more of a parts and service

20   guy, or was he more of a sales guy?

21   A     He was really more of a parts and service guy.

22   Q     What makes you think that?

23   A     Because he was a fixed operations manager most of his

24   life.

25   Q     Is fixed operations...

1   A     Service department, main things of that nature.

2   Q     Okay.  You stated you didn't have a whole lot of contact

3   with him?

4   A     No, not a whole lot, no, ma'am.

5   Q     Have you had any contact with him recently?

6   A     No, ma'am.

7   Q     When do you think was the last time you saw Mr. Housner?

8   A     Probably three or four months ago when he came through

9   the dealership about an oil change on his car.

10  Q     How did he look?

11  A     Frail.

12  Q     Pardon me?

13  A     Frail.

14  Q     Frail?

15  A     He didn't look real healthy.

16  Q     Did he look different than he had before?

17  A     Kind of.  He looks like he's lost a little weight.

18  Q     Did you speak to him then?

19  A     Yes.  We shook hands.  Absolutely.

20  Q     You said he looked frail.  Did he seem...

21  A     He looks a little frailer.  I understand he has been

22  sick.

23  Q     Okay.  Before speaking with anyone from the government on

24  this case, had you ever heard the term "pooling of sales"?

25  A     Not until this really happened.

1   Q    Okay.  Before speaking with anyone from the government on

2   this case, and based on your experience in the car industry,

3   would you think it was improper to falsely report a car as

4   being sold at one dealership when in fact it was sold at

5   another one?

6   A    Yes, ma'am.

7   Q    You would think that was improper?

8   A    Yes, ma'am.

9   Q    Why would you think that?

10  A    Because every dealer stands on their own.  They'll shoot

11  for their own personal numbers.

12  Q    Have you ever been asked to stop RDR'ing cars to shift

13  sales in past?

14  A    No, ma'am.

15  Q    Have you ever been asked to stop RDR'ing cars for any

16  reason in the past?

17  A    No, ma'am.

18  Q    In your position as sales manager in 2013, did you have a

19  lot of contact with Ms. Branch?

20  A    Not a whole lot.

21  Q    What type of contact would you have with her?

22  A    E-mail about pay maybe at that time.  That's really -- or

23  a check request.

24  Q    Did she seem knowledgeable?

25  A    Absolutely.

1    Q    In February, March '13, what incentive program was

2    running for the dealership?

3    A    What do they call that?  A valued bonus program.

4    Something like that.

5    Q    Would it be maybe the dealer volume?

6    A    Dealer volume bonus, yes, ma'am.

7    Q    Was that a big push to sell?

8    A    Yes, I believe at this time it was a two-month program

9    instead of the normal one-month program that they have.

10   Q    The Cullman store had an objective for that --

11   A    Yes, ma'am.

12   Q    -- a sales objective?  And the Birmingham store would

13   have an objective for that, would they not?

14   A    Correct.

15   Q    Okay.  Did Cullman hit its objective?

16   A    Yes, ma'am.

17   Q    Mr. Boyles, did you receive what's called a proffer

18   letter from the government in this case?

19   A    Yes, ma'am.

20   Q    What do you understand the terms of that proffer letter

21   to be?

22   A    To tell the truth, if I don't, I am in trouble.

23   Q    Okay.  What do you get in exchange for your testimony

24   here today?

25   A    Nothing.

1    Q     Were you promised anything?

2    A     No, ma'am.

3    Q     Have you been charged in this case?

4    A     No, ma'am.

5    Q     Do you have any idea if you'll be charged?

6    A     No, ma'am.

7    Q     How many times have you met with the government prior to

8    today?

9    A     Twice.

10   Q     Okay.  Did the government give you any specific

11   instructions about your testimony today?

12   A     No, ma'am.

13   Q     Did the government tell you anything about how you should

14   testify?

15   A     No, ma'am, tell the truth.

16   Q     What happens if you don't tell the truth?

17   A     I'd get in trouble.

18   Q     Mr. Boyles, I am going to hand you what has already been

19   admitted as Government's Exhibit 40.

20              MS. MURNAHAN:  Permission to approach the witness?

21              THE COURT:  Granted.

22   BY MS. MURNAHAN:

23   Q     Mr. Boyles, prior to meeting with the government, had you

24   ever seen that document before?

25   A     No, ma'am.

1    *Q*    Can you read it over and see if you understand what it

2    says?

3    *A*    (Witness complying.)

4          MR. BROOME:  Your Honor, I am going to object.  He

5    said he never saw the document before they gave it to him.

6          THE COURT:  Ms. Murnahan, where are you going with

7    this?

8          MS. MURNAHAN:  I just want to establish that he has

9    not seen it, but we can move on.

10          THE COURT:  I think he testified to that already.

11          MS. MURNAHAN:  Okay.

12   BY MS. MURNAHAN:

13   *Q*    I will take it back from you.

14   *A*    There's both of them.

15   *Q*    Thank you.

16   *A*    I don't know what this is.

17   *Q*    Mr. Boyles, you testified that you didn't have a lot of

18   contact with Ms. Branch while you were sales manager at

19   Cullman; not a lot of contact?

20   *A*    Not a whole lot, no, ma'am.

21   *Q*    Has that amount of contact increased since you became

22   general manager?

23   *A*    Just a smidge, just because I need more items for her to

24   help me figure out mistakes, and things of that nature.

25   *Q*    What type of mistakes?

1    *A*    Things being accrued to the wrong journal; when we go to

2    work, our rebate schedules; if she finds the cars that have

3    actually been RDR'd that we likely could -- sometimes salesmen

4    delivered their own car, so we had to back one out and redo

5    the right car.  Things of that nature.

6    *Q*    Okay.  So would these be mistakes that are made in both

7    the RDR process and the accounting system?

8    *A*    No, just, naturally, it's just in the accounting process,

9    normally.  Where it got stuck to the wrong account.  This

10   account is showing negative, this one is showing positive, and

11   it's not supposed to be that way.  Things of that nature.  She

12   helps me with my used cars, because I take the cars to auction

13   and sell them, and she helps me process the paperwork to

14   those.

15   *Q*    Okay.

16   *A*    Things like that.  Normal day-to-day operation stuff.

17   *Q*    Okay.  So as the general manager, do you have a pretty

18   good understanding of what her job responsibilities are?

19   *A*    Yes, ma'am.

20   *Q*    Okay.  One moment, Your Honor.

21          In your understanding as GM and based on your

22   interactions with Ms. Branch, what do you think her job

23   responsibilities are?

24   *A*    To run the financials of the dealership.

25   *Q*    Can you elaborate on that a little bit more?

1    *A*    Just make --

2            THE COURT:   If you know.

3    BY MS. MURNAHAN:

4    *Q*    If you know.

5    *A*    Just make sure that everything is taken care of at the

6    dealership, all the payrolls, the accountings, the deals,

7    insurance, 401K, things of that nature.

8    *Q*    Would she be involved in an audit?

9    *A*    Probably so.

10   *Q*    Have you ever been involved in an audit?

11   *A*    Just a Nissan audit.

12   *Q*    A Nissan audit, not a tax audit?

13   *A*    Just a Nissan audit.

14   *Q*    Was that at Cullman, or was that at a different store?

15   *A*    I have been in one through each.

16   *Q*    Okay.  What happens in an audit?

17   *A*    They just come in and make sure that your paperwork is

18   correct with all of the rebate forms, and cars are to the

19   right people, and things of that nature.

20   *Q*    Do they check deal jackets?

21   *A*    They pull a certain amount.  They don't check them all.

22   They give you a list a few days before they get there to have

23   these deals pulled.

24   *Q*    Do you know how they get that list?

25   *A*    Nissan sends it to them.

1    Q      Okay.

2    A      They do a bunch of cross-matching in their stuff.   Then

3    they see that they, oh -- there may be a problem with that

4    deal or that deal, and so they just pull certain deals to look

5    at them.

6           MS. MURNAHAN:  Nothing further at this time.

7           THE COURT:  Cross examination.

8           MR. BROOME:  Yes, Your Honor.

9                      CROSS EXAMINATION

10   BY MR. BROOME:

11   Q      Mr. Boyles, we've never met, have we?

12   A      No, sir.

13   Q      My name is Bill Broome, and I represent this lady here

14   Kim Branch who you know.

15          Back in March of 2013 when Harold Yelverton tells you

16   we're not going to RDR anymore cars in Cullman -- you got my

17   time frame, right --

18   A      Yes, sir.

19   Q      -- you never had any conversations with Kim regarding

20   transferring sales from Cullman to Birmingham, did you?

21   A      No, sir.

22   Q      Thank you.

23          MR. BROOME:  That's all I have, Your Honor.

24          MS. MURNAHAN:  Nothing further.

25          THE COURT:  All right.  Mr. Boyles, thank you for

1    your time.  You are dismissed.

2              THE WITNESS:  Thank you.

3              THE COURT:  All right.  The government should go

4    ahead and call its next witness, please.

5              MS. MURNAHAN:  Your Honor, the government calls Jeff

6    Green.

7              THE COURTROOM DEPUTY:  Remain standing, please, and

8    raise your right hand.

9         Do you swear or affirm to tell the truth, the whole

10   truth, and nothing but the truth so help you God?

11             THE WITNESS:  I do.

12             THE COURTROOM DEPUTY:  Thank you.  Please be seated.

13   Will you state your first and last name.

14             THE WITNESS:  Jeffrey Green.

15             THE COURTROOM DEPUTY:  Thank you.

16                      DIRECT EXAMINATION

17   BY MS. MURNAHAN:

18   Q    Good morning, Mr. Green.

19   A    Good morning.

20   Q    Where were you born?

21   A    Port St. Lucie, Florida.

22   Q    Did you grow up there?

23   A    One year.

24   Q    You grew up there one year?

25   A    I lived there for one year.

1   Q     You lived there for one year.  Where did you go after

2   that?

3   A     Wilmington, North Carolina.

4   Q     Where did you go to high school?

5   A     In Eustis, Florida.

6   Q     So you moved around a lot?

7   A     Yes, ma'am.

8   Q     Did you go to college?

9   A     Yes, ma'am, Florida State University.

10  Q     Did you graduate?

11  A     Yes, ma'am.

12  Q     What was your degree in?

13  A     Political science.

14  Q     Any post graduate?

15  A     No, ma'am.

16  Q     Where do you work now?

17  A     Honda of Cartersville.

18  Q     Cartersville?

19  A     Georgia.

20  Q     When did you first get in the car business?

21  A     2006.

22  Q     2006.  What was your job?

23  A     I was a salesperson.

24  Q     Salesperson?

25  A     Yes, ma'am.

1   Q    Okay.  Where was that?

2   A    Employed at Pontiac Cadillac Buick GMC Nissan in Panama

3   Beach City, Florida.

4   Q    2006 to now, that's about roughly nine years --

5   A    Yes, ma'am.

6   Q    -- that you have been in the car industry?

7        Was that continuous, or did you have any other jobs?

8   A    I spent one year working for my brother-in-law's

9   construction company.

10  Q    So, nine years minus one, eight years, roughly, total?

11  A    Yes, ma'am.

12  Q    When did you first start with a Serra dealership?

13  A    It would have been September of 2011.

14  Q    Which one did you work at?

15  A    Serra Nissan.

16  Q    In Birmingham?

17  A    Yes, ma'am.

18  Q    What was your position there?

19  A    Finance manager.

20  Q    What does a finance manager do?

21  A    Process the paper work, get loans approved, sell warranty

22  products such as extended warranty, GAP insurance, credit life

23  disability.

24  Q    Did you work at any of the other Serra dealerships?

25  A    I was the sales manager for Serra Volkswagen across the

1    street.

2    Q    At the same time?

3    A    At different times.

4    Q    Okay.  Which dealership were you working at in March of

5    2013?

6    A    Serra Volkswagen.

7    Q    What was your position?

8    A    Sales manager.

9    Q    When you were working as a finance or -- what were your

10   responsibilities as a sales manager?

11   A    Structure car deals, manage the salespeople, and any

12   other employees under my supervision.  Day-to-day operations

13   of the dealership itself.  I also did finance for that

14   dealership, as well.  For a period of time, I was the sole

15   manager down there.  So it was me and five salespeople.  So I

16   would do pretty much everything from the front end to the back

17   end for that dealership.

18   Q    So, do you have any familiarity with incentive programs

19   that manufacturers offer to dealers?

20   A    Yes, ma'am.

21   Q    Was there an incentive program in effect for Serra Nissan

22   in March of 2013?

23   A    Yes, ma'am.

24   Q    Do you know which incentive program that was?

25   A    It was the typical stairstep program that Nissan puts out

1    giving you tiers for the number of vehicles that you sold,

2    retro'ing back specific monies for those levels that you hit.

3    At that specific point at that time, I believe was a 45-day

4    retro.

5    Q    Did it have a particular name, if you know?

6    A    Not that I remember.

7    Q    You mentioned it was a 45-day retro.  Is that bigger than

8    normal?

9    A    Yes, ma'am.  Normally, they're only 30 days.

10   Q    Based on your experience as a finance manager and as a

11   sales manager, have you ever heard the term "pooling of

12   sales"?

13   A    Yes, ma'am.

14   Q    What do you understand that to be?

15   A    Reporting sales from other dealerships at another store

16   in order to receive increased incentive money.

17   Q    In your experience, is that permissible practice?

18   A    No, ma'am.

19   Q    Why do you say that?

20   A    It's a lie.

21   Q    Have you ever had any conversations with Kim Branch about

22   pooling of sales?

23   A    Yes, ma'am.

24   Q    Tell us about those conversations.

25   A    I received deal jackets from the Cullman store that Mr.

1   Visser also owned, and I falsified documents in order to make

2   it look like those vehicles were sold at Serra Nissan in

3   Center Point.

4   Q    What documents did you falsify?

5   A    Buyer's orders, contracts, warranty registrations, title

6   documents, power of attorneys.  Everything that would go into

7   a typical car deal.

8   Q    Have you ever had to do that before for any other

9   dealership?

10  A    No, ma'am.

11  Q    In this particular incident, you may have stated this.

12  Was Cullman transferring sales to Birmingham?

13  A    Yes, ma'am.

14  Q    Was Birmingham not going to meet its objective?

15  A    They were behind pace, yes, ma'am.

16  Q    Had Cullman met its already?

17  A    Yes, ma'am.

18  Q    Let's go back to those deal jackets.  What was your first

19  conversation about that whole process.  How did you get

20  involved in it?

21  A    Mr. Housner called me to his office at the Nissan store.

22  I walked over.  And he asked me if I could create the

23  documents in order for us to report those sales at the Center

24  Point location, so that in case Nissan of North America came

25  in and audited us, we had the appropriate documentation to

```
 1   back up the sales at the Center Point store.
 2   Q    You mentioned Mr. Housner.  Who do you mean by that?
 3   A    Forest Housner was kind of like a VP of operations or
 4   director for Mr. Visser in his stores.  He was over the
 5   Cullman store, the Center Point stores, and also I believe the
 6   Honda store that Serra owned in Sylacauga.
 7   Q    How much contact did you have with him?
 8   A    Day to day.
 9   Q    You saw him every day?
10   A    Yes, ma'am.
11   Q    Did you interact with him every day?
12   A    Normally if he was in that dealership that day, yes,
13   ma'am.
14   Q    Did he seem knowledgeable?
15   A    Yes, ma'am.
16   Q    Was he pretty sharp?
17   A    Yes, ma'am.
18   Q    He seemed competent?
19   A    Yes, ma'am.
20   Q    When was your last contact with Mr. Housner?
21   A    It would have been September of 2013.
22   Q    You haven't spoken with him since?
23   A    No, ma'am.
24   Q    Have you seen him since?
25   A    No, ma'am.
```

1    Q    Shifting back to the deal jackets.  How did you know

2    which sales to create a deal jacket for?

3    A    I had spent at that point in time five or six years as a

4    finance manager.  I had done, roughly, probably, in my career,

5    I averaged a hundred car deals a month that I was finance

6    manager for printing out those documents.  So I knew how to

7    create the documents while documents needed to be in there to

8    make it look like it was a car deal.

9    Q    How did you know which ones you needed to create

10   documents for then?

11   A    I just created everything that would have normally been

12   in a car deal.

13   Q    Who gave you the deal that you needed to create the

14   jacket for?

15   A    The original deal from the Cullman dealership was given

16   to me by Ms. Branch.

17   Q    Okay.  Do you remember what color the Cullman deal

18   jackets were?

19   A    I do not remember exactly what the colors were.  If I had

20   to remember, I would say they were like an off purple, like a

21   lavender color.

22   Q    Okay.  What color were the Birmingham deal jackets?

23   A    Normally either -- I believe they were gray.

24   Q    Gray?  Okay.

25        MS. MURNAHAN:  Permission to approach the witness,

1    Your Honor?

2           THE COURT:  Yes.

3    BY MS. MURNAHAN:

4    Q    I am going to show you 15 deal jackets.  Would you look

5    through those a little bit and see if you recognize them.

6    A    (Witness complying.)  It looks like a new car deal jacket

7    for Serra Visser Nissan.

8    Q    The Cullman store?

9    A    Yes, ma'am.

10   Q    Would you also go through and see if any of the outside

11   of those deal jackets have handwriting on it that says, billed

12   to the wrong dealer?

13   A    (Witness complying.)  This one has "wrong dealer" written

14   on it.

15   Q    Nine, okay.  Is that the only one?

16   A    11.

17   Q    Okay.

18   A    13 and 14, and then also 15.

19   Q    Do you recognize the handwriting that that's in?

20   A    I do not.

21   Q    Let me take those back from you.  Well, leave them right

22   there.  Now I am going to hand you these.  Would you please

23   look through these exhibits.

24        They've been marked as Government's Exhibits One through

25   15.  And let the jury know if these exhibits are accurate

1    copies of these deal jackets (indicating).

2    A    (Witness complying.)

3    Q    And you don't have to go through every page, but if

4    there's a glaring difference, please, let the Court know.

5    A    (Witness complying.)

6         MR. BROOME:  Your Honor, if it will move things

7    along, I would stipulate to what's in the -- I don't want to

8    call it manila folders -- would be copies of what is in there

9    -- I don't know what color to call it.

10        THE COURT:  Turquoise.

11        MR. BROOME:  Thank you -- in the turquoise folders.

12        THE WITNESS:  The stock numbers and vin numbers

13   match.

14        MS. MURNAHAN:  With Mr. Broome's stipulation, the

15   government moves to admit Exhibits 1 through 15.

16        MR. BROOME:  Judge, we've already entered into a

17   stipulation, and those were the deal jackets.

18        THE COURT:  They're admitted.

19   BY MS. MURNAHAN:

20   Q    Mr. Green, these have customer identifying information,

21   these are originals that cannot be redacted which is why we

22   have those.

23   A    Yes.

24   Q    So, walk the jury, if you would, through the process of

25   how you created these new Birmingham deal jackets.  Who would

1    you get a Cullman deal jacket from that you needed to falsify?

2    A    Ms. Branch would call me and let me know normally four or

3    five deals ahead of time.  I would come up to the accounting

4    office, which was located upstairs of my store, which was the

5    Volkswagen store.  I would take those deal jackets, take them

6    back downstairs, type in the information, load it into our

7    computer system called Reynolds and Reynolds, reprint all the

8    documentation so that it would have not only the name for

9    Serra Nissan in Center Point, but also the correct addresses,

10   reproduce everything from contracts, buyers' orders, the

11   retail delivery sheets, which would be a jacket showing that

12   not only the technician inspected the vehicle when it came in

13   off the truck and was free of any defects, but also that the

14   salesperson went through all of the delivery steps in order to

15   teach the customer all the benefits and obviously the

16   functionality of the car.  I would reproduce title

17   applications, power of attorneys, odometer statements,

18   everything in order to have that yield here and look like it

19   was sold from the Center Point location.

20   Q    Would you do bill of sales?

21   A    Yes, ma'am.

22   Q    You said you would reproduce title applications -- did

23   those original have title applications in them?

24   A    No, ma'am.

25   Q    Okay.  So you --

1   A    -- I would produce title applications.

2   Q    You would produce title applications.  Would you produce

3   a correct one or -- and would you produce a Serra Visser one

4   and a Serra Nissan one, or would you just do them both for

5   Serra Nissan?

6   A    No, ma'am, the state system would only allow one title

7   application on that vin at a time.  So you could not do two,

8   one for the Cullman location and one for the Center Point

9   location.

10  Q    So which one did you do?

11  A    I did one for the Center Point location.

12  Q    So it sounds like when you created these documents, you

13  just took everything that would have Serra Visser Nissan on it

14  and make it so it was Serra Nissan?

15  A    Yes, ma'am.

16  Q    You said Ms. Branch would call you and you would come

17  pick up some deals.  Did this happen more than one time?

18  A    If I remember correctly, it happened on three different

19  occasions.

20  Q    Okay.  Do you remember, if you remember, how many you did

21  total?

22  A    Around 50.

23  Q    She would always be the one to call you?

24  A    Yes.

25  Q    Would you then go pick them up from her?

1    A    Yes, ma'am.

2    Q    What did you do with the fake deal jackets?

3    A    I would then deliver them to Mr. Gerald Shepard so that

4    he could report the vehicles being sold to Nissan of North

5    America, and then return not only the original but the

6    fraudulent deal jacket back to Mrs. Branch.

7    Q    You would return those --

8    A    Yes, ma'am.

9    Q    -- both sets of deal jackets --

10   A    Yes, ma'am.

11   Q    -- to Ms. Branch?

12   A    Yes, ma'am.

13   Q    When you would go pick up a deal jacket or a set of deal

14   jackets from Ms. Branch, did she ever ask you why we had to do

15   this?

16   A    No, ma'am.

17   Q    Did you ever deal with anyone else other than Ms. Branch

18   about the deal jackets?

19   A    Just Gerald Shepard.

20   Q    No one else from the accounting office?

21   A    No, ma'am.

22   Q    What about the stock numbers on those cars, did you have

23   to create a new stock number?

24   A    Yes, ma'am.

25   Q    So, what is a stock number?

1    *A*    It is an internal identifier for that specific vin number

2    of the car.  So dealerships can do it in a multiple of

3    different ways.  Everyone has their own system.  But it allows

4    you to more readily pull up that vehicle or identify that

5    vehicle as opposed to entering in a complete vin number for a

6    vehicle.

7    *Q*    Vin numbers are pretty long?

8    *A*    Yes, ma'am.

9    *Q*    The stock number was shorter?

10   *A*    Yes, ma'am.

11   *Q*    Okay.  Why did you create a new stock number for the

12   Birmingham deal?

13   *A*    To identify these deals as the deals that we pulled from

14   Cullman.

15   *Q*    Was there anything special that you did to them to make

16   them readily identifiable?

17   *A*    I believe I put a "C" on the front of it and then the

18   last six of the vin number.

19   *Q*    Did Birmingham stock numbers typically have a "C" in

20   front of them?

21   *A*    No, ma'am.

22   *Q*    You did this so that they would be readily identifiable?

23   *A*    Yes, ma'am.

24   *Q*    If you remember, what color deal jackets did you create?

25   *A*    They were green.

1    Q    Green?  Okay.

2    A    Yes, ma'am.

3    Q    Once you gave the originals and the fake deal jackets

4    back to Ms. Branch, did you ever see them again?

5    A    No, ma'am.

6    Q    Do you have any idea what happened to them?

7    A    No, ma'am.

8    Q    If you know, why did the fake deal jackets have to be

9    created?

10   A    Nissan of North America would audit its dealerships based

11   upon the incentives that they received in order to make sure

12   that obviously they followed the processes and procedures that

13   needed to be followed and that everything was truthful.  If

14   they found any discrepancies or you didn't follow the policies

15   and procedures that they identified during that audit, then

16   they would rescind the incentive money that they paid.

17   Q    By rescinding, you mean charge back?

18   A    Yes.

19   Q    Would that be known as a charge back?

20   A    Yes.

21   Q    So you created these to be an audit?

22   A    Yes, ma'am.

23          MS. MURNAHAN:  Permission to approach the witness?

24          THE COURT:  Yes.

25   BY MS. MURNAHAN:

1   Q    Mr. Green, I'm handing you what has been marked as

2   Government's Exhibit 24.  Do you recognize that?

3   A    Yes, ma'am.

4   Q    Do you recognize that first page?

5   A    Yes, ma'am.

6   Q    What is that?

7   A    It is a list of the deals that were given to me in order

8   to create the false documents.

9        MS. MURNAHAN:  Permission to publish?

10       THE COURT:  Yes.

11  BY MS. MURNAHAN:

12  Q    So you recognize these as the deals that you falsified?

13  A    Yes, ma'am.

14  Q    That stock number on the left, is that the original

15  Cullman stock number?

16  A    Yes, ma'am.

17  Q    The ones that you created for the Birmingham store, the

18  Center Point store had a "C" in the last six of the vin?

19  A    Yes, ma'am.

20  Q    So you didn't just put a "C" in front of this stock

21  number?

22  A    No, ma'am.

23  Q    Okay.  You created a whole different stock number?

24  A    Yes.

25  Q    This "date given" column, does that correspond roughly

1    with the dates you think you were given the deals by Ms.

2    Branch?

3    A    Yes, ma'am.

4    Q    How long would it take you to create all those documents

5    or deal jackets?

6    A    On average, about 45 minutes to an hour.

7    Q    So would this take up a good chunk of your day when you

8    had to do this?

9    A    Yes, ma'am.

10   Q    At the bottom where it says "pay SNVW for SEC+," do you

11   know what that means?

12   A    Yes, ma'am.

13   Q    What does that mean?

14   A    The deals that were pulled from the Cullman dealership

15   and reported sold in the Center Point dealership.  Probably

16   around 50 percent of them they sold a Security+Plus warranty

17   on them.  You would report that warranty as being sold through

18   the Center Point dealership.  The money was collected,

19   obviously, at the Cullman dealership, so they would have to

20   pay back Serra Nissan Volkswagen for the remittance that they

21   needed to pay for the warranty or the cost of the warranty.

22   Q    Okay.  I am going to walk through that a little bit.

23        Security+Plus is an extended service contract, you

24   said?

25   A    Yes, ma'am.

1    Q    What is that?

2    A    It's an extended warranty.  It's a coverage in order to

3    protect the mechanics of the vehicle for a given period of

4    time.

5    Q    Once the original manufacturer's warranty expires?

6    A    It would actually start from the date of purchase.  So it

7    would go along with the manufacturer's warranty.  It would be

8    in force, as well as that, and then also continue to cover you

9    after the original warranty had expired.

10   Q    Okay.  So if a customer comes in to Cullman and buys an

11   Altima and buys a Security+Plus extended warranty or extended

12   service contract on that car, does the customer pay Cullman

13   for that warranty?

14   A    Yes, ma'am.

15   Q    Who in a normal situation, who would Cullman have to pay

16   for that warranty -- did that warranty cost Cullman anything?

17   A    Yes.

18   Q    Is Security+Plus sort of a third party vendor?

19   A    Yes, ma'am.  They would be -- they were affiliated -- it

20   was Nissan's warranty company.

21   Q    But were they paid directly for the warranties that were

22   sold?

23   A    Yes.

24   Q    Okay.  So, if a customer came in and bought a car, bought

25   this Altima and extended service contract, Cullman, Serra

1   Visser Nissan would have to pay Security+Plus for the costs of

2   that warranty?

3   A    Yes, ma'am.

4   Q    So, in this case, what does that mean that Serra Visser

5   Nissan would have to do for the Security+Plus contracts on

6   these cars?

7   A    In order to maintain the fact or continue to show that

8   these vehicles were sold from Center Point, you would need to

9   report the warranty as being sold from Center Point, as well

10  as all the fraudulent documentation that I did.  So when you

11  reported that warranty as being sold from Serra Nissan

12  Volkswagen in Center Point, that dealership would then be

13  charged for the cost of the warranty.  And so they would have

14  to remit back or pay back -- the Cullman dealership would need

15  to pay them back for that money because they never received

16  any of the profit for that warranty or any of the monies for

17  that warranty.

18  Q    So Security+Plus would get concerned or curious if a car

19  sold in Birmingham, for all intents and purposes, they're

20  being paid through Cullman for that same car's warranty; that

21  would make them curious or they wouldn't accept it?

22  A    It might make them curious.  I don't know.  But they

23  would be more along the lines of you reported the warranty

24  sold from -- you would always report the warranty, if it was a

25  new car warranty, you always report that warranty as being

1    sold from the dealership that sold the car because it was

2    purchased at time of sale.

3    Q    So Cullman had collected that money, but Serra Nissan in

4    Center Point or Birmingham was going to have to pay that

5    money.  So, at some point there was going to have to be a

6    transfer of money from Cullman to Center Point to pay that

7    money up to the Security+Plus vendor?

8    A    Yes, ma'am.

9    Q    Is that what that line on Government's Exhibit 24

10   indicates?

11   A    Yes, ma'am.

12   Q    $500 per car, $700 per car.  What was that?

13   A    That was probably -- it looked like a stairstep program

14   for the actual cash for the car.

15   Q    When that money is transferred on the Security+Plus, who

16   would do that?

17   A    Your controller, Kim Branch.

18   Q    Would you please pull up Government's Exhibit Three.

19        And Mr. Green, I will help pull that out for you.  Do

20   you have one up there?  Let's try to keep them in order.

21   Okay.

22        Do you see the numbers that run along the edge, DISC 00

23   -- on the bottom, or hopefully on bottom, it may be on the

24   side, DISC-000105?

25   A    Yes, ma'am.

1    Q      Would you please turn to page 118.

2    A      (Witness complying.)

3    Q      Ms. Gold, can call out that box right there.

4    A      So the first line is "A.M.O. (Back)."  The second line is

5    "Service Contract" with a dollar amount of $2,466.

6    Q      Service contract, what is that?

7    A      That would be the retail cost to the consumer and also

8    the amount for the service contract for the extended warranty.

9    Q      That's the Security+Plus --

10   A      Yes, ma'am.

11   Q      -- contract?  And that's the retail costs -- that's how

12   much the customer paid?

13   A      Yes, ma'am.

14   Q      Okay.  Continue.

15   A      Next line is service contract cost of $1,266.  That is

16   the dollar amounts that the dealership would pay for the

17   Security+Plus warranty.

18   Q      Okay.  So profit of $1,200.  Okay.  We don't need to go

19   through the rest of them.

20           Can you take that down but leave the document up,

21   please.

22           Just in general, what is this document?

23   A      This is what they what we would refer to as a recap sheet

24   or cap sheet or a gross sheet.

25   Q      Does it just give all the details of the sales

1    transaction, the price what the customer paid, any options

2    they had, or any extended warranty, and things that they

3    bought?

4    A    Yes, ma'am, it would allow you to calculate your gross

5    profit and your gross sales amount.

6    Q    Okay.  It included the service contract?

7    A    Yes, ma'am.

8    Q    Can you please turn to page 145.

9    A    (Witness complying.)

10   Q    What is this document?

11   A    This is the application for a Security+Plus vehicle

12   service contract.

13   Q    Ms. Gold, would you please call up the very top portion.

14        Would the sales person who sold the car normally fill

15   out this contract?

16   A    No, ma'am, the finance manager would.

17   Q    The finance manager would.  Okay.  Is this contract or

18   this document, does it come out of a program that's preloaded?

19   A    Yes.

20   Q    Okay.  So, is that provided by Security+Plus?

21   A    No, it would be -- the application would be programs to

22   print out of your DMS or your computer system that you printed

23   all of your other documents out of.  So it would be out of

24   Reynolds and Reynolds.

25   Q    Okay.  Reynolds and Reynolds, what was that?

1   *A*   Your dealer management system or operating system.

2   *Q*   For across the board or -- did other dealerships use

3   different ones?

4   *A*   Other dealerships used different variations or different

5   systems, but Reynolds and Reynolds is one of the more

6   prevalent.

7   *Q*   Who used Reynolds and Reynolds?

8   *A*   The Serra Nissan in Center Point store did.

9   *Q*   Are you familiar with which one they used?

10  *A*   If I am not mistaken, I believe their DMS was

11  Dealertrack, but I am not sure.

12  *Q*   When you pulled this application up in Reynolds and

13  Reynolds, was the dealership preloaded?

14  *A*   Yes, ma'am.

15  *Q*   So, where it says "dealer named Serra Visser Nissan,"

16  that could not be changed in Cullman or it could not be

17  changed in Birmingham?

18  *A*   No, ma'am.

19  *Q*   When Birmingham pulled it up, it would say Serra Nissan?

20  *A*   Yes, ma'am.

21  *Q*   What about this contract number?  Is that preloaded?

22  *A*   Yes, that's preprinted on the contracts when you order

23  them from Security+Plus.

24  *Q*   It cannot be changed?

25  *A*   No, ma'am.

1   Q    So when you had to duplicate the vehicle service contract

2   in Birmingham, would it be possible for you to get this same

3   contract number as it existed in the Cullman deal?

4   A    No, ma'am.

5   Q    It would have to have a different number?

6   A    Yes, ma'am.

7   Q    Would the customer have this original one?

8   A    Yes, ma'am.

9   Q    The customer has no idea that the documents are being

10  changed?

11  A    No, ma'am.

12  Q    So all the contract numbers that were reported to

13  Security+Plus were inaccurate?

14  A    Yes, ma'am.

15  Q    Do you know what Security+Plus is?

16  A    I do not know where they're located, no, ma'am.

17  Q    It's affiliated with Nissan North America?

18  A    Yes, ma'am.

19  Q    Can we take that down and go back to 118 and call out

20  that box again.

21       Where it says "service contract, 2,466," that is the

22  retail cost of that Security+Plus application we just looked

23  at?

24  A    Yes, ma'am.

25  Q    But the cost to the dealership was $1,266?

1    A    Yes, ma'am.

2    Q    That is how much would have to be transferred from

3    Cullman to Birmingham to pay Security+Plus?

4    A    Yes, ma'am.

5    Q    Okay.  You can take that down.

6         Let's look at Four.  Mr. Green, would you, please,

7    take a look at Government's Exhibit Four and turn to page 170.

8    A    (Witness complying.)

9    Q    What is this document?

10   A    It's the recap sheet.

11   Q    Okay.  Ms. Gold, would you please call out that box.

12        Was there a service contract sold on this deal?

13   A    Yes, ma'am.

14   Q    How much was it?

15   A    $2,489.

16   Q    And what did it actually cost to the dealer?

17   A    $889.

18   Q    Would $889 be how much had to be transferred from Cullman

19   to Birmingham?

20   A    Yes, ma'am.

21   Q    That would be done in accounting?

22   A    Yes, ma'am.

23   Q    If you can take that down and turn to page 164.

24        I know this is fuzzy.  I apologize.  Can you tell what

25   that document is?

1    A    This is a retail installment contract on the bottom half

2    of it.

3    Q    Okay.  Could you take a look through that whole deal and

4    see if you can find a Security+Plus contract in there?

5    A    (Witness complying.)

6    Q    I do not see a copy of the Security+Plus contract?

7    A    Okay.

8    Q    You think it may be missing from that deal jacket?

9    A    Yes, ma'am.

10   Q    Okay.  Let's take that down.

11            If you can take a look at Government's Exhibit Nine.

12   And would you please turn to page 397.

13   A    (Witness complying.)

14   Q    What is this?

15   A    Another recap sheet.

16   Q    Ms. Gold, would you please call up that area.  Okay.

17            Was there a service contract sold on this deal?

18   A    Yes, ma'am.

19   Q    How much was it?

20   A    $1,766.

21   Q    What did it cost the dealership?

22   A    $1,266.

23   Q    So how much would have had to have been transferred in

24   accounting from Cullman to Birmingham?

25   A    $1,266.

1   Q     Would you please turn to page 421.

2   A     (Witness complying.)

3   Q     It should be up on your screen, Mr. Green.

4   A     Yes, ma'am.

5   Q     Either one.  What is this?

6   A     That is an application for a vehicle service contract for

7   Security+Plus.

8   Q     Okay.  On this one, I would like to go through a little

9   bit of the codes with you.

10         Ms. Gold, could you please pull up at new vehicle

11  plans -- down.

12         Is what kind of -- were there codes associated with

13  the different types of extended service contracts that

14  customers could buy?

15  A     Yes, ma'am.

16  Q     Did those codes correlate in any way with the cost of the

17  plan?

18  A     It would correlate to the cost based upon the mileage and

19  time and what the coverage was.  So yes, the more coverage for

20  the longer period of time, the more costs the warranty would

21  be.

22  Q     What kind of service plan did this customer purchase?

23  A     So they received a Gold preferred 72-month, 75,000-mile

24  warranty.

25  Q     Okay.  72-month?  Where do you see those?  Where did you

1    see that delineated?

2    A    So at the top box, the "X" is in the box next to "Gold

3    preferred".   And then the "X" --

4    Q    Let me stop you for that.   Is the code for that "RC"?

5    A    Yes, ma'am.

6    Q    Is the code after each one?

7    A    Yes.   So it would be "RC," the contract type would be

8    "C."   And then the plan type would be "D" as in 72 months,

9    75,000 miles.

10   Q    Okay.   So "RC" "CD" is the code?

11   A    Yes, ma'am.

12   Q    Would that information be necessary when you are entering

13   the Security+Plus contract into the system?

14   A    Yes, ma'am.

15   Q    Or recording it to Security+Plus?

16   A    Yes, ma'am.   That is how you let the system know what

17   warranty and type that you sold.

18   Q    Okay.   That's how Security+Plus knows how much money it

19   is supposed to get?

20   A    Yes, ma'am.

21   Q    If you can turn to Exhibit No. 11.

22   A    (Witness complying.)

23   Q    On the front page of that deal jacket, can you read the

24   writing at the bottom?

25   A    "Wrong dealer."

1   Q     Do you recognize that handwriting?

2   A     No, ma'am.

3   Q     Could you please turn to page 503.  I think it should be

4   in the next page.

5   A     (Witness complying.)

6   Q     It's another recap sheet?

7   A     Yes, ma'am.

8   Q     Ms. Gold, could you call out that little box.

9         Was there a service contract purchase on this?

10  A     Yes, ma'am.

11  Q     How much did it cost retail?

12  A     $1,289 to the consumer.

13  Q     How much did it cost the dealership?

14  A     $889.

15  Q     So how much would have to be transferred from Cullman to

16  Birmingham?

17  A     $889.

18  Q     If you could take that down.

19        Can you please turn to page 549.  Do you recognize

20  this?  This is another fuzzy one?

21  A     Yes, ma'am, it's the bottom of a retail installment

22  contract.

23  Q     Would you flip through, well -- do you see, if you can, I

24  am having trouble myself -- can you tell if there is a service

25  contract reported on this installment contract?

1    A    Yes, ma'am.

2    Q    Where do you see that?

3    A    Under "Service, Maintenance, and Related agreements."

4    Q    Does this give the information that it's duplicated on

5    that recap sheet?

6    A    Yes ma'am.

7    Q    But this does not have the codes?

8    A    No, ma'am.  This is just a disclosure to the consumer.

9    Q    Okay.  Would you flip through that deal jacket and see if

10   there is a Security+Plus application in there?

11   A    (Witness complying.)  I do not see one.

12   Q    So it's probably just missing from it?

13   A    Yes, ma'am.

14   Q    If you were handed a deal jacket that did not have that

15   Security+Plus contract or application in it, how would you

16   know what to load into the system?

17   A    Well, you could tell by a couple of different pieces of

18   information that you have received from the deal jacket.  So

19   here you can see that -- I know that the term on this warranty

20   is 72 months.  By the recap sheet, I could tell what the cost

21   was.  And by marrying up those two things, I could find the

22   appropriate codes in the book that I had showing what the

23   costs were.

24   Q    So you had a book that correlated all the codes to their

25   corresponding costs?

1   A     That gave you the costs and of the warranty based on the

2   car, the term, and the type of contract sold.

3   Q     Okay.  Let's take a look at Number 13.  And again on this

4   first page.  Do you see any writing at the bottom of that deal

5   jacket?

6   A     Yes, ma'am.

7   Q     What does it say?

8   A     "Billed wrong dealer."

9   Q     Do you recognize that handwriting?

10  A     No, ma'am.

11  Q     Please turn to page 619.  Another recap sheet?

12  A     Yes, ma'am.

13  Q     Julie, would you please call out the --

14        How much was this service contract?

15  A     $2,489.

16  Q     How much did it cost the dealership?

17  A     $889.

18  Q     How much would have to be transferred from Cullman to

19  Serra Nissan in Birmingham through accounting?

20  A     $889.

21  Q     Would you please turn to page 640.  What is this?

22  A     That is an application for a Security+Plus vehicle

23  service contract.

24  Q     Ms. Gold, would you please pull up the very top part.

25        Do you see the contract number, Mr. Green?

1    *A*    Yes, ma'am.

2    *Q*    To the left of that, what are those letters?

3    *A*    Those letters are indicating the contract type and plan

4    type.

5    *Q*    So that was sort of a summary of what was going on down

6    below it?

7    *A*    That would be how you would actually create the complete

8    contract number for the consumer and also for Security+Plus.

9    *Q*    Okay.  So, what does "RCC" -- is that a name --

10   *A*    Yes.

11   *Q*    What does that mean?

12   *A*    That means that this customer purchased a Gold preferred

13   72-month, 75,000-mile, 100-dollar deductible Security+Plus

14   contract.

15   *Q*    Would the details of that be below this?

16   *A*    Yes, ma'am.

17   *Q*    Call up the new vehicle plans box.  So "RC" is by the

18   Gold preferred?

19   *A*    Yes, ma'am.

20   *Q*    And the contract type is "C"?

21   *A*    Yes, ma'am.

22   *Q*    And then "D" is 72 months?

23   *A*    Yes, ma'am.

24   *Q*    Take a look at Government's Exhibit 14.  On the front, do

25   you see more handwriting on the front of that deal jackets?

1   A    Yes, ma'am.

2   Q    What does it say?

3   A    "Wrong dealer" at the bottom -- "not a" something at the

4   top, and it's been scribbled out.

5   Q    Do you recognize the handwriting on either one of those?

6   A    No, ma'am.

7   Q    Please turn to page 674.  Is this a recap sheet?

8   A    Yes, ma'am.

9   Q    Did the customer on this deal purchase the service

10  contract?

11  A    Yes, ma'am.

12  Q    How much was the retail cost?

13  A    $1,989.

14  Q    How much did it cost the dealership?

15  A    $889.

16  Q    How much would have to be transferred in accounting from

17  Cullman to Birmingham?

18  A    $889.

19  Q    Could you please turn to page 680.  What is this?

20  A    An application for a Security+Plus vehicle service

21  contract.

22  Q    Is there anywhere on this contract that tells what the

23  retail price is?

24  A    Yes, ma'am.

25  Q    Where is that?

1   *A*    It's under "VSC purchase price."

2   *Q*    Julie, could you pull that up, it's in the center.

3         You could tell based on that number right there what

4   type of contract it was?

5   *A*    No, ma'am, based upon the cost.

6   *Q*    Oh, that's the cost.  Okay.  That's a good thing to

7   clarify.  So those codes correlate to the dealership costs for

8   the warranty, not the customer?

9   *A*    Yes, ma'am.

10  *Q*    Okay.  Mr. Green, I would like you to look at

11  Government's Exhibit 15.  And again on the front of this deal

12  jacket, do you see any handwriting below the other

13  handwriting?

14  *A*    Yes, ma'am.

15  *Q*    What does it say?

16  *A*    "Billed to wrong dealer."

17  *Q*    Do you recognize the handwriting?

18  *A*    No, ma'am.

19  *Q*    Would you please turn to, I guess, it's the next page

20  706.  What is this?

21  *A*    Recap sheet.

22  *Q*    Did this customer purchase a Security+Plus contract?

23  *A*    Yes, ma'am.

24  *Q*    How much did that contract cost the customer?

25  *A*    $2,489.

1  Q    How much did it cost the dealership?

2  A    $889.

3  Q    How much would have had to have been transferred over in

4  accounting from Cullman to Birmingham for that contract?

5  A    $889.

6  Q    So Birmingham would have had to remit $889 to

7  Security+Plus?

8  A    Yes, ma'am.

9  Q    But that $889 as part of the $2,489 had been collected in

10  Cullman?

11  A    Yes, ma'am.

12  Q    Could you please turn to page 739.  What is this?

13  A    An application for a Security+Plus vehicle service

14  contract.

15  Q    What were the codes on this?

16  A    "RCCD."

17  Q    This one actually got filled out at the top, didn't it?

18  A    Yes, ma'am.

19  Q    Was there ever a time when warranty payments or these

20  service contract payments would have to be shifted between two

21  dealerships other than if they were shifting sales?

22  A    No, ma'am.

23  Q    There was no other reason that one dealership would have

24  to pay another dealership for a contract that it had purchased

25  or a customer had purchased?

1   *A*    No, ma'am.

2   *Q*    Had you ever had to do that before?

3   *A*    No, ma'am.

4          MS. MURNAHAN:  Your Honor, this is probably a good

5   stopping point if the Court wanted to, or we can keep going.

6          THE COURT:  Y'all are the boss.  Do you want to take

7   a lunch break now?

8          ALL JURORS:  Yes.

9          THE COURT:  Lunch.  All right.  So be it.  Let's

10  take a break until -- let's come back for 1:15, please.  And I

11  am going to give you the instruction you are tired of hearing.

12  Please do not discuss the case with anyone.  Please do not do

13  any research.  I will look forward to seeing you all at 1:15.

14         (Jury luncheon recess at 12:09 p.m.)

15         (In open court.  Jury not present.)

16         THE COURT:  Mr. Green, you essentially have to

17  pretend like you are on the witness stand through lunch.  No

18  discussing the case with anyone.  All right?

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  All right.  Anything we need to take up

21  before we take a lunch break?

22         MS. WICK:  Your Honor, the jury instructions, was

23  that resolved, or do you have what you need, or do we need to

24  e-mail something?

25         THE COURT:  I just said that if you all had any

1   supplemental requested instructions that I needed to get them

2   from you.

3           MS. WICK:  Was there a Word document issue for

4   somebody I think?

5           THE COURT:  Oh, I guess -- I thought you all had

6   e-mailed those to chambers.  Did you all do that?

7           MR. BROOME:  I'm the only one that did that.

8           THE COURT:  Oh, okay.  I got confused then.  I knew

9   I had seen an e-mail in chambers inbox.

10          MS. MURNAHAN:  Your Honor, we can get you a Word

11  version of our proposed instructions.

12          THE COURT:  If you all can e-mail that to the

13  chambers e-mail address, that would be great.  Thank you.

14          MS. MURNAHAN:  We will do that.

15      (A recess was taken at 12:11 p.m., until 1:15 p.m.)

16          (In open court.  Jury present at 1:18 p.m.)

17          THE COURT:  I hope you all have had a nice break.  I

18  think we are ready to resume with Mr. Green.

19          MS. MURNAHAN:  Thank you, Your Honor.

20  BY MS. MURNAHAN:

21  Q   Welcome back, Mr. Green.  When we left off, we were

22  talking about Security+Plus extended service contracts that a

23  customer would purchase from Nissan?

24  A   Yes, ma'am.

25  Q   I want to circle back to when you first began creating

1  these deal jackets.  What specifically do you remember -- what

2  specific conversations did you have with the defendant, Ms.

3  Branch, about these deal jackets?

4  A    Conversations would have been how many deals came in,

5  when they came in, how I was to come upstairs, grab them from

6  her, and then return them to her.

7  Q    You worked at Serra Volkswagen at the time?

8  A    Yes, ma'am.

9  Q    And she was -- well, were y'all in the same building?

10 A    Yes, ma'am.

11 Q    Okay.  So you were just on different floors?

12 A    Yes, ma'am.

13 Q    And so on a given day, would she call you up and say --

14 what would she say?

15 A    I have got five more deals from Cullman for you to do,

16 come up and grab them.

17 Q    Okay.  And you understood when she said for you to do,

18 did you understand what she meant?

19 A    Yes, ma'am.

20 Q    Okay.  So how many conversations in total do you think

21 you had with her?

22 A    Four or five.

23 Q    Okay.  Then you would have contact with her.  Would she

24 have the deals waiting on you when you got up there?

25 A    Yes, ma'am.

1    Q     Then you would bring the originals back to her?

2    A     Yes, ma'am.

3    Q     So, for any given batch -- you did these in batches,

4    right?

5    A     Yes, ma'am.

6    Q     You didn't do all 15 at once?

7    A     No, ma'am.

8    Q     So for any given batch, there would be a phone call from

9    her saying, hey, I have got these deals.  Then there would be

10   contact with her when you went to pick up the deals.  Then

11   there would be contact with her again to bring back the deals.

12   And that would occur for every batch?

13   A     Yes, ma'am.

14   Q     Mr. Green, you seem pretty familiar with the accounting

15   process and how these cars moved through the system.  I would

16   like you to walk the jury through what's involved in booking a

17   car.  So can you tell us how that process goes.  A customer

18   walks in and starts negotiating on a car.  What happens?

19   A     The first step would be for the salesperson to enter

20   their customer's information into what we call a CRM, which is

21   a customer tool that is a separate website.  It enables the

22   salespeople to track their customers and enables the managers

23   to track the flow of traffic coming through, follow up with

24   customers, and then also print out the preliminary paperwork.

25   The salesperson would present the numbers and the preliminary

1   paperwork that gets signed before the customer goes into the

2   finance office.

3   Q     So this is on a specific car?

4   A     On a specific car.

5   Q     Is there anything flagged on that specific car in the

6   accounting system at that time?

7   A     Not in the accounting system at that time.  Until they

8   finalize their paperwork from the CRM, then that deal folder

9   comes to me.  I would then load all that information -- as a

10  finance manager, you would load all that information into the

11  DMS, which is Reynolds and Reynolds.  You would then print out

12  all their paperwork that is associated with purchasing and

13  titling of the vehicle.  I would then do what we would refer

14  to as book the car deal, which then removes that vehicle from

15  our inventory.  It marks that specific stock number and vin

16  number sold in our system.

17  Q     So it's no longer available for somebody else to buy?

18  A     It's no longer available for somebody else to buy.  That

19  system would then communicate with other systems, your

20  websites, you know, things like Cars.com, Autotrader, any

21  other listings to remove that vehicle from those listings so

22  that it no longer shows online for sale.  I would then

23  finalize the paperwork, make sure everything was correct,

24  package up a package for the loan documents to go to the bank,

25  and that's when I would turn the deal into accounting.

1   Q     Is there anyone specific you would turn the deal into

2   accounting to?

3   A     Normally, you would turn it into a specific girl in

4   accounting or a person in accounting that was there to not

5   only ship out the contract to the lending institution, but

6   double check to make sure that all of my paperwork was

7   correct; and begin distributing the documentation to the

8   appropriate people, whether it be a title clerk to do the

9   title work, or whether it would be someone there to strip the

10  deal and finalize it and make sure all the costs and

11  everything are right on the accounting side.

12  Q     So there's booking the deal, and then you said something

13  about finalizing the deal.  What does that entail, who does

14  that?

15  A     That would be done in the accounting office by the person

16  that is normally stripping the car deal.

17  Q     What do you mean stripping the car deal?

18  A     Basically removing any documentation that, like I say,

19  needs to go to the state for the titling of it.  They would

20  also -- if it was a used vehicle, they would pull the title

21  out, reassign the title to that customer, and send that title

22  off to the state.  If it was a new car, you would have what

23  you referred to as an MSO or a manufacturer supply order that

24  they would give to -- do the same thing, assign that vehicle,

25  assign that title or that title document to that customer, so

1    then that vehicle would be titled in that customer's name.

2    Put all documentation together, send what needs to go to the

3    bank, to the lending institution, say what needs to go to the

4    state --

5              THE COURT:  Mr. Green, that's a lot of information,

6    and you are speaking fairly quickly for Chanetta to get it

7    down.  If you will slow down, please.

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Thanks.

10   BY MS. MURNAHAN:

11   Q    You mentioned the leading institutions.

12   A    Yes, ma'am.

13   Q    Keep going from there.

14   A    They would send the contract packet, which is all the

15   documentation needed for the funding of that specific car deal

16   to the lending institution.  Like I said, you would send the

17   title information to the state that were to title the vehicle.

18   Q    Okay.  So once all of that was done, is the car then

19   marked in accounting as finalized or finalized the deal?

20   A    Yes, ma'am.

21   Q    And by the deal being finalized, it means that all of

22   those processes that you just mentioned have been completed?

23   A    Yes, ma'am.

24   Q    Okay.  Based on your knowledge of the accounting systems

25   and your experience in the car industry, in general, would

1    there be a problem in accounting if a car that was sold in

2    Cullman was booked in Birmingham?

3    A    On my end, if the vehicle was not loaded by the

4    accounting office into our inventory, then I could not book

5    that car deal and mark it as sold.  That vehicle does not

6    exist in our system.

7    Q    Okay.  But the vehicle could still be RDR'd, couldn't it?

8    A    Yes, ma'am.

9    Q    How is that possible?

10   A    You simply -- what you would do from a sales manager

11   standpoint, you would electronically dealer trade the vehicle.

12   So you would tell Nissan of North America that the Cullman

13   store has dealer traded this specific vehicle to the Center

14   Point store.  That vehicle would then move from the inventory

15   on Nissan's side to the Center Point dealership.  It would

16   allow them to have the information needed to RDR that vehicle

17   and report it as being sold from the Center Point store.

18   Q    This is complicated, so I am trying to frame my questions

19   correctly.  What problems would it create for accounting?

20   What specific problems that you can think of would it create

21   for accounting if those cars had been booked in Birmingham but

22   sold in Cullman?

23             MR. BROOME:  Your Honor, I am going to object to

24   that.  Unless a proper predicate is laid that he did things in

25   accounting and he knows accounting principles as they operated

1   at Serra Nissan, I don't think he is qualified to answer that

2   question about problems.

3           MS. MURNAHAN:  Your Honor, he is very familiar with

4   accounting systems and how these cars moved through the system

5   and all of the reports and reporting that must be done from

6   the dealership to Nissan.  And I believe that he has already

7   demonstrated his familiarity and his ability, too.

8           THE COURT:  Mr. Green has talked about the steps in

9   the process for finalizing the deal, and Mr. Green has talked

10  about inputting data to create paperwork.  I don't believe he

11  has talked about the date the work -- what has to be input in

12  the accounting department to do the accounting department's

13  portion that he just described, generally, to finalize the

14  deal.  So can you lay some predicate for that, please.

15          MS. MURNAHAN:  I can ask him some questions about

16  that.  Okay.

17  BY MS. MURNAHAN:

18  Q    If a deal is booked in Cullman and the car is reported as

19  sold in Cullman, what accounting entries -- say the car was

20  financed, what accounting entries would go into Cullman, if

21  you know?

22          MR. BROOME:  Your Honor, I hate to keep

23  interrupting, but I still don't see how that goes to his

24  qualifications of what he knows about the accounting systems.

25          THE COURT:  Well, we have to give him a chance to

1    let us know.

2              MR. BROOME:  Yes, Your Honor.

3    A    They would have a gross sales amount and amounts that

4    needs to be collected from the lending institution.  So the

5    amount financed would be ACH or distributed by check to the

6    accounting office to pay for that vehicle.  You would have

7    that gross sales amount in your accounting system in Reynolds

8    and Reynolds, also a net profit and loss or gain when it comes

9    to those sides of it that would be booked in Cullman that you

10   can see and also report.  And that's how all the salespeople,

11   the managers, everyone would be paid.

12   BY MS. MURNAHAN:

13   Q    Okay.  That's how everyone would be paid?

14   A    Yes, ma'am.

15   Q    Including the salesman who is getting a commission on the

16   deal?

17   A    Yes, ma'am.

18   Q    So if a vehicle was financed and you're expecting money

19   from a lender, and the deal was booked in Birmingham but was

20   sold in Cullman, where would the lender send the money?

21   A    If they sold the vehicle in Cullman, then they would send

22   the money to Cullman.

23   Q    Okay.  Even if it was booked in Birmingham?

24   A    Yes, ma'am.

25   Q    Okay.  Would there have to be any accounting entries or

1    transfers of money in that instance?

2    A    If you finalized or if you booked the deal in the Center

3    Point store, then you would not receive that money there, and

4    you would certainly have that money outstanding, you would

5    need to do something with it, make a journal entry of some

6    type to rescind that money, because the Cullman store is the

7    one that's received the money.   I actually sold the car -- and

8    you had an entry in your system if you booked and finalized

9    that deal in your Center Point system that you are never going

10   to receive money for.

11   Q    Okay.  Would Nissan -- if the vehicle was floor planned

12   or say and the dealership owed Nissan money for that car, if

13   it was booked in Birmingham but sold in Cullman, Nissan is

14   going to expect money to be coming from Birmingham, or RDR'd

15   in Birmingham?

16   A    Well, that would depend on who your floor plan would be

17   with.

18   Q    Okay.  That's right.  A floor plan can be with another

19   lending institution?

20   A    Yes, ma'am.

21   Q    But the floor plan or --

22   A    You would have to pay -- you have a certain period of

23   time to pay off that vehicle once it leaves the lot with your

24   floor plan.  Then that money would come from the dealership

25   that sold the car.

1    Q    We have already discussed the extended service contract

2    Security+Plus, so booking a deal in Birmingham for a sale in

3    Cullman did entail a transfer in the accounting system of

4    funds from Cullman to Birmingham; is that correct?

5    A    Yes, ma'am.

6    Q    And that would be done in accounting office?

7    A    Yes, ma'am.

8    Q    Would booking those deals in Birmingham have created more

9    problems from an accounting perspective?

10   A    You would need to do something with them, move that money

11   around some way, somehow, in order to make sure that the

12   managers and the salespeople in the Center Point store got

13   paid correctly.

14   Q    Or in the Cullman store, you mean, got paid correctly?

15   A    Both dealerships.

16   Q    Okay.

17   A    Because if you book those deals and finalized those deals

18   and just left them there, then you would have a gross profit

19   amount or a gross loss amount on vehicles that those managers

20   didn't sell.  So they would get paid on a gross amount that

21   wasn't theirs.

22   Q    Then somebody else would not get paid for a car that they

23   did sell?

24   A    Yes, ma'am.

25   Q    So would it be cleaner to just book these deals in

1    Cullman, so that all the payroll and the financing and the,

2    you know, all those things could be accurately accounted for

3    and then just RDR them in Birmingham?  Would it be cleaner to

4    book them in Cullman from an accounting perspective?

5    A    Yes, ma'am.

6    Q    In your opinion, who would have known that it would be

7    easier to book these deals in Cullman?

8              MR. BROOME:  Your Honor, I am going to object about

9    his opinion as to -- I don't think he is qualified to make

10   that determination.

11             THE COURT:  Can you rephrase your question maybe,

12   Ms. Murnahan?

13             MS. MURNAHAN:  Yes, Your Honor.

14   BY MS. MURNAHAN:

15   Q    Who was responsible for finalizing deals?

16   A    The accounting office.

17   Q    In Cullman and in Birmingham?

18   A    Well, we had one centralized accounting office for both

19   those dealerships.  So the accounting office at the Center

20   Point location was the main accounting office for both

21   dealerships.

22   Q    Okay.

23             MS. MURNAHAN:  One moment, Your Honor.

24   BY MS. MURNAHAN:

25   Q    You said you dealt with a few people in the accounting

1   office, I believe.  Do you know who in the accounting office

2   had the authority to finalize a deal?

3   A    Anybody with administrative level access.  So Kim Branch

4   would have access to finalize a deal or un-finalize a deal, as

5   well as normally the stripper of that car deal, when they go

6   through and verify that the grosses are correct, they would go

7   in and finalize that car deal so that someone like myself or

8   another manager or anybody else couldn't go back through and

9   change any information in that deal.

10  Q    So it was a secure, controlled access-type system?

11  A    Yes, ma'am.

12  Q    And you didn't have authority to finalize a deal?

13  A    No, ma'am.

14  Q    But Kim Branch did?

15  A    Yes, ma'am.

16  Q    Okay.  Mr. Green, why do you think you were picked to

17  create these false documents in this case?

18  A    I was the most proficient finance manager at the

19  dealership at the time.

20  Q    Had you ever created false documents before?

21  A    Yes, ma'am.

22  Q    What was that about?

23  A    Loan documentation.

24  Q    What types of things did you create?

25  A    Proof of residence, proof of income for loans.

1  Q     Were you charged by the government in connection with

2  that activity?

3  A     Yes, ma'am.

4  Q     Did you plead guilty?

5  A     Yes, ma'am.

6  Q     What specifically did you plead guilty to?

7  A     Conspiracy.

8  Q     Conspiracy to?

9  A     Commit consumer credit fraud.

10 Q     Okay.  What were the basic facts of that case?

11 A     Myself and the other managers at the time at that

12 dealership conspired to qualify customers that normally

13 wouldn't qualify for auto loans by creating documentation and

14 submitting false information to lending institutions.

15 Q     Did you enter a plea agreement with the United States?

16 A     Yes, ma'am.

17 Q     Under the terms of that agreement, did you agree to

18 cooperate?

19 A     Yes, ma'am.

20 Q     What are you hoping to receive in exchange for your

21 cooperation?

22 A     I do not know.

23 Q     Anything at all?  Are you hoping?

24 A     I hope for the best, yes, ma'am, but I have not been

25 promised anything.

1    Q    You have not been promised anything.  Okay.  You were

2    anticipating my next question.

3         So you have not been promised anything by the

4    government in exchange for your cooperation?

5    A    No, ma'am.

6    Q    How many times have you met with the government during

7    the course of this investigation for this case?

8    A    Around ten times, 12 times.

9    Q    What instructions, if any, has the government given you

10   with respect to your testimony here today?

11   A    To tell the truth.

12   Q    What is your understanding of what will happen if you do

13   not tell the truth today?

14   A    I would be liable under another act.  I mean, I would

15   then be breaking the law again.

16   Q    Could it impact --  have you been sentenced yet on your

17   other case?

18   A    No, ma'am.

19   Q    Could a lie here today impact that sentence?

20   A    Yes, ma'am.

21   Q    When did you leave?  You worked for -- it's called Serra

22   Nissan Volkswagen?

23   A    Yes, ma'am.

24   Q    SNVW.  When did you leave that dealership?

25   A    September of 2013.

1    Q    What were the circumstances of that?

2    A    I had an IRS agent and FBI agent show up at my front door

3    asking me questions about creating false documents, submitting

4    false information to lending institutions.  I then reported to

5    Mr. Visser what had happened, and he put me on administrative

6    leave.

7    Q    Was that made permanent at some point later?

8    A    I was never contacted.  But you know, I no longer

9    received any pay, and it was pretty obvious that I was no

10   longer employed at the dealership.

11   Q    At the time you were creating these documents for Serra

12   Nissan, did your pay plan include any sort of percentage of

13   net or gross of any dealership?

14   A    My pay plan was structured around finance income, so

15   income on interest rate, markup.  So if you receive a buy rate

16   of five percent from a lending institution, you could then

17   mark that up a certain amount.  That income, as well as the

18   income like we saw on the recap sheets, the warranty income,

19   and also income off of GAP insurance, and then also the income

20   off of selling the other products such as life insurance and

21   disability insurance.

22   Q    Okay.  Was that only for one dealership, or was it for

23   all of the associated dealerships?

24   A    Just for the car deals that I actually processed for not

25   only Serra Nissan but Serra Volkswagen at the time because we

1    would do deals for both dealerships.

2    Q    So with these cars that were sold in Cullman, these 15

3    deals, you didn't really process the actual finance paperwork

4    for any of those deals, did you?

5    A    No, ma'am.  At that time, my pay plan was structured

6    solely on the gross profit of Serra Volkswagen.

7    Q    So did you get anything out of faking these documents?

8    A    No, ma'am.

9    Q    The case that you pled guilty in, how many other people

10   were charged in that, if you recall?

11   A    Seven or eight.

12            MS. MURNAHAN:  Nothing further at this time, Your

13   Honor.

14            THE COURT:  All right.  Cross examination.

15            MR. BROOME:  Yes, Your Honor.  Thank you.

16                      CROSS EXAMINATION

17   BY MR. BROOME:

18   Q    Mr. Green, you kind of short-changed yourself there about

19   when you were talking about what you pled guilty to.  You also

20   pled guilty to, did you not, sir, the failure to file a

21   federal income tax return?

22   A    Yes, sir.

23   Q    And failure to report -- what was it about $130,000 worth

24   of income?

25   A    2012, yes, sir.

1    Q    Am I right about the figures?

2    A    Yes, sir.

3    Q    Okay.  And you short-changed yourself when you were

4    talking about falsifying documents, too, didn't you?  You can

5    falsify just anything, can't you?

6    A    I can falsify what needed to be done, yes, sir.

7    Q    Okay.  Well, I want to ask you -- you actually had a

8    template or a form where you could falsify bank statements,

9    couldn't you?

10   A    Yes.

11   Q    You could say, I had a million bucks in a bank, but I got

12   maybe a dollar, couldn't you?

13   A    Yes, sir.

14   Q    I might not even have a bank account at that bank and you

15   would just say I did, right?

16   A    Yes, sir.

17   Q    You could do that?

18   A    Yes, sir.

19   Q    And you never got caught for years doing that, did you?

20   A    Just that year at Nissan.

21   Q    A whole year?

22   A    No, sir.

23   Q    About how long?

24   A    I started there in September of 2011, and I left to go to

25   the Volkswagen dealership in March of 2013.

1   Q    Okay.  So we got September, October, November, December,
2   January, February, and March?
3   A    No, sir.
4   Q    I am sorry?
5   A    We did not start the falsifying of the documents until
6   Mr. Mughal came as the general sales manager of the
7   dealership.
8   Q    Give me an idea when that was.
9   A    I believe he started, and I am not positive, but I
10  believe he started in January of 2013.
11  Q    So we got three months?
12  A    Three months, yes, sir.
13  Q    You got any idea of how many false bank statements you
14  did in three months?
15  A    Total of everything, or just bank statements?
16  Q    Well, we'll talk about any.  Well, give me a total of
17  everything, and then we'll work backwards.
18  A    There was probably 25 or 30 car deals.
19  Q    Okay.  And each one had a bogus bank statement?
20  A    Not necessarily.
21  Q    Okay.  You also were able to even falsify utility bills,
22  weren't you?
23  A    Yes, sir.
24  Q    How do you do that?
25  A    Copy and paste.

1   Q    Oh, okay.  And you did that 25, 30 times?

2   A    No, sir, if the deal needed it.

3   Q    In other words, if it needed something, you could do it?

4   A    Yes, sir.

5   Q    And you did it?

6   A    Yes, sir.

7   Q    And I think you even falsified credit apps, like if a

8   husband needed a wife or something, you would create a wife

9   for him, wouldn't you, in the paperwork?

10  A    No, sir.

11  Q    Oh, you didn't?  Well, how about if people needed to live

12  together so you could count both their incomes, would you

13  falsify them living together?

14  A    That information was submitted to the bank by the sales

15  managers at the desk.

16  Q    Okay.  So you didn't do that?

17  A    No, sir.

18  Q    Okay.  So, when you signed this plea agreement, you lied

19  when you signed the plea agreement?

20       Read page 4 and number three to yourself, please.

21  A    (Witness complying.)

22  Q    Do you understand what it says?

23  A    Yes, sir.

24  Q    Do you want to reconsider your answer?

25  A    I conspired with those gentlemen, yes, sir.

1   Q    Well, that's not what it says, is it?  Read what it says.

2   A    "Green and others falsified credit applications to show

3   individuals living together when in fact they did not.

4   Financial institutions would believe they were combined

5   greater income than they actually existed for the individual

6   customer."

7   Q    So it doesn't say you conspired with folks, it says Green

8   and others falsified the credit apps?

9   A    Yes, sir.

10  Q    So you lied when you signed this plea agreement?

11  A    No, sir.

12  Q    It also says that Green and others -- well, did you also

13  submit false features on the cars to make them look like they

14  were more expensive cars?

15  A    Yes, sir, we do.

16  Q    What would you do?  Would you say I had a convertible

17  when I had a hard top, or what would you say?

18  A    They would say it had options that the vehicle had on it.

19  So if it was a truck, a bedliner, a tow hitch, something like

20  that, they would increase the value of the vehicle to the

21  lending institution.

22  Q    But wouldn't Nissan or the lending institution be able to

23  tell that, they'd just go look at?

24  A    They wouldn't look at the vehicle, no, sir.

25  Q    So you knew they wouldn't look?

1    *A*    Yes.

2    *Q*    It also says that you falsified documents showing

3    customers paid down payments.

4            MS. MURNAHAN:   Your Honor, I object to relevance of

5    this to Ms. Branch.

6            THE COURT:   I think it's cross examination.   So I

7    believe -- well, let me let Mr. Broome tell me what he is

8    doing.

9            MR. BROOME:   They put it up there, Your Honor.   I am

10   testing his credibility and enjoying how he has lied on many,

11   many, many times, Your Honor.

12           THE COURT:   Objection overruled.

13   BY MR. BROOME:

14   *Q*    You falsified documents about showing a customer paid a

15   down payment, didn't you?

16   *A*    Yes, sir.

17   *Q*    How would you do that?

18   *A*    Simply show it on the contract but not collect the money.

19   *Q*    And nobody would ever catch that?

20   *A*    No, sir.

21   *Q*    They wouldn't catch that in this accounting department

22   you are talking about?

23   *A*    It would be set up in the deal and against the cost of

24   the car.

25   *Q*    Did you also -- I am not even sure -- what is a straw

1    buyer?

2    A    Someone that purchases a car for someone else to drive.

3    Q    You would actually tell lending institutions that I was

4    buying the car when somebody else was buying the car?

5    A    Yes, sir.

6    Q    And did you also falsify trade-in values -- maybe I can

7    help you again.  Read number seven to yourself.

8    A    (Witness complying.)  Yes, sir.

9    Q    Tell us what you did.

10   A    You would inflate the value of their vehicle in order to

11   meet the stipulation for the lending institution.

12   Q    Well, isn't there a Black Book or a Blue Book, or what do

13   they call it now?

14   A    There are many different sources, NADA, Kelley Blue Book,

15   Black Book.

16   Q    Okay.  Well, couldn't somebody just look and see that a

17   2010 Ford was worth "X" dollars, and you put down it was worth

18   four times "X" dollars, wouldn't that be easy to check?

19   A    Lending institutions wouldn't look.

20   Q    Oh, they wouldn't look.  Okay.

21        Did you sometimes even lie to your own customers and

22   tell them their payments were going to be more than the car

23   payment would be just so it would cover GAP insurance and the

24   warranty?

25   A    Yes, sir.

1    Q    And that would be so the dealership could make more
2    money, wouldn't it?
3    A    Yes, sir.
4    Q    So you could tell me my car payment was going to be $700,
5    and my car payment was only $500, but you are adding in the
6    GAP insurance and the warranty?
7    A    Yes, sir.
8    Q    In other words, sir, you were pretty good at doing
9    anything you needed to do to get it done, right?
10   A    Yes, sir.
11   Q    Now you also hope to get something by being here today,
12   don't you?
13   A    By hope?
14   Q    You hope you will get a downward departure or a lower
15   sentence, don't you?
16   A    Yes, sir.
17   Q    Okay.  Nobody's promised you exactly what you are going
18   to get, right?
19   A    Yes, sir.
20   Q    But you have been told, and you hope if you testify like
21   they want you to testify, that you will get a downward
22   departure; right?
23   A    I testified from what I know.
24   Q    Right.  And you have met with these good folks over here
25   ten times; right?

1    A    Yes, sir.

2    Q    I don't want to know what you talked about, but you went

3    over everything ten times, right?

4    A    Yes, sir.

5    Q    Okay.  Let's go to March, 2013.  Just a regular day?

6    A    Yes, sir.

7    Q    We come to work to defraud lending institutions and

8    customers, but it's just a regular day, right?

9    A    A regular day.

10   Q    And Forest Housner comes to see you or called you to his

11   office.  You tell me how it happened.

12   A    He called me to his office.

13   Q    Okay.  Was that the same building, or you had to walk

14   across the street?

15   A    I had to walk across street.

16   Q    And I guess after y'all exchanged pleasantries, what

17   happens?

18   A    He asked me if I could create false documentation for the

19   deals that they would be moving from the Cullman store to the

20   Center Point store.

21   Q    Now, Mr. Housner, Forest Housner knew you were making

22   false statements for the financial side of the store; right?

23   A    No, sir.

24   Q    Oh, he didn't?  Well, why would he ask you can you do

25   this if he didn't know you could do it?

1    *A*    Because I was the finance manager -- when I was a finance

2    manager, my paperwork was always the most correct.

3    *Q*    You got to be kidding that you said that.  That your

4    paperwork work was the most correct?  Are you talking about

5    the fraudulent paperworks was the most correct?

6    *A*    Anything.

7    *Q*    Both of them?  Right?

8    *A*    Yes, sir.

9    *Q*    So he just -- how many finance managers would have been

10   at the Nissan store or the Volkswagen store in March of 2013?

11   *A*    At that time, if I remember correctly, I did not have a

12   finance manager at the Volkswagen store, but there was two

13   finance managers at the Nissan store.

14   *Q*    Okay.  So there's three of you; is that right?

15   *A*    Well, at that time I was a sales manager, but I could do

16   finance.

17   *Q*    In March of 2013?

18   *A*    Yes, sir.

19   *Q*    So why did he call you instead of the other two folks?

20   *A*    I assume to make sure it got done right.

21   *Q*    Well, you and I have a different opinion of what's right.

22   It got done?

23   *A*    Yes, sir.

24   *Q*    Would that be a fairer way to say it?

25   *A*    Yes.

1   Q     It didn't always get done right, would you agree with me?

2   A     Yes, sir.

3   Q     Now, when you go in Mr. Housner's office, Kim Branch is

4   not there; right?

5   A     No, sir.

6   Q     And Mr. Housner instructs you or asked you can you create

7   false -- you tell me.

8   A     Create false deal jackets or false documentation to show

9   that the vehicles were sold in Center Point, in case there was

10  an audit.

11  Q     And you said, oh, no, I can't do that -- didn't you?

12  What did you tell him?

13  A     No, sir.  I told him I can assist him.

14  Q     Is that all he told you?

15  A     To my recollection, yes, sir.

16  Q     Okay.  Now, at some point did Forest tell you what

17  documents had to be made?

18  A     Just that the deal needed to be correct for the audit.

19  Q     What did that mean, correct for the audit?

20  A     That all the documentation needed to be in there in case

21  Nissan audited the deals based on the incentives.

22  Q     What documents would those be so I can write them down?

23  A     You would make everything that normally goes into a --

24  Q     I am sorry.  Just start me and walk me through it.

25  A     A buyer's order.

1    Q    A buyer's order.  Okay.

2    A    If the vehicle is financed, you would create a retail

3    installment contract.

4    Q    Okay.  I appreciate you going slow so I can write it

5    down.  Thank you.  Yes, sir?

6    A    Odometer statements for the sold vehicle, and the

7    trade-in, you create an odometer statement for the statement.

8    Q    Why couldn't you just use the one that came from Cullman?

9    A    Because it would list Serra Visser Nissan on it.

10   Q    Okay.  You need two odometer statements, I am sorry?

11   A    If you had two vehicles.  So obviously, you would need

12   one for every sold unit.  And if customer had a trade-in or

13   two trade-ins, you would make an odometer statement for each

14   trade-in.

15   Q    All right.

16   A    A power of attorney for each vehicle involved in the

17   transaction.

18   Q    And what would you need that for -- to get the title in?

19   A    Just for show, more than anything.  You wouldn't actually

20   use that to title the car, you would use the original from the

21   Cullman deal, but you would want it to appear as if the

22   vehicle was sold from Center Point.

23   Q    Okay.  What else?

24   A    A delivery jacket.

25   Q    I am sorry, what is that?

1   A    A delivery jacket is a folder that comes from Nissan.   It

2   has an inspection checklist for the technician to check off to

3   make sure that the vehicle is free of any defects and make

4   sure that everything is functioning properly on the vehicle

5   before it goes on the lot for sale.

6   Q    Why would you have to create a new one of those, why

7   wouldn't you use the one for Cullman?

8   A    Because it would be signed off on by a technician that

9   works at Serra Visser Nissan.   They would have information for

10  Serra Visser Nissan as opposed to Center Point.

11  Q    Okay.   What else?

12  A    An incentive claim form.

13  Q    Would that be like customer cash or something, a rebate

14  or something went to the customer?

15  A    It would notate what incentive was used, what program

16  number was used, and how the rebate would be distributed,

17  whether it was retained by the dealer or whether it was given

18  back to the customer in cash.

19  Q    When you are talking about retained by the dealer, are

20  you talking about used toward down payment of the car?

21  A    Yes.

22  Q    And again, why couldn't I use the Cullman store?

23  A    Because it would have information on it for the Cullman

24  dealership.

25  Q    What else?

1    A    You would make copies of all the other pertinent

2    information, driver's licenses, insurance cards.

3    Q    I could use that from Cullman, couldn't I?

4    A    Yes, sir, you would just take the ones from Cullman.

5    Q    What else?

6    A    A title application.

7    Q    All right.

8    A    Bill of sale.

9    Q    Why couldn't I use the Cullman bill of sale?

10   A    Once again, it would have the Cullman information.

11   Q    All right.

12   A    And then any products that the customer would buy.  So,

13   Security+Plus extended warranties, GAP insurance, credit life

14   and disability insurance.

15   Q    I think I know what GAP insurance is, but what is it?

16   A    GAP insurance covers any deficiency from what an

17   insurance company would pay if the vehicle was a total loss to

18   what the loan balance is.

19   Q    What else?

20   A    That would be the majority of the paperwork, sir.

21   Q    I am sorry?

22   A    That would be all the paperwork.

23   Q    Now to create these documents, you had to do what?

24   A    I would --

25   Q    Let's just talk about the buyer's order.

1   A      You would load up all the information into our DMS,

2   Reynolds and Reynolds, just as if you were doing a normal car

3   deal that came through that dealership, and then simply with a

4   dot matrix printer, print out all that documentation, buyer's

5   order, retail contracts, things that needed to go through the

6   dot matrix.  And then other information, such as title

7   applications, stuff like that, would go through the state

8   system.

9   Q      It would go through the state system?

10  A      Yes, sir.

11  Q      How long would it take you to do something like that for

12  each car?

13  A      45 minutes to an hour.

14  Q      You type pretty quickly?

15  A      Yes, sir.

16  Q      Let me get you to look at Government's Exhibit Nine,

17  please.

18  A      (Witness complying.)

19  Q      Can you see on your screen there?

20  A      Yes, sir.

21  Q      What is that that I am looking at?

22  A      That is a copy of the deal jacket.

23  Q      Something like this?

24  A      Yes, sir.

25  Q      It may not be the same one, but something like this?

1    A    Yes, sir.

2    Q    And if you were making a new deal jacket, would you have

3    the jacket itself to make?

4    A    The jackets for the deals that I created?

5    Q    Yes, sir.

6    A    Yes, sir.

7    Q    So, you would handwrite on the jackets yourself?

8    A    Yes, sir.

9    Q    You would put a little information about when it was

10   bought and things like that on that deal jacket, right?

11   A    Yes, sir.

12   Q    I think you have already talked about this.  This one

13   says Serra Visser Nissan.  This one says without me touching

14   it at the top of the page, Serra Visser Nissan.  Is that

15   right?

16   A    Yes, sir.

17   Q    What would you have had to have created?

18   A    I would have entered the information, like I say, into

19   Reynolds and Reynolds.  Our DMS was different, so our recap

20   sheets looked different.  Ours was a standard one that went

21   through the dot matrix printer.  It was two or three ply, if I

22   if I remember correctly.

23   Q    It wouldn't look like this?

24   A    No, sir.

25   Q    But would it have Serra Nissan Oldsmobile?  What would it

1    have on it?

2    A    It would have Serra Nissan Oldsmobile on it.

3    Q    This one also says Serra Visser Nissan on it.  What would

4    you have created on this document?

5    A    Once again, I wouldn't have created a document like this.

6    Our recap sheet was different.  But I would print one for

7    these vehicles.

8    Q    Let's forget that.  Let's go to the next one.  What is

9    this?  It looks like a hundred-dollar check?

10   A    This is a check to a customer that referred this customer

11   in to buy this car.

12   Q    If you were creating a new deal jacket, would you put

13   that in the new deal jacket?

14   A    No, sir.

15   Q    The reason you wouldn't because it had Serra Visser

16   Nissan on it, right?

17   A    Yes, sir.

18   Q    Next page, please.  I am not even sure what this is.

19   Tell us what this is.

20   A    This is a privacy policy.

21   Q    If you had one that you were creating, a new deal jacket

22   in Birmingham, yours would say what on it?

23   A    Serra Nissan Volkswagen.

24   Q    And you would already have those print out, or you would

25   just hit a little thing on your printer to print it out?

1    A    Yes, sir, these would come --

2    Q    I think that was it, three or four pages.  It looks like

3    a driver's license?

4    A    Yes, sir.

5    Q    Do you know how to bogus up driver's licenses?

6    A    No, sir.

7    Q    So you would just make a copy of the driver's license,

8    right?

9    A    Yes, sir.

10   Q    Or use the one from Cullman?

11   A    You would just make a copy of the one that was in the

12   deal from Cullman.

13   Q    The next page, the insurance card?

14   A    Yes, sir.

15   Q    You just copied that, right?

16   A    Yes, sir.

17   Q    What is that?

18   A    That is a vehicle invoice.

19   Q    Could you use -- just copy that one, or would you have to

20   make this up?

21   A    No, sir, you just copy that one.

22   Q    Okay.  Next page.  I have no idea what that is?

23   A    That is a loan approval.

24   Q    But it has Serra Visser Nissan up there?

25   A    Yes, sir.

1   Q     So you would have to change that also?

2   A     That would not need to be retained in the deal for an

3   audit, so I wouldn't leave it in there.

4   Q     So you would just take that out?

5   A     Yes, I just wouldn't make a copy of it and put it in

6   there.

7   Q     The next page.  Well, let me go back to that page.

8         Would the folks in accounting want to know why that

9   wasn't in there?

10  A     They wouldn't look at this folder.

11  Q     They wouldn't look at the folder?

12  A     No, sir.

13  Q     Why wouldn't they look at the folder?

14  A     Because this was only there for an audit.

15  Q     So you kept them in a special place?

16  A     No, sir.  I turned them back into accounting.

17  Q     But you gave it to the accounting folks?

18  A     Yes, sir.

19  Q     How many clerks worked there at the time, accounting

20  clerks?

21  A     To my knowledge, there was -- I remember four or five

22  people in that office.

23  Q     It could have been as many as nine?

24  A     Not that I remember, no, sir.

25  Q     Okay.  But at least four or five?

# *USDC-EDMO*

**CRIMINAL CASE COVER SHEET**          **SUPERSEDING INDICTMENT**

**Division of Filing:**       **County of Offense:**       **Matter to be Sealed:**       **Type of Charge:**

Eastern                EDMO                  NO                          Felony

**Defendant Information:**
Defendant's Name     JOHN HENRY HARVEY
Alias Name           _____
Birthdate            08/09/1983
SSN:                 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

**Related Case Information:**
Superseding Indictment/Information?   X   Yes ____ No   *If yes, original case number*: 4:15CR404
Is this a New Defendant in the Superseding Indictment/Information?   X   Yes ____ No
Prior Complaint?   X   Yes __ No   If yes, Complaint No.   4:16MJ5055
Complaint:   X   Pending _____ Dismissed
Defendant has had an appearance before a Magistrate?   X   Yes ___ No   If yes, name   Judge Baker

**Victim-Witness Act applies:**     No
Name of AUSA:          Michael A. Reilly
Agency/Agent:          FBI

**Recommended Bond/Detention:**     Detention motion taken under submission

**Interpreter Needed:**
   X     No

**Location Status:**
Arrest Date _____
   X     Currently in Federal Custody

**U.S.C. Citations and Total # of Counts against this Defendant:**     1

| Index Key/Code/Offense Level/AOcd/Sev | Description of Offense Charged | Count(s) | Penalty Information |
|---|---|---|---|
| 18:922g.F | Felon in possession of firearm | 21 | I nmt 10 yrs.; F nmt $250,000, or both Sup. Rel. nlt 3 yrs. $100.00 Special Assessment |

**Return Date**     2/18/2016     **Signature of AUSA** _____

                                              **MICHAEL A. REILLY**

# *USDC-EDMO*

**CRIMINAL CASE COVER SHEET**          **SUPERSEDING INDICTMENT**

| **Division of Filing:** | **County of Offense:** | **Matter to be Sealed:** | **Type of Charge:** |
|---|---|---|---|
| Eastern | EDMO | NO | Felony |

**Defendant Information:**

Defendant's Name    JOHN HENRY HARVEY
Alias Name
Birthdate    08/09/1983
SSN:    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

**Related Case Information:**

Superseding Indictment/Information?    X    Yes ____ No   *If yes, original case number*: 4:15CR404
Is this a New Defendant in the Superseding Indictment/Information? X    Yes ____ No
Prior Complaint? X    Yes __ No   If yes, Complaint No.    4:16MJ5055
Complaint:    X    Pending _____ Dismissed
Defendant has had an appearance before a Magistrate? X    Yes ____ No   If yes, name    Judge Baker

**Victim-Witness Act applies:**    No
Name of AUSA:    Michael A. Reilly
Agency/Agent:    FBI

**Recommended Bond/Detention:**    Detention motion taken under submission

**Interpreter Needed:**
X    No

**Location Status:**
Arrest Date _____
X    Currently in Federal Custody

**U.S.C. Citations and Total # of Counts against this Defendant:**    1

| Index Key/Code/Offense Level/AOcd/Sev | Description of Offense Charged | Count(s) | Penalty Information |
|---|---|---|---|
| 18:922g.F | Felon in possession of firearm | 21 | I nmt 10 yrs.;<br>F nmt $250,000, or both<br>Sup. Rel. nlt 3 yrs.<br>$100.00 Special Assessment |

**Return Date    2/18/2016    Signature of AUSA** _____

                                                                        **MICHAEL A. REILLY**

# *USDC-EDMO*

**CRIMINAL CASE COVER SHEET**          **SUPERSEDING INDICTMENT**

| Division of Filing: | County of Offense: | Matter to be Sealed: | Type of Charge: |
|---|---|---|---|
| Eastern | EDMO | NO | Felony |

**Defendant Information:**

Defendant's Name   JOHN HENRY HARVEY

Alias Name

Birthdate   08/09/1983

SSN:   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

**Related Case Information:**

Superseding Indictment/Information?   X   Yes _____ No   *If yes, original case number*:   4:15CR404

Is this a New Defendant in the Superseding Indictment/Information?   X   Yes _____ No

Prior Complaint?   X   Yes __ No   If yes, Complaint No.   4:16MJ5055

Complaint:   X   Pending _____ Dismissed

Defendant has had an appearance before a Magistrate?   X   Yes ____ No   If yes, name   Judge Baker

**Victim-Witness Act applies:**   No

Name of AUSA:   Michael A. Reilly

Agency/Agent:   FBI

**Recommended Bond/Detention:**   Detention motion taken under submission

**Interpreter Needed:**

  X   No

**Location Status:**

Arrest Date

  X   Currently in Federal Custody

**U.S.C. Citations and Total # of Counts against this Defendant:**   1

| Index Key/Code/Offense Level/AOcd/Sev | Description of Offense Charged | Count(s) | Penalty Information |
|---|---|---|---|
| 18:922g.F | Felon in possession of firearm | 21 | I nmt 10 yrs.; F nmt $250,000, or both Sup. Rel. nlt 3 yrs. $100.00 Special Assessment |

**Return Date**   2/18/2016   **Signature of AUSA**

**MICHAEL A. REILLY**

# *USDC-EDMO*

## CRIMINAL CASE COVER SHEET    SUPERSEDING INDICTMENT

| | | | |
|---|---|---|---|
| **Division of Filing:** | **County of Offense:** | **Matter to be Sealed:** | **Type of Charge:** |
| Eastern | EDMO | NO | Felony |

**Defendant Information:**
Defendant's Name    JOHN HENRY HARVEY
Alias Name    _____
Birthdate    08/09/1983
SSN:    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

**Related Case Information:**
Superseding Indictment/Information?    X    Yes    ____ No    *If yes, original case number*: 4:15CR404
Is this a New Defendant in the Superseding Indictment/Information? X    Yes    ____ No
Prior Complaint?  X    Yes  __ No    If yes, Complaint No.    4:16MJ5055
Complaint:    X    Pending    _____ Dismissed
Defendant has had an appearance before a Magistrate?  X    Yes  ___ No    If yes, name    Judge Baker

**Victim-Witness Act applies:**    No
Name of AUSA:    Michael A. Reilly
Agency/Agent:    FBI

**Recommended Bond/Detention:**    Detention motion taken under submission

**Interpreter Needed:**
  X    No

**Location Status:**
Arrest Date _____
  X    Currently in Federal Custody

**U.S.C. Citations and Total # of Counts against this Defendant:**    1

| Index Key/Code/Offense Level/AOcd/Sev | Description of Offense Charged | Count(s) | Penalty Information |
|---|---|---|---|
| 18:922g.F | Felon in possession of firearm | 21 | I nmt 10 yrs.;<br>F nmt $250,000, or both<br>Sup. Rel. nlt 3 yrs.<br>$100.00 Special Assessment |

**Return Date**    2/18/2016    **Signature of AUSA**    _____

                                                          MICHAEL A. REILLY

1    A    Yes, sir.

2    Q    And you would turn this back into them?

3    A    I would turn the fraudulent deals back into Ms. Branch.

4    Q    Okay.  The Cullman deal back into accounting?

5    A    Yes, sir.

6    Q    So you didn't give Ms. Branch the Cullman deals?

7    A    I would give both deals to her.  The Cullman deals would

8    go to the girl or the people in accounting in order to process

9    the loan information process and the title information.

10   Q    So someone in accounting, one of the accounting clerks

11   would get the original Cullman jackets?

12   A    Yes, sir, after I was done with them.

13   Q    Okay.  Next page, please.  What is that?

14   A    This looks like a service term.  Sometimes we would call

15   this as -- there is a -- to explain it fully, there is a

16   question on your new vehicle delivery surveys, when the Nissan

17   North America or Volkswagen or whoever contacts the customers

18   to ask them.  If you had set their first service appointment

19   and they had met a service writer or service manager, this

20   form is signed off on by the customer and the salesperson.

21   Q    Now this would be the salesperson in Cullman?

22   A    Yes, sir.

23   Q    So if you created one of these -- did you create another

24   one of these due?

25   A    No, sir, this solely internal document.  It was not

1    needed for any audits or anything like that.

2    Q    So accounting would not look at that and think anything

3    of that?

4    A    They would in the original deal because, if I remember

5    correctly, there was a policy at the time that this was not in

6    there, then the salesperson would not sever the commission for

7    the car deal.

8    Q    Okay.  Next page, please.  What is this?

9    A    That is a vin zip incentive look up sheet.

10   Q    Tell us what that is.

11   A    That is basically verifying what incentives are available

12   and what capacities on what type style of vehicle.

13   Q    If I'm reading this right, the customer would have gotten

14   $2,000?

15   A    If they paid cash or did non-Nissan financing.  For a

16   standard APR they would receive $2,000.

17   Q    Somebody had to write them a check or just hand them

18   $2,000 dollars in cash or -- if the customer got that $2,000,

19   it would have to be a check, wouldn't it?

20   A    99.99 percent of the time, the customer cash was applied

21   as down payment.

22   Q    This one says Serra Visser Nissan.  So you had print up

23   another one of these?

24   A    No, sir, once again this was solely for our internal use.

25   Q    Thank you.  Next page, please.  Is that something

1   different from what we looked at?   Oh okay.

2          MS. WICK:   No, it's not.

3   BY MR. BROOME:

4   Q     One-to-one rewards program?

5   A     That is a program that Nissan has that issues a card to a

6   customer.   What it enables them to do is to put a $250 in this

7   case, rebate in sales.   If customer was to come back and

8   purchase another new vehicle, they could claim that, as well

9   as if they spent money in the service department, then they

10  would earn rewards on that car for spending dollars in

11  services.

12  Q     Would you put that in the deal of the Birmingham deal

13  jackets?

14  A     No, sir, once again it was for our internal use.

15  Q     Next page, please.

16         What is this, credit score?

17  A     This is a credit score disclosure.

18  Q     Okay.   Would you put that in the deal jacket?

19  A     No, sir.

20  Q     Let's go skip a page or two.

21         What is Promax?

22  A     That is the CRM that both dealerships use.

23  Q     Would you put that in the Birmingham deal jackets?

24  A     No, sir.

25  Q     The Birmingham deal jackets are going to be a lot

1    thinner, right?

2    A    Yes, sir.

3    Q    Next page, please.  What is that?

4    A    That is a copy of their credit bureau.

5    Q    Would you put that in the Birmingham jacket?

6    A    No, sir.

7    Q    Next page, please.  It looks like another credit score;

8    you wouldn't put that in?

9    A    No, sir.

10   Q    Next page.  Did you put that in the new deal jackets?

11   A    No, sir, that is the co-applicant or the other

12   applicant's credit score.

13   Q    Dealertrack, what is that?

14   A    This is the printed electronically submitted credit

15   application.

16   Q    Now Dealertrack was only used in Cullman?

17   A    No, Dealertrack was used at both locations.

18   Q    Would you reprint this out?

19   A    No, sir.

20   Q    You wouldn't put that in a new deal jacket?

21   A    It wasn't needed for the audits.

22   Q    Next page, please.

23        Is that something else you wouldn't put in a new deal

24   jacket?

25   A    No, sir, that is the dealer section of the credit

1    application showing what information was submitted, car-wise,

2    to the lending institution.

3    Q    Next page, please.

4         That's just part of the same thing we were looking at,

5    isn't it?

6    A    Yes, sir, that is the signature page in the disclosures.

7    Q    But you wouldn't put that in the new deal jacket?

8    A    No, sir.

9    Q    This power of attorney, would you put that in a new deal

10   jacket, or would you have to start over?

11   A    In this case, on that one, I could solely make a copy of

12   it.  It wasn't filled out.  The accounting office would

13   normally fill those out.

14   Q    Next page, please.  What is this, is this the sales

15   contract, I mean, the Security+Plus application?

16   A    Yes, sir.  This is the application for a service

17   contract.

18   Q    It says Serra Visser Nissan on it, also.  Would you have

19   to redo this one?

20   A    Yes, sir.

21   Q    The next page, please.

22        It's got two lines for signatures.  Whose signature

23   would go on the left line where it is blackened out?

24   A    The applicant.

25   Q    Whose signature would go on the right line?

1   A   The finance manager.

2   Q   But it would be the finance manager that would have

3   signed this in Cullman, though, right?

4   A   Yes, sir.

5   Q   You may not want to answer this question because you may

6   admit to more crimes.

7       Did you sign someone's name on these applications?

8   A   Yes, sir.

9   Q   So you signed not only the customer's name, but the

10  salesman's name?

11  A   Yes, sir.

12  Q   So you are pretty good at making signatures look

13  different?

14  A   I wouldn't need to make it look exactly like the

15  customer's.

16  Q   Because nobody is going to look?

17  A   Yes, sir.

18  Q   Next page, please.

19      This says the retail order?

20  A   This is what I would refer to as a buyer's order.

21  Q   Okay.  That had to be in there, right?

22  A   Yes, sir.

23  Q   So you had to do what to create this document?

24  A   Once again this would print out of the dot matrix printer

25  from the information that I loaded into Reynolds and Reynolds.

1   Q    So you put the information in the Reynolds and Reynolds
2   about these deals?
3   A    Yes, sir.
4   Q    Gerald Shepard didn't do it?
5   A    No, sir.
6   Q    Next page, please.
7        It looks like it's got another signature on it.  Did
8   you sign the purchase order?
9   A    Yes, sir.
10  Q    You would sign the customer's name and the finance
11  manager's name?
12  A    I would just sign my name.
13  Q    Oh, you wouldn't sign the customer's name on this one?
14  A    I would sign the customer's name, yes, but for the
15  dealer, I would just sign my name.
16  Q    Because it was in Birmingham?
17  A    Yes, sir.
18  Q    Do you get confused sometimes and put the wrong names on
19  them and have to start over?
20  A    Not that I remember, no, sir.
21  Q    Next page.
22        And that's just part of the same thing, isn't it?
23  A    Yes, sir.
24  Q    And the next page, please.  I think I am done with this,
25  Ms. Gold.

1              Is that another retail order?

2    A     Another copy of the same thing.

3    Q     It's a copy of the same thing.  Skip two or three pages.

4              I am back to another -- now what is that?

5    A     That is a simple interest retail installment contract.

6    So it is the actual financing contract.

7    Q     Okay.  And did you have to put that in the Birmingham

8    deal jackets?

9    A     If the vehicle was financed, yes, sir.

10   Q     And how would you create that document?

11   A     The same way as printing it out through the dot matrix

12   printer from Reynolds and Reynolds.

13   Q     So you had to put the numbers in there, didn't you?

14   A     Yes, sir.

15   Q     We have established that I am old-school.  The numbers --

16   would you have to individually key in the numbers, or would it

17   pull it up from the Reynolds and Reynolds program?

18   A     I had to individually key in every number.

19   Q     Okay.  The next page, please.

20             It looks like it has buyer's signatures.  So you are

21   signing loan documents, right?

22   A     Yes, sir.

23   Q     You had to sign it two or three times, didn't you?

24   A     Yes, sir.

25   Q     The next page, please.

1            Is that the same page again?

2   A    Yes, sir.

3   Q    What is this?

4   A    That is the incentive claim form.

5   Q    Is that for the customer or the dealer?

6   A    For the dealer.

7   Q    Is that your handwriting?

8   A    No, sir.

9   Q    But would you create a new one of those for the

10  Birmingham store?

11  A    Yes, sir.

12  Q    Would you type it in, or would it be in your handwriting?

13  A    Handwriting.

14  Q    Well, it's got a signature.  Whose name would be on the

15  signature line?

16  A    For whom?

17  Q    Well, down at the bottom there on the left-hand --

18  A    The customer's name.

19  Q    Did you have to sign the customer's name?

20  A    Yes, sir.

21  Q    The next page.  And the next page.  And the next page.

22           What is that document?

23  A    That is an agreement to provide insurance.

24  Q    What kind of -- liability or --

25  A    What this would state if the vehicle was financed, it's

1   letting the customer know that they must provide full coverage

2   insurance for the vehicle.

3   Q    Again, the buyer's signature, you would have to sign

4   that?

5   A    Yes, sir.

6   Q    How about the dealer/salesperson, who would you sign

7   there?

8   A    My name.

9   Q    Where it says "insurance verified by," who would verify

10  it?

11  A    I would put whatever name that I put as the salesperson

12  on the deal.

13  Q    The next page.

14       What is "We owed"?

15  A    This is a document that stating that, let's say, a

16  customer needed or we had agreed to install something on the

17  car that was not there.  Then this document shows them --

18  gives them proof that we owe them a trailer hitch or a sunroof

19  guard, whatever the case may be.

20  Q    And the customer would have to sign that?

21  A    Yes.

22  Q    So you would sign that for them?

23  A    Yes, sir.

24  Q    The next page.

25       What is that?

1  A    That is GAP insurance agreement.

2  Q    Again, I think you told us that GAP insurance was if I

3  totaled my brand-new car and the insurance company depreciates

4  it, this will cover the finance company?

5  A    The deficiency.

6  Q    I hate to keep asking this, but does it have a place on

7  there where you are supposed to sign at as the customer?

8  A    Yes, sir, on the next page.

9  Q    On the next page.  If we can go to the next page.

10       Again, you would sign that document?

11  A    Yes, sir.

12  Q    The next page, please.  What is that?

13  A    An odometer statement for the sold vehicle.

14  Q    The transferor signature, that would be the person

15  trading in the car?

16  A    That would be the dealership.

17  Q    Okay.  The signature on the right side that's darkened

18  out, that would be what?

19  A    The customer's.

20  Q    I had that backwards.

21       Again, you would sign the customer's signature?

22  A    Yes, sir.

23  Q    And the next page.  What is that?

24  A    It looks like a copy once again of the odometer

25  statement, but it's a different page of it.  That was the

1    forms where carbon copy had several different pages on there.

2    You could see it at the bottom.

3    Q     And the next page.

4    A     The same thing.

5    Q     And the next page.

6          What is that?

7    A     Once again, another page of that same document.  This one

8    is a warranty disclosure.

9    Q     And you would sign that, too?

10   A     No, sir.  That wouldn't need to have that in there.

11   Q     You wouldn't put that in there?

12   A     No, sir.

13   Q     The next page.

14         Is that the same thing?

15   A     That is a delivery receipt.

16   Q     The buyer would have to sign that.  So you would sign

17   that?

18   A     I would not need that.

19   Q     Oh, you wouldn't put that in there.  Okay.

20         And the next page?

21   A     The credit life and disability waiver.

22   Q     You wouldn't need that, though?

23   A     No, sir.

24   Q     The next page.

25         Is this what you were talking about before someone

1  would have to at a dealership inspect the car when it first

2  came in?

3  A    Yes, sir.

4  Q    It says, "service manager" on this one, Mr. Bell, doesn't

5  it?

6  A    Yes, sir.

7  Q    He would have been in Cullman?

8  A    Yes, sir.

9  Q    How would you have worked the one for Birmingham?

10 A    I would have signed it.

11 Q    Okay.  You would have to put that into the deal jacket?

12 A    Yes, sir.

13 Q    How many pages are those documents usually?

14 A    That folder is just two sides on the inside.

15 Q    Let's skip the next two pages.

16       This is just the same checklist you are talking about?

17 A    That is the inside of the left-hand side of that folder,

18 the inspection.  Predelivery inspection.

19 Q    Would you have been able to have used all of that -- all

20 of that information, but you hadn't gone through there and

21 checked all those boxes.

22 A    Yes, sir.

23 Q    I am sorry, yes to which part of the question?

24 A    Repeat the question.

25 Q    Would you have had to -- this had to be in the new deal

1    jacket?

2    A    Yes, sir.

3    Q    So you had to check off about ever how many check marks

4    there are on that document?

5    A    Yes, sir.

6    Q    And the next page.

7         MS. WICK:  That's the end.

8         MR. BROOME:  And the jury says, thank you.

9    BY MR. BROOME:

10   Q    Thank you for helping me understand that.

11        There's no question in your mind that Forest Housner

12   told you to do this -- or asked you if you would do it?

13   A    Yes, sir.

14   Q    Did you have an idea that it came from higher up through

15   Mr. Housner, or do you think it was Mr. Housner's idea, or did

16   you just not think about it at all?

17   A    I assumed.

18   Q    It came from Mr. Visser?

19   A    Yes, sir.

20   Q    He told us that yesterday.

21        Kim Branch was not there when you talked to Mr.

22   Housner?

23   A    Yes, sir.

24   Q    Was she there when you talked to Mr. Housner?

25   A    No, sir.

1       MR. BROOME:  That's all I have, Your Honor.  Thank

2   you very much.

3       THE COURT:  Ms. Murnahan.

4                   REDIRECT EXAMINATION

5   BY MS. MURNAHAN:

6   Q    Mr. Green, is there any doubt at all in your mind about

7   having conversations with Ms. Branch about faking these deal

8   jackets?

9   A    No.

10  Q    When Mr. Housner asked you to create these deal jackets,

11  and you had left his office, did you go straight to Ms.

12  Branch, or did she contact you?  What was the next step in

13  that process?

14  A    I was told by Mr. Housner that the deals would come over

15  from the Cullman store to the accounting office.  I can

16  receive them from Mrs. Branch and do what I needed to do.

17  Q    So, were you just waiting on Ms. Branch to contact you at

18  that point?

19  A    Yes, ma'am.

20  Q    Okay.  You mentioned in your testimony a few minutes ago

21  that in January of 2013, when Abdul Mughal was hired on at the

22  dealership, that that's when the falsification of documents

23  started?

24  A    Yes, ma'am.

25  Q    Was Ms. Branch the controller at that time?

1    A    I am not sure.  I don't remember if she was employed at

2    that time or not.

3    Q    But that was January of 2013?

4    A    Yes, ma'am.

5    Q    Okay.  In your plea agreement, you referenced a

6    conspiracy to falsify documents, credit reporting

7    institutions -- were you the only one at the dealership who

8    was falsifying documents?

9    A    No, ma'am.

10   Q    How many people do you think there were?

11   A    At the time like I said seven or eight people that were

12   involved in doing various different things.

13   Q    Was it sort of the not-very-well-kept secret at the

14   dealership that this was going on?

15   A    Between those people, yes, ma'am.  And several other

16   managers that were there knew what was going on but weren't

17   participating.

18   Q    So there were numerous people at the dealership who knew

19   this was going on?

20   A    Yes, ma'am.

21   Q    I forgot to ask you about your tax charge in your plea

22   agreement.  But tell the jury a little bit about the tax

23   charge that you pled guilty to?

24   A    I had failed to file a 2012 tax return.

25   Q    Okay.  Was that the only year?

1    *A*    No, ma'am.  That was the only year that I failed to file,

2    yes, ma'am.

3    *Q*    So that's only one year that you pled guilty to failing

4    to file a tax return?

5    *A*    Yes, ma'am.

6    *Q*    I am going to take you back to your change of plea

7    hearing, in your case.

8    *A*    Yes, ma'am.

9    *Q*    Did you review the factual basis of your plea agreement

10   before you signed it?

11   *A*    Yes, ma'am.

12   *Q*    So, everything in the factual basis of this plea

13   agreement, you did it?

14   *A*    Yes, ma'am.

15   *Q*    Are you disputing anything in the factual basis of this

16   plea agreement?

17   *A*    No, ma'am.

18   *Q*    Did you admit all of that in open court?

19   *A*    Yes, ma'am.

20   *Q*    Was it a normal part of your day-to-day operations to get

21   deal jackets from Cullman?

22   *A*    No, ma'am.

23   *Q*    Is there any reason for you to have deal jackets from

24   Cullman?

25   *A*    No, ma'am.

1    Q    Before these 15, had Kim Branch ever given you any other

2    deal jackets from Cullman?

3    A    No, ma'am.

4    Q    Did you just have a box of empty Birmingham deal jackets

5    in your office?

6    A    No, ma'am.

7    Q    How did you get the actual deal jackets that you created

8    for these new deals?

9    A    From the accounting office.

10   Q    From anyone in particular?

11   A    Not that I can remember.

12   Q    But you got them from accounting?

13   A    Yes, ma'am.

14   Q    I believe you testified to this before, when you finished

15   making the fake deal jackets, what did you do with it, with

16   the fake deal jackets?

17   A    I gave it back to Mrs. Branch.

18   Q    Did you ever give them to Shepard?

19   A    I gave the products -- the ones to Shepard so that he

20   could RDR the cars and report the warranties.

21   Q    Would he give them back to you?

22   A    Yes, ma'am.

23   Q    And then you would take them to who?

24   A    Mrs. Branch.

25   Q    Okay.  Did you ever give any of those fake deal jackets

1    to anyone other than Gerald Shepard or Kim Branch?

2    A    No, ma'am.

3    Q    Mr. Broome took you through some documents in a deal

4    jacket and you testified as to which ones you would need to

5    include in the fake deal jacket and which ones that you would

6    not?

7    A    Yes, ma'am.

8    Q    And the ones that you would not need to include in the

9    fake deal jackets were ones that were being used internally?

10   A    Yes, ma'am.

11   Q    Just for the dealership's recordkeeping and business

12   purposes?

13   A    Yes, ma'am.

14   Q    So the fake deal jackets were simply for an audit?

15   A    Yes, ma'am.

16   Q    They were only created in the event of an audit?

17   A    They were used for nothing else.

18   Q    Okay.  Again, Mr. Green, what instructions did the

19   government give you with regard to your testimony today?

20   A    To tell the truth.

21           MS. MURNAHAN:  Nothing further.

22                  RECROSS EXAMINATION

23   BY MR. BROOME:

24   Q    Mr. Green, I am a little confused, if you gave the deals

25   to Gerald Shepard, the Birmingham jackets to Gerald Shepard,

1    why would he want to give them back to you?  Why wouldn't he

2    just take them to accounting?

3    A    Gerald was too lazy to walk them across the street to the

4    Volkswagen store.

5    Q    Okay.  You have not been charged with falsifying or

6    forging signatures or anything else that we talked about on

7    those Birmingham deal jackets, have you?

8    A    No, sir.

9    Q    And you have not been charged with conspiring to defraud

10   Nissan North America out of some incentive money, have you?

11   A    No, sir.

12   Q    But what you did actively advanced that conspiracy to

13   defraud Nissan North America, didn't it?

14   A    Yes, sir.

15   Q    But you hadn't been charged?

16   A    No, sir.

17          MR. BROOME:  That's all I have.  Thank you.

18          THE COURT:  Mr. Green, thank you for your time.  You

19   are released.

20          MS. WICK:  I believe the government has already read

21   all the stipulations that would be relevant.  I think the

22   remaining ones had to do with authenticity of documents and if

23   the jury is allowed to take a copy back, I think that would be

24   sufficient.  Otherwise, the government has no more witnesses,

25   and the government rests its case.

1         THE COURT:  All right.  Why don't we do this.  I

2    need to talk with counsel for a few minutes.  So let's take

3    about a ten-minute break, please.

4              (Jury out at 2:32 p.m.)

5         (In open court.  Jury not present.)

6         THE COURT:  I would like to talk about the

7    instruction that we need to work on.  Is there anything else

8    that we need to talk about during this break?

9         MR. BROOME:  Yes, Your Honor.  Judge, on behalf of

10   Kim Branch, pursuant to Rule 29 of the rules, we make a motion

11   for judgment of acquittal, Your Honor, and would briefly state

12   to the Court that on the conspiracy count and on Counts Two

13   through Sixteen, that the evidence for which the government

14   has presented to this jury would be insufficient to sustain

15   any conviction.  Your Honor has heard the evidence, and I am

16   not going to go back over it, but Your Honor, we believe the

17   government -- no reasonable jury could find this lady guilty

18   and sustain any conviction for either Count One or Counts Two

19   through Sixteen.  And we would ask the Court to grant a motion

20   for judgment of acquittal.

21        THE COURT:  Does the government wish to make a

22   response?

23        MS. WICK:  Yes, Your Honor, I think between the

24   testimony that is heard, numerous co-conspirators testified,

25   Mr. Green just testified that she gave him the deal jackets,

1    she called him, multiple witnesses testified to the terms that

2    this was clearly a scheme with an intent to defraud.  I think

3    the defendant's agreement to the plan and her -- not just her

4    acknowledgment and understanding of it, but the actual overt

5    acts that she took as part of the scheme can be established to

6    survive a Rule 29 motion on all sixteen counts.

7             THE COURT:  The motion is denied.

8             MR. BROOME:  That would be all I would have, Your

9    Honor.

10            THE COURT:  Okay.  Why don't we talk about the

11   instruction up here at the bench, please.

12        (The following proceedings were held at the bench:)

13            THE COURT:  All right.  Yesterday, after the

14   conclusion of the evidence, we discussed the options for

15   trying to address Mr. Housner's inability to remember facts

16   about what happened back in 2013 and the fact that his

17   demeanor yesterday seemed to be different, and perhaps

18   significantly so, from what his demeanor would have been in

19   March of 2013.

20        To certain extent, witnesses who have testified today

21   have addressed that.  During a break, off the record, I

22   indicated to counsel that I believed it would also be

23   appropriate for the Court to give an instruction to the jury

24   on that topic.  I gave counsel the opportunity to give the

25   Court some draft language -- but I did not require that -- and

1    counsel hasn't given me any.

2        The Court has in mind an instruction that would tell

3    the jurors that at the conclusion of the evidence when the

4    Court gives its instructions on the law, the Court will talk

5    about credibility of witnesses, and that the jurors are the

6    judgment of each witness's credibility.  But there is a unique

7    circumstance with respect to Mr. Housner, and the Court must

8    instruct them that with respect to issues of credibility as

9    they pertain to Mr. Housner, that the jurors heard yesterday

10   some information about recent medical issues that Mr. Housner

11   has had.  Those medical issues or other medical issues seem to

12   have affected his memory, and affected it in a way that he

13   doesn't even recognize that his memory has been impacted, so

14   that things that he may have testified about that he could not

15   remember.  That may not be a credibility issue, it may be a

16   medical issue, and they need to be aware of that.  That's the

17   instruction that I have in mind.

18           MS. WICK:  I think that's fair.

19           MR. BROOME:  We're satisfied, Your Honor.

20           MS. WICK:  That's fair, Your Honor.

21           THE COURT:  Well, when the jurors come back in, I

22   will give them that instruction then.  And then, Mr. Broome,

23   you can proceed with your case.

24           MR. BROOME:  Yes, Your Honor.

25               (Conclusion of bench conference.)

1          (A recess was taken at 2:37 p.m.)

2          (In open court.  Jury in at 2:55 p.m.)

3          THE COURT:  All right.  Ladies and gentlemen of the

4   jury, the government has rested.  Before we proceed with the

5   defendant's case, I need to talk to you all about something

6   that happened during the trial yesterday.  At the end of the

7   case, I am going to give you the instructions on the law, and

8   some of those instructions will talk about credibility of

9   witnesses.  The jurors, you all, are the judges of the

10  credibility of the witnesses in this case.  I will talk to you

11  about that some more in instructions at the end of the case.

12          But yesterday you all heard Mr. Housner testify, Mr.

13  Forest Housner.  There is a specific issue that touches on

14  credibility with respect to Mr. Housner.  You heard some

15  testimony yesterday about some medical issues that Mr. Housner

16  has had recently.  You didn't necessarily hear about all of

17  the medical issues that he has been confronting.  Some of the

18  medical issues that he has been confronting appear to have had

19  an impact on his memory, so much so that he doesn't recognize

20  that his memory has been impacted in the past few weeks or

21  months with the medical issues that he has.  So, things that

22  might ordinarily appear to be a credibility issue really

23  should be attributed to a medical condition, in Mr. Housner's

24  situation.  So, we just wanted you to be aware of that.

25  Okay?

1              All right.  Mr. Broome.

2              MR. BROOME:  Yes, Your Honor.

3              THE COURTROOM DEPUTY:  Will you stand and raise your

4    right hand.

5          Do you swear or affirm to tell the truth, the whole

6    truth, and nothing but the truth so help you God?

7              THE WITNESS:  I do.

8              THE COURTROOM DEPUTY:  Please be seated.  Will you

9    state your first and last name.

10             THE WITNESS:  Kim Branch.

11             THE COURTROOM DEPUTY:  Thank you.

12             MR. BROOME:  Ms. Branch, may I call you Kim?

13             THE WITNESS:  You may.

14                          DIRECT EXAMINATION

15   BY MR. BROOME:

16   Q    Kim, you understand you are the defendant in this case,

17   don't you?

18   A    Yes, sir.

19   Q    And you don't have to testify if you don't want to?

20   A    I do not.

21   Q    But you want to testify, don't you?

22   A    I do.

23   Q    Kim, back in March of 2013, did you conspire with Randy

24   Visser and Forest Housner to defraud Nissan North America?

25   A    No, sir.

1  Q    Did you conspire with anybody to defraud Nissan North

2  America?

3  A    No, sir.

4  Q    Did you honestly believe what you did was okay?

5  A    Yes, sir.

6  Q    Some time in March of 2013 Forest Housner talked to you

7  about something, right?

8  A    Yes, sir, he did.

9  Q    What did he talk to you about?

10 A    He told me that Serra Nissan was not going to meet their

11 objective, and that they were going to -- I am not sure of the

12 exact term he used, but shift or move or some deals from

13 Cullman to Birmingham so that Birmingham would meet their

14 objective.

15 Q    And Forest Housner in the corporate structure was what to

16 you?

17 A    I would say he was my direct supervisor.

18 Q    And was he more than that to you?

19 A    He was.

20 Q    What was he?

21 A    Sorry.  I looked up to him.

22 Q    Do the best you can.  Okay?

23 A    I looked up to him as a mentor, someone that I would say

24 probably was the best manager I ever worked for, one that I

25 respected.  And I just thought that he was a good person and a

1   good leader.

2   Q    Did you ever think Forest would ask you to do anything

3   wrong?

4   A    No, sir.

5   Q    Was there a reason you can tell these good folks why you

6   thought it was okay to transfer or shift those deals?

7   A    I had heard in the past that to meet other incentives for

8   parts and trips and stuff like that that they could -- because

9   of the two stores they could swap parts from Cullman to

10  Birmingham or Birmingham to Cullman to meet whatever

11  guidelines that Nissan had stipulated to kind of help each

12  other out.  I didn't really think anything was wrong.

13  Q    As part of your job as controller, did you actually write

14  the checks to pay for some of those parts?

15  A    Yes, sir, we wrote checks back and forth between stores.

16  Q    Back and forth for what?

17  A    Various things, office supplies, payroll expenses.

18  Because we operated out of one location, we bought a lot of

19  things for the Cullman store and had to be reimbursed.

20  Q    So it was not unusual for you to write a check for

21  Cullman or for Birmingham, reimbursing each store?

22  A    No, sir.

23  Q    I neglected to ask you a couple of things to start with.

24  Tell us a little bit about yourself.  Where were you born?

25  A    In September 1980 in North Carolina.

1   Q     A gentleman is not supposed to ask a lady how old she is,

2   but how old are you?

3   A     34.

4   Q     Are you married?

5   A     I am.

6   Q     Who are you married to?

7   A     Jamie Branch.

8   Q     That's the gentleman on the front row?

9   A     Yes, sir.

10  Q     Any children?

11  A     Two.

12  Q     What are their ages?

13  A     8 and 5.

14  Q     I think you told me tomorrow is a big occasion for one of

15  your children.

16  A     Yes, sir.

17  Q     What is it?

18  A     She'll start kindergarten tomorrow.

19  Q     These folks promised me in voir dire they would not hold

20  this against you, but you graduated from the University of

21  Georgia, didn't you?

22  A     Yes, sir.

23  Q     You and I have kidded about that?

24  A     We have.

25  Q     Where did you go to high school?

1    A    Troup County High in Lagrange, Georgia.

2    Q    Where did you go -- you went to Georgia?

3    A    I did.

4    Q    Did you graduate there?

5    A    I did.

6    Q    When did you graduate?

7    A    I believe it was in 2009.

8    Q    Did you get a degree in a particular field of study?

9    A    In general business.

10   Q    What is that?

11   A    It's almost like a business management degree, but it's a

12   little easier to obtain.

13   Q    Okay.  Have you worked most of your life?

14   A    I have.

15   Q    When did you first go to work?

16   A    When I was 16.

17   Q    Where did you go to work?

18   A    A dealership in Lagrange, Georgia, Mike Patton, Honda,

19   Mazda.

20   Q    And what did you do for them?

21   A    I started as a cashier and a filing clerk and

22   receptionist type of position.

23   Q    Where did you end up there?

24   A    I was promoted to the owner's administrative assistant at

25   that store.

1    Q    Without going into all your jobs, have you worked --

2    would it be fair to say you have worked in the automotive

3    industry all your life?

4    A    Yes, sir.

5    Q    Are you a certified public accountant?

6    A    No, sir.

7    Q    Do you have some studies in accounting?

8    A    I believe I took two accounting classes when I was -- and

9    ended up taking a general business degree at the University of

10   Georgia.

11   Q    But you have been a controller most of your life after

12   you were an accounting clerk?

13   A    I believe my first accounting position was in 2006 -- I

14   am sorry, controller position was in 2006.

15   Q    Where was that?

16   A    Honda Mall of Georgia in Buford, Georgia.

17   Q    Had you worked for dealerships that had a bigger volume

18   than Serra Nissan and Serra Nissan Visser?

19   A    Not as a controller.  As an office manager, I worked for

20   Atlanta Toyota, but never as a controller, no.

21   Q    Had you ever worked for any dealerships that had two

22   separate franchises that sold the same brand of cars?

23   A    No, sir.

24   Q    Until you went to work at?

25   A    Serra Nissan and Serra Visser Nissan were the first.

1   Q    How did you you get that job if you remember?

2   A    I was working in Enterprise, Alabama, and my son was in

3   kindergarten there, and we decided to start looking for a

4   better area, better school system.   And my sister lives in

5   Trussville, so we decided to look in the Birmingham area.   And

6   I think I found the job on like LinkedIn or something where

7   Randy Visser had posted a job.

8   Q    I am sorry, found it online?

9   A    Online.   Yeah, LinkedIn.   And he had posted a job on like

10  AUTOjobs.com.   I am not sure exactly.

11  Q    Now the last job you had before coming to Serra Visser,

12  you worked where?

13  A    In Enterprise, Alabama, there was a group of -- it was

14  Mitchell Mazda Lincoln, Mitchell Nissan, and Mitchell Hyundai.

15  It was three separate dealerships, but I was kind of over the

16  three -- not as a controller, but just kind of oversaw the

17  office managers and controllers of those stores.

18  Q    What did you make there?

19  A    At that store?

20  Q    Yeah, in Enterprise?

21  A    My salary was $100,000 a year.

22  Q    Did you move to Birmingham at some point in time?

23  A    I did.   In 2012.

24  Q    Do you remember what month?

25  A    November.

1   Q     Okay.  Did you have an interview with Randy Visser, who

2   was here earlier?

3   A     I did.

4   Q     Was that a face-to-face person-to-person interview?

5   A     It was.  I came to visit my sister one weekend, and we

6   set up a time -- I believe it was a Monday, I think, or a

7   Friday -- and we interviewed.

8   Q     Where did you do the interview, if you remember?

9   A     At Serra Nissan.

10  Q     You went to the dealership?

11  A     Yes, sir.

12  Q     Were you told what your salary would be there?

13  A     We did talk about it, yes.

14  Q     And what was it?

15  A     $100,000.

16  Q     Okay.  In Enterprise, did you get any percentage of the

17  profit or anything there?

18  A     No.  No, sir.

19  Q     How about your move to Birmingham?

20  A     I did.

21  Q     And what was that?

22  A     It was two percent of the net profit.

23  Q     And that would be the net profit of which stores?

24  A     Of those locations, the Serra Nissan Volkswagen, which

25  operate under one financial statement, and then Serra Visser

1    Nissan in Cullman, as well.

2    Q    Okay.  So you and Jaime and the two children moved here?

3    A    We did.

4    Q    I may have misspoke the other day, but was it like a

5    fairytale coming true to you?

6    A    It was.

7    Q    You all go buy you a house?

8    A    We built a house, yes, we did.

9    Q    A house you had always wanted?

10   A    Yes, sir.

11   Q    Okay.  Now, how did things go the first few months there

12   at Serra Nissan?

13   A    Very stressful.  I was probably in over my head.  Coming

14   back to the controller level, I had overseen controllers for

15   the last several years, and to come back to the day to day and

16   the amount of the books were, as Randy said, a disaster.

17   Q    You agree with his description?

18   A    Yes, I do.  And it was just a very busy, busy time.  A

19   lot of volume of vehicles coming in and out, and two different

20   dealerships two different set of books, it was just a very

21   difficult time.

22   Q    You said two sets of books, what do you mean by that?

23   A    Serra Visser Nissan would be one, and then Serra Nissan

24   Volkswagen would be the other.  And also two different

25   computer systems at the time, as well, Dealertrack and

1    Reynolds and Reynolds.

2    Q    How many accounting -- you call them accounting clerks?

3    What do you call them?

4    A    Accounting assistants, clerks, either one.

5    Q    How many did you have to start with?

6    A    In the office with me was probably about five or six.

7    There's another in the Cullman that actually worked out of the

8    Cullman store.  And then the receptionist and cashiers, I also

9    supervised them.  And there was two part-time receptionists,

10   and then a full-time receptionist, and then one other person

11   that worked at the Nissan store.  So I am not sure of my math

12   there, but about ten.

13   Q    So you had a lot of people to supervise?

14   A    I did.

15   Q    Had you ever supervised that many folks before?

16   A    No, sir.

17   Q    Now let's just get right to it, some time in March of

18   2013?

19   A    Yes, sir.

20   Q    Do you recall a conversation with Forest Housner?

21   A    I do.

22   Q    Do you remember when that took place or how it took

23   place?

24   A    I remember we didn't work in the same building, so he

25   would call me a lot on my phone, just the inner office phone,

1    and he would call and said that -- what I said earlier -- that

2    Serra Nissan was not going to meet their objective, and Serra

3    Visser Nissan was going to shift -- or whatever word he used

4    at the time -- Cullman deals to Birmingham so that Birmingham

5    would meet their objective.

6    Q    And again, did you think anything was wrong with that?

7    A    No, I did not.

8    Q    What did Forest instruct you or ask you or tell you to

9    do?

10   A    He told me that someone in Cullman was going to -- and I

11   am not sure who, I don't think he listed a name -- but he said

12   that the particular deals that they wanted to shift to

13   Birmingham would be sent directly to me, and that I was to

14   take them to Jeff Green and that he would create the paperwork

15   for the Birmingham jacket.

16   Q    Now, tell us how it usually worked if they sold ten cars

17   one day in Cullman, how did those deals get to you in your

18   accounting office?

19   A    They had a runner, because we did so many -- Cullman

20   bought a lot of parts from us and we bought from them as

21   well -- they would -- they had a runner every day that would

22   come to the store, and they would go to the different

23   departments, parts departments, to the office and transport

24   back and forth car deals, parts, whatever, that we had and

25   checks that customers were going to pick up from the store.

1    Stuff like that.

2    Q    What's a runner?

3    A    A runner is basically someone that -- they also call them

4    porters -- they basically use one of the company vehicles and

5    just drive back and forth between the stores and pick up or

6    drop off.  Whatever the case may be.

7    Q    Now these deals that were going to be shifted or

8    transferred from Cullman to Birmingham, they were to come to

9    you specifically?

10   A    That's what Forest said, yes.

11   Q    Did they actually come to you?

12   A    They did.

13   Q    Do you remember in what order or what deals came to you?

14   A    No.  He told me to keep a list of them, so it's been in

15   evidence, I am sure, but of -- I know that there was like a

16   few a day -- they would send them as they got them ready

17   packaged up from the Cullman store, and they would send them.

18   Q    Now logistically when you got those deals, did you wait

19   until you got all 15 and then make a list, or how would you do

20   it?

21   A    I didn't know how many it would be.  But as I got them, I

22   was told to give them to Jeff.  So, I would have made a list,

23   and on the list, I just put the date that I had given them to

24   him just as a record of mine.

25   Q    The date you gave it to whom?

1   A   To Jeff Green.  I'm sorry.

2   Q   Did you do that on your computer or handwritten or --

3   A   I like to use my computer, so I typed it up in Excel just

4   to make it easier.

5   Q   At some point, did you have a complete list of all the

6   deals?

7   A   I did.

8   Q   Now, what else were you told to do by Forest Housner in

9   regards to those 15 deals?

10  A   At one point -- and I am not sure exactly when we

11  discussed the fact that because Cullman was in essence losing

12  the sales of those 15 vehicles, Birmingham would still be

13  paying the incentive money that they would have received had

14  they kept those deals in their system.  And he told me that he

15  didn't -- that they didn't feel it was right for Cullman not

16  to be paid on that money.  So at the end of the month, we

17  would pay them per unit back, and I believe it was $700 per

18  unit, plus they would also get an additional $500 per unit

19  because they had given up those sales for Birmingham.

20  Q   What else were you instructed by Forest Housner to do?

21  A   Make the list, give them to Jeff, and keep track of the

22  deals.  I believe that's all.

23  Q   Did you ever talk to Randy Visser about these 15 deals,

24  at this point when it first started?

25  A   No, sir.

1   Q    Did Randy Visser ever give you any instructions when it

2   first started as to what to do?

3   A    No, sir.

4   Q    So as I understand it, the only instructions you got were

5   to keep a list of the deals and take the Cullman deal jackets

6   to Jeff Green?

7   A    Yes, sir.

8   Q    Did you ever get the deal jackets back from Jeff Green?

9   A    No, I got the Cullman deal jackets back, but I do not

10  remember ever seeing the Birmingham deal jackets.

11  Q    Did you ever ask Jeff, where are the jackets?

12  A    No, sir, I don't remember asking him.

13  Q    Now we've been talking about a list.  I think it was

14  Government's Exhibit 24.  Can you see that list?

15  A    Yes, sir.

16  Q    I don't want you to talk about the names, but there are

17  stock numbers that are there.  What are those stock numbers?

18  A    The last six of the vin of the vehicle that was

19  purchased.

20  Q    So there's six numbers there, and those are the last six

21  of the vehicle identification numbers?

22  A    Yes, sir.

23  Q    Then we got the names.  You have got over there typed in

24  "date given."  What is that?

25  A    That's the date that I received the deals from Cullman

1    and gave them to Jeff Green.

2    Q     So if you got the deals, you wouldn't hold them and give

3    them to Jeff, you would get a dealer to give it to Jeff; is

4    that the way it worked?

5    A     Well, the porter or runner, whatever you want to call

6    them, they came every day at one time, one time a day.  As I

7    received those deals, I don't recall calling him.  I remember

8    actually just taking them downstairs to him.

9    Q     Y'all are in the same building?

10   A     Right.  Right.  I remember going down there and just

11   laying them on his desk.

12   Q     Do you remember any conversations with Jeff?

13   A     No, sir.

14   Q     There's been a lot of testimony talking about Jeff of all

15   those bogus documents, financial documents and utility bills,

16   and everything else that Jeff could and did do.  At this point

17   in time in March of 2013, do you know anything about this?

18   A     No, sir.

19   Q     You subsequently found out about it, right?

20   A     Yes, sir.

21   Q     The government was asking for subpoenas to the

22   dealership, weren't they?

23   A     Yes, sir.

24   Q     But at that point in time, you had nothing to do with

25   that, right?

1    A    No, sir.

2    Q    Did you ever have anything to do with that?

3    A    No, sir.

4    Q    Let's go back to this Government's Exhibit 24.   It's got

5    $500 per car and $700 per car.   And let me just ask you what

6    the $500 per car means.

7    A    The $500 per car, Forest said that Birmingham would be

8    paying Cullman $500 per car based on the fact that they

9    actually sold the vehicle.

10   Q    What's the $700 per car, if you know?

11   A    The $700, I believe, is from the actual incentive that

12   Nissan would have paid to Cullman.

13   Q    The lady and the gentlemen that testified yesterday and

14   the day before that were talking about --

15   A    Yes, sir.

16   Q    The dealer volume -- what's it called?

17   A    Dealer volume bonus, I believe.

18   Q    So that said $700?

19   A    Yes, sir.

20   Q    Did you type that on your spreadsheet or on your Excel?

21   A    Yes, sir.

22   Q    What's the next "pay SNVW for SEC"?

23   A    That is to pay Serra Nissan Volkswagen for the

24   Security+Plus warranty.   Basically, these three line items

25   were just notes that I had made as I talked to Forest about

1    $500 and $700, and then I don't remember when I wrote the note

2    about the Security+Plus.  But it's a note to myself just to

3    remind me of what I would have to do.

4    Q    There's also another note on there, it looks like on this

5    document, do you recognize the handwriting on that document?

6    A    That's my handwriting.

7    Q    Okay.  What does it say?

8    A    It says "pull SVN jackets."

9    Q    What did you mean by that?

10   A    Pull Serra Visser Nissan jackets.

11   Q    That would be the Cullman jackets?

12   A    Correct.

13   Q    What did you want to pull them for?

14   A    I believe it was to pull the -- because the Security+Plus

15   warranties were submitted under Birmingham, and I would need

16   to pay the right checks from Cullman to Birmingham for those

17   policies.  So I wanted to pull the deals to see which ones had

18   actually had Birmingham or Security+Plus policies inside of

19   them.

20   Q    Tell me that again.  You had to pay who to who?

21   A    When the vehicle was reported sold to Birmingham at

22   Birmingham.

23   Q    How did you know the deals were reported sold in

24   Birmingham?

25   A    They -- Forest told -- that was part of the -- from

1    moving the deals or shifting the deals from Cullman to

2    Birmingham, they had to be reported sold at Birmingham.

3    Q    All right.

4    A    Okay.  And because they were they reported sold at

5    Birmingham, the warranty also was reported sold at Birmingham.

6    So Cullman would have to pay Birmingham back because

7    Birmingham would be billed for the Security+Plus warranties.

8    Q    Did you, in fact, do that?

9    A    I did.

10   Q    May I show you what's been marked as for identification

11   as Defendant's Exhibit Two.  Have you ever seen that document,

12   or what is that?

13   A    This is a check that I wrote from Serra Visser Nissan to

14   Serra Nissan in July of 2013.

15   Q    You wrote that check?

16   A    Yes, sir.

17   Q    There are some numbers on that check.  What are those

18   numbers, if you know?

19   A    Under the account number column is the account number for

20   the Security+Plus payables account.  The control number is the

21   last six of the vin of the vehicle that was of one of the 15

22   vehicles.  And the amount would be the cost of the warranty.

23   Q    Now is that check kept in the normal course of business

24   there in the controller's office at Serra Nissan?

25   A    Yes, we keep copies of our checks.

1    Q    Who's in charge of the controller's office?

2    A    I am.

3    Q    And you recognize that document?

4    A    Yes, sir.

5              MR. BROOME:  Your Honor, we would like to offer

6    Defendant's Exhibit Two.

7              MS. WICK:  No objection, Your Honor.

8              THE COURT:  It's admitted.

9              MR. BROOME:  Judge, may I use this?

10             THE COURT:  Yes, sir.

11   By MR. BROOME:

12   Q    Can you tell us -- it's got a check number, that's pretty

13   easy and a vendor number -- the vendor name, what is that?

14   A    Serra Nissan.

15   Q    Would it be fair to say you wrote the check July the 3rd,

16   2013?

17   A    Yes, sir.

18   Q    And the account numbers, again, tell us what those are.

19   A    The 2020 is our bank account number.  So the money is

20   coming out of our bank account for the $6,977.  The account

21   numbers 3323 are the Security+Plus payable account.  So we're

22   paying -- Serra Visser Nissan is paying Serra Nissan for the

23   policies that Serra Visser Nissan actually sold, but Serra

24   Nissan was actually billed for.

25   Q    And the control number, what is that?

1   *A*     The control number is the last six of the vin of the

2   vehicle that was sold.

3   *Q*     So if I go back to Government's Exhibit 24, those numbers

4   should match up with the numbers of your controller numbers?

5   *A*     Yes, sir.

6   *Q*     I mean they're not in order, but they match up.  Is that

7   correct?

8   *A*     Yes, sir.

9   *Q*     And the total amount that you paid was what?

10  *A*     $6,977.

11  *Q*     When I said when you paid, you paid it on behalf of --

12  *A*     Serra Visser Nissan.

13  *Q*     And that was to pay for the --

14  *A*     Security+Plus warranty.

15  *Q*     So you are not trying to hide this from anybody, are you?

16  *A*     No, sir.

17  *Q*     It's right there in your books, right?

18  *A*     Yes, sir.

19  *Q*     And control numbers for what you are paying are right

20  there?

21  *A*     Yes, sir.

22  *Q*     So, if you know, did Serra Nissan ever have their own

23  internal auditors?

24  *A*     Yes, sir.

25  *Q*     So it would be very easy for your internal auditor to

1    find this?

2    A    Yes, sir.

3    Q    Not a real good job of hiding it, is it?

4    A    No, sir.

5    Q    Now, were there other things that you had to do to that's

6    so-called, in my mind, balance the books, or what would you

7    call it?

8    A    I guess balance would be a good term.   The warranties of

9    course was one, the Security+Plus warranties.   I would have to

10   pay Cullman for the $700 per dollar and the $500 per car.

11   Q    That was $1,200?

12   A    $1,200.

13   Q    Per car?

14   A    Yes, sir.

15   Q    It was 15 cars?

16   A    Yes, sir.

17   Q    Do you know right off your top of your head, how much

18   that would be?

19   A    $18,000 based on the copy that I have seen.

20   Q    Let me show you what's been marked for identification as

21   Defendant's Exhibit One.   Do you recognize that?

22   A    Yes, sir.

23   Q    What is that?

24   A    This is the receipt on Serra Visser Nissan's books from

25   Serra Nissan for the $18,000 check that was written

1    approximately -- the receipt was written April 9th, 2013.  So

2    I am assuming the check was written some time around that

3    time, as well from Serra Nissan.

4    Q    Again, is that Defendant's Exhibit One kept in the normal

5    course of business at Serra Nissan?

6    A    Yes, sir.

7    Q    Is it kept in the controller's office?

8    A    Yes, sir.

9    Q    Again, who's in charge of that?

10   A    I am.

11        MR. BROOME:  Your Honor, we would like to offer

12   Defendant's Exhibit One.

13        MS. WICK:  No objection, Your Honor.

14        THE COURT:  It's admitted.

15   BY MR. BROOME:

16   Q    Just briefly tell me what this 18,000 dollars was again.

17   A    It was the $700 per car that Nissan would have paid to

18   Birmingham, because the Birmingham deals were reported sold at

19   Birmingham, and an additional $500 that Forest had instructed

20   me to pay Serra Visser Nissan for the actual selling of the

21   vehicles.

22   Q    It's got the check number up there, right?

23   A    Yes, sir.

24   Q    What's the -- well, it says something, "2214," what is

25   that?

1  *A*    2214 is Serra Visser Nissan's incentive receivable

2  account.

3  *Q*    Again, anybody in the accounting office or the auditors,

4  internal auditors, anybody could have looked at this check,

5  right?

6  *A*    Yes, sir.

7  *Q*    So you are not trying to hide paying the Cullman store

8  $1200, are you?

9  *A*    No, sir.

10  *Q*    Let me show you what's been marked for identification as

11  Defendant's Exhibit Three.  Will you look at that and see if

12  you recognize that document?

13  *A*    (Witnesses complying.)  Yes, sir.

14  *Q*    And what is that?

15  *A*    This is a receipt to Serra Nissan from Serra Visser

16  Nissan for the customer rebate money that would have been paid

17  to Birmingham because the vehicles were reported sold at

18  Birmingham.  So Serra Nissan wrote a check for $19,950 to

19  Serra Visser Nissan to pay them for the $19,950.

20  *Q*    How did you come up with that $19,000 -- well, let me

21  back up.

22        Did you create that document yourself?

23  *A*    Yes, sir.

24  *Q*    How did you come up with the figures to do that?

25  *A*    When the vehicles were reported sold in Birmingham,

1   Nissan automatically pays us -- paid the store for different

2   customer cash, whatever was qualified at the time, I guess.

3   And when I was reconciling the schedule -- the incentive

4   schedule, I saw all of the credits where Birmingham had been

5   paid and realized that this money was actually owed to Serra

6   Visser Nissan.

7   Q    Again, this is kept in your regular course of business

8   there?

9   A    Yes, sir.

10  Q    Kept in the controller's office?

11  A    Yes, sir.

12  Q    And you are the controller?

13  A    Yes, sir.

14          MR. BROOME:  Your Honor, we would like to offer

15  Defendant's Exhibit Three?

16          MS. WICK:  No objection, Your Honor.

17          THE COURT:  It's admitted.

18  BY MR. BROOME:

19  Q    Again, there's a lot of numbers there.  Well, there's an

20  account 2214, what is that?

21  A    That's the Serra Visser Nissan or the Cullman store's

22  incentive receivable account.

23  Q    And the next set of numbers, like the top line is 019010,

24  what is that?

25  A    That is the last six of the vin number also known as the

1    stock number of one of the 15 vehicles.

2    Q    So that would match up with your list that you were

3    keeping?

4    A    Yes, sir.

5    Q    Is that right?

6    A    Yes, sir.

7    Q    So again, you are not hiding this very well, are you?

8    A    No, sir.

9    Q    Because the vin numbers match up with your incentive

10   payments; is that right?

11   A    Yes, sir.

12   Q    And this check was written when?

13   A    That's in actually the receipt.  I believe the government

14   has already put the check as evidence.  I am not sure what the

15   date was, but it was received June 7th.  So approximately

16   around that time, I would assume.

17   Q    Is there a reason some things were done in April and some

18   things were done in June and some things were done in July?

19   A    Like I insinuated earlier, it was a very busy time, and

20   as I realized different accounts had balances in different

21   places was when I would handle the issue.

22   Q    I think I have used that analogy before.  Were there any

23   meetings in any smoke-filled rooms with you and Randy Visser

24   and Mr. Housner about this conspiracy?

25   A    No, sir.

1   Q      Did you ever really talk about it to anybody?

2   A      Other than Mr. Housner, no, sir.

3   Q      Ma'am, at some point in time, that incentive program was

4   over; is that right?

5   A      Yes, sir.

6   Q      Was that some time around the 1st of April?

7   A      Yes, sir, I believe so.

8   Q      Again, other than keeping the list, taking the deal

9   jackets to Jeff Green, and reconciling the monies, was there

10  anything else that you did in regards to those 15 deals?

11  A      No, sir.

12  Q      I believe you told me and these good folks that you got

13  the 15 deal jackets back from Cullman?

14  A      Yes, sir.

15  Q      From Jeff?

16  A      Yes, sir.

17  Q      What did you do with them?

18  A      They would have went to our costing clerk in the office

19  for Cullman.  Cullman had a costing clerk and Birmingham had

20  one.  So I would have given them to her.

21  Q      What's a costing clerk?

22  A      Basically someone that goes through the deal, actually

23  posts it in accounting, finalizes it.  There's all different

24  kind of terms that have been used today.  But they actually

25  post the deal into accounting.  They also write payoff checks

1    for trade-ins, send out the contract to the bank, give the

2    title application to the title clerk.   Just different

3    processes inside the deal.

4    Q    I am holding up a deal jacket.   What color would you call

5    this?

6    A    Turquoise.

7    Q    Is that some of the colors that you used there at your

8    store?

9    A    Yes, sir.

10   Q    And a turquoise deal jacket would mean to you it was

11   whose deal?

12   A    It would be a new Cullman sale.

13   Q    Cullman sale.   All right.   So, when Jeff Green brings the

14   deal jackets back to you, he brought you Birmingham or Cullman

15   deal jackets or both?

16   A    He brought me Cullman -- they would not have been in a

17   jacket at that point, but they would have been in a manila

18   folder.   The jacket was actually made by the billing clerk.

19   Q    I am showing you one here.   Do you recognize whose

20   handwriting that is?

21   A    That would be Yolanda, and she is our Cullman billing

22   clerk at the store.

23   Q    So when Jeff brought the deal jackets back to you, you

24   did what with them?

25   A    I would have given them to Yolanda to strip the deal

1    which is the term that's used, as well, and actually post it

2    into accounting.

3    Q    Again, are you trying to hide the Cullman deal?

4    A    No, sir.

5    Q    You are posting it in all of the accounting procedures

6    that you would a normal everyday correct deal, right?

7    A    Yes, sir.

8    Q    And then when accounting or costing clerk, or whatever

9    the clerk's called, gets through with whatever they need to do

10   with the deal, what would have to physically happen to this

11   deal jacket?

12   A    They would put the little labels on the side, the last --

13   the first letter of the last name.

14   Q    I am sorry, they would put what?

15   A    They would put these two labels right here (indicating),

16   and they would be filed on a filing cabinet to where you could

17   see an open shelving unit where you could see the "B" and the

18   year it was sold.

19   Q    Okay.  While I am over here with this, this deal jacket

20   says "wrong dealer" on it.  Do you recognize the handwriting

21   on that?

22   A    Yes, sir, I do.

23   Q    Whose handwriting?

24   A    That's my handwriting.

25   Q    Why did you put "wrong dealer" on this particular deal

1   jacket?

2   A    Because the Security+Plus warranty was billed in essence

3   to the wrong dealer, because the vehicle was reported sold to

4   Birmingham instead of Cullman.  So I notated --

5           MR. BROOME:  Judge, I just realized I am walking

6   around with a real deal jacket that has somebody's name on it.

7   If I could just a second to find the redacted ones that won't

8   have somebody's name on it.  Excuse me, I am sorry, I just

9   realized what I did, Judge.

10  BY MR. BROOME:

11  Q    I want to show you what's been introduced as Government's

12  Exhibit Nine.  Tell us what you are talking about.

13  A    Which portion, the "wrong dealer"?

14  Q    Yeah.

15  A    Okay.  I wrote "wrong dealer" on this jacket because the

16  Security+Plus warranty would have been billed to, in essence,

17  the wrong dealer because Cullman actually sold the warranty.

18  But because it was reported sold at Birmingham, it was -- the

19  Security+Plus was reported as being sold from Birmingham.

20  Q    So when you are talking about wrong dealer, are you

21  saying it was -- this deal was sold in Cullman?  You have to

22  answer yes or no.

23  A    I am sorry, yes.

24  Q    But then it was billed out in Birmingham -- or have I got

25  it backwards?

1    A    No, I wouldn't call it billed out.  The warranty was sold

2    in Cullman, but it was -- I guess you could say billed out --

3    was charged to the Birmingham store, because the vehicle was

4    reported sold in Birmingham, and the warranty was reported

5    sold in Birmingham -- or at Birmingham.

6    Q    So you actually wrote "wrong dealer" on this one and

7    several others, right?

8    A    I did.  It might coincide with the check that I wrote or

9    the receipt that we have talked about.  I am not sure if all

10   of them will coincide.

11   Q    Let me jump ahead a second while I am thinking about it.

12         You were involved in some audit processes by Nissan,

13   weren't you?

14   A    I was.

15   Q    And what was your involvement in those processes?

16   A    In the Nissan --

17   Q    What would you have to do?

18   A    The incentive audit?

19   Q    Any of their audits.

20   A    No, they do two different types, but depending on which

21   one they do.

22   Q    Let's say the incentive audit because that's what we've

23   been talking about.

24   A    Okay.  Okay.  The incentive audit, I would get an e-mail

25   stating what kind of report the auditor would need, what

1    information he would need or she, and I would download that

2    report from whatever computer system we were using at the

3    time.

4    Q    Then you would do what with it?

5    A    I would e-mail it back to him.  And then, from what I

6    understand, they would then request certain deals to be pulled

7    from that list.

8    Q    Well, let's say they requested -- and I am going to call

9    this deal John Doe.

10   A    Okay.

11   Q    Let's say that Nissan requested John Doe's deal, what

12   would you do?

13   A    I would pull the John Doe deal.

14   Q    You would pull this whole jacket?

15   A    Yes, sir.

16   Q    Even though it says wrong dealer on it?

17   A    Yes, sir.

18   Q    You are not real good at hiding this, are you?

19   A    No, sir.

20   Q    And you did that on at least three or four different

21   jackets?

22   A    I believe so.

23   Q    Let me go back to --

24          MR. BROOME:  Judge, if I could have one second to

25   put these exhibits back.

1    BY MR. BROOME:

2    Q    Anymore conversations with Forest Housner about shifting

3    these deals in April, May?

4    A    No, sir, just not that I remember, no, sir.

5    Q    Again, there's no meetings in smoke-filled rooms talking

6    about this?

7    A    No, sir.

8    Q    Let me move up to in June of 2013, and I am going to show

9    you what's been admitted as Government's Exhibit 24.   Again,

10   the underlining is mine.

11        Did you receive this e-mail that says -- what does

12   this e-mail say, the top part?

13   A    It was from Randy Visser to Forest Housner and myself.

14   Q    Did you get that?

15   A    Yes, sir, I did.

16   Q    And I know it's been read two or three times, but would

17   you read it for us one more time.

18   A    Yes, sir. "When Birmingham missed their objective two

19   months ago and we used Cullman sales, did we book these units

20   in Reynolds accounting under Birmingham?  I just wanted to

21   make sure we did.  When Nissan audits us, they get a log of

22   every deal booked in Reynolds."

23   Q    Now what is Reynolds?  I think we have talked it, but

24   what is it?

25   A    It's a DMS.  It's a type of -- a way of keeping track of

1    our car deals and accounting.  And there are several of them

2    out there, but Reynolds and Reynolds is one of them.

3    Q     What's a DMS?

4    A     Dealership marketing system or management system.  Yeah.

5    Sorry.

6    Q     So you understood what Mr. Visser was asking you, right?

7    A     Yes, sir, I did.

8    Q     Did you respond to his -- it says it was on a Saturday.

9    Do you recall if it was on a Saturday or not?

10   A     I am assuming so, if that's what it says.

11   Q     And did you respond to him?

12   A     Yes, sir.

13   Q     When did you respond to him?

14   A     On Monday.

15   Q     Again, it's been read, but what did you tell him?

16   A     "These deals were not booked in accounting, but I have a

17   list of these deals and can manually add them to any report

18   that Nissan requires.  Jeff also created a Birmingham deal

19   jacket for each of these deals so we would have it if they

20   ever request the deal to be pulled."

21   Q     Now you told him and told Mr. Randy Visser that Jeff had

22   created a Birmingham deal jacket.  How did you know he did

23   that?

24   A     When Forest told me to give the deals to Jeff, he said

25   that he would be creating a Birmingham jacket.

1    Q    Where was Jeff going to keep these, if you know?

2    A    I don't know.

3    Q    Did you ever see the Birmingham deal jacket?

4    A    No, sir.

5    Q    And you are telling Mr. Visser these deals were not

6    booked in accounting?

7    A    Yes, sir, that's correct.

8    Q    When you got the e-mail from Randy Visser, what did you

9    think?

10   A    I had read that I was or should have booked the deals in

11   Reynolds and Reynolds is what I understood from the e-mail,

12   and I had not.

13   Q    And you had not done this, why?

14   A    Because I was never told to.

15   Q    So the first time you knew or thought that you knew that

16   you were to put these in the Reynolds accounting is in June

17   when you get this e-mail from Randy Visser; is that right?

18   A    Yes, sir.

19   Q    Well, why didn't you run down to the dealership on

20   Saturday, June the 1st, and put all these deals in that

21   accounting system and keep your boss happy?

22   A    Once the accounting month is closed, which would have

23   happened around April 10th, you can't alter the records at

24   that point.

25   Q    So even if you had wanted to do it in June, you couldn't

1    have done it?

2    A    No, sir, the Reynolds system would not allow you to.

3    Q    And did Mr. Visser get on you for not doing this or

4    chastise you or say anything to you about it?

5    A    No, other than this e-mail.

6    Q    You are talking about the next e-mail?

7    A    Right.

8    Q    And you got this next e-mail, again, on a Saturday, July

9    the 27th, or it was sent that day?

10   A    Yes, sir.

11   Q    You don't know -- do you know what day you got it?

12   A    No, sir, I don't remember.

13   Q    Okay.  Are those instructions to you?

14   A    Yes, sir.

15   Q    And again, what do they say?

16   A    "Okay.  Just manually add them or manually remove them if

17   they audit Cullman, when they do the next audit.  In Alabama,

18   the factory has 12 months from the date the incentive was paid

19   to conduct an audit."

20   Q    Did you ever respond to Randy Visser about that July 27th

21   e-mail?

22   A    No, sir.

23   Q    Did you ever talk to him again about these 15 deals of

24   manually putting them or manually removing them, or anything

25   like that.

1   A    No, sir.

2   Q    I forgot to ask you about something.  This has been

3   marked or this has been admitted as Government's Exhibit 40,

4   the so-called instructions.

5            In March of 2013, did you see these instructions?

6   A    No, sir.

7   Q    When is the first time you saw these instructions?

8   A    I believe it was a couple of Saturdays ago when you

9   showed these to me.

10  Q    But you never got these instructions?

11  A    No, sir.

12  Q    Kim, at some point, were there some -- for lack of a

13  better term -- legal difficulties there at the dealership?

14  A    Yes, sir.

15  Q    And how did you come to learn about those?

16  A    I am not sure exactly when or how.  Probably more hearsay

17  at first.  And then, I believe, we started receiving

18  subpoenas, and stuff like that.

19  Q    Subpoenas from the government?

20  A    Yes, sir.

21  Q    And what type information did those subpoenas request?

22  A    Car deals.

23  Q    Any specific car deals that you can recall?  Was it the

24  15 deals that we're talking about today?

25  A    I believe there was another subpoena that was not related

1   to those deals.

2   Q    Okay.  Were you in charge of getting those deals in

3   response to the subpoena?

4   A    Yes, sir.

5   Q    Did you find out later that it was about what Jeff Green

6   and Mr. Shepard talked about today?

7   A    Yes, sir.

8   Q    Do you have any idea what it was about when you first got

9   the subpoena?

10  A    No, sir.

11  Q    Now at some point in time, did you receive another

12  subpoena or were told about another subpoena?

13  A    Yes, sir.

14  Q    Do you remember approximately when that was?

15  A    June, July of 2014 maybe.  Somewhere around there.

16  Q    Okay.  Do you remember what that subpoena asked for?

17  A    15 deals.

18  Q    When you saw that subpoena for those 15 deals, what did

19  you think?

20  A    At first, I thought that it was in regards to Birmingham

21  deals because that was what the previous subpoena had been

22  about.  It wasn't until later that it was realized that they

23  were not Birmingham deals, they were the 15 Cullman deals.

24          MR. BROOME:  Your Honor, I believe the subpoena has

25  been admitted as Exhibit 45.

1            Could I bother you one more time?  (Speaking to Julie

2    Gold, paralegal specialist.)

3            That's okay.  Excuse me, Your Honor.

4              THE COURT:  Do you need a copy of the subpoena?

5              MR. BROOME:  Well, these seem to be all the deal

6    jackets.  I'm looking for Exhibit 45.

7              MS. WICK:  It's right here.

8              MR. BROOME:  Thank you.

9    BY MR. BROOME:

10   Q    Let me show you what's been admitted as Government's

11   Exhibit 45, and I will just ask if you can recognize that.  Do

12   you recognize that?

13   A    Yes, sir.

14   Q    More importantly, let's go to page 1.  It's items that

15   were requested.

16           Now that subpoena was issued to Serra Nissan; is that

17   correct?

18   A    Yes, sir.

19   Q    And it asked for 15 deals; is that right?

20   A    Yes, sir.

21   Q    Would you tell me on what is showing here -- the date,

22   what does that mean to you?

23   A    At first I thought it was the date sold, but it actually

24   correlates with the dates that I actually gave the deal to

25   Jeff.

1    Q    What is the stock number telling you?  In other words,

2    these dates came off your list that you had?

3    A    Yes, sir.

4    Q    Okay.  And what did the stock number tell you?

5    A    The stock number would be the last six of the vin.

6    Q    And what's an alternate stock number?

7    A    I wasn't sure what that actually was.

8    Q    Okay.  Now there's also -- that list continues for the

9    rest of the deals; is that right?

10   A    Yes, sir.

11   Q    Okay.

12   A    It appears to be.

13   Q    When you got this subpoena, whoever gave it to you, what

14   did you do?

15   A    I gave it to one of the ladies in my office and asked

16   them to start pulling the deals for the subpoena.

17   Q    And you all were looking for what deals?

18   A    The Birmingham deals.

19   Q    Did you find them?

20   A    No, sir.

21   Q    Did you ever find any deals that correlated to that stock

22   number?

23   A    The original stock number?

24   Q    Yes, ma'am.

25   A    Yes.

1   Q     Where did you find those?  Did you find them or someone

2   else?

3   A     No, she found them.  We wanted -- our billing clerk for

4   Cullman heard us talking about the list of deals, and she

5   recognized one of the names as being a customer for Cullman,

6   and that's when we realized that these were actually Cullman

7   deals, and she had been looking for Birmingham deals.

8   Q     And again, it's the different color of the jackets; is

9   that right?

10  A     Right.  Exactly.

11  Q     And what did you do then?

12  A     She then pulled the Cullman deals, and I told Randy

13  Visser that we had found Cullman deals, but the subpoena was

14  asking for Birmingham deals.

15  Q     And you gave those to who, the deals?

16  A     I believe the lady in accounting, she made copies of the

17  deals, and I believe they went to Alan Baty, as best I can

18  recall.

19  Q     And Alan was the lawyer for the dealership at the time?

20  A     Yes, sir.

21  Q     Okay.  I want to show you what I believe has been

22  introduced as Government's Exhibit 23.  Do you recognize this?

23  A     Yes, sir.

24  Q     Did you type that document up?

25  A     No, sir, I believe Alan Baty e-mailed that to me.

1    Q    The lawyer for the dealership at the time?

2    A    Yes, sir.

3    Q    Did you read it?

4    A    Not really.

5    Q    That's your signature on there?

6    A    Yes, sir.

7    Q    And you told the government that was the 15 deals that

8    they asked for?

9    A    Basically, yes, it looks like it.

10   Q    You thought that was the 15 deals they asked for.  When

11   they asked for deals for those stock numbers, you gave it to

12   them?

13   A    Yes, sir, that's what we had.

14   Q    Kim, did you shred, burn, obliterate, or whatever you

15   want to call it those 15 Birmingham deal jackets for the deals

16   we've been talking about?

17   A    No, sir.

18   Q    Did you ever hear of anyone else doing that?

19   A    No, sir.

20   Q    Do you know whether those exists even to this day?

21   A    No, sir, I do not.

22   Q    Lately, even at my request, have you looked for those

23   deals?

24   A    I actually asked someone in my office to look for them

25   again, yes.

1    Q      Did they find them?

2    A      They did not.

3    Q      Going back to the auditing process, were you ever

4    involved in any of the exit reviews or closing meetings,

5    whatever they're called?

6    A      No, sir.

7    Q      Did anyone ever come to you and say, there's some

8    accounting problems, we need to change this up or something --

9    A      No, sir.

10   Q      -- as a result of the audit?

11   A      No, sir.

12   Q      You were over the entire accounting department; is that

13   right?

14   A      Yes, sir.

15   Q      How about the sales department?

16   A      No, sir.

17   Q      Did you have anything to do with the sales department?

18   A      I mean, we would talk occasionally, but not on a

19   day-to-day basis.

20   Q      Were you ever told by Forest Housner to book those deals

21   in your accounting Reynolds and Reynolds?

22   A      No, sir.

23   Q      And you never did?

24   A      No, sir.

25   Q      So those deals in accounting always sat in Cullman?

1    A    Yes, sir.

2    Q    Or in the Cullman side of the business?

3    A    Right.

4    Q    Kim, the things that you did regarding those 15 deals,

5    did you think it was illegal?

6    A    No, sir.

7    Q    Did you think it was frauding Nissan North America?

8    A    No, sir.

9    Q    What did you think it was?

10   A    I didn't think anything was wrong.

11            MR. BROOME:  That's all I have, Your Honor.  Thank

12   you.

13            THE COURT:  All right.  Cross examination.

14            MS. WICK:  Your Honor, permission to approach the

15   bench, please?

16            THE COURT:  All right.

17   (The following proceedings were held at the bench, out of the

18   hearing of the jury:)

19            MS. WICK:  Two things, I forgot to ask the Court to

20   do the colloquy prior to her testifying, and I think we need

21   to do that on the record.  I am sorry.  I wasn't paying

22   attention.  You came in, the jury came in, and it was too

23   late.  I did not want to interrupt his direct.

24            MR. BROOME:  What colloquy are you talking about?

25            MS. WICK:  The colloquy where the defendant --

1          MR. BROOME:  I asked her to start with.

2          MS. WICK:  I just wanted to make sure my

3    understanding was normally the Court has to do a colloquy with

4    the defendant prior to her testimony to make sure she

5    understands her rights.  I think it can be an appeal issue,

6    and I forgot to remind the Court.  If it's not an issue, I may

7    be worrying over nothing.  But I'm pretty sure --

8          THE COURT:  Mr. Broome --

9          MR. BROOME:  I thought I asked her.

10         THE COURT:  -- do we need to do that, or do you feel

11   like your client is aware of her rights and is freely

12   testifying in trial today?

13         MR. BROOME:  Your Honor, to answer that question, I

14   guess in two parts is she understands her rights, she

15   understood her rights, she didn't have to testify, and she

16   insisted, and I wanted her to testify.

17         THE COURT:  She said that she was here today because

18   she wanted to testify.  So, I think we're okay on that.  If

19   you insist, I will.

20         MS. WICK:  No, if the Court feels --

21         MR. BROOME:  I could get her to waive that.

22         THE COURT:  Do you want to go talk to her for a

23   moment, Mr. Broome?

24         MR. BROOME:  Sure.

25         THE COURT:  And then we'll put it on the record.

1           MS. WICK:  I forgot.

2           MR. BROOME:  Judge, do you want her to approach?

3           THE COURT:  That will be fine.  Why don't we do

4    that.

5           MS. WICK:  Thank you, Your Honor.  I apologize

6    again.

7           THE COURT:  Ms. Branch, you do have a right not to

8    testify at this trial.  Are you aware of that?

9           MS. BRANCH:  Yes, Your Honor.

10          THE COURT:  Are you testifying because you wish to

11   testify?

12          MS. BRANCH:  Yes, Your Honor.

13          THE COURT:  So you were giving up your right not to

14   testify?

15          MS. BRANCH:  Yes, Your Honor.

16          THE COURT:  Okay.  Thank you.

17          MS. WICK:  Thank you, Your Honor.

18          THE COURT:  Okay.  Number two?

19          MS. WICK:  The other issue may be, Mr. Broome

20   specifically asked her if she was aware of the other fraud

21   going on at the dealership.  I know we talked about that

22   yesterday.

23          MR. BROOME:  I was talking about the ones that they

24   talked about this morning.

25          MS. WICK:  Right.  The other --

1            THE COURT:  Let's go in the back hallway.

2            (Conclusion of bench conference.)

3            THE COURT:  Let's take a five-minute break, please.

4            (Jury recess at 4:04 p.m.)

5     (The following proceedings were held in the hallway, out of

6     the hearing of the jury:)

7            THE COURT:  All right.  The second issue?

8            MS. WICK:  The second issue was yesterday we had a

9     discussion about the government's ability to ask Ms. Branch

10    about fraud outside of the 15 deals.  And before we had

11    anything on cross, I thought it would be good to clarify.  My

12    understanding was in terms of being able to ask her about the

13    cleaning the schedules or the dollar cars or the ghost trades

14    that were in another case not related, when Mr. Broome asked

15    her about the fraud that was in the background of the

16    witnesses that testified, I wanted to check before asking her

17    on the record that we could ask her about her knowledge of the

18    power booking, the fluffing, all of the things that Mr. Broome

19    asked her.

20           THE COURT:  He didn't ask her any of that.

21           MS. WICK:  No, no, no our witnesses -- excuse me, I

22    got all tangled up.  He asked her if she was aware of the

23    fraud that those other witnesses had testified to.  That was

24    my understanding of what he asked.

25           THE COURT:  Right, and she said initially it was

1    hearsay around the office.  And then she became formally aware

2    of it because the subpoena came to the dealership.  That was

3    her testimony.

4           MR. BROOME:  Because the stipulations said that

5    there was two subpoenas.  I was just trying to explain the

6    first one.

7           MS. WICK:  I'm talking about at the very, very

8    beginning of cross.  You asked her a question:  Were you

9    involved in any of that?  You asked her -- you referred to the

10   fraud.  You said:  Were you involved in any of that?  And she

11   said no.  And I wasn't sure if we could ask her on cross about

12   whether she was aware of, you know, that fraud, even though we

13   couldn't ask about the other fraud.

14          THE COURT:  You need to be a lot more clear about

15   what these different frauds are to help me out because we've

16   had -- you have put on witnesses who have been charged and

17   pled guilty to consumer credit, defrauding consumers, bank

18   fraud -- help me understand --

19          MS. WICK:  It was all one fraud.  He called it

20   consumer credit fraud, but it was one case, one fraud.  Mr.

21   Green, Mr. Shepard, they had one conspiracy, one case.

22          THE COURT:  Okay.

23          MS. WICK:  When Mr. Green said it was seven people,

24   he was talking about Mr. Shepard.

25          The only person who has been different was Mr. Visser,

1   and his conspiracy is this case.

2          THE COURT:  Okay.  Because I thought yesterday you

3   told me there was a third fraud.

4          MS. WICK:  There was, and that's what Mr. Broome was

5   talking about was the cleaning of the schedules and the dollar

6   trades and the ghost trades.

7          THE COURT:  That was yesterday.

8          MS. WICK:  Yes.

9          THE COURT:  In what way did he talk to Ms. Branch

10  about that today?

11         MS. WICK:  My understanding, at the beginning of

12  direct, he said, when they were talking about all that

13  fraud --

14         THE COURT:  And you just told me that that's not the

15  fraud about cleaning schedules.  You just said that.

16         MS. WICK:  Yes, Your Honor.

17         THE COURT:  So how would you be able to get into

18  with her the fraud about cleaning schedules?

19         MS. WICK:  I am sorry.  I couldn't.

20         THE COURT:  That's what I am hearing.

21         MS. WICK:  Let me start over.  Okay.  Because I

22  clearly butchered that.

23         THE COURT:  Please help me understand what fraud

24  we're talking about.

25         MS. WICK:  Cleaning schedules and all of that are

1    off the table, totally out, clearly gone.  Let's not even

2    confuse the issue.

3                  THE COURT:  Okay.

4                  MS. WICK:  The fraud that our cooperators talked

5    about, today, that they pled guilty to in their factual basis,

6    that Mr. Broome talked about, at the beginning of her direct,

7    he asked her, were you involved in that?

8                  MR. BROOME:  I did that.

9                  MS. WICK:  That's all I am talking about.  And I

10   just wanted to check, because of our conversation yesterday,

11   make sure there was no problem of asking her if she had ever

12   heard the term fluffing, if she had ever heard the term power

13   booking, just the things that Mr. Broome raised in those

14   crosses.

15                 THE COURT:  So I didn't hear any witness today use

16   the term fluffing.

17                 MS. WICK:  He said power booking.  He was reading

18   their plea agreement -- and I don't have to use those terms, I

19   can just read their plea agreement like he did.  It's not the

20   term, it's the type of fraud that they were committing, if she

21   was familiar with that, if she was aware of that happening at

22   the dealership.

23                 MR. BROOME:  The only thing I would ask the Court to

24   do is limit them to a time frame.  Did you know about it in

25   March of 2013?  She obviously knows about it now because she

1    and I have discussed their plea agreements and we've discussed

2    their proffers and 302s.

3              MS. WICK:  Not was she aware of it now, but was she

4    aware of it at the time in March '13.  Because you had gotten

5    out that Mughal -- the fraud started in January '13 with

6    Mughal.

7              MR. BROOME:  I don't think I ever said Mughal

8    because I can't pronounce his name.

9              MS. WICK:  Well, that was on Jeff Green.  But that

10   was my only question.  I just didn't want to stumble into that

11   without addressing it first and kind of clarifying.

12             THE COURT:  As long as what you do is limited to the

13   contours of what was on direct with Ms. Branch and what is in

14   those plea agreements, because, I don't want, again, to spin

15   off into a minitrial about other frauds that we have heard

16   nothing about really other than a few words yesterday.

17             MR. BROOME:  It's going to be very quick.  She is

18   going to tell no.

19             MS. WICK:  I think it will make it simple.  I will

20   use Mr. Green's plea agreement.

21             THE COURT:  Perfect.

22             MS. WICK:  And just read from that since that was -

23   if that's okay with everybody.

24             THE COURT:  Yeah, that way I can follow along and

25   try to make sure I understand.

1          MS. WICK:  Yeah, I think you already have that one.

2    So perfectly -- I just wanted to make clear.  I didn't want to

3    get confusing before we went on.

4          (Conclusion of hallway conference at 4:11 p.m.)

5                    (A recess was taken.)

6                    (Jury in at 4:20 p.m.)

7          THE COURT:  Cross examination, please.

8          MS. WICK:  Yes, Your Honor.  Thank you.

9                    CROSS EXAMINATION

10   BY MS. WICK:

11   Q    Ms. Branch, I believe you testified on direct you worked

12   dealerships since you were 16 years old; is that right?

13   A    Yes, ma'am.

14   Q    I think you said you started as a cashier, filing clerk,

15   one of the owners, their administrative assistant, and then

16   controller; did I miss any positions that you held?

17   A    I had various positions in the office, and then I was an

18   office manager at some point, but yeah, that's about right.

19   Q    In any of those positions during the 16 years, did you

20   create false documents?

21   A    No, ma'am.

22   Q    Did anyone ask you to create false documents?

23   A    No, ma'am.

24   Q    Not until these deal jackets, the 15 fake Birmingham deal

25   jackets?

1   *A*    I was not asked to create the deal jackets, so no, ma'am.

2   *Q*    Okay.  So, earlier you said that you had a conversation

3   with Mr. Housner.  You said he told you that someone in

4   Cullman would send the deals to you, that you would take them

5   to Jeff Green, that Jeff Green would create the Birmingham

6   deal jackets, that you would have to keep a list of the deals,

7   and that they had to be RDR'd in Birmingham; is that right?

8   *A*    I believe so.

9   *Q*    Did I miss anything in terms of what all Mr. Housner told

10  you to do?

11  *A*    No, ma'am.

12  *Q*    He didn't tell you that you would have to pay the

13  warranties or you would have to pay the customer rebates, you

14  figured that out on your own, right?

15  *A*    He did discuss the rebates, the $500 and $700, but I

16  figured out the Security+Plus on my own later.

17  *Q*    Okay.  You said earlier that it was your understanding

18  that it was okay to shift the deals because you had heard that

19  it was okay in the parts incentives area; who told you that?

20  *A*    Roger and Forest had had a conversation about that --

21  some kind of trip that Cullman had won.

22  *Q*    Roger who?

23  *A*    Bradford.

24  *Q*    Who is that?

25  *A*    He is the parts director.

1    Q    Did they have a conversation with you about that?

2    A    I heard them talking about it in the office.

3    Q    Was it your understanding that the parts incentive had an

4    audit program?

5    A    I am not sure.

6    Q    You didn't know anything about it?

7    A    No.

8    Q    Do you remember when that conversation was between Mr.

9    Bradford and Mr. Housner that you overheard?

10   A    No, ma'am.

11   Q    You don't remember if it was before the shifting of the

12   15 deals or after the shifting of the 15 deals?

13   A    No, I am not sure.

14   Q    So, you could have taken a part in this and heard after

15   the fact that it was okay because parts did it?

16   A    Again, I am not sure what date that was.

17   Q    Earlier you said there were a lot of checks going back

18   and forth between the two dealerships.  If I understand you,

19   they operated out of the one location in Birmingham, right?

20   A    Correct.

21   Q    Would you have said there are two separate entities?

22   A    Yes.

23   Q    Did you actually understand the entity structure of the

24   dealership?

25   A    Yes.

1    *Q*    What did you understand the structure to be?

2    *A*    Serra Nissan Oldsmobile and Serra Visser Nissan.

3    *Q*    What did you understand Serra Nissan Oldsmobile to

4    include?

5    *A*    Serra Nissan and Serra Volkswagen.

6    *Q*    What did you include -- what did you understand Serra

7    Visser Nissan to include?

8    *A*    Serra Visser Nissan.

9    *Q*    Just the Cullman store?

10   *A*    Correct.

11   *Q*    I think you also said that they had separate accounts and

12   that's why you had to do separate checks?

13   *A*    Yes.

14   *Q*    How many accounts did each dealership have?

15   *A*    Hundreds.

16   *Q*    Let's start with Serra Nissan, how many different

17   accounts did Serra Nissan have?

18   *A*    I can only give you an estimate.  A hundred accounts,

19   maybe.

20   *Q*    When you say accounts, do you mean bank accounts or do

21   you mean accounts?

22   *A*    Oh, I'm sorry, you are talking bank accounts.

23   *Q*    You explain it to me.  You are the accountant.  Trust me.

24   I am not going to know.  So you explain it to me.

25   *A*    Each store had two bank accounts.

1    Q    Okay.

2    A    As far as accounts, as in general ledger accounts, I

3    would be estimating, I don't know, 100, 200 different

4    accounts --

5    Q    For each --

6    A    -- general ledger accounts.

7    Q    For each store?

8    A    Yes.

9    Q    Okay.  So, I want to make sure I understand.  So each

10   store had two actual bank accounts, like the one that I would

11   deposit a paycheck in kind of bank account --

12   A    Correct.

13   Q    -- and then the general ledger account, what you are

14   talking about, Serra Nissan had about 100 to 200, that was a

15   ballpark, and Serra Visser Nissan had about 100 to 200?

16   A    Correct.

17   Q    Can you explain, like -- understanding that there's like

18   100 or 200 of them -- what are those accounts for on the

19   general ledger?

20   A    There's different ones.  Some of them are assets,

21   liabilities, cost of sales, sale accounts.

22   Q    I got a D in accounting, so you are going to have to bear

23   with me.  Is that debits, credits -- earlier, when we were

24   talking about reconciling, can you explain like what you had

25   to do with those 100 to 200 account items on the ledger?  Like

1   what was your job?

2   A    Depending on the account, each account would be handled

3   differently.

4   Q    Can you pick an example?  Like, earlier you said the

5   incentive is accounts receivable, did I butcher that?

6   A    Yes.

7   Q    I did butcher that?

8   A    No, no, I am sorry.  That is correct.  I did not hear,

9   but what you said, that is right.

10  Q    Use that as an example.  Explain how that account line on

11  the ledger would work.

12  A    When you sell a car, you would set up a receivable for

13  the incentive, and then Nissan would pay you the incentive and

14  it would clear off the receivable.

15  Q    And I think we talked earlier about how those payments

16  are made.  They didn't come in per car, they came in like a

17  giant lump sum, right?

18  A    Some of the payments came in as a -- well, one lump sum

19  into the bank account, yes.

20  Q    The bank account we are talking about is different than

21  the generally ledger account?

22  A    Right.

23  Q    So the money -- correct me if I get this wrong -- the

24  money gets direct deposited from Nissan into the bank account

25  --

1    A    Correct.

2    Q    -- and then you would go in and figure out and reconcile

3    what every dollar of that deposit went to put it into the 100

4    to 200 different lines in your general ledger?

5    A    Someone else would actually make the entry, but I would

6    look over the account after they made the entry.

7    Q    Who made the entry?

8    A    Depending on the store, I have two different girls that

9    do it for two different school stores.

10   Q    But you would have to approve it, right?

11   A    No, the report would go directly to them and they would

12   just enter it, and then at the end of the month, I would print

13   the schedule and look at the schedule.

14   Q    Check it?

15   A    Right.

16   Q    What happens after they prepare it, is there a submission

17   or is there a finalizing, is there something that you did

18   after they prepared it, or if they put it in there, it would

19   just sit there?

20   A    If they put it in there, it would sit there.  If

21   something was incorrect, they would have to make an entry or

22   move.  But no, when they posted the entry, it was in there.

23   Q    So it's fair to say that it was your responsibility,

24   though, to make sure that their postings were correct?

25   A    Because I oversaw the office, yes.

1    Q    Okay.  I think you said when you got to Serra Nissan, the

2    books were a disaster.  I think somebody else used that, but

3    you agreed with that characterization of it, right?

4    A    Yes, ma'am.

5    Q    There was two different sets of books for the separate

6    dealerships that you kept, right?

7    A    Yes.

8    Q    When you say disaster, what was wrong with the financials

9    when you got there?

10   A    Different accounts just had old balances.  Like

11   receivables had old, aged balances that weren't collectible.

12   Stuff like that.  Just random aged receivables.

13   Q    Is it fair to say that those ledger accounts that you

14   were talking about, they were inaccurate?  If I'm

15   understanding you, the problem was if somebody who had done

16   your job before had not accurately kept this ledger?

17   A    I would say it just got them oversaw -- I guess she

18   oversaw some things that are not correct.

19   Q    She oversaw things that were --

20   A    That's not a good word.  She wasn't, I guess, running the

21   schedules regularly and keeping up with them.

22   Q    Okay.  So, was it important to accurately input that

23   information on that general ledger schedule you are talking

24   about?

25   A    Yes.

1   Q    Okay.  If you didn't accurately report it, your financial

2   calculations for taxes, for income, for paychecks, for

3   calculating net, calculating gross, if you didn't do that

4   accurately, it would be completely screwed up, right?

5   A    Yes.

6   Q    Earlier you said that as you got -- sorry to change

7   topics for a minute -- you said you got the deals from Jeff

8   Green, and as you got them you made a list.  And you put the

9   dates that you gave them to Mr. Green on there -- no, I got

10  that wrong, you are shaking your head.

11  A    I didn't get the deals from Jeff Green.  I got them from

12  the Cullman store.

13  Q    As you got them from the Cullman store, that's when you

14  created your list, and then you put the dates that you gave --

15  that you gave the Cullman deals to Mr. Green on Government's

16  Exhibit 24, that list we've all been referring to?

17  A    Yes.

18  Q    Okay.  Can we call up Government's Exhibit 24, the first

19  page.  Can we just blow up the top half?

20       So, Ms. Branch, you are talking about that column date

21  given?

22  A    Yes, ma'am.

23  Q    You would have given that top deal jacket -- excuse me,

24  top two on March 28, 2013, right?

25  A    Yes.

1    Q      And then the next day on March 29, 2013?

2    A      Yes.

3    Q      And then eight more deals on April 1st, 2013?

4    A      Yes.

5    Q      And then three on April 2nd, 2013?

6    A      Yes.

7    Q      So you made four trips with the Cullman deal jackets to

8    Mr. Green, and you never had any discussions with him at all

9    when you brought those deals to him?

10   A      I don't think it was in regards to those deals.  It might

11   have been good morning or --

12   Q      You just kind of went in and said, hey, and dropped them

13   on his desk and left?

14   A      I am sure.  Yeah, I think on several occasions he wasn't

15   even in there, I just laid them on his desk.

16   Q      You never called him and told him to pick up these deals

17   for me?

18   A      I do not remember doing that.

19   Q      You don't remember not doing it, though; you could have

20   done it, or do you actually remember whether you called him to

21   come pick up these deals?

22   A      No, I am almost positive I took them to him.

23   Q      Okay.  So you make the four trips over there.  And your

24   understanding, each time you do that, is that the purpose is

25   to bring those to him for him to make the Birmingham deal

1    jackets?

2    A    Yes.

3    Q    Okay.  Had you ever had to bring people documents to make

4    fake deal jackets before?

5    A    No, ma'am.

6    Q    Had you ever seen fake deal jackets created at any of the

7    dealerships you worked at?

8    A    No.

9    Q    In your experience, I think in 16 -- no, 16 years?  What

10   was the math on that?  18 years.  In 18 years in the car

11   industry, how many times did you see fake deal jackets

12   created?

13   A    I had not.

14   Q    Never before?

15   A    No.

16   Q    Okay.  So, the time when this was explained to you, you

17   thought it was okay to make fake deal jackets?

18   A    Yes, I did.

19   Q    Okay.  So, had anyone ever had a talk with you, maybe in

20   your accounting background, no one ever said, hey, the

21   creation of false documents is generally not a good practice

22   in accounting or life?

23   A    No, ma'am.

24   Q    No one ever had that discussion?

25   A    No.

1    Q     In your life, had you ever created false documents,

2    submitting false tax returns, or creating a false bank

3    statements, or any documents that you created in your own

4    personal life?

5    A     No, ma'am.

6    Q     How come?

7    A     I just haven't.

8    Q     Did you know it was wrong in your personal life to make

9    false documents?

10   A     I just have never done that.

11   Q     Okay.  So at the time you made the four trips, you 100

12   percent understand the purpose of that is for Jeff to make the

13   fake deal jackets like Forest told you.  And I want to ask you

14   about the "pull SVN jackets" up in top right.  Earlier you

15   said the purpose of that was in the event of an audit?

16   A     No, I did not say that.

17   Q     Okay.  Let me back up.

18         Mr. Broome, said your role in the audit process, part

19   of what you do is pull the deal jackets?

20   A     No, I usually give the list to someone in my office to

21   pull the deal jackets.

22   Q     Okay.  The auditor from Nissan sends you the list and

23   says these are the deals we want pulled?

24   A     Correct.

25   Q     I have that.  Then you give this to somebody and say,

1   hey, this is what Nissan wants, can you go pull these deal

2   jackets?

3   A    Correct.

4   Q    So you knew that Nissan would come on site for an audit

5   and would ask to see copies of the jackets, right?

6   A    I believe so.

7   Q    Can we go to page 2 of that exhibit.  If we could call up

8   the middle e-mail.

9        A minute ago when you were talking about your e-mail

10  back to Mr. Visser -- and I will come back to the first

11  sentence -- but you said, "Jeff also created a Birmingham deal

12  jacket for each of these deals, so we would have it if they

13  ever request the deals to be pulled."  The "they" was Nissan

14  North America, right?

15  A    Yes.

16  Q    And if they ever request the deal to be pulled was if

17  they asked it to be pulled during an audit, right?

18  A    Yes.

19  Q    So you knew when you wrote this e-mail that the purpose

20  of those Birmingham deal jackets was to hide these in the

21  event of an audit?

22  A    I wouldn't say hide, no.

23  Q    What word would you use?

24  A    To pass the audit.

25  Q    Okay.  What happens if you don't pass the audit; you get

1    a charge back, right?

2    A    Yes, I believe so.

3    Q    You understood charge backs because when the dealership

4    -- when money came -- when the funds got charged back, you had

5    to account for them on the ledger, right?

6    A    I believe, yeah, we had one charge back since I have been

7    there.

8    Q    Was it the $24,000 one?

9    A    No, I don't remember.

10   Q    I think the 2013 audit results were April, and you were

11   there in 2012.  So that $24,000 charge back would have been

12   after you had been there for like five months?

13   A    Right.  I don't remember the amount is what I meant.

14   Q    It was 24-something.  So the amount wasn't real

15   important.  It's just that you would have noticed the $24,000

16   amount coming out of the account, right?

17   A    Yes, I don't remember it in particular.

18   Q    You knew that if something went wrong in the audit or if

19   Nissan found something, Nissan would take money back from the

20   dealership that it had gotten the incentive, right?

21   A    Yes, I believe so.

22   Q    So when you wrote, "so we would have it if they ever

23   request the deal to be pulled," you understood that if you

24   didn't have that Birmingham deal jacket, and they saw the

25   Cullman deal jacket, it would be caught, and there would be a

1    charge back, right?

2    A    I don't know that they would -- as far as pulling the

3    deal jackets, they don't -- Nissan auditors don't actually

4    pull the jackets.

5    Q    No, no, no, I know.  You did.  That's why you wrote pull

6    -- that's why you just said you were responsible; that he

7    knows you, they gave you the list, and then you asked somebody

8    to pull the jacket -- did I get that wrong?  I thought you

9    were saying Nissan e-mails you?

10   A    Correct.

11   Q    They say here is the deal jackets we want to look at.

12   You asked somebody to go pull those jackets so that they're

13   sitting there when Nissan gets there.  I have that process

14   right?

15   A    Yes.

16   Q    You guys are shifting these 15 sales.  You are told --

17   let me make sure I have my list right.  Get the deals, someone

18   is going to send the deals from Cullman, you take the Cullman

19   deals to Jeff Green, Jeff Green will make the fake Birmingham

20   deal jackets, you need to keep a list of the deals, and they

21   had to be RDR'd in Birmingham.  Right?  So you know what's --

22   you have already said, you knew they were shifting the sales,

23   the 15 sales, right; that's not in dispute, right?

24   A    No.

25   Q    Okay.  So, in June of 2013, the deals that you have sold

1    in March -- right, they haven't been audited yet, have they?

2    A    No.

3    Q    Because the end date, I think, you said earlier would

4    have been April 10th, 2014.  Right, April 2014?

5    A    The end date of --

6    Q    The one-year period that they would have to audit if the

7    -- I think earlier the --

8              THE COURT:  I think that's testimony earlier in the

9    trial.  I am not sure if you have gone over that with Ms.

10   Branch.

11   BY MS. WICK:

12   Q    Do you remember the one-year audit period limitation that

13   Nissan had to do the audit?

14   A    I am not sure how it went in the one-year -- would be or

15   how that works.

16   Q    So, let's just say that the incentive period ended April

17   1st, 2013.  So let's just say it was April 1st, 2014, that the

18   audit period ended.  Okay?  When you sent this e-mail, you

19   were still in that audit period, right?  You could still get

20   caught by Nissan in an audit?

21   A    Yes.

22   Q    Okay.  You write, "Jeff also created the Birmingham deal

23   jackets for each of these deals so we would have it if they

24   ever request the deal to be pulled."  You were the person that

25   they would send that request for the deal to be pulled to,

1   right?

2   A     Yes.

3   Q     So you knew when you sent this that Jeff creating the

4   Birmingham deal jackets would allow you to hide from Nissan

5   during the audit that these cars were never sold in Birmingham

6   and they were sold in Cullman?

7   A     I didn't know this was wrong.

8   Q     That was my question.  My question --

9   A     What is your question?

10   Q     My question was is when you wrote, "Jeff also created a

11   Birmingham deal jacket for each of these deals so we would

12   have it if they ever request the deal to be pulled" you knew

13   the purpose of that was to hide it during an audit if they

14   audited these deals?

15   A     I don't know that I meant it that way.  I see how you can

16   interpret it that way, but I don't know that I meant it in

17   that way.

18   Q     Let me go back to the first sentence.  You said, "These

19   deals were not booked in accounting, but I have a list of

20   these deals and can manually add them to any report that

21   Nissan requires."

22         You were talking about -- I think Mr. Broome

23   mentioned, and I forget the word you used -- but it was

24   essentially the data report that you had send to Nissan in the

25   event of an audit, right?

1    A    Right.

2    Q    And that was your job as the controller?

3    A    Yes, I would say so.

4    Q    In the past, I think you said you were a controller

5    before you were at Serra Nissan, right?

6    A    Yes, I had been.

7    Q    Had you participated in manufacturers' audits before?

8    A    No, I had not.

9    Q    You never had before?

10   A    No.

11   Q    Okay.  So this Serra Nissan was your first manufacturer

12   audit -- incentive audit?

13   A    Correct.

14   Q    So, when you said, I have a list of these deals and can

15   manually add them to any report that Nissan requires, was it

16   your understanding that when Nissan asked you for that data,

17   it was suggested what information you gave to them, like you

18   could decide what data you kept and what data you didn't share

19   with them?

20   A    I didn't think about that situation during this e-mail.

21   Q    What were you thinking when you sent this e-mail?

22   A    I was thinking that Randy had said that I was supposed to

23   have booked those deals in accounting, and I did not and was

24   telling him that because it was too late at this point to book

25   them, so that I would add them to the report.  And --

1    Q    Oh, I'm sorry.  No, no, no, you finish.

2    A    I am done.  Thank you.

3    Q    Why didn't you book those deals in accounting?

4    A    I was not told to.

5    Q    Was it a common practice -- my understanding was you

6    booked hundreds of deals in accounting.  Did you always need

7    somebody to tell you to book these deals in accounting before

8    you booked them?

9    A    I didn't physically book them ever.  Someone else in my

10   office did.

11             THE COURT:  Can I see counsel up at the bench for a

12   moment, please.

13   (The following proceedings were held at the bench, out of the

14   hearing of the jury:)

15             THE COURT:  Help me make sure that we're not getting

16   terminology confused here, because I thought Mr. Shepard

17   testified that he booked the deals into the Reynolds system

18   after Mr. Green made the second set of jackets, and that the

19   testimony is that the general managers did all of the

20   inputting into Reynolds until the deal went to accounting to

21   be finalized.  So I am just wondering whether what you are

22   referring to is the same thing that the witness is referring

23   to.

24             MS. WICK:  No.  I don't think so, Your Honor.  And I

25   am sorry, I am a little confused in terms of what you were

1   saying to what the terms were.  What Mr. Shepard was talking

2   about was that he RDR'd the deals which was the separate

3   system.  I asked if he had ever booked deals, if he ever

4   booked deals in accounting, and he said, yes.  But he did not

5   say he booked these 15 deals into accounting.

6            THE COURT:  Okay.

7            MS. WICK:  Maybe that's the confusion.

8            THE COURT:  Okay.  Maybe that's why I was getting

9   confused.  Okay.  I just wanted to make sure.  Okay.  Thanks.

10            (Conclusion of bench conference.)

11   BY MS. WICK:

12   Q    Ms. Branch, a moment ago I was asking you about the first

13   sentence and we were talking about the audit process.  When

14   Nissan asked you for the data, they asked you to send the

15   customer name, the customer address -- I think you were

16   present when Mr. Creecy talked about all the information that

17   Nissan would request, right?

18   A    Yes.

19   Q    Okay.  You remember the data that you sent to Nissan?

20   A    Yes.

21   Q    Okay.  When you sent that data, did you change any of it?

22   A    No.

23   Q    Why not?

24   A    I don't know I just didn't.

25   Q    Did you get the impression that when he asked you for

1  that data, that he wanted the real data and not fake data?

2  A    I don't understand.   I mean --

3  Q    What was your understanding when Nissan asked you, we

4  want you to send us this data, did you understand them to want

5  honest data or false data?

6  A    I am assuming the data that was pulled from the system.

7  Q    Okay.   So the real data that was in the Reynolds and

8  Reynolds accounting system?

9  A    Correct.

10 Q    Because you understood as an accountant that the purpose

11 of an audit was to make sure that the RDR matched the

12 Reynolds, matched the deal jacket, right?   You understood

13 that?

14 A    Yes.

15 Q    Okay.   So when you write that you can manually add these

16 or remove these to the Nissan report, you knew that would be

17 to hide it from Nissan in step one of the process, didn't you?

18 A    No, I was stating because I had not booked the deals in

19 accounting, like he implied in what he wanted me to do, that

20 the only option I would have would be to add them to the

21 report.

22 Q    You can manually add them to any report that Nissan

23 requires, any report -- not the Birmingham, not the Cullman

24 report, not one report, to any report, because then, can we

25 call up the other e-mail -- Mr. Visser writes you back and

1    says, "Okay.  Just manually add them or manually remove them

2    if they audit Cullman when they do the next audit.  We have 12

3    months from the date the incentive was paid."  Did you e-mail

4    him back and say whoa, whoa, whoa, I am not okay with manually

5    or adding removing and submitting false information to Nissan?

6    A    I thought that the fact that they did these switchings

7    between the stores was not wrong.

8    Q    Even when it requires the creation of a false set of deal

9    jackets, you thought it was okay to submit that information to

10   Nissan when you had to create false paperwork to hide it?

11   A    I did not understand that at the time, no.  I still do

12   not believe I was doing anything wrong.  I did not believe

13   that Forest would have instructed me to do anything wrong.

14   Q    Ms. Branch, earlier Mr. Broome asked you if you had any

15   idea about all of the fraud that was happening in Serra Nissan

16   while you were working there that started in, I think, January

17   of 2013.  I think your answer was no?

18   A    Correct.

19   Q    I want to clarify, while you were there, you had never

20   heard that anybody at the dealership was fraudulently

21   inflating the income information of other people, submitted to

22   financial institutions, to customers that would otherwise not

23   qualify for car loan funding to be able to get loans that they

24   weren't entitled to?

25   A    I don't remember hearing that, no.

1   Q     Okay.  And you never heard that people were creating

2   fraudulent utility bills to financial institutions or fake

3   credit applications to show people live together, so that they

4   could also get cars they weren't otherwise entitled to?

5   A     Not before the investigation.  I mean, what time frame

6   are you referring to?

7   Q     You started in 2012.  I think the testimony was that the

8   fraud started in January '13.  So January '13 until those

9   people were arrested and charged.

10  A     I don't remember the time frame of when I realized that

11  people were being charged for fraud.

12  Q     Prior to them being charged, you were never aware of any

13  of that happening at the dealership as the controller?

14  A     Not that I remember, no.

15  Q     You never heard of anybody power booking and submitting

16  book out sheets to financial institutions that had features

17  that did not exist on the vehicle?

18  A     No, I do -- I remember some checks we had to write for, I

19  think, they call it power booking, but I am not sure.  I don't

20  know that it was anything that I did on purpose at the time.

21  Q     It was the bank's contact with you saying that they had

22  found out that the cars had been power booking and that you

23  had to reimburse them for the amount that they had paid that

24  you weren't entitled to at the dealership, right?  You had to

25  pay those banks back?

1    A    There was some invoices, yes, I remember Randy giving me

2    some of those to pay back.  But I didn't know at the time that

3    it was fraud or that it was done on purpose.  I didn't know

4    enough about it to -- they would remember writing some checks

5    back to some banks for that.

6    Q    And you never heard about the down payment assistance

7    program where people lied about customers having down payments

8    when in fact the dealership paid it to get them into a car?

9    A    I heard about that later, as well.

10   Q    Not before they were charged -- not while it was

11   happening prior to people being charged?

12   A    No, I don't remember them doing that.

13   Q    And you never heard about people using straw buyers to

14   purchase a vehicle?

15   A    I have heard of that in previous -- in passing, but I

16   don't know that it was happening at that store.

17   Q    And people fraudulently increasing the value of a

18   customer's trade-in -- or trade-ins that never existed?

19   A    No, I was not.

20   Q    You never heard of the finance manager's quoting

21   customers inflated monthly payments so that they could put in

22   warranty and GAP insurance without the customers realizing it?

23   A    No, I was not aware of that.

24   Q    So as the controller of the dealership where Mr. Green

25   testified that seven or eight people were charged for a fraud

1    scheme, you never heard about any of those practices while you

2    were the controller?

3    A    Other than the few that I just stated, no.

4    Q    Did you ever have any conversations with Mr. Visser about

5    the 15 shifted sales?

6    A    Back in March, no.

7    Q    When did you have conversations with Mr. Visser about the

8    15 sales?

9    A    This e-mail here in June.  I don't believe that -- when

10   the subpoena was sent, I informed him that when we realized

11   that they were Birmingham -- or Cullman deals, I informed him

12   that the list was actually for Serra Nissan deals, but we had

13   the -- they were Serra Nissan deals and we only had the

14   Cullman deals.

15   Q    Do you remember when you informed him of that?

16   A    I think I have the e-mail.  Somewhere around, but I am

17   not sure of the exact date, but it was probably a little bit

18   before we actually submitted the documents to...

19   Q    When you said actually before you submitted the documents

20   to --

21   A    -- for the subpoena, to the government, or to Alan Baty.

22   Q    To Mr. Baty.  Okay.

23   A    Because it took us a while to actually locate the deals.

24   Q    So the day after the subpoena was issued on June 18th

25   when Mr. Visser testified that they had figured out that it

1  was the 15 and he e-mailed Nissan, you didn't have any

2  conversations with anyone that those were the 15 deals that

3  government had asked for?

4  A    No, that is not -- I did not.

5  Q    So, when did you become aware that the subpoena was for

6  the 15 Cullman deals that had been shifted?

7  A    When, like, I stated earlier, one of the billing clerks

8  for Cullman stated that she recognized one of the names, and

9  we actually realized that they were Cullman deals and not

10 Birmingham deals.

11 Q    Okay.  When you say Cullman deals, the subpoena provided

12 you with the Cullman stock numbers.  So that was on there.

13 When did you realize that they were the 15 deals that had been

14 shifted, that the fake deal jackets had been created for?

15 A    The stock numbers are the same for both stores.  The last

16 six are the vin, the stock number for Cullman, and the stock

17 number for Birmingham.

18 Q    Except for the "C"?

19 A    That "C" was something that I am assuming, from hearing

20 Jeff's testimony, he put in there -- I have never -- we have

21 never put a "C" in front of the stock number on a new car.

22 Q    Right.  And he testified that he did that on purpose.  My

23 question was when did you realize that the 15 deals that we

24 asked for in the subpoena were those 15 shifted Cullman deals

25 -- not that they were Cullman deals, that they were the 15

1    deals?

2    A    When one of the billing -- my Cullman billing clerk said

3    that the customer's name sounded familiar, and that that was a

4    Cullman customer.

5    Q    Okay.  And then you realized, oh, those are the 15 deals

6    from the list on my desk?

7    A    No, and then I took -- I looked up some of the stock

8    numbers and saw that I pulled them up -- tried to pull them up

9    under Birmingham and they would not pull up.  And so I

10   switched to Cullman, and they pulled up under Cullman's books.

11   Q    Did you try pulling them up in Birmingham using the "C"

12   stock number?

13   A    No, I was just putting the last six in the vin.

14   Q    Okay.  So they don't come up in Birmingham, and you

15   pulled them up in Cullman, and that's what you realized, oh,

16   these are the 15 Cullman deals we shifted?

17   A    Right.  That's when I realized they were Cullman deals,

18   yes.

19   Q    Okay.  I feel like we're saying two different things.  I

20   get that at some point you realized that the Cullman deal

21   jackets existed, but you couldn't find the Birmingham deal

22   jackets.  What I am asking you is when did you realize that

23   that subpoena was for the 15 deals that you had shifted, not

24   any 15 Cullman deals, but the 15 from March that you guys had

25   shifted from Cullman to Birmingham?

1   *A*     When my billing clerk stated that and I went back and

2   looked and they were -- those deals are all around the same

3   time when I noticed the March date.

4   *Q*     At that point in time, did you tell anybody, hey, even

5   though they're asking for these Cullman deals, Jeff created

6   these 15 Birmingham deal jackets.  So there's also these other

7   Birmingham deal jackets out there that they might be asking

8   for -- seeing that's how the subpoena was sent to Serra

9   Nissan -- did you have any conversations with anyone about

10  that?

11  *A*     No, I did not.

12  *Q*     Did you tell anybody in regards to that subpoena that

13  there were 15 Birmingham deal jackets that you knew existed?

14  *A*     No, I did not because I never actually saw those deal

15  jackets.

16  *Q*     But in your e-mail, you said Jeff also created a

17  Birmingham deal jacket for each of these deals.  Did you tell

18  anyone that I think Jeff created some deals based on this

19  e-mail that the government asked for?  Did you tell anybody

20  about that?

21  *A*     No, at this point, I don't believe I even remembered that

22  he had even created deal jackets because I never remember

23  seeing them.

24  *Q*     So there were two subpoenas issued in 2014.  The second

25  one asked for these 15 deals, and you realized that they're

1    Cullman deals.  There was a subpoena issue to Serra Nissan

2    Birmingham, you realize there's only Cullman deal jackets.

3    And although you have never made fake documents in your career

4    and you have never shifted sales, this episode completely

5    slips your mind when asked about by the government to produce

6    15 jackets that you knew had been created in a duplicate set?

7    A    I did not know that that had happened.  According to my

8    e-mail, Jeff had been told to make the jackets, but I never

9    saw them.  When we went to look for the 15 deals, the only 15

10   deals we had were the Cullman 15 deals.

11   Q    Okay.  And I understand that you couldn't find them.  My

12   question was is did you tell anyone there may be 15 deal

13   jackets out there that Jeff created that we can't find?

14   A    No, because I do not remember that at this point.  This

15   was, what, a year and a half later.  I don't remember exactly.

16   Q    Earlier you said that when Cullman lost those sales,

17   Birmingham would pay the incentive at the end of the month.  I

18   think you were talking about the $700 and the $500 on

19   Government's Exhibit 24, right?

20   A    I believe I know what you are talking about, yes.

21   Q    Can we go back to the first page of 24.  Just call up the

22   top half.

23        I want to make sure I had this right.  I thought you

24   said $500 per car was what you had to pay Cullman for the

25   processing, like in Randy's instructions, that was the $500 to

1    pay Cullman?

2    A    That was what Forest told me, yes.

3    Q    So Forest told you we're going to have to pay Cullman

4    $500 per car, plus the $700 per car was what?

5    A    I believe that was the incentive at the time.

6    Q    So that $500 and $700, so you were going to have to pay

7    Cullman $1,200 for all 15 cars -- or per car?

8    A    Yes, that's what I was told to do.

9    Q    Had you ever paid incentive money to Cullman prior to

10   this from the Birmingham account?

11   A    No, but I had only been there four months, so no I had

12   never done that.

13   Q    At any dealership that you had before, had you ever paid

14   incentive monies from one account to another dealership's

15   account?

16   A    I had never worked for a dealership that had the two.

17   Q    The two Nissan manufacturers?

18   A    Right.

19   Q    When you wrote, "pay Serra Nissan VW for SEC+," you said

20   earlier that was because -- I'm going to get all that wrong if

21   I talk about the warranties -- but that was basically because

22   when you shifted the sales, you had to do something on the

23   books in order for the warranties to kind of match up, right?

24   A    The warranty were billed to Birmingham, so Cullman was

25   going to have to write a check from -- Cullman was going to

1    have to write a check to Birmingham for the warranties.

2    Q    That seemed like a normal process or procedure for you at

3    a dealership for all the financial activities for one

4    dealership to pay for the other's warranties to kind of cover

5    up that one pay that the other one didn't?

6    A    I had never really done anything like this before so, no,

7    I didn't think anything about it.

8    Q    And you didn't understand that the documents that were

9    submitted to Nissan would say that the customer's warranty was

10   running out of Birmingham, even though it was running out of

11   Cullman?

12   A    I didn't think that would really matter --

13   Q    I didn't mean to interrupt you.  You said, "I didn't

14   think that would really matter," please finish.

15   A    That it was from a different store, the warranty.  And as

16   long as they have the warranty, I am not sure that it would

17   matter what store it was issued from.

18   Q    You didn't understand that those SEC+ contracts have a

19   number on them, based on what store they bought it at, so that

20   when the customer called and gave that number to Nissan to

21   access its warranty, that when it has a fake document and they

22   didn't have the real document, they wouldn't be able to access

23   that warranty, didn't you?

24   A    I am pretty sure that the Security+Plus warranty goes by

25   the vin numbers.  So if they would have given them the vin

1    number, it would have pulled up.

2    Q    The bogus contract number that was associated with it?

3    A    No, the vin number --

4              MR. BROOME:  Your Honor, I hate to object, but I

5    don't think there's been any testimony that the warranties

6    were bogus.  Mr. Green, as I remember the testimony said, I

7    didn't put those in the jackets.  I didn't have to.  That's

8    the document I didn't put -- so, there weren't bogus

9    warranties.  I would object to the term that she is using.

10             MS. WICK:  I can say altered if that would be

11   clearer.  He testified that they were different; that they

12   said, Center Point.  Some of the SEC contracts that he made.

13   If it's that confusing, it's really not that important that

14   she didn't understand.

15             THE COURT:  Well, I think, if I am hearing the

16   testimony correctly, Ms. Branch is explaining that if a

17   customer gave a vin number, that the customer would receive

18   the warranty coverage requested?

19             MS. WICK:  I think Ms. Branch is saying that if they

20   gave the vin number, that would get them the end result.  I

21   don't know if Ms. Branch knows if the contract number on the

22   customer's paperwork didn't match what was submitted to Nissan

23   if that would create a problem.

24             THE COURT:  Why don't you ask her that question.

25   BY MS. WICK:

1    Q    Ms. Branch, if the customer contacted Nissan and gave

2    their vin number, and then gave their SEC+ contract number,

3    and that contract number wasn't the same as what was reported

4    to Nissan, would that create an issue?

5    A    No, it would not.

6    Q    Why not?

7    A    Because the vin number is what's important, and the

8    agreement number actually -- as long as the vin number matched

9    and the customer's name matched, the agreement number wouldn't

10   matter from what I understand.

11   Q    Okay.  You mentioned earlier that there were internal

12   auditors that came to Nissan.  Can you tell us about that

13   process?

14   A    They basically just look over the books once a year to do

15   the tax returns, and stuff like that.

16   Q    Who?  Like a CPA firm?

17   A    I can't think of their name.

18   Q    Were they looking for fraud?

19   A    I don't know.

20   Q    You didn't have conversations with them as the

21   controller?

22   A    I don't remember them mentioning fraud.

23   Q    Is it your understanding that when internal auditors come

24   to prepare tax returns that they're doing a forensic audit for

25   fraud?

1   A    No.

2   Q    I think earlier you said it was defense exhibit -- do you

3   have the defendant's exhibits?

4        Earlier you said that you were balancing the books,

5   and I think it's Defense Exhibit One -- earlier when you were

6   referring to it, I think you said that this $18,000 was to pay

7   Cullman for the incentives; is that right?

8   A    This is the receipt I believe.  Is that what you said?

9   Q    I will tell you what, so I don't want to get it wrong,

10  just explain to me again what the $18,000 was for?

11  A    The $18,000 is from when Forest instructed me to pay the

12  $500 per car and the $700 per car.

13  Q    Okay.

14  A    From Birmingham to Cullman.  Sorry.  It's confusing

15  between the stores.

16  Q    Got it.  Okay.  So this was the incentive repayment from

17  Birmingham to the Cullman store for what Cullman lost as a

18  result of the cars being shifted in Birmingham?

19  A    Plus $500.

20  Q    Plus the $500.  Right.  But you never saw those

21  instructions that Mr. Broome showed you in the facts, you just

22  were told by Mr. Housner to send the $500?

23  A    Correct.

24  Q    So that $500, plus the $700 -- $1,200 per car times 15 --

25  I am trusting your math is $18,000 -- did you also send back

1    Nissan the $68,400 that you got because of the shifting at

2    that time?

3    A    No, I did not.

4    Q    Okay.  On the deal jackets, you said you wrote "wrong

5    dealer."  And the reason for that was because the SEC+ was

6    billed to wrong dealer.  Did I get that right?

7    A    Right.  It was billed to Birmingham and Cullman instead

8    of Cullman.

9    Q    Why did you mark that on the jacket?

10   A    Because when I pulled the deal, I realized that

11   Birmingham had been billed instead of Cullman.

12   Q    When did you pull those deals?

13   A    I don't remember exactly when.  Probably around the time

14   that I wrote that check paying Birmingham or --

15   Q    Is it this one?  Defense Exhibit Two?  Is that the one

16   you are talking about?

17   A    Yeah, and again, I am guessing.  I think that it would be

18   around the same time.

19   Q    So in about July of 2013, you had pulled those deals.

20   Why would you have pulled them in like on or around July 2013?

21   A    I was probably looking at the warranty schedule or

22   something.

23   Q    Okay.  So that's when you figured out that there was that

24   billing problem, you wrote it on the deal, and then you wrote

25   a check between the accounts to balance it?

1    *A*    Right.

2    *Q*    Ms. Branch, earlier it was discussed that Exhibit Number

3    24 -- can you pull that back up?

4        It was discussed that this document, that's actually

5    like a stapled copy in the upper left-hand corner -- but this

6    was a piece of paper stapled to the second page shown on your

7    desk, right?

8    *A*    Yes, that's what I believe happened, yes.

9    *Q*    And earlier Mr. Broome said, well, you weren't trying to

10    hide anything.  But when these deals were logged in March 2013

11    and you had one year from the audit to be caught by Nissan in

12    April 2014, roughly, you had to keep these deals on your desk

13    in case the audit came, didn't you, because otherwise how

14    would you keep track of which 15 you had to manually add or

15    remove when they asked for the data?  And you couldn't get rid

16    of this, right, because wasn't this what Forest told you to

17    keep in the event of an audit?

18    *A*    No, he didn't tell me to keep this in the event of an

19    audit.  He told me to keep it for the list -- how many deals

20    there were.

21    *Q*    Why did you think you needed to keep a list of the

22    specific deals that were being shifted from Cullman to

23    Birmingham?

24    *A*    I don't know.  There was a lot of paperwork on my desk.

25    I don't remember specifically why other than maybe when I

1    pulled the deals, I just threw it back on my desk and didn't

2    throw it away or do anything with that.  I had an electronic

3    copy as well.

4    Q    But so this piece of paper -- and let's go to the second

5    page.  The second page in your e-mail, you say, "but I have a

6    list of these deals," which is what was stapled to the front

7    page.  So you literally printed out these e-mails.  This was a

8    printout, right?

9    A    Right.

10   Q    Then you stapled it to the list.  And you left it on your

11   desk.  And your e-mail literally says, "I have a list of these

12   deals and can manually add them to any report that Nissan

13   requires."  So you are just leaving them there so that you

14   still had it when the audit came.  Because otherwise, you

15   hadn't entered them.  You had no way to keep track of it,

16   except unless you happen to remember the Excel spreadsheet.

17   But you had to keep this list in case the audit came because

18   that's what you told them to do, right?

19   A    On my desk.  I don't think I will keep it on my desk for

20   a year and a half or how ever long.  I don't think I would

21   have thought to do that.

22   Q    How else would you have kept track of them?

23   A    I had a list that I made on my computer.

24   Q    You had that e-mail on your computer, too, but you

25   thought it was important to print out the e-mails, print out

1  the list, staple them together, and put them on your desk, and

2  that's when you found them in the search warrant, right?

3  *A*    I don't remember keeping them for that purpose.

4  *Q*    But you don't remember what purpose you kept them for

5  putting them out and leaving them on your desk?

6  *A*    Other than pulling the Serra Visser Nissan jackets,

7  that's the only reason I remember as far as the Security+Plus

8  portion of it.  That's the only other reason I would have left

9  it on my desk.

10  *Q*    But that Security+Plus, that was back in July 2013.  When

11  we seized this off your desk in October 2013, that was three

12  months later that this was still sitting on your desk after

13  you had done the Security+Plus contract check.  So why was it

14  still sitting there three months later if you didn't need to

15  hold on to it in case you were audited?

16  *A*    I am pretty sure there was a lot of stuff on my desk

17  during that time that could have been thrown away, shredded,

18  done something else.  There was a ton of documents on my desk.

19  *Q*    Were there any other listed deals that had e-mails

20  attached that instructed you on how to hide those deals in the

21  event of an audit?  Were there any other of those on your

22  desk?

23  *A*    I am guessing not.

24  *Q*    We could have missed them in the search warrant, don't

25  get me wrong, but I am asking you, do you remember if there

1    were any other lists of deals that you shifted in those
2    attached e-mails that said, hey, if we get audited, here is
3    how you hide it?
4    A    No, ma'am.
5    Q    Okay.  Can we pull up Government's Exhibit 40.
6         Ms. Branch, I think you said you had never seen these
7    instructions before?
8    A    No, ma'am.
9    Q    Before two Saturdays ago, I think, when Mr. Broome showed
10   you?
11   A    Yes.
12   Q    Where it says, "this is important," and I am under, "so
13   here is the process, number three."
14         "The bill of sale and title app will be added to the
15   deal when the deal comes over from Cullman.  The deal will be
16   booked into Nissan Birmingham accounting.  This is important.
17   In audits, Nissan pulls the sales directly from Reynolds, so
18   the sale must be booked into Reynolds for Birmingham."
19         Do you understand what that's referring to?
20   A    Oh, yes.
21   Q    What is your understanding of what that's talking about?
22   A    That he -- which portion, the bill of sale or the book?
23   Q    Just the part where it says, "the deal will be booked
24   into Nissan Birmingham accounting.  This is important.  In
25   audits, Nissan pulls the sales directly from Reynolds, so the

1    sale must be booked into Reynolds for Birmingham."

2    A    Yes, he stated that he wanted the deals booked in

3    Birmingham.

4    Q    What is your understanding -- why was that important for

5    the shifting sales process?

6    A    To pull to the audit report.

7    Q    I'm sorry?

8    A    To pull from the report.

9    Q    What do you mean to pull from the report?

10   A    The audit report that he is mentioning here.

11   Q    That's the audit report where we were talking about

12   earlier where Mr. -- somebody from Nissan would e-mail you and

13   say, I need your Reynolds and Reynolds accounting data?

14   That's the report?

15   A    Correct.

16   Q    Okay.  So he is saying, this is important that we do it

17   this way because if we don't book into Nissan Birmingham

18   accounting, Nissan is going to see that it was sold in

19   Cullman, right?

20   A    I believe so, yeah.

21   Q    Who is responsible for booking deals into accounting?

22   A    I have two billing clerks, one for Cullman and one for

23   Birmingham.

24   Q    Did any of them ever come to you and say, hey, there's

25   this really weird thing, we're being asked to book Cullman

1    sales into the accounting system?

2    A    No, none of them.

3    Q    None of them ever came to you and said they were being

4    asked to do that?

5    A    No.

6    Q    Would it have been odd for them if they were sent deal

7    jackets and being asked to book these deals in the Birmingham

8    accounting system?

9              MR. BROOME:  Your Honor, I am going to object.

10   There's been no testimony any booking clerks were asked to do

11   anything like this.

12             MS. WICK:  She just said that the clerks --

13             THE COURT:  This is what we talked about a few

14   minutes ago.  And I'm --

15             MS. WICK:  Let me rephrase the question.  Actually,

16   it's 5:16.  If you want, we can end, and we can figure out a

17   better way to ask this tomorrow, Your Honor.

18             MR. BROOME:  Judge, I would like to proceed on.

19             MS. WICK:  I am sorry?

20             THE COURT:  Rephrase your question.  Okay?  Try to

21   ask it again, and let's see where we can go, please.

22   BY MS. WICK:

23   Q    Ms. Branch, do you actually know how these 15 deals were

24   booked in accounting?

25   A    They were booked in Cullman's books by the Cullman

1    billing clerk.

2    Q    Which billing clerk?

3    A    The Cullman billing clerk.

4    Q    Who?

5    A    Her name is Yolanda.

6    Q    Yolanda.  Okay.  When you say they were booked --

7              THE COURT:  Okay.  You know what, I need to speak to

8    counsel again.  Let's go in the hallway for about two minutes.

9    (The following proceedings were held in the hallway, out of

10   the hearing of the jury:)

11             THE COURT:  I went back and I looked at my notes

12   from Mr. Shepard's testimony, and I was scribbling at this

13   point, so they're not complete.  And I also may have written

14   something down incorrectly.  Let me get back to them.

15             Okay.  Mr. Shepard explained that there are three

16   stages that data is input into the Reynolds system.  There's

17   the pending stage, there's the book stage, and there's the

18   final stage.  His testimony, if I understood it correctly --

19   and let me see one other thing.  I am trying to find my notes

20   about what his position was at the dealership.  Do you

21   remember?

22             MS. WICK:  Sales manager.

23             THE COURT:  Okay.  So, my understanding was that the

24   sales managers did the inputting for pending and booked.  They

25   took it all the way through booking and input the RDR

1    information.  Then the deals went to accounting.  The

2    accounting department took the deals through final status,

3    stripped the paperwork, okay, and then finalized the sale.

4         You keep asking Ms. Branch about people in her

5    accounting department booking the deals.  Okay.  The testimony

6    that Mr. Shepard gave is that the accounting department didn't

7    do the booking, they finalized the deals.  And that's what I

8    was asking you about up at the bench earlier.  So you are

9    confusing the terminology that has been given to the jury, and

10   perhaps dangerously so, given what the allegations are.

11        MS. WICK:  I think, I mean --

12        THE COURT:  But if I am wrong about what Mr. Shepard

13   said and I am misunderstanding the stages --

14        MS. WICK:  No, no.

15        THE COURT:  -- correct me.

16        MS. WICK:  Your Honor, I don't think you are.  I

17   think one or two things could be happening.  One, I think Mr.

18   Shepard could have been wrong about the process.  Maybe.  The

19   other thing is is there are two separate systems, so, people

20   could have been booking in Cullman in a separate accounting

21   system than from Birmingham.  But I think Ms. Branch could

22   explain --

23        THE COURT:  When you use the term "booking," what do

24   you mean?

25        MS. WICK:  Well, can I ask her to explain that?

 1   Because all the instructions say, booked in accounting.  They

 2   need to be booked in accounting.  It makes sense for the

 3   controller to explain the booking process.  Then if it's

 4   different, then -- I mean, wouldn't it make sense to ask her

 5   can you explain the book -- there's some confusion about the

 6   different statuses.  Can you explain who had the authority to

 7   do pending, who had the authority to do, what -- the booking

 8   that we keep referring to, and then the final?  And I can just

 9   walk her through it.

10           THE COURT:  Okay.  Because you are right,

11   Government's Exhibit 40 refers to booking.

12           MS. WICK:  -- in accounting.  Right.

13           THE COURT:  And if that's what Mr. Shepard and the

14   other sales managers were doing -- and first of all, Ms.

15   Branch has said she didn't even see Government's Exhibit 40.

16           MR. BROOME:  Right.  There's no evidence that either

17   billing clerks did either.

18           THE COURT:  So, you are possibly mixing apples and

19   oranges here in some pretty critical testimony.

20           MS. WICK:  So since it's 5:16, and I don't -- if the

21   Court wants to resolve this now, I can go back in there and

22   ask her to explain.

23           MR. BROOME:  I would rather do it now so the jury

24   doesn't worry about it all night.

25           MS. WICK:  I can ask her to just explain the stages

1    who had the authority, etc.

2            THE COURT:  Right.

3            MS. WICK:  Okay.

4            MS. MURNAHAN:  What she --

5            MR. BROOME:  We're not going back into the billing

6    clerks about those instructions because they never saw those

7    instructions.

8            THE COURT:  Government's Exhibit 40.

9            MS. WICK:  Did somebody testify to that?

10           MR. BROOME:  Nobody did testify to that.  That's

11   what my argument is.

12           MS. WICK:  Nobody testified -- my point was is

13   somebody in accounting booked the -- had to finalize these

14   deals.

15           MR. BROOME:  She told you, she gave them to the

16   billing clerks from Cullman that handles Cullman.

17           MS. WICK:  That's what I was trying -- okay.

18           THE COURT:  Amanda, let me explain something to you

19   that is also part of the incongruency that I am having trouble

20   wrapping my brain around.  When Nissan North America comes in

21   to do an audit, there are two stages.  The first stage is they

22   ask for a bunch of information to be downloaded, right?  The

23   second page is they come physically to the dealership, examine

24   a bunch of paperwork, right?

25           MS. WICK:  Yes.

1          THE COURT:  When Nissan North America did the audit

2     in 2013, they asked for that download of information as the

3     first stage, right?

4          MS. WICK:  Yes.

5          THE COURT:  And in that download of information,

6     they found the 15 deals, right?

7          MS. WICK:  No.

8          MR. BROOME:  They never audited these 15 deals.

9          MS. WICK:  These are --

10         MS. MURNAHAN:  That audit was for a prior time

11    period.

12         THE COURT:  Okay.  Okay.  I can see how that's

13    confusing.

14         I thought that was --

15         MS. WICK:  I will clarify that.

16         THE COURT:  Okay.  Because you are asking about the

17    audit and Nissan finding and not finding.  And -- okay.

18         MS. WICK:  No, no, but I appreciate that because if

19    that is confusing to you, that is absolutely confusing to the

20    jurors.

21         So I will make clear that the scope of the audit from

22    2013 that you provided information for was this date.  These

23    deals were outside of that.

24         MR. BROOME:  There's no question about that.

25         MS. WICK:  You questioned her about that?

1          MR. BROOME:  No, no, that would save me having to
2    question her on redirect about that.
3          MS. WICK:  That way we can clarify that.  But I will
4    do the booking process now to clarify that, and then if you
5    want to, I can do the audit clarification tomorrow, because
6    there's no way we are not going into it tomorrow.
7          MR. BROOME:  I don't see why you can't finish today.
8    I would like for this jury to hear what she has to say today.
9          MS. WICK:  Because you can't limit the government --
10   I mean, you chose to put the defendant on the stand.  The
11   government gets its full opportunity --
12         MR. BROOME:  She was going to tell you she didn't do
13   this.  So I don't know why you keep making about why I chose
14   to put her --
15         THE COURT:  Ms. Wick, about how much longer do you
16   think you have for --
17         MS. WICK:  Your Honor, when we get the defendant on
18   the stand, it's so rare to limit it and ask that the time be
19   cut off.
20         THE COURT:  I am not asking you to cut off the time.
21   I am asking you how much longer.
22         MS. WICK:  I am sorry, Your Honor.  I have to look
23   at all of my checkmarks.
24         THE COURT:  I am not asking for a specific number
25   either.  I am just trying to get an estimate by how much?

1          MS. WICK:  How long have we been going?

2          MS. MURNAHAN:  I don't know.  I think she took the

3    stand at around 3:00.

4          MS. WICK:  No, I mean cross.  How long on cross?

5          MR. BROOME:  20 or 30 minutes.

6          MS. WICK:  Maybe that and more?

7          THE COURT:  Okay.  Straighten this out, finish this

8    line of questioning, and then let me know how much time you

9    think you have left after that.  Okay?

10          MS. WICK:  Okay.

11          THE COURT:  How does that sound?  We'll see where we

12    go from there.

13          MS. WICK:  Okay.

14              (Conclusion of hallway conference.)

15          THE COURT:  Please proceed.

16    BY MS. WICK:

17    Q    Ms. Branch, can you explain -- there is confusion about

18    the term of the booking process.  And could you explain to us

19    -- there are currently multiple stages and different words

20    used, can you just explain to us in terms of when things are

21    booked into Reynolds and Reynolds, as you understand that

22    term, can you just explain that process, the different stages

23    and the proper words to use.

24    A    Okay.  There is actually two sets depending on the DMS

25    you are using.  For instance, with Reynolds and Reynolds, you

1    will have different terms versus when you are just using a

2    Dealertrack, which will be Cullman different -- they just have

3    different labels, per se, because of the two different

4    computer systems.

5    Q    And I just want to make sure we're talking about the

6    accounting systems that were in place in March 2013?

7    A    Okay.  Again, there's two different -- there was two

8    different DMSs.

9    Q    It was Reynolds and Reynolds in Birmingham and --

10   A    -- dealer track.  Correct.

11   Q    Please keep going.

12   A    Okay.  For Reynolds and Reynolds, the F & I manager, when

13   they start a deal, it's just pending, and then the finance

14   manager books the deal, and then the accounting office

15   finalizes the deal.  In some of the Randy's e-mails, he is

16   saying, "booked," which in turn would actually mean

17   "finalized."

18   Q    Okay.

19   A    And then for Dealertrack, there is "accepted" which is

20   what the F & I manager does, and there's "capped" which is

21   what the accounting office does, which in fact means "booked."

22   Q    Are you saying cat?

23   A    Capped.

24   Q    Capped?

25   A    C-a-p-p-e-d.

1    Q    Okay.  So I want to make sure I have this.  This is super

2    important.  The Dealertrack first stage, the F & I guys, it

3    would be "accepted"?

4    A    Correct.

5    Q    The accounting office would do "capped"?

6    A    They would cap the deal, c-a-p-.

7    Q    Right.  And that's the equivalent of booking it?

8    A    Booking it into accounting --

9    Q    Okay.

10   A    -- is probably the best term.

11   Q    And then is there a finalization process for Dealertrack?

12   A    No.

13   Q    So that one really only had two stages?

14   A    Correct.

15   Q    And I want to make sure I got the Reynolds and Reynolds

16   one in Birmingham right.  The first stage would be the F & I

17   manager would put it in and that would be pending status?

18   A    The sales reps would probably put it in to be pending,

19   and then F & I would do the booked.

20   Q    Okay.  So either the -- can I say either the sales desk

21   or F & I would do the pending status; is that accurate?

22   A    I believe so.  I am not sure.

23   Q    And then F & I would book the deal into accounting?

24   A    No.

25   Q    No, I got that wrong.  They would book the deal?

1    *A*    Correct.

2    *Q*    And then accounting -- the accounting office, your office

3    would finalize the deal?

4    *A*    Correct.

5    *Q*    Okay.  Functionally, the pending status is just inputting

6    the information?

7    *A*    Right.  It's just when the customer first comes in.

8    *Q*    Okay.  Functionally, what happens when the F & I person

9    in Reynolds books the deal?

10   *A*    Nothing really.  I mean, it doesn't do anything to

11   accounting.  It just -- it's like the stage that lets

12   accounting know that now they're done with it.  They're

13   completed.  They have set up everything in the deal that

14   they're going do and it's done.

15   *Q*    So is it fair to say that while it's in pending, they can

16   change, they can edit -- if the customer changes something, if

17   the deal was restructured, pending status is their time to fix

18   things before they book the deal, which notifies accounting

19   that it's ready to be finalized by your office, stripped, sent

20   to the lender, all those things that we talked about earlier?

21   *A*    Right.

22   *Q*    Okay.

23   *A*    But to confuse it, Randy uses the term "booked" as also

24   meaning "finalized," and I think that's where the confusion

25   lies.

1    *Q*    So when you -- are you referring to --

2    *A*    I said booked, as well because it's booked in accounting.

3    It's on our books.  So that's where that booked term comes in.

4    *Q*    So when we were looking at Government's Exhibit 40

5    earlier, and I think Mr. Visser said, it's important that

6    these deals be booked in accounting, your understanding, based

7    on previous times he confused the terms, was that what he

8    meant by that is that it's important that it be finalized in

9    accounting in Birmingham?

10   *A*    Correct.

11   *Q*    Okay.

12            MS. WICK:  Your Honor, is that -- okay.

13            THE COURT:  Okay.

14   BY MS. WICK:

15   *Q*    Were these 15 deals ever finalized in accounting in

16   Birmingham?

17   *A*    No, ma'am.

18   *Q*    Okay.  Were they kept in Cullman in Dealertrack?

19   *A*    Yes.

20   *Q*    Okay.  Do you know if they were entered in pending status

21   or booked in Reynolds and Reynolds in Birmingham?

22   *A*    I do not know.

23   *Q*    Okay.  Did anybody -- I want to make sure I haven't been

24   confusing this -- I am trying to make sure I don't continue

25   confusing the terms.

1      If I understood you right, you were saying that Mr.

2  Visser had a tendency to use "booked" in accounting as meaning

3  "finalized" in accounting in Birmingham.  So for clarity.  Can

4  I refer when he says in his e-mail, "it's important that this

5  be booked," I am going to say, it's important that this be

6  finalized in accounting in Birmingham.  That's what you

7  thought he meant?

8  A     Yes.

9  Q     Okay.  Who would have been responsible for finalizing

10  those deals in accounting in Birmingham?

11  A     The billing clerk.

12  Q     Okay.  Did any of the billing clerks come to you and say,

13  I have been told to book -- that you finalize these deals in

14  accounting in Birmingham, but it looks like they were sold in

15  Cullman?

16  A     No, they didn't.

17  Q     When Forest came to you and gave you the instructions

18  that you talked about earlier, you said, the deals -- he told

19  you the deals were going to come to you, you would have to

20  take the paperwork to Jeff for him to make the jackets, you

21  would have to keep a list of the deals, and they had to be

22  RDR'd in Birmingham.

23      He didn't say anything to you about having to book

24  the deals in accounting?

25  A     No, and I don't remember him telling me about the RDR's.

1    He just told me they were going to be moved from -- so, I

2    guess I assumed they would have to be RDR'd.  But, no, he did

3    not tell me that they needed to be booked or finalized in

4    accounting for Birmingham.

5    Q    Okay.  So, did you have any conversations with anybody in

6    your accounting department of how these 15 deals were going to

7    be booked in order for them to be able to shift them and do

8    all the accounting necessary?

9    A    No, because I was never told to book them or finalize

10   them in Reynolds and Reynolds.

11   Q    Let me ask this a better way.  Do you remember what

12   happened to these 15 deals in terms of the accounting process?

13   A    They were treated like Cullman deals and capped in the

14   Dealertrack system.

15   Q    Okay.  So your understanding was that, just like any

16   other deal in Cullman, they were accepted by the F & I guys in

17   the Dealertrack system, in Cullman, and then capped in the

18   accounting system in Cullman?

19   A    Yes.

20   Q    So your understanding was none of what Mr. Visser said is

21   important; that none of that happened?

22   A    No, I was never told to do that.

23   Q    Okay.

24             MS. WICK:  Your Honor, you wanted a time estimate

25   after that?

1        THE COURT:  Yes, please.

2        MS. WICK:  I would say maybe 30 minutes.

3        THE COURT:  Okay.  You all have been the bosses

4   about lunch.  You are also the bosses about when we wrap up.

5   On previous days, we have wrapped up at the end of somebody's

6   testimony.  We're not there yet.  We're going to have about 30

7   more minutes of cross examination from Ms. Wick, and then Mr.

8   Broome will have an opportunity to ask some more questions.

9        MR. BROOME:  Mr. Broome won't ask any more

10  questions, Your Honor.

11       THE COURT:  Do you all feel like you can listen to

12  another 30 minutes so that we can wrap up this examination, or

13  would you rather get started again in the morning, or do you

14  want a few minutes to confer with each other and make a

15  decision?

16       JUROR MORGAN:  We're going to have to come back

17  anyway tomorrow?

18       THE COURT:  Yes, ma'am.  Tomorrow, when Ms. Branch's

19  testimony is concluded, we'll have closing arguments.  You

20  will hear jury instructions, and you will have to deliberate.

21       MS. WICK:  Your Honor, I would hate to say the time

22  and be wrong and then trap them here like that.

23       THE COURT:  Sure.  Sure.  Well, we don't want to

24  make anybody feel uncomfortable.  So let's go ahead then and

25  break, and we'll pick up with this in the morning.  I hope

1    everyone has a safe trip home.

2         JUROR MORGAN:  Sorry.

3         THE COURT:  No, don't apologize.  That's exactly why

4    I ask because I want to make sure we're being considerate of

5    everybody.

6         Please follow the normal instructions.  Please do not

7    discuss the case.  Please do not do research about the case.

8    All right?

9              (Jury out at 5:39 p.m.)

10        MS. WICK:  Your Honor, do you want to meet about the

11   charges today or tomorrow or whatever you prefer?

12        THE COURT:  Mr. Broome, should we meet about charges

13   now or in the morning?

14        MR. BROOME:  That's fine, Your Honor.  Whatever Your

15   Honor's preference.

16             (Jury in at 5:40 p.m.)

17        THE COURT:  Okay.  I forgot to say what time to come

18   back in the morning.  Let's say 9:15 tomorrow morning in case

19   we have any odds and ends we need to take care of please.  All

20   right.  Thank you.

21             (Jury excused at 5:41 p.m.)

22        THE COURT:  Why don't we go back to chambers to talk

23   about the charges, please.

24   (Discussion on the record in chambers at 5:46 p.m. with the

25   defendant not present.)

1          THE COURT:  The government has proposed

2    instructions, they are Document 24.  Why don't I just go

3    through each one, Mr. Broome, and ask if you have an

4    objection.

5          MR. BROOME:  Judge, just for future reference, I

6    think my secretary called and was told to send the

7    instructions to chambers.  They filed theirs, and I sent mine

8    to chambers.  Which way should I do it in the future?

9          THE COURT:  We generally have -- and I may have

10   miscommunicated on this -- we generally have charges e-mailed

11   to chambers.  We come up with the charge and then -- but

12   it's --

13         MS. WICK:  Okay.  I am sorry, Your Honor.

14         THE COURT:  Either way is fine.  I think that's what

15   our civil pretrial instruction says.  So frankly we just

16   haven't thought -- I haven't, my fault, I haven't thought

17   through it on the criminal side.

18         Okie doke.  Mr. Broome, government's proposed charge

19   Count One, conspiracy.

20         MR. BROOME:  Judge, I think that's from the standard

21   Pattern charges, from what I understand.

22         MS. WICK:  I believe all of ours are Pattern

23   instructions.

24         MR. BROOME:  I guess I would have no objection to

25   number one.

1          THE COURT:  Okay.  The second -- I am sorry -- it
2    starts with Proposed Charge Number Two for Count One.
3          MS. WICK:  No, no, with Charge Number One, I think,
4    is like this introduction.
5          THE COURT:  Oh, that's what happened.
6          MS. WICK:  So, I pulled it out when I did the
7    preliminary charges.  So I am missing a page.
8          THE COURT:  Okay.  I apologize.
9          MS. WICK:  No, it's okay.  I was like, that was a
10   little confusing.
11         THE COURT:  That's on me.  So Proposed Charge Number
12   Two, Count One, Conspiracy.  I apologize for the confusion.
13         MR. BROOME:  That's pretty much out of the -- I
14   didn't compare it word for word.
15         THE COURT:  Okay.
16         MR. BROOME:  I am pretty sure it's out of the book.
17         THE COURT:  Then government's Requested Charge
18   Number Three, Counts Two through Sixteen.
19         MR. BROOME:  You took that out?
20         MS. WICK:  Yeah, I am pretty sure they're just
21   Pattern instructions.  We didn't change anything.
22         If there was a change, it was one of those parentheses
23   paragraphs where it wasn't applicable.
24         THE COURT:  Right.  Okay.
25         MR. BROOME:  I have no objection to that.

1              THE COURT:  Government's Request to Charge Number

2    Four.

3              MR. BROOME:  Judge, I'm still a little confused what

4    they're talking about if I aided and abetted folks.  I think

5    they're saying that I did it.  Or either conspired with folks

6    or I did it.  I would think Number Four may be a little

7    redundant or confusing.  I am not really charged with aiding

8    and abetting.  I understand you don't have to charge me with

9    that.

10             MS. MURNAHAN:  We did include it in the indictment.

11             MS. WICK:  We did.  That is actually not legally

12   required under the theory of liability, but I believe we did

13   say 1343 and (2).

14             THE COURT:  You did say that.

15             MS. MURNAHAN:  1349.

16             MS. WICK:  Yes.

17             THE COURT:  Yes.

18             MR. BROOME:  If that's the case, I guess that's

19   correct.

20             THE COURT:  Then Government's Charge Number Five.

21             MR. BROOME:  I think I even asked for the knowingly,

22   willingly, and intentionally.

23             THE COURT:  Okay.

24             MS. WICK:  Well, there is a distinction here because

25   the knowingly and willfully that the government requested is

1    9.1A.   The one that defense counsel requested was 9.1B.   The

2    knowingly's are the same, but the willfully's are different.

3              THE COURT:   I apologize.   I gave my copy -- no,

4    wait, I can pull it up.   I just remembered.

5              MR. BROOME:   Judge, the only part of their

6    willfully, I would object to, would be the "While a person

7    must have acted with the intent to do something the law

8    forbids, before you can find that person acted willfully, the

9    person need not be aware of the specific law that her conduct

10   may be violating."

11          And the willfully that I requested just says, "the

12   term willfully means the act was done voluntarily and

13   purposely with the specific intent to violate a known legal

14   duty, that is, with the intent to do something the law

15   forbids."

16          It's almost what the other one says, except it says

17   that I need not be aware of the specific law or rule that her

18   conduct may be violating.

19              MS. WICK:   Those are completely different mens rea

20   requirements.   The one that Mr. Broome asks is for tax cases

21   and structuring cases, and there's ample 11th Circuit case law

22   that conspiracy and wire fraud would not have the heightened

23   mens rea.   The definition of willfully that he requested in

24   9.1B -- and that's some of the case law that the government

25   cited in its objection.

1           MR. BROOME:  I am not sure if it's a heightened

2    standard.  I just think it's more applicable in this case

3    because --

4           MS. MURNAHAN:  Does she have a known duty not to

5    commit wire fraud?

6           MR. BROOME:  She didn't commit any wire fraud, and

7    you will find that out tomorrow.

8           MS. WICK:  Actually the annotation section of the

9    Pattern that calls it the heightened mens rea that exclusively

10   says the conspiracy annotation actually say that 9.1A should

11   be used.

12          MR. BROOME:  I think if you give the charge, which

13   we will obviously ask for, the good faith defense, by telling

14   someone I need not be aware of the specific law or the rule,

15   that my conduct may be violating kind of is incongruent with

16   my good faith defense, which we would ask the Court to give.

17   So we would object to the last part of the last sentence in

18   their requested Number Five.

19          MS. WICK:  The government would just argue that

20   there would be no need to modify the Pattern.  Removing that

21   sentence makes it confusing, and that sentence is actually

22   what makes it the lower mens rea of 9.1A, as opposed to 9.1B.

23   I think it unnecessarily confuses.

24          I do think Mr. Broome is correct that under the law he

25   has put on -- at least with Ms. Branch's testimony --

1    sufficient evidence to give the good faith defense

2    instruction.  But I think good faith instruction would be

3    complete instruction that the Pattern suggests.  And 9.1A

4    would be what the jury should hear and not removing what's

5    essential.  Because that is what delineates 9.1A versus 9.1B.

6    And removing that last sentence, I think, makes it worse

7    rather than -- it makes it legally confusing rather than

8    better.  And there's no case law to support that the 9.1B

9    would be what wire fraud or conspiracy would require.  And

10   taking that sentence out leaves it ambiguous enough that -- I

11   don't think it would be a proper instruction on the law for

12   the jury.  I think it would make it unnecessarily confusing.

13            MR. BROOME:  I don't see how it could be confusing.

14            MS. WICK:  Because we don't have to prove that she

15   needed to be aware of a specific law or rule.  That's 9.1B.

16   That's case tax cases.  That's currency structuring cases.

17   That's not our burden.

18            THE COURT:  Help me with this -- and you will have

19   forgive me, this is my first criminal trial.  So I need you to

20   walk me through a little bit of this, please.

21            Let me read one more thing before I ask my question.

22            (Pause.)

23            THE COURT:  All right.  I may be missing it.  There

24   is knowing language with respect to Count One, the conspiracy

25   count.  So that's in Charge Number Two.  There is knowing

1    language with respect to the wire fraud count.  So that's

2    Charge Number Three.  Where is the willful language in Count

3    One, or Counts Two through Sixteen, or in the aiding and

4    abetting count such that the Court must define the term

5    "willfully" for the jury?

6         MS. WICK:  So if you are looking at Charge Number

7    Two Count One, Conspiracy -- and you flip to -- it may be

8    easier just, page 4 of Doc.  24, if you look at the elements.

9    "Second:  The defendant knew the unlawful purpose of the plan

10   and willfully joined in it."

11        THE COURT:  Oh, I had highlighted the "knew" and

12   didn't highlight the "willfully."

13        MS. WICK:  No, it's okay, I had look when I was

14   doing my motion.  That's the only reason I know.

15        Then in Charge Number Three for the wire fraud --

16   where is it?

17        MS. MURNAHAN:  I don't think it's in the elements

18   there.

19        MS. WICK:  It may not be there, actually.

20        THE COURT:  Okay.

21        MS. WICK:  I think -- hold on a minute.  Wire fraud

22   may be less than conspiracy.  I learned something new.  I

23   thought it was in there, but I have not seen willfully

24   actually.

25        THE COURT:  All right.

1          MS. WICK:  It might help, Your Honor, since I messed

2     that up, maybe to clarify that conspiracy has to be willfully

3     where wire fraud can be knowingly.  Because those are -- you

4     are right.  They're different.  I thought they both had to be

5     willfully.  But I am not seeing willfully in wire fraud.  And

6     the reason that would be relevant is if they could find that

7     she knowingly aided and abetted in the wire fraud, without

8     finding that she willfully conspired -- I know that's a really

9     fine distinction and maybe that's for scholars.  But I think

10    you are right that that would be the accurate description of

11    the law, rather assuming that willfully applied to both.

12         THE COURT:  Okay.  Mr. Broome, I am going to read

13    the annotations to both your proposed charge -- excuse me, on

14    willfully and the government's proposed charge on willfully.

15    If the annotations are consistent with the explanation that

16    the Court has heard this evening, then the Court will use the

17    government's charge and overrule your objection there.  But I

18    will have a draft of the charges for you all in the morning to

19    review.

20         MS. WICK:  It does make sense now that's why

21    conspiracy only has the suggestion at the bottom that says,

22    for willfully, we suggest 9.1A.  And I was like why didn't

23    they put it for wire fraud?  So, okay.  I am sorry.

24         THE COURT:  Okay.  And then Charge Number Six has to

25    deal with multiple counts.  Mr. Broome, any objection there?

1          MR. BROOME:  No, Your Honor.

2          THE COURT:  Okay.

3          MS. WICK:  Can I make a suggestion, Your Honor, that

4    might be a good place to squish in a distinction?  If we were

5    going to explain where it says, "Each count charges a separate

6    Crime...If you do find the defendant..." like put in there,

7    there are different mens rea requirements.

8          THE COURT:  Actually, what I was thinking about

9    doing is saying:  There are a couple of terms that I need to

10   define for you.  You heard the term "knowingly" both when I

11   talked about conspiracy and when I talked about wire fraud.

12   This is what "knowingly" means.  In addition, when the Court

13   explains conspiracy to you, the Court mentioned the term

14   willfully.  Here is what the term "willfully..."

15         MS. WICK:  We can address that in closing since you

16   were going to do the substantive charges which will be really

17   helpful for us.

18         THE COURT:  All right.  Then, Ms. Branch's proposed

19   instructions.

20         MR. BROOME:  Judge, one I think I left out, but I

21   would assume it would be in the standard Pattern charges, the

22   presumption of innocence and reasonable doubt.

23         THE COURT:  Yes, sir.  I got all of that.

24         MR. BROOME:  And I think the government has conceded

25   I put on enough to get the good faith defense.

1          THE COURT:   So that's your proposed Charge Number

2   One.

3          MR. BROOME:   Yes, I think I copied that one

4   directly.

5          Charge Number Two, I also copied.

6          MS. WICK:   That's the subset of the 13.1.  We didn't

7   object because it's included in ours.

8          MR. BROOME:   I will concede that, Three, Four, and

9   Five, that I made up on my own.  But I paraphrased from the

10  first two so they would fit what I would say the facts are in

11  this case.  Like Number Three, "Merely associating with

12  certain people, employers, supervisors, superiors and

13  co-workers, and simply following the instructions..." which is

14  what our defense is, "without any knowledge those instructions

15  advanced a criminal activity, doesn't establish proof of a

16  criminal conspiracy."

17         And I would say that, I took sentences out and put

18  sentences in, and if that is a correct statement of the law.

19  And the same thing with Number Four, again, if I have "no

20  knowledge that those acts advanced the criminal" conspiracy --

21  and I think I was a little redundant in Numbers Five and just

22  said the same thing again.  But I think that's pretty much

23  what the Pattern charges that "a person who doesn't know about

24  a conspiracy but happens act in way that advances some purpose

25  of one doesn't automatically become a conspirator."  And I

1    just rephrased it to say, "the defendant is never to be

2    convicted of a conspiracy where she acted without knowledge

3    that her acts furthered the conspiracy."

4            THE COURT:  Does the government have an objection to

5    Defendant's Requested Charge Number Two?

6            MS. WICK:  Sorry, I lost track.

7            THE COURT:  Sorry, Number Three.

8            MS. WICK:  Yes, the government objected to Three,

9    Four and Five.  Seven was the willfully one that we already

10   handled.  So the only one that government objected to was

11   Three, Four and Five.  We had no objections to One, Two, and I

12   believe, Six.

13           THE COURT:  And I apologize, I read those objections

14   a few days ago.  I have not read them recently.  So what's the

15   government's objection?

16           MS. WICK:  Essentially, Three, Four, and Five do not

17   accurately state the law, and they basically paraphrase the

18   13.1 Pattern in such a way as to make it sound like the

19   government has a higher burden than it does.  We do not have

20   to prove that she knew it was against the law, that she was

21   advancing in criminal activity.  We have to prove that she

22   knew, that she had the intent to defraud, that she knew that

23   they were defrauding Nissan North America.  But the way that

24   Three, Four, and Five are phrased -- and I am sorry, I am

25   always better when I write than I talk -- but the way that

1    they're phrased is a small distinction but a critical

2    difference from how the Pattern explains conspiracy.

3              MR. BROOME:  Yeah, I may have paraphrased them, but

4    I don't think they misstate the law, and I don't think that I

5    said anywhere in Three, Four, or Five that she didn't need to

6    be aware of that for you to prove that I was aware of the law

7    and violated it.  I concede paraphrased that.

8              MS. WICK:  I think the problem is the use of the

9    term advancing a criminal activity, which presumes that you

10   know that it's criminal.

11             THE COURT:  But what about Three?  I am having

12   trouble seeing how that's inconsistent with the standard?

13             MS. WICK:  Well, it's not.  Because he took the

14   first sentence the first part, "Merely associating with

15   certain people, employers, supervisors, superiors, and

16   co-workers..." I think that may actually be from the 13.1

17   Pattern.  The change is "...and simply following their

18   instructions in a work-related setting, without any knowledge

19   that those instructions advanced a criminal activity..."

20   That's the addition?  And that I think goes to the cases that

21   we cite where if there's a Pattern that is sufficient -- and

22   it is covered by a separate Pattern instruction.  "The Court

23   is not required to give a theory of defense instruction that

24   merely recites a defendant's 'not guilty' position and

25   discusses the sufficiency or insufficiency of the evidence or

1    argumentative inferences..."

2            I understand what he is saying -- this is essentially

3    her saying, she was simply following what she -- it's

4    essentially a defense written out in the Pattern.  I think the

5    Pattern is sufficient to play what constitutes this conspiracy

6    and not without him adding language that's basically saying,

7    this is all she was doing, she was just doing what he told

8    her.  That's not actually the valid defense that she was just

9    doing what she was told.

10           MR. BROOME:  I can see that part.  I don't know that

11   I am advancing any conspiracy.  What if you took out the

12   "without any knowledge that those instructions advanced a

13   criminal activity," if that's what you object to.

14           MS. WICK:  I think that the problem is is all of

15   these are paraphrasing 13.1.

16           MR. BROOME:  What's wrong with that?

17           MS. MURNAHAN:  It's duplicative.

18           MS. WICK:  And it's confusing and unnecessary.

19           MR. BROOME:  Unnecessary to your side, I understand

20   that.

21           MS. WICK:  Well, there's a written why they create a

22   Pattern, and I don't know why to -- if you wanted to add

23   certain people, car dealership employers, supervisors -- to

24   make it relevant to this case is one thing, but to add the

25   language that in some way kind of muddies the waters of what

1    the government's burden of proof is I think does more harm

2    than good.

3             MR. BROOME:  I guess that depends on which side of

4    the table you are sitting at.

5             MS. WICK:  I think the table should be what helps

6    the jury understand the law clearest.

7             MR. BROOME:  I don't mind --

8             THE COURT:  I can't think.  Shush.

9             MR. BROOME:  I am sorry.

10            THE COURT:  The reason I am doing this comparison

11   is, Ms. Wick, you said that it might be appropriate, looking

12   at the last paragraph of 13.1, to tailor the language a bit

13   more to the employment setting that we have here, which is

14   what Mr. Broome has done in his proposed Charge Number Three.

15   So, I was trying to see whether there's a way to satisfy both

16   of you by tweaking the language of 13 a little bit.

17            Because the Pattern instruction refers to being

18   present at the scene of an accident or merely associating with

19   certain people.  This isn't really about present at the scene

20   of an event in this case.  It's about a work environment.  And

21   associating with people in that work environment, I don't know

22   that there was any discussion of common goals in this case.

23   So, that --

24            MS. WICK:  Can you tell me where you are at?

25            THE COURT:  Yes, ma'am, I am on page 5.  This is the

1    language from the Pattern Jury Instructions that I understood

2    Mr. Broome paraphrased to create his requested Charge Number

3    Three.

4              MS. WICK:  Sorry, I was looking at the wrong

5    document, Your Honor.  So it would be Doc. 24, page 5.

6              THE COURT:  Doc. 24 is your requested jury

7    instructions.

8              MS. WICK:  Yes, Your Honor, I'm with you.

9         Oh, I see what you are saying, Your Honor.

10        Perhaps we can say, "Of course, simply being present

11   at the scene of an event or merely associating with certain

12   people, employers, supervisors, superiors, or co-workers and

13   discussing common goals and interests doesn't establish proof

14   of a conspiracy"?

15             THE COURT:  Something along those lines.  Does that

16   help you, Mr. Broome?

17             MR. BROOME:  Yes, Your Honor.

18             THE COURT:  So, would the government have an

19   objection to the Court taking out the "present at the scene of

20   an event" language because that does not seem to be applicable

21   here?

22        If have you an objection, that's fine.

23             MS. WICK:  Well, the only reason -- it may be

24   helpful in the sense of if she was just present at a meeting

25   -- or if she was present --

1          THE COURT:  There's no evidence in this case,

2     though, that I have heard that she was present at any meeting.

3          MS. WICK:  It was either she was having a

4     conversation or she wasn't there.

5          THE COURT:  Right.

6          MS. WICK:  Yeah, we can take that out.

7          THE COURT:  Okay.  So "merely associating with

8     certain people, employers..."  So then take that phrase from

9     the defendant's proposed instruction, "...employers,

10    supervisors, superiors, and co-workers, doesn't establish

11    proof of a conspiracy."

12         MS. WICK:  Do you want to take out, "and discussing

13    common goals and interests"?

14         MR. BROOME:  I guess they could be talking about

15    sales and information.

16         MS. WICK:  There were things she probably had

17    conversations with them about.

18         THE COURT:  Okay.  Fine.  All right.  So we just add

19    that specific list of individuals with whom Ms. Branch would

20    have interacted at the dealerships.

21         So the Court is going to sustain the government's

22    objection to Four.

23         Five is "The defendant is never to be convicted of a

24    conspiracy where she acted without knowledge that her acts

25    furthered the conspiracy."

1          MS. WICK:  I think that's a paraphrase at the last

2    sentence, "a person who doesn't know about a conspiracy but

3    happens to act in a way that advances some purpose of one

4    doesn't automatically become a conspirator."  It's just

5    unnecessarily confusing.

6          MR. BROOME:  Judge, again, I think we've got the

7    knowledge and requested Charge Number Five and the "furthered"

8    and the "conspiracy."  So I think even though it's

9    paraphrased, it is applicable here.

10         MS. WICK:  I don't think it's the law.

11         MS. MURNAHAN:  In what act is it if she did

12   something without knowing that that particular action

13   furthered the conspiracy but other actions may have --

14         MS. WICK:  Because whether she knew her own acts

15   furthered the conspiracy is irrelevant if she agreed to the

16   unlawful plan, knew the unlawful purpose, willfully joined in

17   it, and any overt act in furtherance was taken by any

18   co-conspirator.  So this actually misstates the 371.

19         THE COURT:  All right.  The Court will sustain the

20   government's objection.

21         All right.  Then we're fine with "Knowingly."

22         MS. WICK:  Those are the same, Your Honor.

23         THE COURT:  And "Willfully" we've already covered.

24         All right.

25         MS. WICK:  "Willfully" is the one you were going to

1      send a proposed -- that one was kind of still hanging.

2            THE COURT:  Yes, I am going to look at the

3      annotation tonight, and if they're consistent with the

4      government's explanation, I'll use the government's proposed

5      instruction.

6            Is there anything else we need to take up?

7            MR. BROOME:  No, Your Honor.

8            MS. WICK:  Closing tomorrow after Ms. Branch, Your

9      Honor?

10           THE COURT:  I will give the instruction on the law,

11     and then you all will do your closings.  So that the Court has

12     the last word, I will do some housekeeping instructions.  And

13     we will let the jury deliberate.

14           MS. WICK:  I am hoping you have the same rule if we

15     argue too long at our peril.

16           THE COURT:  You argue too long at your peril.

17           MS. WICK:  I feel like I did not heed that at the

18     start of this cross.  I will do it for close tomorrow.

19           THE COURT:  All right.  Well, I have got a little

20     work to do.

21           MR. BROOME:  We do, too.

22           MS. WICK:  Thank you so much.

23           THE COURT:  See you all tomorrow.

24                (Proceedings concluded at 6:41 p.m.)

25