Case 2:15-cr-00167-MHH-TMP   Document 25-4   Filed 02/18/16   Page 1 of 41

VOLUME IV of V, page 696

FILED
2016-Feb-18  PM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF ALABAMA

4                       SOUTHERN DIVISION

5

6   UNITED STATES OF AMERICA,        *
              Plaintiff,             *
7                                    * Case No. CR-15-MHH-0154-S
                 v.                  *
8                                    *
    KIMBERLY H. BRANCH,              *    Birmingham, Alabama
9                                    *     August 13, 2015
             Defendant.             *         9:15 a.m.
10  ********************************

11

12          TRANSCRIPT OF TRIAL BY JURY, VOLUME IV OF V
            BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
13                 UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24  Court Reporter:          Chanetta L. Sinkfield, CCR, RMR
                             United States Federal Courthouse
                             1729 Fifth Avenue North
25                           Birmingham, AL 35203

1

2                         **APPEARANCES**

3

   FOR THE PLAINTIFF:       U.S. ATTORNEY'S OFFICE
4                           Assistant U.S. Attorney,
                            AMANDA SCHLAGER WICK
5                           JENNIFER SMITH MURNAHAN
                            1801 4th Avenue North
6                           Birmingham, AL 35203

7

8  FOR THE DEFENDANT:       WILLIAM H. BROOME, ESQ.
                            1110 Wilmer Avenue
9                           P.O. BOX 1952
                            Anniston, AL 36202
10

11

12

13

14

15

16

17

18

19

20

21

22

23
   Court Reporter:          Chanetta L. Sinkfield, CCR, RMR
24                          United States Federal Courthouse
                            1729 Fifth Avenue North
25                          Birmingham, AL 35203

## I N D E X

### August 13, 2015; VOLUME IV

|                    | *Direct* | *Cross* | *Redirect* | *Recross* | *Further Redirect* |
|--------------------|----------|---------|------------|-----------|--------------------|
| **DEFENSE WITNESS** |          |         |            |           |                    |
| KIMBERLY BRANCH    | 699      | 724     | 734        |           |                    |

CLOSING ARGUMENTS P. 755

JURY QUESTION    P. 806

1                    P R O C E E D I N G S

2

3                        (9:30 a.m.)

4            (Outside the presence of the jury.)

5            THE COURT:  Tammi is bringing you the draft

6    instructions on the law that I e-mailed last night.  I have

7    made a few revisions, but they are minor.  They're stylistic.

8                   (Jury in at 9:32 a.m.)

9            THE COURT:  Y'all ready to get started this morning?

10           ALL JURORS:  Yes, ma'am.

11           THE COURT:  All right.  We were in the middle of

12   some cross examination yesterday.

13        Ms. Branch, as you are walking toward the stand, I

14   will remind you that you are still under oath.

15           THE WITNESS:  Yes, Your Honor.

16           MS. WICK:  Thank you, Your Honor.

17                 CONT'D CROSS EXAMINATION

18   BY MS. WICK:

19   Q   Ms. Branch, yesterday, I kind of jumped around all over

20   the place, and I am sorry for that.  I am trying to go in

21   topic order.  And I am not trying to trick you.  But if don't

22   understand my question, please don't hesitate to ask me to

23   rephrase it.

24        Yesterday, you were talking about the accounting

25   process and you were explaining the booking, and it was very

1    helpful in terms of clarifying.  And I just wanted to make

2    sure we had covered the tiers -- not the tiers, but the I want

3    to say again, and you can correct me if I am wrong -- Cullman,

4    the first step was booking?

5    *A*    No.

6    *Q*    I knew I was going to get this wrong -- accepted?

7    *A*    Yes.

8    *Q*    So the F & I guy accepted in Cullman, and the final stage

9    in Cullman was called capped?

10   *A*    Correct.

11   *Q*    In Reynolds and Reynolds in Birmingham, the first stage

12   was the F & I manager would put it in as pending?

13   *A*    Usually the sales manager.

14   *Q*    The sales manager.  And the -- I think you said the sales

15   manager or an F & I person could book the deal, but that was

16   not final in Birmingham?

17   *A*    Correct.

18   *Q*    Okay.  They just sent it to accounting to notify them

19   that it was ready to be finalized, and that was called

20   finalizing in Birmingham in the accounting system?

21   *A*    Correct.  They didn't really send it to accounting, but

22   accounting could not finalize the deal unless it was booked.

23   So when they booked the deal, they would turn the deal into

24   accounting, and then accounting would be able to pull that

25   deal up and book it.  But if it was still in pending,

1    accounting would send it back, and say, okay, this deal is not

2    booked, so we cannot finalize it.

3    Q    Okay.  I totally understand that.  Okay.  So, for these

4    15 deals that we have been talking about, the ones that were

5    shifted from -- that were actually sold in Cullman but were

6    reported sold in Birmingham, those deals were capped in

7    Cullman you said?

8    A    Yes.

9    Q    Okay.  They could have been booked in pending status and

10   then booked by a finance manager in Birmingham without ever

11   having been finalized in Birmingham, right; because they were

12   two separate systems, weren't they?

13   A    Yes.

14   Q    Okay.  Can you only finalize one car once?

15   A    On one DMS, yes.

16   Q    Okay.  Let me talk with you briefly about the audit that

17   we have been talking about.  Government's Exhibit 25, that

18   everybody was looking at, that audit report from 2013, that

19   closing meeting was held on March 15th, 2013.  That was before

20   these 15 deals, wasn't it?

21   A    Yes.

22   Q    So these 15 deals that we've been talking about, they

23   weren't part of the scope of that audit that Mr. Creecy was

24   talking about?

25   A    No, ma'am.

1    *Q    Okay.  Do you know -- were these 15 deals ever part of a*

2    *Nissan audit?*

3    *A    No, ma'am.*

4    *Q    For that audit, the one that we were talking about, prior*

5    *to these 15 deals -- the one that Mr. Creecy testified -- and*

6    *I think you said, I would have been the one to send the*

7    *accounting data, I would have been the one to pull the deal*

8    *jackets, do you know if there were any fake deal jackets*

9    *created for that audit?*

10   *A    I do not know.*

11   *Q    Did any of those deals that you pulled for that audit*

12   *have two sets of deal jackets?*

13   *A    I didn't pull the deal jackets.*

14   *Q    The ones that you made sure were pulled for Mr. Creecy?*

15   *A    Not that I remember, no.*

16   *Q    You didn't check to make sure there's not a duplicate,*

17   *there's not a double of these deal jackets before we pull them*

18   *for Nissan?*

19   *A    No, I didn't.*

20   *Q    You knew having those deal jackets was important to the*

21   *audit, right?*

22   *A    Yes, that was part of the scope of the audit, yes.*

23   *Q    And you knew that the purpose of that process, having*

24   *those deal jackets for when the auditor came, was to make sure*

25   *that you were doing things properly, right?*

1    *A     Yes.  I believe so.*

2    *Q     Yesterday you mentioned some internal auditors that came*

3    *on that would check what you did.  I think you said that was*

4    *like a bookkeeping audit for tax returns.  Did they audit for*

5    *Nissan -- well, did I mischaracterize what you said; is that*

6    *not right?*

7    *A     We have internal auditors, yes, that come in once a year.*

8    *Q     And I thought I understood you to say the purpose of that*

9    *was they check your bookkeeping to make sure that the debits*

10   *and credits and the books are balanced?*

11   *A     They basically just review the books.*

12   *Q     But they don't audit for Nissan incentives, do they?*

13   *A     I don't know if they -- I mean, I am sure they look at*

14   *all the schedules.*

15   *Q     Do you know if they are familiar with the audit world,*

16   *check the deal jackets?  Do they go through what the Nissan*

17   *auditors do when they come on site to do the Nissan incentive*

18   *audit?*

19   *A     They do pull deal jackets and request paperwork out of*

20   *the deals, so -- inside their audit.*

21   *Q     Would they be able to know if you gave them a fake*

22   *Birmingham deal jacket, that that car was sold in Cullman?*

23   *A     I don't know why they would -- no.*

24   *Q     They wouldn't be able to tell, right, because you would*

25   *hand them a Birmingham deal jacket, and it says the car was*

 1   sold in Birmingham, how would they know if the car was sold in

 2   Cullman, if they didn't call every customer and say did you

 3   buy this car?

 4                MR. BROOME:  Judge, these are multiple questions.

 5   If she would ask one question and let her answer the question.

 6                THE COURT:  Good point.

 7   BY MS. WICK:

 8   Q    If you handed the auditors a Birmingham deal jacket, how

 9   would they know that car wasn't sold in Birmingham?

10   A    I don't know.

11   Q    Could they?

12   A    I don't know.  I guess they could if they -- I have no

13   idea why they would request certain deal jackets at certain

14   points.  But yeah, I guess they wouldn't be able to tell.  I

15   don't know.

16   Q    They would or would not?

17   A    I would think they would not.

18   Q    Okay.  Do you remember -- was it part of your job as the

19   controller to calculate the net profit for the dealership?

20   A    Yes.

21   Q    Do you know what the net profit for the dealership was in

22   2013?

23   A    No, ma'am.

24   Q    Can you ballpark it?

25   A    No, ma'am.  I believe Randy stated something, one million

1    something, but I don't know if he is accurate or not.

2    Q    Do you know what the net profit was for 2014?

3    A    No, ma'am, I don't.

4    Q    Is it part of your job to calculate that for a tax return

5    and other paperwork?

6    A    I don't do the tax returns for the stores, so no.  I

7    mean, I'd calculate it on a monthly basis, but typically I

8    don't keep track of it on a yearly basis without -- if I

9    wanted to know, I could pull the financial statement, but

10   that's not something that stands out in my mind.

11   Q    I think you said -- and I don't want to get the number

12   wrong -- but I think you said it was something a little over a

13   million?

14   A    I think that's what he said, yes.

15   Q    And that was for the Serra Nissan -- that was just Serra

16   Nissan and Serra VW, right?

17   A    If I remember correctly, yeah, that's what he said.

18   Q    That was, I think, at least 20 or -- two percent of the

19   net of that was at least 20 or $30,000.  So your base salary

20   for 2013, not including the net that you got for Serra Visser

21   Nissan, was at least 120 or $130,000, wasn't it?

22   A    If the one point is right, yes.

23   Q    Let's not even use those numbers.  What did you make in

24   salary from Serra Nissan and Serra Visser Nissan in 2013?

25   A    Around $150,000.

Case 2:15-cr-00167-MHH-TMP  Document 25-4  Filed 02/18/16  Page 11 of 41
VOLUME IV of V, page  706
CROSS - BRANCH

1    Q    Do you remember what you made in 2014?

2    A    I believe it was about the same.

3    Q    So at your old dealership, that was a $50,000 increase

4    -- you said you made $100,000 when you left.  So that was 50

5    percent pay raise when you went to Serra Nissan, roughly?

6    A    Yes.  Roughly.

7    Q    Earlier you have said you weren't familiar with the sales

8    side.  Are you familiar with the recap sheet, with what that

9    is?

10   A    Yes.

11   Q    Stipulations?  Stips?

12   A    No.

13   Q    You don't know what stips are?

14   A    Stipulations?  No, I don't know what stipulations are or

15   would be in deal.

16   Q    Do you remember testifying in a hearing after the

17   government did a search warrant in October of 2013?

18   A    Yes, I do.

19   Q    Okay.  Do you remember being asked under oath what stips

20   are?

21   A    I understood you to say stipulations.

22   Q    I said stips, and then I said stipulations.

23   A    Oh, I am sorry.

24   Q    Okay.  So now you know what a stip is?

25   A    No, no, I understood you to say stipulations.

1   Q    Okay.  So do you know what stips or stipulations are?

2   A    Yes, I do know what stips are.

3          MR. BROOME:  Your Honor, I think we're talking about

4   two different things.  We have entered into stipulations here

5   today, and I am sure that's not the same thing as stips are in

6   a car dealer situation.

7          MS. WICK:  Your Honor, I was asking about the sales

8   process, the recap sheet.  I said stips or stipulations.  If

9   the witness is now saying she understands what stips or

10  stipulations is, that's fine.

11         MR. BROOME:  We're still talking about two different

12  things.

13         THE COURT:  All right.  Ms. Wick, why don't you ask

14  your question again and make clear the foundation for the line

15  of questions.

16         MS. WICK:  Sure.

17  BY MS. WICK:

18  Q    Earlier, you said that you weren't familiar with a lot of

19  the sales process side.  I asked you if you were familiar with

20  the recap sheet, which is something they use on the sales

21  side.  You said, yes.  I asked if you were familiar with stips

22  or stipulations, talking about the sales process at the

23  dealership, and I thought you were saying, no, you weren't

24  familiar with stips or stipulations of the sales process at

25  the dealership.

1          I'm not talking about when we say stipulations to

2    facts here in court, but the stips or stipulations that is

3    used in the sales process at the dealership.  Do you

4    understand what those are?

5    A    I understand what stips are, but I have never heard them

6    called stipulations.  So, that was my confusion.

7    Q    Okay.  You didn't know that stips was short for

8    stipulations?

9    A    I had never heard that used in the terminology at the

10   dealership.  I just heard stips.

11   Q    Okay.  And that's fair.  I don't want there to be any

12   confusion about what the question was.

13          Are you familiar with what a "we owe" sheet is?

14   A    Yes.

15   Q    You still work at the Serra Nissan dealership as the

16   controller, right?

17   A    Yes, ma'am.

18   Q    And you have a pretty good relationship with the Vissers?

19   A    I don't really talk to them very often, but I wouldn't

20   say we have a bad relationship.

21   Q    Well, isn't the dealership paying for your legal fees in

22   this case?

23          MR. BROOME:  Judge, I would object to that question.

24          MS. WICK:  Your Honor, that goes directly to her

25   motivation for her answers and why she is here.

1             MR. BROOME:  Judge, I would object to that

2    characterization, also.

3             THE COURT:  Sustained.

4    BY MS. WICK:

5    Q    Ms. Branch, yesterday you talked about a woman named

6    Yolanda -- and I want to make sure -- she is the coster for

7    Cullman, but she is located in the Birmingham store?

8    A    Yes, ma'am.

9    Q    Okay.  Is she who would have capped the deals in Cullman

10   system in Birmingham?

11   A    She would have capped them in the Cullman DMS.  And yes,

12   she is located at the Birmingham office.

13   Q    So she has the ability out of the -- and I think you said

14   that you guys are located actually in the VW side, so in the

15   city of Birmingham -- but she has ability to go into

16   Cullman's, you said Dealertrack system and cap the Cullman

17   deals?

18   A    Yes.

19   Q    Okay.  Can you explain exactly what her responsibilities

20   are as a coster?

21   A    She would pull out the contract and send it to the bank,

22   post the deal into accounting, do any payoffs, write any

23   referral fees, pull up the warranties, and basically just go

24   through the whole deal.

25   Q    When you say pull out the warranties, would she have had

CROSS - BRANCH

1    to send those to -- and maybe we're talking -- I want to make

2    sure I am not talking about the wrong thing.

3         Are you talking about the warranty that starts with

4    the car, or the extended warranty, the SEC+, that we talked

5    about?

6    A    SEC+.

7    Q    So she would have to pull those out and send them to

8    somebody?

9    A    We usually had them sent over to someone else to make

10   sure they got submitted.  If they were new cars, they were

11   submitted -- they were submitted when the vehicles RDR'd.  But

12   if they were used cars, they would still have to be actually

13   manually entered into the system for Security+Plus.

14   Q    Was she responsible for dealing with bills of sale and

15   title applications?

16   A    The bill of sale being the deal and title app, she would

17   give to the title clerk.

18   Q    So who would be responsible for actually pulling out a

19   bill of sale and title application from the deals to do

20   whatever was next to those documents?

21   A    She would give that to the title clerk.

22   Q    So it would be the coster?

23   A    She would pull them out, yes.

24   Q    So she would pull them out and literally hand them to the

25   title clerk to use those to what -- to send them to the state

1    for a title or something?

2    A    The title app -- I believe, or the title.

3    Q    If she pulled out a Birmingham, Center Point bill of sale

4    title application out of a Cullman deal jacket, would she come

5    talk to you about that?

6    A    I don't know.  I don't know if she would notice.  I don't

7    know.

8    Q    It wasn't part of her job to notice if the bill of sale

9    or the title applications that Birmingham with the deal jacket

10   was that bright turquoise color?

11   A    I don't know that she would notice the difference in the

12   documents.

13   Q    So, nobody ever came to you or said anything to you in

14   the accounting office about 15 deals having bills of sale and

15   title applications that were Birmingham in Cullman deal

16   jackets?

17   A    No, they did not.

18   Q    Wouldn't they have had to access those deals pretty

19   regularly?  I mean, wouldn't they be constantly in there

20   looking through the paperwork?

21   A    Not typically after the deal is done, no.  Once the

22   billing clerk caps the deal, it gets filed.

23   Q    And then what happens to it?

24   A    It gets filed on the shelf.

25   Q    Does it just sit there untouched for years?

1   A    Unless for some reason we need something out of it.  But

2   typically, yes, it would just stay in the filing cabinet.

3   Q    I want to go back when we were talking about your

4   testimony in those previous hearings.  Do you remember being

5   asked how often in the daily operation of your business those

6   deal files are accessed on a regular basis for information?

7   Do you remember being asked that under oath?

8   A    I do.

9   Q    Do you remember saying that those deals were accessed

10  daily, regularly, constantly?

11  A    I was referring to all the deals.  So, on a daily basis,

12  at one point we're going to need one deal, two deals on a

13  daily basis.  I wasn't referring to every single deal.  If I

14  remember the question correctly.

15  Q    Would you like me to refresh your recollection with your

16  testimony?

17  A    Sure.

18  Q    You were asked:  To be clear, were dealer files taken

19  during the raid on Thursday night?

20  A    You said:  Yes, ma'am.

21  Q    You were asked:  Tell the Court how you know that to be a

22  fact.  In the accountant office, we keep two years worth of

23  deals because we access them so regularly.  You were asked:

24  In the daily operation of these businesses, are those deal

25  files accessed on a regular basis for information?  Yes,

1    ma'am.

2    A    I was referring to if 300 deals are missing from the

3    filing cabinet, customers are wanting to call about certain

4    things that they need out of those deals, not one particular

5    deal of 300 or 200 deals that -- I don't know how many there

6    were.  But at one point on a daily basis, someone is going to

7    call and want something out of one of those deals.

8    Q    Did anybody need anything out of these 15 deals, or these

9    were the 15 that sat untouched for two years?

10   A    I don't know if they needed anything out of them or not.

11   If they would have been, they would have been on the shelf.

12   Q    I want to talk with you briefly about your attestation.

13   If we could pull up Government's Exhibit 23.

14        Yesterday we were talking about the subpoena that was

15   issued to the dealership, to Serra Nissan for the 15 deals.

16   In fact, I think you said they were issued to the Birmingham

17   dealership.  And you understood that they were looking for

18   Birmingham deal jackets, and you couldn't find Birmingham deal

19   jackets.  I think you also said you didn't review this

20   document; is that right?

21   A    No, I did not read it completely.  Not that I remember.

22   Q    Can we call out the top part from certification and

23   acknowledgment down to the first set of signatures?

24        Ms. Branch, do you see where it says, "I declare under

25   penalty of perjury the foregoing is true and correct"?

1    A     I do see that.

2    Q     Okay.  Did you read that before you signed this?

3    A     I don't remember.

4    Q     Did you understand that signing this and having it

5    notarized was the equivalent of an affidavit under oath?

6    A     I was just asked to sign it by an attorney that -- I

7    just -- no, I did not read it in its entirety and realize

8    exactly -- he told me that I needed something about a

9    custodian or something like that.  And so I printed out and

10   signed it and had my title clerk notarize it.

11   Q     Did you review the content for accuracy at all?

12   A     Not that I remember.

13   Q     So did you contribute or tell the attorney anything to

14   put into this?

15   A     No, ma'am.

16   Q     Okay.  So you had absolutely nothing to do with the

17   drafting of this content?

18   A     Not that I recall.  I remember I think it was e-mailed to

19   me by the attorney to sign.

20   Q     Okay.  Yesterday when we were talking about when you

21   realized that the 15 deals requested in the subpoena were the

22   15 shifted car sales, you said it was some time prior to -- I

23   think you said something about the warranties, like when you

24   had to pay the warranty check, right?

25   A     Can you repeat that?

1    Q    I don't want to butcher what you said.  So, it would be

2    helpful if you could just tell me.

3          When you realized when the 15 deals that were asked

4    for in the subpoena to Serra Nissan, when did you realize that

5    those 15 deals were the 15 shifted sales?

6    A    I believe that was when we realized that they were

7    Cullman deals was the first -- of course, signed, and then

8    when I started to look up each stock number and saw that they

9    were all Cullman, and then I also, I had a list of those

10   deals.  So I looked at that list and realized that they were

11   the same deals.

12   Q    Okay.  And it's coming back to me now.  I think you said

13   it was right before you produced the documents to Mr. Baty to

14   give to the government, right?

15   A    I don't know how long it took for them to actually get

16   them copied and all of that.

17   Q    Okay.  Can we agree that it was before you signed this on

18   August 1st, 2014?

19   A    Yes.

20   Q    Okay.  So when you signed this under penalty of perjury,

21   you were aware that this subpoena asked for the Serra Nissan

22   deal jackets for these 15 shifted deals that you knew Jeff had

23   created?

24   A    No --

25              MR. BROOME:  Your Honor, I am going to object to

1    form of that question.  The subpoena has been admitted.  The

2    subpoena speaks for itself.

3              MS. WICK:  I can break that question down, if it

4    needs to be simpler, Your Honor.

5              THE COURT:  Why don't you try breaking it down.

6    BY MS. WICK:

7    Q    Ms. Branch, let me back up a minute.  Okay?  Because I

8    don't want it to be confusing.

9              You said you knew that this subpoena asked for the 15

10   deals that had been shifted, the Birmingham deal jackets,

11   prior to signing this on August 1st, 2014, right?

12   A    No, I knew that it was asking for the 15 deals, and the

13   only 15 deals that we had were the 15 Cullman deals.

14   Q    Your e-mail to Mr. Visser in June made it clear that you

15   knew Jeff had created 15 Birmingham deal jackets for these

16   deals, right?

17             MR. BROOME:  Judge, again, I object to the form of

18   that question.

19             THE COURT:  I am sorry.  What did you object to?

20             MR. BROOME:  She said, "you knew" -- if she could

21   just repeat the question.

22             THE COURT:  Okay.

23             MS. WICK:  Chanetta, can you read the question back

24   please?

25                  (The last question was read.)

1    A    No, I did not know that they were created.  My e-mail to

2    him stated that Birmingham jackets had been created by Jeff;

3    that at that point, I was using the conversation that I had

4    with Forest Housner that Jeff was to create Birmingham

5    jackets; that I was not positive at that point --

6    Q    Okay.

7    A    -- that they actually were.

8    Q    And I am sorry.

9    A    -- I was trying to reassure him, I guess.

10   Q    Okay.  Sorry, I couldn't find -- is it possible for us to

11   call up 24 with this?  Is that possible?  Together?  I don't

12   know if that's possible.  Let's just do 24.  Sorry.  And the

13   second page.  And the middle e-mail.

14        Ms. Branch, when you e-mailed Mr. Visser on June 3rd,

15   did you say, "I think Jeff also created a Birmingham deal

16   jacket"?  Or did you say, "Jeff also created a Birmingham deal

17   jacket for each of these deals so we would have it if they

18   ever request the deal to be pulled"?

19   A    No, I did not say, "I think," but I never actually saw

20   these jackets.  I just knew that they had supposedly been

21   made.

22   Q    Because you made four separate trips to bring him the

23   Cullman deals for him to duplicate them, didn't you?

24   A    I gave him the Cullman deals, but I never saw the actual

25   Birmingham deals.

 1   *Q*    So, you sent this e-mail months after making four trips

 2   to bring him all those deals, and you were unclear if Jeff

 3   made the jacket -- I mean, let me back up.  I don't want there

 4   to be any confusion.

 5          MR. BROOME:  She asks her a question, and then she

 6   never lets her answer the question.

 7          MS. WICK:  I want to back up because I know defense

 8   counsel wants us to be perfectly clear.

 9          MR. BROOME:  I want everybody to be perfectly clear.

10          THE COURT:  Come up to the bench, please.

11   (The following proceedings were held at the bench, out of the

12   hearing of the jury.)

13          THE COURT:  Number one, we went through all this

14   testimony yesterday evening.  You did the same examination

15   with this same exhibit and asked the questions that you just

16   covered.  Okay?  So it's kind of beating a dead horse.

17          MS. WICK:  Okay.

18          THE COURT:  Second, let's get through this

19   questioning.  Okay?  I don't think there was anything wrong

20   with the last question that Ms. Wick asked that was not a

21   question that was asked yesterday.  And so, let's try to do

22   this.

23          MS. WICK:  I am sorry, Your Honor.  I'm questioning

24   her about the attestation and subpoena unfortunately is kind

25   of doubling back on that.  I will try to limit the redundancy,

 1   but -- and I know it's kind of breaking it down, but if every

 2   time there's an objection and I have to dumb it down to a

 3   level, I apologize for that.

 4                THE COURT:  Well --

 5                MR. BROOME:  Just ask her a question and let her

 6   answer it.

 7                THE COURT:  You need to stop the editorial comments.

 8   Okay?  Just go ahead and ask your question and get an answer,

 9   please.  Thank you.

10                (Conclusion of bench conference.)

11   BY MS. WICK:

12   Q    If we could pull out the top part.

13        Ms. Branch, when this subpoena was issued to Serra

14   Nissan for the Birmingham deal jackets, the subpoena asked for

15   the 15 shifted deals, didn't it?

16   A    It asked for the 15 deals, yes, that were shifted from

17   Cullman to Birmingham.

18   Q    Okay.  You signed this attestation August 1st, 2014,

19   after you had become aware that it asked for the 15 deals that

20   had been shifted, right?

21   A    The 15 deals, yes, that were shifted from Cullman to

22   Birmingham.

23   Q    Okay.  Do you see in the attestation where it refers to,

24   "I hereby certify and acknowledge that the documents, images,

25   and data produced herewith are true and accurate copies of

1   business records maintained at Serra Nissan, the records on

2   behalf of Serra Visser"?

3   *A*    I do see that.

4   *Q*    Okay.  That refers to the Cullman deal jackets that were

5   produced to the government, correct?

6   *A*    Yes, they were Cullman deal jackets.

7   *Q*    Okay.  Can we go to page 2 of that exhibit and call out

8   just the e-mail portion.  Just the top.  No, no, page 2 of 23.

9   I apologize that was my mistake.

10          Mr. Baty's e-mail says, "Subject:  June 16, 2014

11  subpoena to Serra Nissan."  Right?

12  *A*    Yes, ma'am.

13  *Q*    Okay.  He writes, "I did not include a certification from

14  Serra Nissan when I produced the 15 deals most recently

15  requested by the grand jury.  Here is Kim Branch's

16  certification for that.  If you need the original, she

17  retained it."

18          Where is there reference to those jackets being Serra

19  Visser Nissan Cullman jackets?

20  *A*    I don't see a reference to Serra Visser Nissan.

21  *Q*    So how does the attestation get Cullman into it, but if

22  you didn't tell somebody, these aren't the Birmingham deal

23  jackets, these are the Cullman jackets?

24  *A*    I believe I did tell Randy Visser that the subpoena was

25  asking for Serra Nissan deals because all that we had were the

1   Serra Visser, the original Serra Visser Cullman deals.

2   Q    Okay.  Okay.  You mentioned that some documents were

3   taken off your desk during the search, and we have established

4   one of those documents was Government's Exhibit 24.  Who did

5   you tell at the dealership that the government had taken the

6   list of deals with the e-mails attached off of your desk?

7   A    I don't remember noticing if that was off my desk.

8   Q    At some point, did you ever notice it?

9   A    I believe when I saw the documents that the government

10  provided to us, I realized that it was -- there was a staple

11  in the copies that that was from my desk.

12  Q    You never told Forest Housner, they took the list of

13  deals off my desk during the search?

14  A    I told -- that I had a list on my desktop, like my

15  computer.

16  Q    Did the government take that?

17  A    I know that they came in and copied my hard drive on the

18  night of the raid.

19  Q    Did you tell somebody at the dealership that they took

20  the list of deals off your computer?

21  A    Yes, when I saw the dates -- I think, I referred to it

22  yesterday -- the dates given were not the dates sold.  I

23  realized those were somehow from the list, but I did not know

24  it was from the list from my desk.

25  Q    So if I am understanding you, your testimony is that when

 1    you told somebody at the dealership that the government had

 2    taken the list of 15 deals after the subpoena in June 2014

 3    when you realized that the subpoena attachment referred to

 4    your list?

 5    *A*    I didn't know they actually took like a physical list.  I

 6    actually told them that I had saved it on my desktop.

 7    *Q*    Okay?

 8    *A*    And that it matched up so clearly with my list that I

 9    still had saved on my desktop, the same order -- the subpoena

10    was in the same order, the same dates, and everything.  So, I

11    did not know that it was from my desk.

12    *Q*    So?

13    *A*    So my desk -- there's actually an icon on my desktop at

14    my computer.

15    *Q*    I am with you.  Is it fair to say -- you are saying you

16    did not have conversations with anyone at the dealership about

17    government taking that list of deals either off your desk or

18    your computer until June 2014 when the subpoena came in?

19    *A*    Can you say that one more time?  I am sorry.

20    *Q*    I am really not trying to -- if I understood you, you

21    said, I didn't have conversations with anyone about the

22    government taking that list of deals off my computer or off my

23    desk until I realized that the dates that you used in your

24    subpoena were from my list of deals.

25    *A*    I would say that's correct.

1    Q    Okay.  When you had your conversations with Mr.

2    Housner -- okay.  Now I am back in March 2013, when you guys

3    decided to shift these deals.  Okay.

4          When you had your conversations with Mr. Housner, did

5    you ask him if what you were doing was legal?

6    A    No, ma'am.

7    Q    Did you ask him if Nissan would have a problem with it?

8    A    No, ma'am, I didn't believe he would ask me to do

9    anything that was wrong.

10   Q    Did he tell you -- I want to be clear.  My understanding

11   was -- you said, he told me to maintain the list, and he told

12   me to take the deal jackets to Jeff.  Did he tell you any

13   instructions on what to do in the accounting system for those

14   15 deals?

15   A    Are you referring to booking them in accounting, or what

16   are you referring to?

17   Q    Any instructions?  Did he give you any instructions

18   during that meeting of what you would have to do in accounting

19   for those 15 shifted sales?

20   A    He told me about the $500 and the $700 that we would be

21   paying Cullman.  So that would be an accounting, I guess,

22   function.

23   Q    And we went over that yesterday, so I don't want to

24   repeat it.

25          Other than the $500, $700, did he say anything about

1    finalizing in Birmingham versus capping in Cullman, anything

2    that would qualify as an instruction on how to handle the

3    accounting for those 15 deals other than the $500 or $700?

4    A    No, ma'am.

5    Q    Okay.  You saw the Government's Exhibit 40, which is the

6    fax, and you said to Mr. Broome, I never saw those

7    instructions.  You saw them today.  Do you remember the big

8    bold print, "This is important..." these deals be booked in

9    Birmingham?  Do you remember that?

10   A    Yeah, I believe so.

11   Q    I know you didn't see it before now, I can call it up if

12   it would be helpful.  I am just talking about that all caps

13   language we were talking about?

14   A    Yeah, I remember it.

15   Q    Okay.  He said nothing to you that resembles that portion

16   of the instructions in Government's Exhibit 40?

17   A    No, he did not.

18            MS. WICK:  Your Honor, no further questions.

19            MR. BROOME:  Judge, I have to apologize to the Court

20   and for the jury.  I said yesterday, I wouldn't have any more

21   questions, but I do now.

22            THE COURT:  All right.

23            MR. BROOME:  I am sorry.

24                      REDIRECT EXAMINATION

25   BY MR. BROOME:

**REDIRECT - BRANCH**

1    *Q*    Kim, as far as you know, did those 15 Birmingham deal

2    jackets for the 15 switched deals ever exist?

3    *A*    No, I never saw those jackets.

4    *Q*    Did you trust Forest Housner?

5    *A*    Yes, sir.

6    *Q*    Was the Forest house we saw in here Tuesday the same man

7    that you knew before?

8    *A*    No, sir.

9    *Q*    What was different?

10   *A*    I could tell that he lost a lot of weight.

11   *Q*    What's a lot of weight to you?  I lost a pound or two,

12   but you can't tell it.

13   *A*    Probably about 20 pounds.  The way he spoke was

14   different.  I could tell that he wasn't processing things.  He

15   was a very intelligent man, very knowledgeable.  And I could

16   just tell that whatever was going on with him medically was --

17   it had affected him in a lot of different ways.

18   *Q*    Forgetting a business relationship with Forest Housner,

19   you liked the man, didn't you?

20   *A*    I did.  I did.

21   *Q*    You still do, don't you?

22   *A*    Yes, sir.

23   *Q*    Did you think Forest would ever tell you to do something

24   wrong?

25   *A*    No, sir.

REDIRECT - BRANCH

1    Q    Had you seen the shifting and parts, maintenance

2    equipment, and accessories done before?

3    A    I had heard about it, yes.

4    Q    Before March of 2013?

5    A    Yes, sir.

6    Q    And how did you know it was done?

7    A    In the accounting office, the checks were written back

8    and forth between the two stores in regards to parts and other

9    things.

10   Q    You heard about it being done to win trips or prizes or

11   contests, didn't you?

12   A    Right.  For Cullman, yes.

13   Q    Would Cullman typically buy from Birmingham or Birmingham

14   from Cullman?

15   A    Both would have them.  I believe in the instance that I

16   heard about it was Birmingham bought from Cullman.

17   Q    So the big store would buy from the little store, why

18   would that happen?

19   A    I believe they did it to attain that contest for Cullman,

20   and so that Cullman could win the contest.

21   Q    Okay.  There has been a lot of talk about money and what

22   you make.  You are not ashamed of what you make, are you?

23   A    No, sir.

24   Q    You earned it, didn't you?

25   A    Yes, sir.

1  *Q*    You didn't earn it by fraudulently trying to take money

2  from Nissan, did you?

3  *A*    No, sir.

4  *Q*    Let's do a little elementary math.  The lady, I think her

5  name was Strickland, had testified she ran all these numbers,

6  and in the end it was $64,800.  Is that her figure, if you

7  remember?

8  *A*    Yes, sir.

9  *Q*    (Writing on board.)  When all is said and done, at the

10 end of the year, you got two percent of the net profit?

11 *A*    Each month I received two percent of the net, yes, sir.

12 *Q*    But it was two percent; is that right?

13 *A*    Correct.

14 *Q*    And if Cullman had booked those 15 deals, you would have

15 made money off what Cullman would have got those 15 deals?

16 *A*    Yes, sir.

17 *Q*    Well, we'll forget about that, because that's kind of

18 confusing.

19        Two percent -- would you look at my math -- and I

20 apologize for my writing.  Is my math correct?

21 *A*    It appears to be, yes, sir.

22 *Q*    So, I understand if you steal a dollar, that's just like

23 stealing a million dollars, but what we're talking about for

24 you is $1,296; is that right?

25 *A*    Yes, sir.

1   Q    Out of $150,000 a year salary?

2   A    Yes, sir.

3   Q    Was there ever any discussions between you and Mr.

4   Housner and he said Kim, you can make $1,300 more for doing

5   this?

6   A    No, sir.

7   Q    And Kim, I apologize for plowing the same ground again.

8   Let's go back, I think it was Government's Exhibit 24.  Again,

9   the highlighting is mine.  Let me just ask you a few

10  questions.

11         The subpoena was to Serra Nissan, right?

12  A    Yes, sir.

13  Q    That's the Birmingham store we've been talking about?

14  A    Yes, sir.

15  Q    All the records for Cullman and Birmingham are kept in

16  Birmingham; is that right?

17  A    Yes, sir.

18  Q    Serra Nissan is Birmingham.  Serra Visser Nissan is

19  Cullman.  Is that right?

20  A    That's right.

21  Q    When you got the subpoena, you and your accounting

22  clerks, or whatever, you guys are looking for Birmingham deal

23  jackets, right?

24  A    Yes, sir.

25  Q    For those 15 deals?

REDIRECT - BRANCH

 1  A     Yes, sir.

 2  Q     Did you ever find them, the Birmingham deal jackets?

 3  A     No, sir.

 4  Q     What did you find that matched those serial numbers?

 5  A     The Cullman deal jackets.

 6  Q     And that would have been Serra Visser Nissan, right?

 7  A     Yes, sir.

 8  Q     And is that not what you said in your attestation?

 9  A     I am reading it now.  It appears to be.

10  Q     Well, you said, "these are true and accurate copies of

11  business records maintained at Serra Nissan."  That's right,

12  isn't it?  That's where you kept the records?

13  A     Yes, sir, that's correct.

14  Q     Then you say, "on behalf of Serra Visser," the Cullman

15  store, right?

16  A     Right.

17  Q     And you gave them the only deal jackets that you had that

18  corresponded to those vin numbers?

19  A     Yes, sir.

20  Q     Thank you.

21          MS. WICK:  Two questions, Your Honor.

22          MR. BROOME:  I hadn't finished.

23          MS. WICK:  Oh, I'm so sorry.

24          MR. BROOME:  It's okay.

25  BY MR. BROOME:

1   Q    You were talking a few minutes about a DMS.   What is a

2   DMS?

3   A    I think it's a dealership -- or dealer management system.

4   Q    That's what you were talking about the Dealertrack is in

5   Cullman?

6   A    Correct.

7   Q    And the Reynolds and Reynolds is in Birmingham?

8   A    Yes, sir.

9   Q    Now, just to clarify for me, RDR'ing is what?

10  A    That's through the Nissan system.   It's basically

11  reporting the vehicles sold to Nissan.

12  Q    That's completely different from the accounting systems

13  or the DMS's that we're talking about?

14  A    Yes, sir.

15  Q    But when a car is RDR'd, the warranties, the incentives

16  the customer rebates, all that goes where it was RDR'd, right?

17  A    Yes, sir.

18  Q    Completely separate from the accounting side?

19  A    Right.

20  Q    Now, Kim, when Forest asked you to keep a list of

21  details, you did that, right?

22  A    I did.

23  Q    And I think you told us you added to your list as the

24  sales came in?

25  A    Yes, sir.

1   *Q*    And you took those Cullman deal jackets to Jeff Green?

2   *A*    Yes, sir.

3   *Q*    I believe you told us you never remembered getting those

4   Cullman deal jackets; you never remembered seeing the

5   Birmingham deal jackets for those 15 deals?

6   *A*    No, sir, I don't.

7   *Q*    Now, briefly back to that e-mail between you and Randy

8   Visser.  When you got that first e-mail -- it was Government's

9   Exhibit 24.  Again the highlighting is mine.  And you replied

10  to Mr. Visser.  Did you think you had done something wrong?

11  *A*    I understood his e-mail to state that he wanted me to

12  book the deals in Reynolds and Reynolds accounting for

13  Birmingham.

14  *Q*    And you hadn't done that?

15  *A*    No, sir, I had not.

16  *Q*    So when I am talking about wrong, I am talking about

17  wrong as far as Randy Visser's wanted you to do it?

18  *A*    Yes, sir.

19  *Q*    He never personally told you to do that?

20  *A*    No, sir.

21  *Q*    And when you said Jeff created these jackets, why did you

22  tell him that, if you hadn't seen him?

23  *A*    Because Forest had said that he did, and I was just

24  trying to reassure him that they were done.

25  *Q*    When you said you could manually enter the reports, did

1    you tell him that with the intention to defraud Nissan?

2    A    No, sir.

3    Q    Why did you tell him that?

4    A    Because he wanted them booked in Reynolds and Reynolds,

5    and it was too late to do that.  So the only option I had to

6    do what he wanted me to do was to add them to the report.

7    Q    Again, did you think there was anything wrong or illegal

8    with doing that?

9    A    No, sir.

10   Q    Are you just trying to keep your accounting, the

11   incentives matching up with what -- well, you tell me what you

12   were trying to do.

13   A    I was just trying to make everything match the books, the

14   reports match -- the RDR compared to the report.

15   Q    To defraud somebody?

16   A    No, sir.

17   Q    And he asked, a response to you, a month or so, six weeks

18   later, and said okay.  Right?  Basically just do that if we

19   get audited?

20   A    Yes, sir.

21   Q    Is that the only discussions you had with Mr. Visser

22   about that?

23   A    Yes, sir.

24   Q    Just to clarify one other thing.  In the Birmingham store

25   when we're talking about putting deals into the system, when

1   the sales managers would put a deal into the system, you call

2   that what?

3   A    It would be just --

4   Q    In Birmingham?

5   A    -- a pending status.  The deal would be in pending

6   status.

7   Q    Does accounting look at those deals when they're pending?

8   A    No, sir.

9   Q    And then I think you said the finance and insurance folks

10  or the sales manager would do what?

11  A    They would book the deal.

12  Q    Would accounting generally or customarily look at those

13  deals when they were booked?

14  A    Usually, once the deal was turned in the office, then

15  they would look at those book deals, yes.

16  Q    So when they're booked, you would look at them?

17  A    Right.

18  Q    But not when they're pending?

19  A    No, sir.

20  Q    When Mr. Shepard testified yesterday he put the deals in

21  the system, or whatever he said, what did that mean?  Where

22  were they?  Which part of the steps?

23  A    It said it would be pending, if he put them there in.

24  Q    So accounting wouldn't look at them at that point?

25  A    No, sir.

1   Q     Kim, did you have an honest belief that what you did was

2   not wrong?

3   A     Not wrong, yes, sir.

4   Q     Now, after talking to lawyers for six months, or how ever

5   long, you realize now that it's wrong?

6   A     Yes, sir.

7   Q     If you had known what you know today, back in March, what

8   would you have done?

9   A     I wouldn't have done it.  I would have -- I just wouldn't

10  have done it.

11          MR. BROOME:  Thank you.  That's all I have now.  I

12  am finished.

13          THE COURT:  Ms. Wick, any further questions?

14          MS. WICK:  Very briefly, Your Honor.

15                    RECROSS EXAMINATION

16  BY MS. WICK:

17  Q     You said that you thought this was okay because they had

18  done it in parts, in the parts shifting process?

19  A     I had heard of that, yes.

20  Q     Did you hear about them having to create false documents

21  for the parts incentive process?

22  A     No, I don't remember them discussing that, no.

23  Q     Did you ever even hear of a parts audit?

24  A     We have parts incentive -- sorry, parts inventory audits.

25  Q     Inventory audits, but not parts incentive audits?

RECROSS - BRANCH

1   *A*    No, ma'am.

2   *Q*    So when you realized before August 1st, 2014, that the

3   subpoena requested the shifted deals, did you tell Mr. Baty

4   before signing that attestation that the Birmingham jackets

5   existed?

6           MR. BROOME:  Judge, I am going to object.  There may

7   be some attorney-client privilege involved here.

8           THE COURT:  Okay.  And first of all, you need to

9   make sure we keep quiet in the audience.  Okay, please.

10          Chanetta, read the question back for me, please.

11                  (The last question was read.)

12          THE COURT:  All right.  I am going to allow the

13  question.

14  *A*    I did not personally speak to Alan Baty about those

15  deals.  But I remember either Forest or Randy, one of the two,

16  had told them that the deals that were being requested were

17  Serra Visser Nissan deals, not Serra Nissan deals.  I do

18  remember that conversation.

19  BY MS. WICK:

20  *Q*    Who was present for that conversation?

21  *A*    Like I said, I don't remember if it was Randy or Forest,

22  which one I spoke to about that.

23  *Q*    I want to be a hundred percent clear.  Your understanding

24  was that Randy or Forest told Mr. Baty that they only had --

25  that you only had Cullman deal jackets for those deals?

1   *A*    That these were actually Cullman deals is what I told

2   him.

3   *Q*    Okay.  When Mr. Broome was asking you about the 15

4   Birmingham deal jackets, okay, and you said you never actually

5   saw them after you brought them to Jeff Green?

6   *A*    I brought him the Cullman deal jackets and --

7   *Q*    You are right.  That was my mistake.  You brought Jeff

8   the Cullman deal jackets -- and I am really not trying to

9   confuse anything.

10  *A*    I understand.

11  *Q*    You brought Jeff the Cullman jackets for him to create

12  the Birmingham deal jackets.  And I thought I understood you

13  to say, you never saw the Birmingham deal jackets that Jeff

14  created?

15  *A*    Yes, that is true.

16  *Q*    Wouldn't he have had to bring them back to you for you to

17  have them in the event that Nissan asked for them to be pulled

18  in an audit?

19  *A*    I didn't ask for the deals back, and I don't remember

20  seeing them.

21          MS. WICK:  No further questions, Your Honor.

22          THE COURT:  All right.

23          MR. BROOME:  Nothing else, Your Honor.

24          THE COURT:  All right.  Ms. Branch, you are excused.

25      Thank you.  All right.  I need to meet with counsel.