# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No.: 2:15-cr-167-MHH-TMP |
| ) | |
| RANDY D. VISSER, ) | |
| ) | |
| Defendant. ) | |

## RANDY VISSER'S REPLY TO GOVERNMENT'S SENTENCING MEMO

Randy Visser stands on his original Sentencing Memorandum. This reply is offered to explain: how can two parties who sat through the same proffers and reviewed the same trial testimony be so far apart with regard to the truthfulness of same? The answer is that incorporated in many of the imprecise and confusing questions relied on by the Government are false assumptions and a basic lack of understanding of the accounting responsibilities of the dealerships' Controller. Randy Visser has been truthful throughout this process and a non-custodial sentence is appropriate in this case.

### Branch's Role

The general thrust of the Government's Sentencing Memorandum is that Visser minimized Kim Branch's job responsibilities. The Government makes this argument despite the fact Visser testified that Branch:

-oversaw the entire accounting office;

-supervised a staff of ten employees;

-made sure that the paperwork flow ran through the office efficiently;

-reconciled bank statements;

-produced financial results;

-submitted financials to manufacturers;

-submitted tax returns;

-handled all accounting duties of the dealerships;

-reconciled incentive payments; and

-supervised training and hiring of all staff.

Randy unequivocally testified that these and Branch's other "responsibilities were extensive". (Transcript *U.S. v. Branch,* Vol. II pages 201, 214-5, 301) Further, her responsibilities encompassed the financial books for two different corporations using two different computer systems (Dealertrack and Reynolds and Reynolds). While this case focused on the sales department, it must be remembered that she was also in charge of the accounting for the service and parts departments, along with human resources, insurance, payroll, taxes, etc.   In addition, when Mrs. Branch began working for Serra Nissan and Serra Visser Nissan in November of 2012, only four or five months prior to the charged conduct, the books were a

2

disaster. (Transcript Vol III p.580)

### Incentive Reconciliation

Randy Visser's testimony was truthful and accurate. The Government does not dispute the vast majority of Randy's testimony describing Branch's far-reaching job responsibilities. Instead, the Government chooses to focus on one solitary aspect of these responsibilities, namely the reconciliation of incentives in the sales department.[1] The Government's primary complaint deals almost exclusively with reconciling incentives.[2] Thus, even if the Government were right on every incentive reconciliation argument it makes, which it is not, this responsibility is but a fraction of Branch's total job responsibilities. When the totality of Randy's testimony is reviewed, he did not minimize Branch's role as Controller but expressly testified it was extensive.

---

[1] In fairness, the Government contests Visser's description of Branch's role in the audit process as "limited". This will be addressed later.

[2] See (Transcript, *U.S. v. Branch,* p. 16 "Visser testified it was not Branch's job to make sure the dealership was paid what it was entitled to in incentives..." "... Branch would have to get the dealer incentive amounts from him or Housner..." "... she did not do any reconciliation other than putting the total number of incentives into the accounting system." "When asked who was responsible for reconciling the lump sum incentive deposits..."; pages17-18 are virtually two entire pages of testimony related to reconciling incentives and audit charge backs; p.37 "... she was not responsible for reconciling those figures." "... she did not do any reconciliation other than putting the total number of incentives into the accounting system." "When asked who was responsible for reconciling the lump sum incentive...." "Branch would reconcile the incentive payments herself...."; p.38 "... the purpose of the VIMS system was so that the dealership could reconcile each vehicle..." "... [Byrnes] would provide Branch directly with the RDR reports ... so she could reconcile what they showed as being sold for those months.")

Secondly, the Government's complaints are not material to the issues before the Court in Visser's plea or Branch's case: a scheme to report cars sold in Cullman as actually sold in Birmingham in order to maximize a Dealer Volume Bonus. Any reconciliation issue would occur after the crime had been committed. Thirdly, the questions that the Government relies on routinely failed to recognize the exactitude and specificity required in accounting.[3] One exchange that the Government relies on twice in its Memo states:

> Q. So who would have been responsible, after you sent that once a month, for actually making every entry into the accounting required for where that money was coming from, how it had to be applied, who had to be paid, which sales representatives had to get commissions, who was responsible for financially calculating that?

(Government's Sentencing Memo pp. 17, 37)[4] There are at least five separate parts to this compound question and it's impossible to answer in that form. Part of the question deals with accounting, part deals with the sales department and part deals with management. Further, it combines the concepts of responsibility and financial calculations with the physical act of making an entry. How would you

---

[3] It is important to note that the portions of the trial transcript quoted herein were not selected by the Defendant as the worst examples of the Government questioning. Rather these are the portions selected by the Government and cited in its Sentencing Memo as the best of the best.

[4] Virtually all of the Government's arguments are made twice. Once in the factual basis and then repeated in the argument section.

answer this? This is how Visser answered the question.

> A. Well, sales people did not get paid on the dealer incentives. That was one inventory [sic] that would be made.
>
> Q. Who was responsible –
>
> A. Kim Branch was responsible for making that entry.

(Transcript *U.S. v. Branch*, p.206)

Further complicating the problem is that the accounting issues are not the same for Individual Incentives as they are for Dealer Volume Bonus incentives (DVB). The accounting department reconciled Individual Incentives with what the sales department says they are entitled to receive. Individual Incentives require the matching of each incentive paid on a specific car. This process includes accounting entries which are usually accomplished by data entry clerks inputting into the system the basic information they received from the sales department (VIN, purchaser, price, date, address, amount, etc.). Then subsequent accounting entries were made when payment was received from Nissan. The Controller is responsible for the entire process but typically only gets personally involved if discrepancies exist. She is not typically involved in basic data entry. The accounting department relies on the sales department to tell it what Individual Incentives were earned.

In contrast, Dealer Volume Bonus incentives are lump sum payments not tied back to individual cars in accounting. The accounting department would reconcile DVB incentives in accordance with what management says they are entitled to receive. Determining what individual incentives the dealership is entitled to receive is a sales department function.

Therefore, accounting for DVB incentives is much simpler than accounting for individual incentives. As an example, assume NNA provided a bonus if the dealership sold 70 cars. Assume the dealership met that DVB objective and earned the incentive. The dealership would recognize a receivable earned from Nissan on the balance sheet. This lump sum is not tied to any individual vehicles in the dealership accounting. There would be one accounting journal entry on the balance sheet as follows:

    (Debit) Receivable    $56,000

When a check is received from NNA for a DVB, another journal entry would be made to clear the receivable:

    (Credit) Receivable    $56,000

That is the only reconciliation done regarding DVBs in accounting. Therefore, questions about how the Controller reconciles DVB incentives to individual cars are nonsensical. Even so, that exact type of questioning is relied on by the

Government at least four times in its Memo. See, Government's Sentencing Memo pp. 16 (twice), 36, 37 citing to Trial Tr. 279:7-12 which reads as follows:

> A. … If we didn't send her an e-mail, she would send us an e-mail saying how much do we earn in Nissan money, and we would send her an e-mail back.
>
> Q. Would it have been for an individual car or just the total number?
>
> A. Total number.
>
> Q. So there really wasn't any reconciliation other than putting that total number in the accounting?
>
> A. That's correct.
>
> Q. So she didn't look at, well, this car number one should have been this amount and this is what we got?
>
> A. Not for dealer incentives, no.

(Transcript, *U.S. v. Branch,* p.279:7-12.) Clearly this line of questioning does not come close to supporting the Government's position that Visser minimized Branch's role. To the contrary, it shows that the questioner was thinking apples and asking about oranges.

Questions can be further complicated if the questioner asks about what incentives the dealership or customer are "entitled to". Individual incentives are the incentives that a specific buyer is entitled to on a specific sale. These individual incentives can be universal, discretionary or regional. Universal

incentives are available to everyone who buys a car during the incentive period. For example, Nissan North America may run an incentive program during a certain period of time that everyone who buys a Nissan Altima is entitled to a $1,000 rebate. Other incentives are discretionary such as military discounts, college graduate discounts, supplier discounts, etc. With a discretionary incentive the buyer must provide proof of entitlement to the sales department which calculates the incentive each specific buyer is entitled to receive. In addition, depending on where the person lives regional discounts may be available. Patrick Byrnes testified that there can be 20 to 30 different incentive codes. (Transcript *U.S. v. Branch*, Vol 1 p.80) It is the sales department that determines what individual incentives a particular individual sale is entitled to – not accounting.[5] Therefore, any questions relating to Mrs. Branch determining what incentives a person is "entitled to" change the context of the question.

For example, the Government twice cites the following portion of the transcript for the incorrect proposition that Randy testified Branch did not reconcile the incentives:

---

[5] This would be the same for the service department. The Controller is not required to memorize the warranty reimbursement program. For instance, suppose a customer with 30,000 miles on his car blows an engine. Is the controller to determine whether or not he's owed a new engine? What if he never changed his oil? That is a Service Manager decision, not an accounting decision.

>   Q. But it was her job to make sure that what you were paid in incentives is what you were entitled to in incentives?
>
>   A. No, that wasn't her job.
>
>   Q. Whose job was that?
>
>   A. That was my job.

(Transcript, *U.S. v. Branch* Vol. II p.201-202 cited in Government's Memo pp. 16, 36)  On the very same page of testimony, ten lines before this exchange (which the Government excludes from both of its citations) is testimony exactly opposite to the Government's position.  The quote in context is as follows:

>   Q. How would she be involved with incentive payments from Nissan North America?
>
>   A. She would have to reconcile the payments from what the sales department set up; with what they told her that the dealership was to earn, she would reconcile those payments as they came in.
>
>   Q. Would that require interaction with people in the sales department and the sales process?
>
>   A. If there was a discrepancy.  If they told her that we're supposed to get one incentive and we get paid another incentive, she would have to get with them and say, they paid us short, can you look into it?
>
>   [Here's where the Government begins it's citation.]
>
>   Q. But it was her job to make sure that what you were paid in incentives is what you were entitled to in incentives?
>
>   A. No, that wasn't her job.

9

    Q. Whose job was that?

    A. That was my job.

(Transcript, *U.S. v. Branch* Vol. II p.201-202)  Contrary to the Government's assertion, Visser clearly testified that Branch reconciled the incentives.  However, a different question which inserts the issue of entitlement changed the response the Government had just gotten two questions earlier.  Contrary to the Government's assertion, Visser did not minimize Branch's role, the Government has.  Under the Government's theory, all Branch would have time to do is reconcile incentives on individual vehicles–nothing else.

## **Audit Process**

As noted above, the Government also challenges Visser's description of Branch's role in the audit process.  (Government Memo p. 18)  The Government does not dispute that Visser accurately described Branch's duties (she sent a spreadsheet to Nissan, had files pulled and made an accounting entry for any charge backs) but it does dispute Visser's characterization that this was a "limited role".  However, the auditor himself testified similarly.  Jeff Creecy testified that his primary contact was Randy Visser;  except for an e-mail identifying specific deal jackets to pull Creecy had no prior conversations with Branch; the persons present during the onsite audit were Randy Visser and Forest Housner (no one

10

else); Creecy had one conversation with Branch in the middle of the audit; Branch was not present during the closing meeting; and he had no subsequent conversations with Branch about the audit. (Transcript, *U.S. v. Branch* p.111, 122, 126, 139, and 140) Clearly, Branch's role in the audit process was limited.

Punctuation plays a role in another issue raised by the Government. The Government claims that Visser attempted to revise a statement he made in his Plea Agreement. The issue is, is the following provision one sentence or two?

> As part of the scheme, J.G., a sales manager at Serra Volkswagen, was instructed to create false documents showing the cars were sold at Serra Nissan, in the event Serra Nissan was audited by Nissan North America, Inc. K.B., the Controller of Serra Nissan, created a list of the fifteen relevant deals to be given to J.G. to make the false deal jackets.

(Visser Plea Agreement, Doc.2 pp.4-5 cited in Government Memo pp.19-20, 40) Despite everyone signing the Plea Agreement, the issue of whether this is one sentence or two never came up until trial. Visser testified he thought it was one sentence. The Government's position was that it is two. But despite the disagreement of whether it is one or two sentences, the Government never asserts why it matters. Frankly, the Government might have been better off in the Branch trial with Visser's interpretation. Under the Government's two sentence interpretation, Kim Branch's separate sentence does not contain the opening

clause, "as part of the scheme". [6] The Government never asks any follow up questions to see if there are any factual differences (other than placement of the period) and never shows how this is material in any way.

## Materiality

The banner under which all of the foregoing must fly is materiality. In order for the complained of issues to be of significance to this Court, they must be material. Visser admitted his responsibility early and acknowledged that the scheme was one hundred percent his idea. (Transcript, *U.S. v. Branch,* Vol.II p.268) The matters raised by the Government are simply immaterial.

For example, the Government asserts that GX 40 (fax instructions to Cullman) supports its position that Visser should be subject to the special skill enhancement. The Government writes: "It was Visser's extensive knowledge of how the NNA incentive programs worked, and most importantly how NNA's audit process worked, that significantly facilitated the commission and concealment of the offense. Visser created specific instructions for how to commit the fraud so

---

[6] Similarly, regarding the fake deal jackets, Visser testified on re-cross-examination that he had never actually seen them and didn't know if they ever existed. (Transcript, *U.S. v. Branch* Vol.II p.317) Then on re-re-direct examination he stated that he had received an email from Branch that gave him the understanding that Jeff Green had created them. (Transcript, *U.S. v. Branch,* Vol. II p.320-1) He still had not seen them but he had an understanding. Both statements are true.

NNA could not detect it. (GX40)"[7]  The Government, despite referencing GX40 seven times in its Memo, never mentions that these special skill instructions were never followed.  However, this fact was clearly known to the Government.  When asked by the Court in the Branch trial to confirm that it was undisputed Kim Branch never saw these instructions, the Government agreed and posited that was evidence of Branch's guilt noting that "part of [Branch's] scheme was she actually made sure it got done correctly in accounting and not what Mr. Visser said to do."  And again, "she knew how to do it better than Visser did". (Transcript *U.S. v. Branch,* Vol. IV p. 796, 798)  The Government is seeking an enhancement for the use of a special skill that was not used.

      Finally, the Government alleges that Visser obstructed justice by minimizing the number of emails he sent Kim Branch (despite the fact that he knew they had seized the corporate computers and had all the emails).  The Government claims that this is a "material misstatement" and writes that Visser testified that he only emailed or texted Branch "very little" and "maybe once a week".  That appears fairly straightforward until read in context with the portions of Visser's testimony which the Government chose to omit:

---

[7]. In addition, GX40 (instructions faxed to Cullman) was referenced seven times in the Government's Memo and attached to it.  (Govt. Memo pp. 5 (twice), 10 (twice), 12, 23, and 30.) The Government fails to mention that these instructions were not even followed.

> Q. Mr. Visser, how many times did you e-mail or text Ms. Branch per day?
>
> A. **I would say, it would be a guess**, but on average I would – very little. I would say once a week.
>
> Q. Once a week.
>
> A. **That would be my guess. I would have to count the e-mails.** It wouldn't be a lot. We would have a conversation, and then maybe we could send three or four back. But unless there was something that I needed, I would get with Forest. **I would have to go back and look, but that's just my estimate**.

(Transcript *U.S. v. Branch*, Vol. II p.304) (emphasis added) This exchange was not part of the Government's direct examination, as you would expect if it was material, but rather it occurred during re-direct examination. And the reason for all the disclaimers posited by Visser is that the Government never addressed this line of questioning with Visser during any of the three proffer sessions they conducted with him, as you would expect – if the information was material.

### Role in the Offense: Five or More Participants

As previously noted, to be counted as a "participant" an individual must be "criminally responsible" and therefore must possess the "intent to defraud". (Doc. 24 Visser's Sentencing Memo p.17) In response, the Government states:

> Five or more participants were clearly established in the record of the Branch Trial. Visser, Gerald Shepard, Jeffrey Green, Harold Yelverton, Forest Housner and Kim Branch all testified regarding

>their role in the fraud – all but Branch admitted they had the intent to defraud NNA and knew it was wrong.

(Doc. 25 Government Sentencing Memo p.23)  This assertion is made without any reference to the record.  In fact, in addition to Branch, Forest Housner testified that he thought it was okay to shift the sales (Transcript, *U.S. v. Branch,* Vol. II p.372 L24 - 373L13) and Harold Yelverton testified that he kept Government Exhibit 40 "in case Nissan ever questions me, they knew I had nothing to do with it." (Transcript, Vol. III p.418 L13-22) There were not five or more criminally culpable persons.

## **Conclusion**

In its opening statement, the Government told the jury:

> You are going to hear from multiple witnesses, both from Nissan North America and people who worked at the dealership that are going to tell you every dollar that came into that store, she had to know how they earned it.  Every incentive payment that they made, she had to know which car it came from.  Every expense, every dollar they spent on toilet paper, she had to know the pool that it came from.

(Government's Opening Statement, Vol. I p.28-29).  Visser did not minimize Branch's role as Controller as it exists in reality.  Admittedly, it may be different from the role the Government fantasized.  But Visser's testimony was true and a sentence of probation with whatever conditions this Court deems appropriate is sufficient but not greater than necessary under the facts of this case.

        Respectfully submitted,


        /s/ David McKnight
        David McKnight (ASB-6258-G63S)
        E-mail: dmcknight@baxleydillard.com
        BAXLEY, DILLARD, MCKNIGHT,
            JAMES & MCELROY
        P.O. Box 530333
        Birmingham, AL 35253-0333
        Phone: 205-271-1100
        Fax: 205-271-1108


## CERTIFICATE OF SERVICE

I hereby certify that I have this 25th day of February, 2016, electronically served a copy of the foregoing on all counsel of record using the CM/ECF system.


        /s/ David McKnight
        Of Counsel